2163

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,          : 18-CR-00583(MKB)
                                   :
          -against-                :
                                   :
                                   : United States Courthouse
NG CHONG HWA, also known as        : Brooklyn, New York
"Roger Ng,"                        :
                                   :
          Defendant.               : Tuesday, March 8, 2022
                                   : 9:30 a.m.
                                   :
- - - - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE MARGO K. BRODIE
United States CHIEF DISTRICT JUDGE

A P P E A R A N C E S :

For the Government: BREON S. PEACE , ESQ.
                    United States Attorney
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201
                 BY:  ALIXANDRA ELEIS SMITH, ESQ.
                      DREW GODFREY ROLLE, ESQ.
                      DYLAN A. STERN, ESQ.
                      Assistant United States Attorneys


                    U.S. DEPARTMENT OF JUSTICE
                      Criminal Division - Money Laundering
                    and Asset Recovery Section
                      1400 New York Avenue, NW
                      Room 7113
                      Washington, DC 20530
                 BY:  JENNIFER AMBUEHL, ESQ.

Court Reporter:   SOPHIE NOLAN
                  225 Cadman Plaza East/Brooklyn, NY 11201
                  NolanEDNY@aol.com
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription

SN       OCR      RPR

2164

A P P E A R A N C E S:  (Continued)


For the Government:    U.S. DEPARTMENT OF JUSTICE
                       Criminal Division - Fraud Section
                       700 13th Street, NW
                       10th Floor
                       Washington, DC 20005
                  BY:  BRENT S. WIBLE, ESQ.


For THE DEFENDANT:     BRAFMAN & ASSOCIATES, P.C.
                       256 Fifth Avenue
                       2nd Floor
                       New York, New York 10001
                  BY:  MARC A. AGNIFILO, ESQ.
                       TENY ROSE GERAGOS, ESQ.
                       ZACH INTRATER, ESQ.
                       JACOB KAPLAN, ESQ.

SN      OCR      RPR

Proceedings                                        2165

1                    (In open court.)

2            (The Hon. Margo K. Brodie, presiding.)

3                  (Defendant present.)

4       (The following occurs outside the presence of the jury.)

5            THE COURT:  Good morning, everyone.  Are you ready

6    to proceed?

7            MR. AGNIFILO:  Yes, Your Honor.

8            MR. ROLLE:  Yes, Judge.

9            THE COURT:  Please call the case.

10           THE COURTROOM DEPUTY:  Criminal cause for trial,

11   docket number 18-cr-538, *United States of America versus Ng*.

12           THE COURT:  And the same appearances for both sides.

13           MR. AGNIFILO:  Your Honor, I had initially told the

14   Court that I didn't think we had an issue, but we were talking

15   and I think there is one issue.

16           THE COURT:  Okay.

17           MR. AGNIFILO:  The issue is this:  On the direct

18   examination of Mr. Leissner he was asked if he made calls

19   meaning controlled calls and the answer was yes, he made

20   controlled calls and that was done at the direction of the

21   FBI.  That's the direct testimony.  I want to very briefly, in

22   probably less than a minute, ask him who he called just to

23   follow up on that topic and the reason that's important is

24   because the direct testimony was that he did not try calling

25   the defendant because there was a belief that the defendant's

Proceedings                          2166

1   phone was compromised, but he called Hwee Bin, his wife, four

2   times and he certainly could have said, Could you put Roger on

3   the phone.  So, I think that's relevant and that's clearly not

4   disputed.

5              And the other thing is he called Low which casts

6   doubt on his direct testimony because why would Roger's phone

7   be compromised and not Low's phone.  I think this is a minute

8   of cross.  I think it's utterly --

9              THE COURT:  Cross as to who he called or cross as to

10   why he may not have called others?

11             MR. AGNIFILO:  No, who he called.  That's it.

12             THE COURT:  Okay.

13             MR. AGNIFILO:  That's it.

14             THE COURT:  And what's the objection here?

15             MR. ROLLE:  Your Honor, we object to the fact --

16   frankly, counsel's attempt to create an empty chair at this

17   trial.  The Government did not elicit the identities of the

18   people who he called.  The only relevance of Mr. Leissner

19   cooperation in controlled calls is the fact that he was

20   willing to make them because he understood that that was

21   expected of him as cooperation.

22             The narrative about not calling the defendant had

23   nothing to do with the questions about cooperation.  That was

24   elicited around the 2017 detention and that, as a factual

25   matter as Mr. Leissner explained, that once the defendant was

Proceedings                                                    2167

1    detained in Singapore he did not communicate directly with him

2    anymore and communicated with Hwee Bin.  That was in 2017.

3            The controlled calls that happened in 2018, to allow

4    them to elicit who he called is to suggest to this jury that

5    there are calls that they should hear which is the only

6    relevance of asking who he called.  The identities of who he

7    called as part of his cooperation don't go to his credibility

8    or his understanding of the cooperation because, as he

9    testified, he did not choose who to call.  He was directed by

10   the FBI to make phone calls and we explicitly asked him did

11   you choose and he said no.  And could you reveal your

12   cooperation, no.  They can ask him did you lie on the phone

13   calls that you made; yes.

14           THE COURT:  I do not see the issue, Mr. Rolle, with

15   Mr. Agnifilo eliciting who he called while he was cooperating.

16   To the extent you want to redirect him as to why he made the

17   calls he did or the fact that he did so under supervision of

18   the FBI is fine.  I don't expect Mr. Agnifilo is going to

19   argue.

20           And, Mr. Agnifilo, maybe you are trying to use this

21   to argue that he called certain people and not others, which

22   you can't do if, in fact, the testimony before the Court is

23   that he was directed by the FBI as to who to call.

24           MR. ROLLE:  No, I'm certainly not going to suggest

25   that he picked and chose who to call.  I know that's not the

Proceedings                                    2168

1   case.

2               THE COURT:  Okay.

3               MR. ROLLE:  So I think with that limitation that

4   quells our concern.  I will say the argument about Jho Low

5   that is an argument about Mr. Leissner choosing to call Jho or

6   not.  It's the point about why would he call Jho Low if his

7   phone was compromised.  He was told to.  As long as there's

8   not a suggestion that he had any agency in the matter, I think

9   that's fine, Your Honor, and we understand the ruling.

10              THE COURT:  I am sure you could make the record

11  clear as to why he made the calls he did.

12              MR. ROLLE:  We will, Judge.  And to be clear there

13  won't be content asked by this witness by Mr. Agnifilo, as to

14  the content of the phone calls?

15              THE COURT:  According to Mr. Agnifilo he just wants

16  to establish who Mr. Leissner called.

17              MR. AGNIFILO:  I'm not going to get into content.

18              MR. ROLLE:  That's it, Judge.

19              THE COURT:  Any other issue?

20              MR. ROLLE:  That's it, Judge.

21              THE COURT:  I reviewed all of the privileged

22  documents that were sent to the Court last night and most, in

23  fact, were duplicates; a lot were privileged; some had nothing

24  to do with anything that I have heard in this trial.  There

25  were one or two documents about Celsius.

Proceedings                         2169

1          I assume, Mr. Agnifilo, that you have all of these

2    documents, but I have a copy of the Celsius Holding, Inc.

3    document dated May 28, 2015.

4          MR. AGNIFILO:  We're looking that up, Judge.  Your

5    Honor is referring to the materials that were just turned

6    over?

7          THE COURT:  Correct.

8          MR. AGNIFILO:  Okay.  So, maybe we have that

9    already.

10         THE COURT:  I am happy to give you a copy of this

11   document.  I assume you have it.  It's just the document

12   itself.

13         MR. AGNIFILO:  Yes.

14         THE COURT:  And there were a few e-mails related to

15   Celsius.  One is where Gerry David president and chief

16   executive officer of Celsius Holdings forwarded -- sent an

17   e-mail to a number of people including Mr. Leissner.  And the

18   topic is Update.  I assume you have that.  Mr. Leissner did

19   forward that to his wife, which you are not entitled to, and

20   so that information is redacted, but I believe the rest of the

21   information you likely have.

22         And then there is -- that e-mail is dated May 29,

23   2015 and then there is a third document, e-mail, dated May 2,

24   2015 from Gerry David to Mr. Leissner.  Other than that, I

25   didn't see anything else that was relevant.

```
                      Proceedings                    2170
```

1          MR. AGNIFILO:  Very well.

2          THE COURT:  And let me know if you don't have those

3     two e-mails that I just identified.  They were later forwarded

4     to Mrs. Leissner.  That, you are not entitled to, but the rest

5     of the e-mail you are.

6          MR. AGNIFILO:  We'll run them down, Judge.  Thank

7     you.

8          THE COURT:  Bring in the witness, please, so we can

9     bring the jury in.

10          (Witness takes the stand.)

11          THE COURT:  And the case is recalled, for the record

12     WITH the same appearances for both sides.  We have the same

13     witness on the stand this morning.

14          Good morning, Leissner.

15          THE WITNESS:  Good morning, Your Honor.

16          (Jury enters.)

17          THE COURT:  Please be seated, everyone.

18          Good morning, members of the jury.

19          THE JURY:  Good morning.

20          THE COURT:  I hope you had a great evening.

21          Mr. Agnifilo, if you could continue.

22          Mr. Leissner, you are still under oath.

23          (Continued on the next page.)

24

25

1    **TIM LEISSNER**,

2         called as a witness, having been previously duly

3         sworn, was examined and testified as follows:

4    CONTINUED CROSS-EXAMINATION

5    BY MR. AGNIFILO:

6    Q    Good morning, Mr. Leissner.

7    A    Good morning.

8    Q    We're going to start with Defense Exhibit 2704 for

9    identification.  I apologize, we don't have this loaded on our

10   system.

11        (Exhibit published to witness only.)

12   Q    Do you see that this is a series of c-hats between

13   yourself and Jasmine Loo?

14   A    Yes, sir.

15        MR. AGNIFILO:  Your Honor, we offer it as 2704.

16        MR. ROLLE:  No objection.

17        THE COURT:  It is admitted.

18        (Defense Exhibit 2704 received in evidence.)

19        (Exhibit published.)

20   BY MR. AGNIFILO:

21   Q    So, what I would like you to do -- I'm going to ask you

22   about some of these.  I'm going to be asking you about the

23   highlighted ones, but you can read the whole thing.

24   A    Yes.

25   Q    Take your time and kind of read it over and I will ask

1   you some questions.

2   A    (Reviewing.)

3          THE COURT:  Do you want to hand him a copy,

4   Mr. Agnifilo?

5          MR. AGNIFILO:  I will do that.  I'm sorry, Judge, I

6   think we only have one copy.

7          Your Honor, the Government has provided a copy.  I'm

8   going to give it to Mr. Leissner.

9          THE COURT:  Okay.

10          (Counsel approaches.)

11   A    I probably have gone through it all.

12   Q    I'm not going ask you about anything that is below that

13   highlighted copy.  You should feel free to read the rest of

14   it, you are absolutely entitled to do that, but let me ask you

15   a couple of questions.

16   A    Yes, sir.

17   Q    Let's go to the top.

18          MR. AGNIFILO:  I want to see the date.

19   Q    This is dated October 28, 2014; correct?

20   A    Yes, sir.

21   Q    All right.  And the body of this are -- are chats between

22   Jasmine -- Jasmine Loo, the JAS and TL1, yourself; correct?

23   A    Yes, sir.

24   Q    So let's look at the first one which is from Jasmine.  It

25   says, Can you help forward to me all the Magnolia, Maximus and

Leissner - cross - Agnifilo                    2173

1   Catalyze interest due dates and exact amounts please?  Thanks.

2   And then she says, Gmail please.

3   A    Yes.

4   Q    What is she asking there in terms of the due dates and

5   the exact amounts for Magnolia, Maximus and Catalyze?

6   A    Well, since every deal happened on different dates, they

7   were all ten-year bond deals effectively.  Each of the

8   different three bonds had different days for interest payments

9   and also different amounts, of course, because they were done

10  at different times, so interest rates were different, et

11  cetera.  So every one had a different set of interest rate and

12  different amounts to each of those.  She's effectively just

13  asking for the schedule of those payments and the exact

14  amounts.

15  Q    Very good.  And you write back, Yes, sure, will do.  And

16  then you write -- by the way, 1M, is that 1MDB?

17  A    Correct.

18  Q    And 1M is behind on submitting semiannual unaudited

19  reports and officers' certificates of no default FYI.

20          What are you telling Jasmine in that sentence right

21  there?

22  A    Under the bond documents, 1MDB had certain obligations

23  other than making interest payments.  Those included, for

24  example, financial statements.  Those are the unaudited

25  reports.

1  Q     I'm going to ask you about the highlighted ones.

2  A     Sure.  And officers' certificates of no default, which is

3  stated, here also in the requirement under the bond documents

4  whereby 1MDB's offices basically attest to the bondholders.

5  They're not aware of any defaults under those bonds.

6  Q     Okay.  So suffice it to say that even though the deals

7  themselves, the Maximus and Catalyze and Magnolia closed in

8  2012 and 2013, that doesn't mean it's the end of the overall

9  effort on those deals because you have the bonds going for

10  another ten years?

11  A     Yes.  Normally there is no additional effort required

12  from the banks because now the money is with the client.  The

13  client has its obligations, and so that they do understand

14  normally what that entails.  Very rarely do we have to pull

15  up, as a bank, obligations.  These are normally handled by the

16  client entirely, but in this case, yes, 1MDB just did not have

17  the setup in their organization.  And so we had to -- we were

18  always involved because the lawyers on the deal, you know,

19  people were telling us at Goldman that these things were

20  missing and we had to communicate that to the client because

21  as an underwriter you to have wider-ranging obligations to

22  your investors as well.

23  Q     Very good.  The next section there, there's two chats

24  from Jasmine a couple of inches below.  She says, Who at GS is

25  handling RHB matter.  Do you see that there?

1    A    Yes, sir.

2    Q    All right.  Do you recall what the RHB matter was?

3    A    I believe around this time Aabar which had -- if you

4    recall three years prior to this or two and a half years prior

5    to this acquired the stake of ADCB in RHB was trying to sell

6    that stake and so we were looking for buyers around this time

7    and so I think the reference here would be to that.

8    Q    So we understand some of the terms ADCB is Abu Dhabi

9    Commercial Bank?

10   A    That's correct.

11   Q    And Aabar had bought shares --

12   A    Aabar had --

13   Q    You describe it.

14   A    Aabar had bout a stake of RHB in 2011 where we were the

15   advisor to the seller ADCB.  Jho Low had -- I think we had

16   done this on direct.  Jho Low had been in an intermediary

17   between Aabar and ADCB to help get that deal done.  So Aabar

18   ended up buying that stake in 2011 and then subsequently for a

19   very long period of time was trying to sell it again.

20   Q    Okay.  So this was a reference to that same matter that

21   was pending since 2011?

22   A    In the context of the timing, that's all I can come up

23   with right now.

24   Q    Very good.  Let's go to the next highlighted section.

25   Jasmine writes, FYI, fren (sic) -- do you understand that to

1    be a reference to Low?

2    A    Yes.

3    Q    FYI, fren asks for IPIC letter signed by Sheikh Mansour.

4    Do you have a copy?  I don't have any.  Do you see that?

5    A    Yes.

6    Q    And then you respond, Which one.  And then you respond

7    again, To the PM?

8    A    Yes.

9    Q    So you are referring to the letter from Sheikh Mansour to

10   Najib Razak; correct?

11   A    Yes.  That's what she is referring to first and then I am

12   asking if that's the one that I think, sitting here too, she

13   was asking about.

14   Q    Right.

15   A    There were the two letters if you recall from Sheikh

16   Mansour to Najib.

17   Q    You said, To the PM, and she says, Yes?

18   A    Yes.

19   Q    And you said, Check what I have, right?

20   A    Correct.

21   Q    Because you had copies of these letters?

22   A    That's right; correct.

23   Q    And then Jasmine says, Okay, he needs it urgently.

24   Please send; correct?

25   A    Correct.

Leissner - cross - Agnifilo                    2177

1   Q    She's conveying to you that Low needs these letters

2   urgently and please send them?

3   A    That's correct.

4   Q    And next, the green -- you then say a few lines down, The

5   Sheikh Mansour letter, I need to get my folder which I can

6   only do in the morning is that going to be okay.  Do you see

7   that?

8   A    Yes, sir.

9   Q    All right.  All right.  And then the next highlighted

10  section she talks about you managing Goldman Sachs.  Do you

11  see that there, that highlighted section?

12  A    Yes, sir.

13  Q    And what she says to you is, You need to do your part to

14  manage GS, Goldman Sachs; correct?

15  A    Yes, sir.

16  Q    You manage Dan and everyone.  You cannot be covering your

17  ass all the time and wishing everyone good luck with it;

18  right?

19  A    Yes.

20  Q    Do you know what she was referring to?

21  A    Only in the context again of the timing.  We -- because

22  we saw that 1MDB had been behind on interest payments before.

23  We had seen some issues that they had complied with the

24  covenants in the bond documents, which are the terms of the

25  bond documents.  Goldman Sachs, as an organization, had

1    started to ask a bunch of questions and then Swift, I think

2    that's the reference to Dan, as head of corporate finance in

3    Asia was taking a lead in trying to get to 1MDB to try to have

4    them essentially comply with the bond documentation and bond

5    requirements and covenants and, so, we were trying to

6    impress -- we, as Goldman Sachs, were trying to impress on

7    1MDB to actually, you know, establish a system whereby they

8    can actually comply with those bond documents.

9    Q    Okay.  And then she says, And then wash your hands of it.

10   Please get your guys to be professional and reasonable.  Do

11   you see that?

12   A    Yes, sir.

13   Q    Okay.  And then the next thing she says, How can GS be an

14   advisor to IPO and not consent to be named in prospectus?  Are

15   you kidding me.  Right?

16   A    Right.

17   Q    Is she have referring in your understanding to the 1MDB

18   energy IPO?

19   A    That's my understanding.

20   Q    Do you have an understanding of the issue that she's

21   bringing to your attention there?

22   A    Sorry, sir, no, I can't remember why we were -- I mean,

23   she's implying that we didn't want to be named on the

24   prospectus.  Again, a prospectus is like what we had seen on

25   the bond documents is a document that describes the

Leissner - cross - Agnifilo                2179

1    transaction itself, the company itself, the risks associated

2    with buying into the equity of 1MBD energy and I can't

3    remember why we were not wanting to be named on the

4    prospectus.

5    Q    Okay.  And then there's reference -- that last part of

6    the highlighting, you say, The Edge article --

7    A    Yes.

8    Q    I'm sorry.  The *Edge* article, friend asked me to check

9    with you what else is needed.  Do you see that?

10   A    Yes, sir.

11   Q    All right.  And here you are referring to Low as friend;

12   right?

13   A    Yes, I believe so.

14   Q    Okay.  And, now, do you recall having a conversation with

15   Low around this time about an article -- now, the *Edge* is a

16   newspaper; correct?

17   A    Yes, the *Edge* -- I think we had done this on direct and

18   we may even have looked at the letter -- the article, of 2014.

19   The *Edge* was -- is and was a newspaper that's somewhat

20   critical of the Government at the time and as well as 1MDB.

21   There were other state-owned media outlets and newspapers that

22   weren't.  This one was one of the critical ones.

23   Q    Okay.  And she says, We need the e-mail which Andy sent

24   over to be crystallized in a formal letter to *Edge* and copied

25   to 1MDB; right?

1    A    Yes, sir.

2    Q    So you guys are talking about some sort of response to

3    this newspaper in light of their article; fair to say?

4    A    I believe so, yes, yes.  I do think so and I think it

5    actually was a letter from Goldman Sachs, perhaps.

6    Q    Okay.  All right.  And, just to be clear, this is October

7    20 -- let's go to the top so we can orient the time.  This is

8    October 28, 2014; correct?

9    A    That's correct, sir.

10    Q    All right.  And do you recall that on October 7th a few

11    weeks earlier World Merit had just paid you $39.75 million?

12    A    World Merit had paid me, sir?

13    Q    World Merit had just gotten $39.75 million.

14    A    Yeah, that may be the case.  I don't know the exact date,

15    but, yes, it have had received that money in 2014.

16    Q    All right.  All right.  We're going to take this down.

17    We're going to go to the next topic?

18    A    Would you like this back?

19    Q    I'll take it, sure?

20         (Counsel approaches.)

21    Q    At some point, you were introduced to Roger Ng's

22    brother-in-law Chee Khang also known as CK; correct?

23    A    That's correct, sir.

24    Q    And do you remember when about you were introduced --

25    when I say introduced, have you ever met him?

Leissner - cross - Agnifilo                    2181

1   A    No, I have not met him personally, at least not that I

2   recall.

3   Q    All right.  But you and he were sort of made known to

4   each other.  You were made known to him?

5   A    Yes, we were in communication.

6   Q    Okay.  And I'm going to show you a document for

7   identification, 1230, Defense Exhibit 1230 for identification.

8            (Exhibit published to witness only.)

9   Q    So, first I am going to have you look at the e-mail first

10  and then I'm going to have you look at the attachment.

11  A    Yes, sir.

12  Q    So let's go to the next page.  I'm going to show you my

13  copy.

14           (Counsel approaches.)

15  Q    So you saw the e-mail.  Now I'm going to show you the

16  next page.  Can you see the top of that okay?

17  A    Yes, sir.

18  Q    And then I'm going to show you the whole thing.  Do you

19  see the whole page?

20  A    Yes.

21  Q    Now I'm going to show you the second page.  Do you see

22  that okay?

23  A    Yes.

24  Q    This is an e-mail from yourself to -- I will put it back

25  up so you can see.  To KLS office; right?

1    A     That's right.

2              MR. AGNIFILO:  Your Honor, we offer it as 1230.

3              MR. ROLLE:  No objection.

4              THE COURT:  It is admitted.

5              (Defense Exhibit 1230 received in evidence.)

6    BY MR. AGNIFILO:

7    Q     All right.  So we're looking at the e-mail part of this

8    and that's from you.  It's to KLS office; right?

9    A     Correct.

10   Q     Kimora Lee Simmons office?

11   A     That's right.

12   Q     And it's dated August the 17th, 2015.  Do you see that?

13   A     Yes.

14   Q     Could you please print.  Do you see that?

15   A     Yes.

16   Q     Attachments.  Cuscaden Capital Limited.  Many thanks

17   Lottie.  Right?

18   A     Yes, sir.

19   Q     Lottie was an assistant that works in Kimora Lee Simmons'

20   office?

21   A     Correct.

22   Q     Okay.  Do you see -- let's go to the next page.

23   A     Yes, sir.

24   Q     All right.  This is a listing of assets purportedly

25   belonging to you; correct?

Leissner - cross - Agnifilo                    2183

1    A    Yes, sir.

2    Q    Okay.  And let's go to the final page:  Do you see that

3    there?

4    A    Yes.

5    Q    Now, this is a list that you put together; correct?

6    A    Yes, sir.

7    Q    And let's just look at the bottom of that.  It says Chee

8    Khang Lim, president, right?

9    A    Yes, sir.

10   Q    Chee Kang Lim being president of Cuscaden Capital Limited

11   Capital Place Holdings Limited; right?

12   A    It doesn't specify that, but the implication would be so.

13   Q    You wrote this yourself, is that true?

14   A    That's true.

15   Q    Chee Kang Lim had no hand in writing this whatsoever?

16   A    I remember discussing it with him, but I put this letter

17   together.

18   Q    Okay.  And if we look at the next document for

19   identification Defendant's 1238.

20            (Exhibit published to witness only.)

21   Q    It is an e-mail from yourself to someone Stephane

22   Bigiere, do you see that?

23   A    Yes.

24   Q    And if we look at the second page, the attachment to that

25   e-mail?

1    A    Yes, sir.

2    Q    Okay.  It's that same -- the same first page of that same

3    document we just looked at; right?

4    A    Yes.

5    Q    And then we go to the second page.  Let's go to the

6    bottom.  There is a signature of what purports to be Chee

7    Khang Lim; right?

8    A    Yes, sir.

9            MR. AGNIFILO:  We offer this, Your Honor, as Defense

10    1238.

11            MR. ROLLE:  No objection.

12            THE COURT:  It is admitted.

13            (Defense Exhibit 1238 received in evidence.)

14            (Exhibit published.)

15    BY MR. AGNIFILO:

16    Q    Okay.  Let's stay on that right there.  You signed that;

17    right?

18    A    I can't remember exactly, but it's possible.

19    Q    When you say it's possible, do you remember scanning out

20    a blank letter and then signing Chee Khang's signature?

21    A    I don't remember doing it but as I said it's entirely

22    possible that I did so.

23    Q    Okay.  Let's go through this a little bit so we

24    understand.  So this is the signature page.  Let's keep the

25    signature page and just take a look at -- I want you to take a

Leissner - cross - Agnifilo                    2185

1   look at how it's signed.  It has a C, a K and then a Lim.  Do

2   you see that?

3   A    Yes, sir.

4        MR. AGNIFILO:  And I would ask that -- we offer for

5   identification Defense 1231 for identification.

6        (Exhibit published to witness only.)

7   Q    This is an e-mail from yourself to Leon Batchelor?

8   A    Yes.

9   Q    And there's an e-mail on the second page, the one that

10  says, Many thanks Lottie, that one?

11  A    Yes.

12  Q    And then there's an attachment and the attachment is that

13  letter from Cuscaden Capital Limited; right?

14  A    Yes.

15  Q    And let's go to the signature page, and there is what

16  purports to be a signature of Chee Khang Lim; correct?

17  A    Yes, sir.

18       MR. AGNIFILO:  Your Honor, we offer this as 1231.

19       MR. ROLLE:  No objection.

20       THE COURT:  It is admitted.

21       (Defense Exhibit 1231 received in evidence.)

22       (Exhibit published.)

23  BY MR. AGNIFILO:

24  Q    Okay, we are going to look at the two signatures.  We're

25  going to put the signature side by side.  We have the two

SN      OCR      RPR

1    documents that have been admitted in evidence.  Those

2    signatures don't look at same to you; right?

3    A     That's right.

4    Q     And that's because you signed both of them?

5    A     Sir, I don't remember doing it, but it's entirely

6    possible.  I will say, however, I did have an agreement with

7    CK about this letter which is why -- his telephone numbers are

8    his actual numbers.  So it's not like he wasn't aware of this

9    letter.  He actually had agreed to this and had agreed to be

10   acting with me -- for me.

11   Q     So CK, you understand, is a lawyer not in the United

12   States, but he's a lawyer; right?

13   A     Yes, sir.

14   Q     And are you saying that a lawyer would have allowed you

15   to sign his name to these letters?

16   A     No.  What I'm saying is this letter had been agreed with

17   him which is why he was on there with his real contact numbers

18   and I believe at least this e-mail as well, the second e-mail

19   being his.

20   Q     My question to you is, did you tell CK you were signing

21   his name to these letters?

22   A     I probably did not.  I don't recall how I signed it or if

23   I informed him about that.  I don't recall, but I do remember

24   going through the context of the letters with him and him

25   agreeing that he would be the contact person.

Leissner - cross - Agnifilo                2187

1  Q    An when you went through the letter, how did you do that?

2  Did you do this by e-mail?  Are there going to be e-mails

3  between you and CK about that?

4  A    No.  I do recall a phone call from the location that you

5  showed me, The Freemont Hotel in Switzerland.  I recall having

6  a phone conversation with him and talking about this.  He was

7  willing to assist me in having conversations with financial

8  institutions around getting loans against around some of these

9  assets.

10          MR. AGNIFILO:  Let's go to the signature page of

11  1238.

12          (Exhibit published to the witness only.)

13          MR. AGNIFILO:  And let's get that whole bottom of

14  the letter.  Okay.  And let's enlarge that second paragraph

15  this, no, that one.  That paragraph.  Let's enlarge that.  We

16  can do it on the ELMO.  Okay.

17  Q    This is a letter purporting to be from Chee Khang Lim, a

18  lawyer; right?

19  A    Yes.

20  Q    Okay.  And what it says is Please do not hesitate to

21  contact me with any question in this matter.  My e-mail

22  contacts are CapitalAdvisors@Ymail.com; right?

23  A    Yes.

24  Q    Is that Chee Khang Lim's e-mail address?

25  A    No.  As I said a minute ago that's mine, that's mine.

1   The second one is his and the telephone numbers are his.

2   Q    The telephone address is his?

3   A    I believe so, sir, yes.

4   Q    And are you saying that Chee Khang knew and approved of

5   you putting your Capital Advisors Ymail address as his e-mail

6   address on a letter that he signed?

7   A    That, I don't know, sir.  I do know that he was okay with

8   him being the contact person, which is why to my belief at

9   least that's his e-mail the second one at least and his

10  telephone numbers.  He agreed to be the contact person; that,

11  he did.

12  Q    Did you understand that Chee Khang had any connection to

13  Hong Kong?  He wasn't from Hong Kong; right?  Did he have any

14  connection to Hong Kong?

15  A    He was from Malaysia, I believe.

16  Q    He was from Malaysia.

17  A    Yes.

18  Q    And that telephone number, isn't that 85 prefix of that

19  telephone number a Hong Kong number?

20  A    Yes, sir.

21  Q    And he wasn't from Hong Kong?

22  A    No, he wasn't.

23  Q    So isn't it the case that you wrote this letter?

24  A    Yes.

25  Q    Right.

1   A    Yes.

2   Q    You wrote this letter?

3   A    Yes, sir.

4   Q    You printed the letter out and you signed Chee Khang's

5   name as though this was a letter from Chee Khang?

6   A    Again, you know, what I said before, I don't remember

7   putting the signature there but I might have well done so,

8   yes.

9   Q    And then you sent this letter to a bank to try to get

10  funding on a loan?

11  A    That's correct.

12  Q    All right.  Let's look at Defense Exhibit 1235 for

13  identification.

14          (Exhibit published to witness only.)

15  Q    That is an e-mail from yourself to someone named Leon

16  Batchelor, do you see that?

17  A    Yes, sir.

18          MR. AGNIFILO:  We offer it, Your Honor.

19          MR. ROLLE:  No objection.

20          THE COURT:  It is admitted.

21          (Defense Exhibit 1235 received in evidence.)

22          (Exhibit published.)

23  BY MR. AGNIFILO:

24  Q    We're going to go to the second page of this e-mail, the

25  bottom of the second page.  So, this is from Leon Batchelor

1   and this is to you; correct?

2   A    Yes, sir.

3   Q    And did you understand that Leon Batchelor was working

4   with a bank called C1 Bank?

5   A    Well, he was a broker, sir.  I mean, he made the contact

6   to C1 Bank.  He wasn't with the bank.

7   Q    Not that he was with the bank, but he was basically the

8   broker between you and the bank in this financing?

9   A    That's correct.

10  Q    What he says to you among other things and I'm going to

11  look at that first entry number one there; A personal

12  financial statement.  Do you see that?

13  A    Yes.

14  Q    It says, Attached.  If you have your own then that is

15  acceptable as well, but they will need an attestation form

16  signed, also attached.  Do you see that?

17  A    Yes, sir.

18  Q    And let's go to the first page.  The bottom.  There we

19  go, stop.  August 25, 2015, 2136 hours you write:  I checked

20  with CK.  He said he just -- he had sent you an e-mail last

21  week.  I will get it from him and send it on to you.  Best,

22  Tim.  Right?

23  A    Yes, sir.

24  Q    You hadn't spoken with Chee Khang last week?

25  A    I did speak to Chee Khang around this bit and getting his

Leissner - cross - Agnifilo                2191

1   help and he had agreed to be the contact person.  I don't know

2   if that in this particular instance that I had spoken to him

3   or not.  That, I don't recall.

4   Q    Isn't it true that you're not telling the truth here to

5   Leon Batchelor; you hadn't spoken to Chee Khang and Chee Khang

6   didn't tell you that he had sent an e-mail?

7              MR. ROLLE:  Objection.

8              THE COURT:  Overruled.

9   A    So, what I just said is the case.  Chee Khang had

10  accepted to be a contact person.  I don't know if he had

11  helped me with sending out any information or not.  That, I

12  can't remember.  So I don't remember if actually I did talk to

13  him or I did not, so I don't remember this.

14

15             (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

Leissner - cross - Agnifilo                    2192

1   BY MR. AGNIFILO:   (Continuing)

2   Q    Let's go to the top e-mail to Leon Bachelor:  I had asked

3   CK to resend everything to me.  We'll get it to you tomorrow.

4        Right?

5   A    Yes.

6   Q    But CK didn't send anything to you, correct?

7   A    Well, again, sir, I mean, it's the same as the two

8   e-mails down.  He had helped me.  He had agreed to be a

9   contact person so I don't know and I can't remember if he

10  indeed sent me anything at that time.  I was working on it

11  myself, yes.  I don't know to what extent, I don't remember to

12  what extent he was being helpful.  I did have conversation

13  which I clearly remember with him where he agreed to be

14  helpful.

15  Q    You've never seen any e-mail from Chee Khang to you with

16  that document that you showed us, that two page personal

17  statement, you've never seen an e-mail from Chee Khang to you,

18  right?

19  A    I don't remember it, sir.

20  Q    I didn't hear you.

21  A    I don't remember it, sir.

22  Q    You're lying to the bank that you have a statement from a

23  lawyer that's signed by a lawyer attesting to your assets,

24  isn't that true?

25  A    I had put this letter together myself, sir, yes, that is

Leissner - cross - Agnifilo                2193

1    true.  Chee Khang was working with me.  I can't remember if I
2    signed the letter or he did.  I don't remember that.  It may
3    well be the case.
4    Q    When you say it might well be the case, you signed the
5    letter, as you sit here today, you can't tell us if you know
6    one way or the other whether you signed those letters with
7    those signatures we looked at?  You don't know?
8    A    As I said, I may well have done so.  I just don't
9    remember doing it, sir.
10   Q    Okay.  You lied to C1 Bank in other ways in addition to
11   this, isn't that true?
12   A    Well, if you can show me the pieces, then we can go
13   through it.
14   Q    Sure.  Let's look at Defense Exhibit 1233 for
15   identification.
16         Do you remember sending an e-mail to someone named
17   Jose Vidal at C1 Bank?
18   A    Yes, I remember having to send him an e-mail, yes.
19   Q    And this is the e-mail from you to Jose Vidal, right?
20   A    That's correct.
21         MR. AGNIFILO:  We offer is as 33, Your Honor.
22         MR. AGNIFILO:  No objection.
23         THE COURT:  Admitted.
24   Q    Okay.  So just to orient us in terms of time, the letter
25   that we looked at that you said was signed by Chee Khang was

Leissner - cross - Agnifilo                2194

1   from August of 2015.  We're now in September of 2015.  Do you

2   see that?

3   A    I see the date but, sir, I didn't say that he had signed

4   it.  I just said I don't remember.

5   Q    All right.  And this says:  Dear Jose, It was good

6   talking to you earlier and thank you again for all your help.

7   As far as 1MDB is concerned, I would like to ensure that you

8   have all the facts rather than what has been reported given

9   some of the distortions and opinions offered by several media

10  outlets.

11          Do you see that?

12  A    Yes, sir.

13  Q    Okay.  You then go on to say that you did nothing wrong

14  with 1MDB, correct?

15  A    Can I just read it?

16  Q    Please do.

17          (Pause.)

18  A    I read it.  Sorry.  Thank you.

19  Q    Okay.  What you're saying here to Jose Vidal is that

20  this, these transactions were reviewed by the appropriate

21  committees at Goldman Sachs, correct?

22  A    That's correct.

23  Q    And that no one has ever found that you had done anything

24  wrong, correct?

25  A    Yes, that's correct.

Leissner - cross - Agnifilo                 2195

1    Q     You're certainly not telling him that part of the money

2    that you have in your possession is from 1MDB bond deals,

3    correct?

4    A     That's correct, yes.

5    Q     You're certainly not telling him that you were involved

6    in an agreement to bribe different government officials,

7    right?

8    A     That's correct, sir.

9    Q     And so fair to say you were lying to C1 Bank, for what?

10   What was the purpose of the money that you were getting from

11   them?

12   A     I was trying to get a loan against the yacht we had

13   bought the year before.

14   Q     And the money that you used to buy the yacht was 1MDB

15   money?

16   A     That's correct.

17   Q     And you didn't tell him that either?

18   A     Correct.

19   Q     Okay.  Let's go to -- at one point, you wrote a letter to

20   a bank called Banque Havilland, correct?

21   A     Yes, sir.

22   Q     We're going to look at Defense Exhibit 2101 for

23   identification.

24         Can you see that okay?

25   A     Yes.

Leissner - cross - Agnifilo                    2196

1   Q    All right.  This is a letter from yourself to someone

2   named Mabel Chu?

3   A    I think we're looking at different documents.

4   Q    Oh, 2101?  I'm sorry.  5101.  My mistake.  My bad.  5101.

5        This is an e-mail from yourself to Mabel Chu?

6   A    Yes, correct.

7            MR. AGNIFILO:  We offer it as 5101.

8            MR. AGNIFILO:  No objection.

9            THE COURT:  It's admitted.

10           (Defense Exhibit 5101 so marked.)

11  Q    Okay.  Who's Mabel Chu?

12  A    She was a friend of mine in Hong Kong who had worked at

13  HSBC before but had gone independent as a financial advisor.

14  Q    Was she a person of some prominence in the financial

15  world?

16  A    I mean she was well known but prominence, maybe not

17  necessarily, but she had been a lawyer at HSBC, was very well

18  regarded there, and she had very strong contacts to family

19  offices within Asia as well as the UK.

20  Q    And one of those offices was of someone named Li Ka

21  Shing, am I right about that?

22  A    I don't think that she's connected to Li Ka Shing.  I'm

23  sorry, sir.

24  Q    So you say to Mabel Chu:  Dear Mabel, One of my friends

25  from Malaysia is looking for a private bank where he could set

1    up an account and also potentially acquire the bank or at

2    least a stake in the bank.  I was thinking of either BBSA or

3    Banque Havilland.

4              Correct?

5    A    Yes.

6    Q    And the friend that you're talking about in that first

7    line there, that's Low, right?

8    A    That's correct.

9    Q    So at this point in time, in April of 2015, I think

10   you've talked about this before, Low was looking to possibly

11   buy a bank?

12   A    Well, as I had described it before, Jho was looking for

13   banks that would accept him as a client where he could do

14   banking transactions, meaning deposit money as well as

15   transact in funds, wiring them, et cetera, so he was really

16   primarily interested in, in doing banking, business with a

17   bank, however, he also at around this time felt that maybe

18   given that he had been declined by many banks by now because

19   of all the articles, that, in fact, it would be easier to

20   actually own a bank or part a bank to enhance his

21   possibility of doing that kind of business.

22   Q    Okay.  And you say here in this e-mail to Mabel Chu that

23   one of the banks was going to be this bank called Banque

24   Havilland, correct?

25   A    Correct.

Leissner - cross - Agnifilo                2198

1    Q    All right.  Let's go to the next e-mail.  It's DX-5106

2    for identification.  Take a look at that.  Take your time.

3            (Pause.)

4            This is an e-mail from you to someone named Jonathan

5    Rowland?

6    A    That's correct.

7    Q    At Banque Havilland?

8    A    He was the chairman of the bank.

9            MR. AGNIFILO:  We offer it as 5106, Judge.

10           MR. AGNIFILO:  No objection.

11           THE COURT:  It's admitted.

12           (Defense Exhibit 5106 so marked.)

13   Q    So here you're speaking with Jonathan Rowland.  Did you

14   know Jonathan Rowland before you sent him this e-mail?

15   A    Yes, I did.

16   Q    How long had you known Jonathan Rowland?

17   A    I mean, I would think maybe two or three years by that

18   time.

19   Q    Okay.  And what you say to him is:  Dear Jonathan, I hope

20   you are well.  It's been a little while since we last spoke.

21   I had tried to reach you on your cell phone, but realize that

22   I might have an old number.  One of my friends from Malaysia

23   was trying to meet you regarding some business opportunities

24   and also getting introduced to the bank.  If it is okay with

25   you, I can introduce you by e-mail or I can give you a quick

Leissner - cross - Agnifilo                    2199

1    call to give you the context.

2              Do you see that?

3    A    Yes.

4    Q    So you're taking this now to the next level; now you're

5    speaking to Jonathan Rowland from Banque Havilland about

6    putting him in touch with Low, correct?

7    A    That's correct.

8    Q    All right.  Let's go to the next e-mail which is 5100.

9              Okay.  You can see that e-mail okay?

10   A    Yes, sir.

11   Q    It's from yourself, it's to Jonathan Rowland and it's

12   copying Jho Low, correct?

13   A    Yes, that's correct.

14             MR. AGNIFILO:  We offer it as 5100.

15             MR. AGNIFILO:  No objection.

16             THE COURT:  Admitted.

17             (Defense Exhibit 5100 so marked.)

18   Q    Okay.  So here, this e-mail to Jonathan Rowland from

19   April the 7th, 2015, copying Low says:  Dear Jonathan, As

20   discussed allow me to introduce Jho to you.  I have copied him

21   on the e-mail.  Would like to establish a banking relationship

22   with Banque Havilland.  He is also interested in acquiring a

23   small to medium-sized private bank and maybe you can help him

24   with some of your friends in the business.

25             Do you see that?

Leissner - cross - Agnifilo                      2200

A     Yes, sir.

Q     Okay.  So this is now you introducing Havilland and Low?

A     That's correct.

Q     All right.  Let's go to the next exhibit, 5102 for
identification, and this essentially is an e-mail from one of
your addresses to another one of your addresses, essentially
you e-mailing yourself, correct?

A     Yes.

Q     Take your time.

A     Yes.

      MR. AGNIFILO:  We offer it as 5102.

      MR. AGNIFILO:  No objection.

      THE COURT:  It's admitted.

      (Defense Exhibit 5102 so marked.)

Q     Okay.  So if we look at the top, just so it's clear, if
we can just blow up the top, the "to" and "from," okay, it's
from the Tim Lee Leissner gmail address to
TimLeeLeissner@gmail.com, from you to yourself, right?

A     That's correct.

Q     And it says -- and if we look at the body of that e-mail,
if we look at the rest of it, it's an e-mail to yourself with
sort of the makings of a letter that you are going to send to
Banque Havilland, correct?

A     That's correct.

Q     And let's just -- if we can go up above the "Dear Sirs"

Leissner - cross - Agnifilo                    2201

1  just to see how you're addressing that.

2          All right.  This e-mail to yourself with the makings

3  of a letter says it's to Mr. Oliver Selwyn who's the director

4  of private banking at Banque Havilland, right?

5  A    That's correct.

6  Q    Let's go to the next exhibit, 5103 for identification.

7  You can see that okay?

8  A    Yes, sir.

9  Q    All right.  It's an e-mail from yourself to someone who

10 is an assistant with Kimora Lee Simmons' business?

11 A    Yes, correct.

12          MR. AGNIFILO:  We offer that as 5103.

13          MR. AGNIFILO:  No objection.

14          THE COURT:  Admitted.

15          (Defense Exhibit 5103 so marked.)

16 Q    Okay.  This is to you, from you to someone who is an

17 assistant at the Kimora Lee Simmons' office, do you see that?

18 A    Yes, sir.

19 Q    And you're asking this person:  Could you print the

20 attached letter on my GS letterhead and scan it back to me at

21 your e-mail address -- that's your Goldman Sachs e-mail

22 address?

23 A    That's correct.

24 Q    All right.  If they can scan it to your Goldman Sachs

25 e-mail address, right?

1    A    That's correct.

2    Q    And the attachment, let's just go to the attachment.  And

3    the attachment is -- as we go to the top, there's no Goldman

4    Sachs letterhead there yet.  Do you see that?

5    A    That's right, correct.

6    Q    But there's the body of the letter?

7    A    Yes, sir.

8    Q    Let's go down so we can see the whole thing.

9         Okay.  All right.  Let's go to the next exhibit,

10   5104.  Can you see it okay?  This is an e-mail from your Yahoo

11   address to your Goldman Sachs e-mail address, correct?

12   A    Yes, correct.

13        MR. AGNIFILO:  All right.  We offer it as 5104.

14        MR. AGNIFILO:  No objection.

15        THE COURT:  It's admitted.

16        (Defense Exhibit 5104 so marked.)

17   Q    Okay.  So that's the top.  If we go down, we see that

18   something has been scanned, right?  If we go to the bottom of

19   that, see?  It says, KLS Office Scanner, right?

20   A    Yes, sir.

21   Q    So let's go to the next page to see what was scanned.

22   All right.  Let's stop right there.

23        Okay.  Now we see there's that same letter but it's

24   on Goldman Sachs letterhead, correct?

25   A    That's correct.

Leissner - cross - Agnifilo                    2203

1   Q    And let's see if we can blow up the whole letter, if we

2   can just get that all on one page so we can see what it is.

3   There we go.  Perfect.

4         Okay.  So before we get into the substance of it,

5   here's a letter now signed by you, correct?

6   A    That's right, correct.

7   Q    Chairman, Goldman Sachs, Southeast Asia, correct?

8   A    That's correct.

9   Q    That was your title at the time?

10  A    That was my title.

11  Q    And this is on Goldman Sachs letterhead, specifically

12  Goldman Sachs Asia LLC, right?

13  A    Yes, sir.

14  Q    And now let's look, let's go step by step through the

15  letter.

16        It's to Mr. Oliver Selwyn who is the director of

17  private banking at Banque Havilland, correct?

18  A    Yes, sir.

19  Q    Okay.  Let's go to the first short paragraph there.

20  Okay?  It says Mr. Low Hock Peng, Mr. Low Taek Jho and the Low

21  Family have been known to myself for more than five years.

22        That is true?

23  A    That's true, yes.

24  Q    Let's go to the next short paragraph.  It says:  In 2014,

25  Goldman Sachs represented an entity, which was jointly owned

Leissner - cross - Agnifilo                2204

1   by the Low Family and Cepsa, wholly owned by the government of

2   Abu Dhabi in the acquisition of coastal energy for

3   approximately $2.2 billion.

4           Do you see that?

5   A    Yes, sir.

6   Q    Is that true or false?

7   A    That actually was still true.

8   Q    That's true?

9   A    Yes.

10  Q    All right.  Let's go to the fourth paragraph then.  You

11  say:  In the course of Goldman Sachs acting as advisor for the

12  above-mentioned transaction, Goldman Sachs conducted all

13  required regulatory due diligence on the Low Family and hereby

14  confirms that the Low Family's wealth of an estimated

15  $1.8 billion at the point of our engagement was generated

16  through legal means.

17          That is not true, correct?

18  A    That's not true.

19  Q    Because a great deal of the Low Family wealth was from

20  the 1MDB deals?

21  A    Correct.

22  Q    And you obviously are not putting that in your letter

23  from Goldman Sachs to Oliver Selwyn, correct?

24  A    That's right.

25  Q    Okay.  And the next thing you say is:  And poses no AML,

1   regulatory or CFT risks.

2         Right?

3   A     Yes.

4   Q     You are saying in this letter that Goldman Sachs, this is

5   a letter on Goldman Sachs letterhead, has reached the

6   conclusion, having looked at Low's financing, that there was

7   no anti-money laundering, regulatory or CFT risks, right?

8   A     Yes, that's correct.

9   Q     And CFT is the combating of financing of terrorism,

10  right?

11  A     That's correct, yes.

12  Q     Goldman Sachs made no such finding?

13  A     That's correct.

14  Q     It says that Low and the family poses no AML risk,

15  anti-money laundering, correct?

16  A     That's right.

17  Q     Goldman Sachs has made no such finding?

18  A     That's correct, indeed.

19  Q     So these are all false statements that you have written

20  in this letter?

21  A     Correct.

22  Q     And part of what makes the letter false, in addition to

23  the factual statements that are themselves false, is that you

24  are holding this out as an official letter from Goldman Sachs,

25  correct?

Leissner - cross - Agnifilo                    2206

1    A    That's correct.

2    Q    And in fact, Goldman -- other than you knowing, no one

3    else at Goldman Sachs knew you were sending this?

4    A    That's correct.

5    Q    Now, do you recall being interviewed -- and at some

6    point, you got in big trouble; this letter was found out by

7    Goldman Sachs, right?

8    A    That's correct.

9    Q    And tell the jury what happened.

10   A    As part of a totally separate transaction that we had

11   attempted to do in Indonesia, Goldman Sachs conducted an

12   e-mail surveillance of all the people involved in that other

13   transaction, the Indonesian transaction, and as part of that

14   surveillance, uncovered this particular letter in my e-mail.

15   Q    Okay.  And what happened then?

16   A    Then in January of 2016 or thereabouts, they called me

17   into the office in New York and confronted me with this

18   letter, asked me questions around this and that day, put me on

19   administrative leave and, I think I testified to that on

20   direct, I decided overnight to retire from the firm before

21   they could fire me.

22   Q    Now, the Indonesian transaction, did that involve someone

23   named Ujin Timan?

24   A    Yes, it did.

25   Q    Who is that?

Leissner - cross - Agnifilo                2207

A     Ujin Timan had been a very prominent investment banker in
Indonesia, Indonesia National.  He was Goldman Sachs' partner
in a local firm called Bahana in the 1990s, had worked
extensively with us.  He had, in the early 2000s, been found,
I think, guilty of some crimes in Indonesia, left the country
for ten years to China, was then exonerated, I believe, and
came back to Indonesia somewhere in 2014, 2013, '14, '15,
somewhere in that time frame.

         He had worked with a consortium in Indonesia to
acquire the Newmont, Newmont gold and copper mines in the
country, and he had approached us as his partner in the '90s
to help this consortium by Newmont's gold mine.  That's how we
got reconnected at the time.

Q     And do you remember that this, that Andy Tai was working
with you on this particular deal?

         MR. ROLLE:  Objection.

         THE COURT:  Basis?

Q     You have to wait until the Judge rules.

         THE COURT:  Basis?

         MR. ROLLE:  401 and 403 as to Mr. Tai.

         THE COURT:  Overruled.

Q     That means you can answer.

A     Thank you.  I don't remember if Andy was part of this
deal.  I can tell you who was part of the deal was Andrea
Vella because there was a very big commodity component to this

Leissner - cross - Agnifilo                    2208

1   and this would have been a transaction, again, with a, you

2   know, with a revenue in excess of $100 million so it was a

3   very, you know, big transaction for us in Southeast Asia for

4   sure or Asia at the time.

5   Q    The letter we were talking about, the letter that you

6   wrote to Banque Havilland, you were not doing that as a favor

7   to Jonathan Rowland, correct?

8   A    No.  I was doing it as a favor to Jho.

9   Q    Okay.  Do you remember being interviewed by Goldman

10  Sachs' lawyers on April 12, 2017?  The name of the firm is

11  called Sullivan & Cromwell.

12  A    2017?

13  Q    It would have been, yes, April 12, 2017.

14  A    No, I don't remember this interview, sir.  I remember the

15  original interview which included Sullivan & Cromwell in 2016.

16  Q    Okay.

17  A    I don't remember this in particular.

18  Q    It's possible I have the date wrong.

19        Do you remember telling the Sullivan & Cromwell

20  lawyers that you wrote the letter as a favor to Jonathan

21  Rowland who requested the letter?

22  A    I don't remember that discussion.  I remember it was a

23  traumatic event at the time, being confronted on this

24  particular letter, and I would have done everything to lie

25  about it but I don't remember saying that in particular.

1  Q    Okay.  And do you remember what, in particular, you did

2  lie about in your interview with Sullivan & Cromwell?

3  A    I don't remember what I was saying there so you may have

4  to refresh me perhaps.

5  Q    Okay.  Suffice it to say, you did not want to indicate to

6  Goldman Sachs' lawyers that you were doing it specifically for

7  Jho Low?

8  A    Yes, I had intended to lie about this and still protect

9  the scheme that we had developed for 1MDB, that's right.

10 Q    And this is in 2016?

11 A    That's correct.

12 Q    Okay.  And you never, you never told the Goldman Sachs

13 lawyers at Sullivan & Cromwell that this was something you

14 were doing specifically for Low, for the benefit of Low?

15 A    Again, I don't believe I ever said that, that's right.

16 Q    All right.  We're going to switch topics.

17        It's the end, the end of 2013.  You're still married

18 to Judy.  Correct?

19 A    Yes.

20 Q    Okay.  And you had not told Judy that you were leaving

21 her, correct?

22 A    I don't remember when I told her about this.

23 Q    Okay.  You were with Kimora Lee Simmons at the time as

24 well at the end of 2013, right?

25 A    That's right.

1    Q    And you wanted Kimora Lee Simmons to believe that you

2    were not still married to Judy, right?

3    A    That's correct.

4    Q    Okay.  And you wanted Kimora Lee Simmons to believe that

5    Judy was, what, your ex-wife?

6    A    Yes, I believe so, yes.

7    Q    And you told Kimora Lee Simmons that Judy was your

8    ex-wife, correct, many, many times?

9    A    Yes.

10   Q    And you sent her communications and you told her verbally

11   and you conveyed to her in every way you could that Judy was

12   your ex-wife, not your current wife?

13   A    I believe so, yes, sir.

14   Q    And so at one point, you created a fake e-mail address

15   for Judy, correct?

16   A    That's right.

17   Q    Okay.  And it was, it was JCLeissner@gmail.com, right?

18   A    That's correct.

19   Q    And this was an e-mail address that you created, right?

20   A    Yes, sir.

21   Q    E-mails to JCLeissner.com went to you, right?

22   A    That's right.

23   Q    Judy never saw them?

24   A    Correct.

25   Q    And you proceeded to have a multiple year correspondence

Leissner - cross - Agnifilo                    2211

1   from this JC Leissner e-mail address with Kimora Lee Simmons?

2   A    Correct.

3   Q    And this started toward the end of 2013, right?

4   A    I believe so, yes.

5   Q    And extended for a long time thereafter, correct?

6   A    Many months, yes.

7   Q    Even more than a year?

8   A    Perhaps so, yes.

9   Q    And part of what you were doing -- so you start this

10  correspondence with Kimora Lee Simmons, correct?

11  A    Yes.

12  Q    Disguising yourself to be Judy, right?

13  A    Yes.

14  Q    And you say things disguised as Judy that you want Kimora

15  Lee Simmons to believe is true, right?

16  A    That's correct.

17  Q    But they're not true for a number of reasons including

18  the fact that it's not coming from Judy at all, right?

19  A    That's correct, again, yes.

20  Q    And you wanted Kimora Lee Simmons to believe that Judy

21  was fine with the two kids you had with Judy vacationing with

22  you and Kimora and her family, correct?

23  A    That's correct.

24  Q    Okay.  And so without getting into all the details, you

25  sent many, many e-mails disguising yourself to be Judy to

Leissner - cross - Agnifilo                    2212

1    Kimora discussing how the kids can't go on this vacation or

2    can't go on this vacation or don't want to leave their mother

3    to go on this vacation, right?

4    A     That's correct.

5    Q     And this always with an eye to leading Kimora Lee Simmons

6    to believe a situation was true when you knew it was not true

7    at all, right?

8    A     That's again right, yes.

9    Q     And on Kimora Lee Simmons' part, you knew she was

10   starting a correspondence with who she thought was Judy,

11   right?

12   A     Yes.

13   Q     And you know this because you were getting the e-mails,

14   right?

15   A     That's right.

16   Q     And so for many, many months, Kimora Lee Simmons would

17   invite Judy to islands in the Caribbean, for instance, right?

18   A     I don't particularly remember that but, yes, she was

19   corresponding on vacation plans.

20   Q     Right.  Asking if Judy and the kids wanted to come skiing

21   in Pittsfield, right?

22   A     Again, I don't remember those specifics but vacation

23   plans were made, yes.

24   Q     You don't remember the specifics but it was an entire

25   life that you had completely falsified because there was no

Leissner - cross - Agnifilo                    2213

1   actual correspondence between Judy and Kimora Lee Simmons, you

2   made the whole thing up?

3   A    That correspondence, yes.  Entire life may be a bit too

4   far but certainly the correspondence, correct.

5   Q    So, for instance, Kimora Lee Simmons would ask if Judy

6   would bring the kids to Paris, right?  Do you remember that?

7   A    Again, I don't remember the specifics but many different

8   vacation plans, yes, sir.

9   Q    Suffice it to say, Kimora Lee Simmons was constantly, on

10  a regular basis, for Easter, for Christmas, for holidays,

11  asking if Judy was going to bring the two kids to different

12  parts of the world, correct?

13  A    For the vacation plans, correct.

14  Q    For the vacation plans.  And the person who would respond

15  that the kids can't go or that Judy can't go was you?

16  A    That's correct.

17  Q    And so Judy -- did you ever tell Judy what you had done

18  with the e-mail address?

19  A    Yes.

20  Q    When did you tell Judy what you had done?

21  A    Much later, like years later.

22  Q    You, you put false stories; not only were you, was it

23  false because who you portrayed to be Judy was actually you,

24  but you had false facts in these, in these e-mails on a

25  regular basis, correct?

Leissner - cross - Agnifilo                    2214

1    A    I believe so, yes.

2    Q    Do you remember telling Kimora Lee Simmons that there was

3    a car accident where your children were injured?

4    A    I don't remember that but it could be possible, yes.

5    Q    Can I show you something to refresh your recollection?

6              MR. AGNIFILO:  I'm just going to show it to the

7    witness, DX-135, just the highlighted part.

8              (Pause.)

9    A    Yes.

10             (Continued on next page.)

Leissner - cross - Agnifilo                2215

1    EXAMINATION CONTINUES

2    BY MR. AGNIFILO:

3    Q    You said there was a car accident when there was not a

4    car accident?

5    A    Correct.

6    Q    And you said that there were injuries, when there were

7    not injuries, right?

8    A    That's right.

9    Q    Why did you say that?

10   A    I don't remember, but I remember that I wanted her to

11   believe that Judy and I were no longer together.

12   Q    But it's not that you're just telling her falsely that

13   you're no longer together, it's that you've created this fake

14   e-mail where you're on a regular basis giving false

15   information to Kimora Lee Simmons, right?

16   A    Yes.

17         MR. AGNIFILO:  I can take that.

18   Q    Do you remember as part of this sort of fake Judy Chan

19   e-mail address that you created explaining to Kimora that Judy

20   had caused you to have a tax audit?

21   A    I don't particularly remember that story.

22   Q    I'm going to show you.

23         MR. AGNIFILO:  I don't know if we have an exhibit

24   sticker for this.

25         We don't have an exhibit sticker.  I can put an

Leissner - cross - Agnifilo                    2216

1    exhibit sticker on it, just so it's been marked for

2    identification.

3              THE COURT:  You can write it on it.

4              MR. AGNIFILO:  Yes, we'll do that.  This is going to

5    be Defense Exhibit 99 for identification only.

6    BY MR. AGNIFILO:

7    Q    So, I ask you to look at the second line there.

8              (Pause.)

9    A    Yes, sir.

10   Q    Okay.  And do you recall that disguising yourself as Judy

11   Chan Leissner you had a communication with Kimora Lee Simmons

12   that there was a tax audit and that I, Judy, I apologized to

13   Tim for bringing about the audit?

14   A    Yes.  I mean I see what is written here.  I don't

15   remember it, but yes.

16   Q    And just in terms of timing, you were doing this starting

17   in the end of 2013 and you were doing this, this -- this fake

18   correspondence with Kimora Lee Simmons disguising yourself to

19   be Judy Chan, for over a year?

20   A    That might be the case, yes.  I don't remember the exact

21   timing, but yes.

22   Q    All right, I can take it from you.

23              Now, in addition to speaking to Kimora while

24   disguising yourself as Judy Chan Leissner, you also had

25   communications with Low with this same fake Judy e-mail

Leissner - cross - Agnifilo                    2217

1  address.  Is that true?

2  A    I believe so, yes.

3  Q    Okay.  I am going to show you, just to refresh your

4  recollection, Defense Exhibit 134 for identification.

5            (Pause.)

6  A    Yes, sir.

7  Q    Okay.  You were using that same fake Judy e-mail address,

8  the JC Leissner e-mail address, to communicate with Low in

9  2016, isn't that right?

10  A    Yes, sir.

11  Q    I can take that from you.

12            And the issue at the time was you wanted to buy a

13  Vincent van Gogh painting, right?

14  A    No, I think it was different, sir.  Jho was trying to

15  monetize this painting or, I think, maybe several paintings, I

16  can't remember.  And he wanted to see if Judy can be helpful,

17  or her family contacts could be helpful, to do so.

18            So, yes, I disguised myself as Judy to Low.

19  Q    And why did you disguise yourself as Judy in dealing with

20  Low?

21  A    Because he had specifically wanted to speak to her, and I

22  wanted to protect Judy at that time, and from actually having

23  to deal with Jho directly.

24  Q    And so, you protected her by communicating with Low with

25  a fake e-mail address in her name?

SAM      OCR      RMR      CRR      RPR

Leissner - cross - Agnifilo                    2218

1   A    That's correct.

2   Q    And for many, many months you communicated with Low under

3   this fake Judy e-mail address you created?

4   A    I don't know if it was months. It was only on the topic

5   of those paintings. That's what I remember, at least.

6   Q    And why didn't you just tell Judy not to deal with Low?

7   A    I wanted to -- there was two objectives.

8         One was for -- to protect Judy, which is to keep Jho

9   away from her directly and from her having to have contact

10  with him directly.

11        Two, I wanted to pacify or be friends with Jho, so

12  at least to make an effort to be seen to be making an effort

13  to help him.

14  Q    When did you first tell the FBI that you were having

15  these communications with Low with the fake Judy e-mail

16  address?

17  A    I don't remember, sir. It's -- you know, that particular

18  incident or those dealings with the painting never transpired.

19  So, it never happened.

20  Q    And when you said that, you said that Low was trying to

21  monetize paintings.

22        What do you mean by that?

23  A    Sorry, that means that he wanted to sell them and get

24  cash for it, or at least get funds for it.

25  Q    Right. And he was interested to know if Judy's family

Leissner - cross - Agnifilo                2219

1   would be interested?

2   A    They or, you know, their contacts would be interested.

3   Q    Now, you used the fake Judy e-mail address with Ujin

4   Timan as well, isn't that right?

5   A    That I don't recall, but it may be the case.

6   Q    Okay.  So, Defense Exhibit 123 for identification.

7        (Pause.)

8   A    Yes.

9   Q    Okay.  So, you communicated with Ujin Timan with the fake

10  Judy e-mail address?

11  A    Yes.  It's -- yes, right here, I guess so.

12  Q    Okay.  And why were you communicating with Ujin Timan

13  disguised as Judy?

14  A    I don't remember, sir.

15  Q    Do you remember if you used the fake Judy e-mail address

16  to disguise yourself in communicating with people other than

17  Kimora Lee Simmons, Jho Low and Ujin Timan?

18  A    I don't remember, no.

19  Q    You had -- you were using the fake Judy Chan e-mail

20  address for many, many years.

21        You started in the end of 2013, and you agree with

22  me you were still using it as late as April 2016, correct?

23  A    Yes.

24  Q    All right, I'll take that.

25        Now, Judy Chan owned two vineyards in China,

SAM     OCR     RMR     CRR     RPR

Leissner - cross - Agnifilo                    2220

1    correct?

2    A    That's correct.

3    Q    And one was called Grace Vineyard, right?

4    A    That's right.

5    Q    And Judy was the president and CEO of Grace Vineyard?

6    A    Correct.

7    Q    And that was in the Shanxi Province, am I saying that

8    right?

9    A    Yes.  As far as I can tell, yes.

10   Q    All right.  And you've been to the vineyard?

11   A    Many times, yes.

12   Q    It was founded in 1997?

13   A    Yes, that's correct.

14   Q    It was founded by Judy's father, whose name was Kee Chun

15   Keung?

16   A    Correct.

17   Q    And you were an investor in Grace Vineyards from 2000 to

18   2010, right, if not -- if not longer?

19   A    Probably longer than that, and I think 2000 or 2001,

20   something like that.

21   Q    Okay.

22        And how much did you invest in Grace Vineyard?

23        MR. ROLLE:  Objection.

24        THE COURT:  Basis?

25        MR. ROLLE:  Beyond the scope, Judge.

Leissner - cross - Agnifilo                2221

1          THE COURT:  Why don't the parties come to the

2   sidebar?

3          (Sidebar held.)

4

5          (Continued on the following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                SAM      OCR     RMR     CRR      RPR

```
                          Sidebar                       2222
```

1          (The following sidebar was held outside the hearing

2   of the jury.)

3          THE COURT:  Where are you going, counsel?

4          MR. AGNIFILO:  I want to establish that he -- he is

5   lying about the money that went to Roger.  He knows the money

6   is coming from Grace Vineyard and an investment, and I am

7   going to ask him what his knowledge is of the vineyard because

8   he's an investor.  Certain things about the vineyard that he

9   knows about.

10         I mean this is the key issue in the case, the source

11  of the money.

12         THE COURT:  I know you are asking about the

13  vineyard, but what difference does the amount of his

14  investment make?

15         MR. AGNIFILO:  Because -- because it impacts -- if

16  you're a 1 percent investor, you may not know everything the

17  way if you're a 20 percent investor.

18         So, I think it's his basis of knowledge, and his

19  basis of interest is clearly relevant.

20         THE COURT:  Okay.

21         What's your objection?

22         MR. AGNIFILO:  The objection, Judge, is to relevance

23  as to the investment.

24         Counsel can ask him what he wants to him.  Was there

25  an investment?  Establishing through this witness facts about

Sidebar                                                    2223

1    a company he didn't own, operate, manage; his wife did.  It's

2    a publicly-traded company as we sit here today.

3              THE COURT:  He can test his knowledge as to what he

4    knows.

5              MR. ROLLE:  I think to some extent.  I don't believe

6    he can have him testify as a Grace Vineyard business

7    representative, which is what he's trying to do, because he

8    has no evidence of Grace Vineyards' finances or any

9    arrangement.

10             THE COURT:  But he can testify about what he knows

11   and what he doesn't know, he'll say he doesn't know.

12             The objection is overruled.

13             MR. ROLLE:  Thank you, Judge.

14             MR. AGNIFILO:  Thank you, Judge.

15             (Sidebar concluded.)

16

17             (Continued on the following page.)

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

Leissner - cross - Agnifilo                    2224

1              (In open court - jury present.)

2              THE COURT:  Please proceed, Mr. Agnifilo.

3              MR. AGNIFILO:  Yes.

4    EXAMINATION CONTINUES

5    BY MR. AGNIFILO:

6    Q    So, my question was:  What investment did you have in

7    Grace Vineyard?

8    A    It's -- I believe I had funded about $3 million, sir,

9    back in the early days, maybe 2001, 2002, something like that,

10   to a real estate project that Judy had and the family had in

11   China.

12             At some point we swapped -- we changed that to a --

13   that 3 million that was in that real estate project into a

14   stake in Grace Vineyard.  I can't tell you that I remember

15   what kind of percentage I got or we got.  Certainly, Judy

16   ended up with, I think, about half of Grace Vineyard at some

17   point.

18   Q    Okay, and so Judy had half.  And what percentage did you

19   have, do you know?

20   A    No, that was all in her -- encompassed by her.

21   Q    Okay.  Do you remember -- do you remember saying you were

22   a 20 percent owner of Grace Vineyard?

23   A    It could well be that that's what I claimed.  Again, it

24   was really all in her 50 percent.

25   Q    I'm sorry?

SAM      OCR      RMR      CRR      RPR

Leissner - cross - Agnifilo                    2225

1   A    All within her 50 percent.

2   Q    And correct me if I'm wrong, that's because Grace

3   Vineyard is a Chinese company?

4   A    Sorry, I don't understand the question.

5   Q    Yes.  Grace Vineyard, it's based in China?

6   A    That's correct.

7   Q    It's a Chinese, it's a mainland Chinese company, right?

8   A    Well, it is in -- it's a Chinese company.  However, it

9   went by a Hong Kong entity.

10            So, I can't tell you where I actually held the

11  stake, but certainly it's a -- it's a Chinese entity held by a

12  Hong Kong entity.  There are various structures to accommodate

13  for that.

14  Q    All right.  And you are aware of the way it was held, you

15  are aware of the structures, the Hong Kong structure and the

16  mainland China vineyard?

17  A    Yeah, I worked with her at the time on the various

18  structures, yes.

19  Q    Okay.  And so tell us how you created, tell us how you

20  helped create the structure.

21  A    I didn't help create the structure, sir.  I understood

22  the structure.  It's them who created the structure.  And it

23  involves a Hong Kong holding company that owns, effectively,

24  part of -- of the Chinese entity, itself.

25  Q    Okay.  And just so we all understand, you're making a

1    distinction between Hong Kong and China, right?

2    A    There is a very big distinction.

3    Q    Okay, tell us what that is.

4    A    Well, a Chinese company is based in China, falls within

5    all the regulations of a China entity, including regulatory

6    issues, monetary issues, et cetera.

7            And then there's the Hong Kong entity, which is

8    regulated in Hong Kong.

9            They are two very separate markets and countries in

10    that respect.

11    Q    Right.  So, was it your understanding, tell me if this is

12    right, that you could -- you could invest and participate in a

13    business if it was a Hong Kong entity, but you could not do so

14    as a non-Chinese national for a mainland Chinese entity?

15    A    Yes, I could only hold it through a Hong Kong entity.

16    Q    And do you recall in 2009 that you were trying to raise

17    money for Grace Vineyard, you and Judy together?

18    A    I don't remember that.  I think we -- no, she used to --

19    she wanted to raise money throughout time, but I don't

20    remember 2009.

21    Q    You said throughout the time?

22    A    Yes, throughout, you know -- you know, times she wanted

23    to raise money, yes.

24    Q    Okay.  And you were aware that there were, at times there

25    was cash flow issues with Grace Vineyard?

Leissner - cross - Agnifilo                    2227

1   A    Not particularly, sir.  I mean it was, you know, it was

2   making money and the family had plenty of money.

3   Q    Okay.  The family had a number of different businesses,

4   right?

5   A    That's right, correct.

6   Q    So, there was Grace Vineyard and then there was another

7   vineyard, right?

8   A    Yeah.

9   Q    And what was the name of the other vineyard?

10  A    Ning Xian.

11  Q    Ning Xian?

12  A    Ning Xian.

13  Q    And then in addition to the two vineyards, I believe

14  there was a water treatment facility?

15  A    Several water treatment facility, yes; yes.

16  Q    Okay.  There was a steel factory in Indonesia?

17  A    Correct.

18  Q    Okay.  Then there was real estate in China, correct?

19  A    Yes.

20  Q    And this was all part of the family's -- of Judy's

21  family's holdings?

22  A    That's correct.

23  Q    Okay.  Do you remember communicating with someone named

24  Kent Ho on October 11th, 2009 about Grace Vineyard?

25  A    Not particularly, sir, no.

Leissner - cross - Agnifilo                2228

1  Q     Let me -- let me show you something that might refresh

2  your recollection.  It's Defense Exhibit 1098.

3  A     Thank you.

4        Yes, sir, sorry.  What's your question, sir?

5  Q     Okay, my question is -- let me ask a more general

6  question.

7        Do you remember having discussion with Kent Ho

8  around that period of time concerning Grace Vineyard?

9  A     Again, not particularly, sir.  Unless you have something

10  to refresh my recollection.

11  Q     Do you remember giving him a case study, a case study

12  that was done on the vineyard?

13  A     Not particularly.  I remember the case study.  It was a

14  Harvard Business School case study, sir, that he was

15  interested -- well, sorry, that -- that Judy had done.

16        I don't know if I passed that onto him, other than

17  what you showed me here in that e-mail chain.

18  Q     Okay.  All right, and so you remember it being a Harvard,

19  a Harvard Business School case study?

20  A     Yes, Grace Vineyard and Judy were -- had a Harvard

21  Business School case study, correct.

22  Q     I am going to show you for identification 1097.  I'll

23  show you that.  The first page is the e-mail, and then take a

24  look at what's after.

25        (Pause.)

SAM     OCR     RMR     CRR     RPR

Leissner - cross - Agnifilo                2229

1          MR. AGNIFILO:  Oh, you know, it's not on that one.

2   BY MR. AGNIFILO:

3   Q    I'm sorry, could I just take that from you for a second?

4   I apologize.

5   A    Of course.

6              (Pause.)

7   A    I can see the case study and I see the e-mail.

8   Q    Okay.  So, my question, you said you got -- you guys had

9   this case study done, correct?

10  A    No, I don't believe that's how it's done.  I think --

11  Q    How did it happen?

12  A    I think Harvard did this case study by interviewing Judy

13  and her dad and other people around the business.  You don't

14  apply to be Harvard Business School's case study, they choose

15  you.

16  Q    Okay.  And that happened here, Harvard Business School

17  did a case study?

18  A    Yes.

19  Q    And do you remember sending that case study to various

20  people?

21  A    I was certainly proud of it, sir.  I don't remember

22  sending it to different people.

23  Q    Okay, all right.  Let me just take that from you.

24  A    Sure.

25  Q    Remind us, what's Harbor Pacific?

Leissner - cross - Agnifilo                2230

1   A    Harbor Pacific was Kent Ho's, the gentleman on the e-mail

2   just now, fund that he had created in the mid 2000's,

3   sometime.  You know, I can't remember exactly when, that I was

4   in the -- I invested some money in.  It was a venture capital

5   fund.

6   Q    A venture capital fund.

7         And do you remember speaking with Kent Ho about

8   possibly him either being an investor or -- in Grace Vineyard?

9   A    Sorry, sir, not particularly.

10  Q    Do you remember sending Kent Ho the Harvard case study in

11  about October of 2009?

12  A    Well, I think what you just showed me was from Judy to

13  him.

14  Q    Actually, let me --

15  A    I thought so, at least.

16  Q    That's all right, I'll show it to you.  Well, you'll tell

17  me if that's the way you remember it.

18  A    Okay.

19         (Pause. )

20  A    Well, it looks like it was from Judy to me --

21         MR. AGNIFILO:  Objection, Judge.

22  BY MR. AGNIFILO:

23  Q    Yes, you can't read.  It's not in evidence, so I am not

24  asking you to read from it.

25  A    I'm sorry.

SAM     OCR     RMR     CRR     RPR

Leissner - cross - Agnifilo                2231

1    Q    All I'm asking is if it refreshes your recollection that

2    Judy sent a case study to you and then you sent it to Kent Ho?

3    A    No, sir.

4    Q    It doesn't refresh your recollection, right?

5    A    It does not refresh my recollection, yes.

6    Q    Okay.  Is it the case that some of the money from the

7    Capital Place Holdings account was used to fund the winery?

8    A    I don't know that, sir; no.

9    Q    Do you remember telling the FBI in July of 2018, at

10   TL-15, page 32, that part of the funds in the CPH account were

11   used to fund Judy's winery?

12   A    I don't remember saying that, sir.

13   Q    Okay, one second.

14        I am going to show you TL-15 at page 32.  Here you

15   go.  And just read that to yourself, and then I'll ask you the

16   question.

17        (Pause.)

18   A    Just the highlighted part?

19   Q    Yes, I think it's just the highlighted part.

20   A    Okay.

21   Q    Okay, and so my question is didn't you tell the FBI in

22   July of 2018 that part of the funds in the CPH account were

23   used to fund Judy's winery?

24   A    I don't remember that, sir.

25   Q    You don't remember telling that to the FBI?

Leissner - cross - Agnifilo                    2232

1   A    That's right.

2   Q    I think you -- I think you testified, and I think it

3   might have even been yesterday, that the -- that in 2011 you

4   and Roger and Boon Kee were dealing with a situation with

5   this -- these Vietnamese warrants.

6            Do you remember that?

7   A    Yes, sir.

8   Q    And if I remember correctly, I asked you if certain

9   things concerning Capital Place happened in 2011, and you

10  weren't entirely sure of the dates.

11           Do you remember that testimony?

12  A    Yes, sir.

13  Q    Okay.

14           MR. AGNIFILO:  So, let me do this.

15  BY MR. AGNIFILO:

16  Q    I am going to show you what's marked for identification

17  as 1174, DX-1174.  It's just for you to look at for the time

18  being.

19           This is an e-mail from yourself to Roger, correct?

20  A    Yes, sir.

21  Q    All right.  Dated -- it's dated March 1st, 2012, right?

22  A    Yes.

23  Q    Okay.

24           MR. AGNIFILO:  We offer it.

25           MR. ROLLE:  No objection.

Leissner - cross - Agnifilo                    2233

1          THE COURT:  It's admitted.

2          (Defense Exhibit 1174 was received in evidence.)

3          (Exhibit published.)

4   BY MR. AGNIFILO:

5   Q    Okay.  This is March of 2012, right, the top e-mail?

6   A    Sorry, I -- given that this is, you know, from different

7   places, it may also be the 3rd of January, but I can't really

8   tell.

9          It's 2012.  Oh no, sorry, it's from March, you're

10  right.  From the -- you're right.

11  Q    That's fine.  Okay, so March the 1st, 2012, right?

12  A    Yes, sir.

13  Q    And to Roger at his personal e-mail to you at your

14  personal -- I'm sorry, you at your personal e-mail to Roger's

15  personal e-mail, correct?

16  A    That's right.

17  Q    And it indicates that there are three attachments to

18  this, correct?

19  A    Yes, sir.

20         MR. AGNIFILO:  All right.  Let's go to the first

21  attachment.

22         (Exhibit published.)

23  BY MR. AGNIFILO:

24  Q    All right, that's Capital Place Holdings Limited, do you

25  see that?

SAM     OCR     RMR     CRR     RPR

Leissner - cross - Agnifilo                    2234

1    A    Yes, sir.

2    Q    Okay.  Incorporated as a British Virgin Islands as a

3    BVI -- in the British Virgin Islands as a BVI business

4    company, right?

5    A    Yes, sir.

6    Q    Okay.  And then if we go down a little bit further, we

7    see the incorporator of the captioned company -- no, no is

8    Mrs. Judy Leissner.

9           The director is Judy Leissner, correct?

10   A    Correct.

11   Q    And then if we go down to incorporation, it says it's

12   incorporated in the British Virgin Islands July 4th, 2011,

13   right?

14   A    Yes, sir.

15   Q    And if we go to the last page, we see that this form is

16   dated October the 20th, of 2011, and Judy signs as director.

17          Do you see that?

18   A    Yes, sir.

19          MR. AGNIFILO:  All right, let's go to the next --

20   the next attachment.

21   BY MR. AGNIFILO:

22   Q    Okay, this indicates that acceptance of appointment as

23   director, that Judy is -- is the director.  If we go down a

24   little bit more we see her signature, right?

25   A    Yes.

Leissner - cross - Agnifilo                    2235

1    Q    Okay.  And then the next page, it says Application For

2    Shares.

3              Do you see that, and we see Judy's signature?

4    A    Yes, yes.

5    Q    And there's 100 shares at U.S. $1 each.  Do you see that?

6    A    Correct.

7    Q    Okay.

8              MR. AGNIFILO:  Let's go to the next page.

9    Q    We have the share certificate.

10             MR. AGNIFILO:  Can we go back?  Okay.  There we go,

11   all right.  There we go, okay.

12   BY MR. AGNIFILO:

13   Q    One-hundred shares, this is to certify that Judy

14   Leissner, with an address there, basically, holds -- holds all

15   100 shares?

16   A    Yes, correct.

17   Q    Okay.

18             MR. AGNIFILO:  And let's go two pages forward.

19   Okay, there.  Let's see if we can even that out.  All right.

20   BY MR. AGNIFILO:

21   Q    And this indicates that date of appointment is October

22   the 20th, 2011, right?

23   A    Yes, sir.

24   Q    It's Judy as the person who is the director, right?

25   A    Yes, correct.

Leissner - cross - Agnifilo                2236

1   Q    Her nationality is Chinese and her business occupation is
2   she's a merchant?
3   A    Yes.
4   Q    Okay.  So, this is -- this is the creation, these
5   documents create Capital Place Holdings Limited, correct?
6   A    That's my understanding, yes.
7   Q    All right.  As of July 4th, 2011, right?
8   A    Yes.
9   Q    Now, if we go to the first page of the e-mail, okay, this
10  is you sending all of these documents to Roger on March 1st,
11  2012, right?
12  A    Yes, correct.
13  Q    Okay.
14       MR. AGNIFILO:  All right, let's go to DX-2201 for
15  identification.
16  BY MR. AGNIFILO:
17  Q    You can see that okay?
18  A    Yes, sir.
19  Q    All right, it's an e-mail from you to Roger, right?
20  A    Yes.
21       MR. AGNIFILO:  All right, we offer it as 2201.
22       MR. AGNIFILO:  No objection.
23       THE COURT:  Admitted.
24       (Defense Exhibit 2201 was received in evidence.)
25       (Exhibit published.)

1   BY MR. AGNIFILO:

2   Q    Okay, so this is still March 1st, 2012, right?

3   A    Correct.

4   Q    Okay.  And looking at the e-mail from Queensgate, that's

5   Roger's company, right?

6   A    Yes, it's Roger, I believe.

7   Q    It's Roger?

8   A    Yeah.

9   Q    Okay.  And that e-mail is to someone at a place that says

10  Kenanga, right?

11  A    That's correct, sir.

12  Q    Okay.  And then the second address there is also to

13  someone else at a place called Kenanga, right?

14  A    Correct.

15  Q    All right.  Now, Kenanga Investment Bank, Kenanga

16  Investment Bank is a -- is a Malaysian financial services

17  company, correct?

18  A    That's correct.

19  Q    And so what Roger is doing here, is he not, is he's

20  sending the -- the documents we just looked at, the Capital

21  Place Holding documents, to these people at Kenanga Bank,

22  correct?

23  A    Yes.

24  Q    Okay.

25  A    I believe so, at least.  I haven't seen the document --

1    Q    All right.

2    A    -- the attachment, but that's what I believe from this

3    context.

4    Q    All right.  And this is in connection with these

5    Vietnamese warrants that you guys were looking at at the time,

6    right?

7    A    Again, that's what the e-mail headline suggests.

8    Q    Okay.

9          MR. AGNIFILO:  Let's go to the next e-mail, it's

10   DX-1175.

11   BY MR. AGNIFILO:

12   Q    Can you see that okay?

13   A    Yes, I can.

14   Q    All right.  It's an e-mail from you to Roger and to Boon

15   Kee?

16   A    Correct.

17         MR. AGNIFILO:  All right, we offer it as 1175.

18         MR. AGNIFILO:  No objection.

19         THE COURT:  Admitted.

20         (Defense Exhibit 1175 was received in evidence.)

21         (Exhibit published.)

22   BY MR. AGNIFILO:

23   Q    All right, let's go with that first, from the Queensgate

24   Capital to Roger, right, and it is to Boon Kee and yourself

25   and Chee Khan, Chee Khan who we were discussing before?

Leissner - cross - Agnifilo                    2239

1   A    Correct.

2   Q    And it says:  Hi, CK.  Further to our conversation, I

3   wanted to loop you into the buyer side contact.  My partner BK

4   Tan -- Boon Kee, right?

5   A    Correct.

6   Q    -- is liaising with them.  Please reach out to her if you

7   have any questions.  Right?  Do you see that?

8   A    Yes.

9   Q    Boon Kee, Tim -- he's saying that to you -- CK is our

10  counsel and is organizing an entity/bvi company to be the

11  buyer from the vendor.  He would also be drafting the

12  necessary documentation for the onward sale to our potential

13  buyer.

14          Right, you see that?

15  A    Yes, sir.

16  Q    Okay.  And tell me if this is right:

17          Someone was selling warrants to a Vietnamese

18  company, and what was the name of the company again?

19  A    So, the company in question that was selling the warrants

20  was a company called FPT.  A Vietnamese retailer, effectively.

21  Retailing mostly mobile phones and, you know, other

22  electronics.  And the buyer who was interested to buy those

23  warrants was actually the Masan Group that Boon Kee, as what

24  was stated here, had a relationship with.

25          But there was never the idea that those two would

Leissner - cross - Agnifilo                    2240

1  interact directly, that's why we saw an opportunity for this,

2  effectively, side deal away from Goldman Sachs.

3  Q    Okay.  And here the idea is that Boon Kee has a

4  connection to the potential buyer, correct?

5  A    Correct.

6  Q    Now, you had a connection to the potential -- to the

7  company selling the warrants, the chairman?

8  A    That's right, correct.

9  Q    And who was the chairman?

10 A    Oh, I don't remember his name, but yes, I --

11 Q    Okay.

12 A    I had -- I had the contact there.

13 Q    Okay.  And you guys were, basically, going to be sort of

14 in the middle trying to make this -- this transaction happen?

15 A    The idea was, sir, that FPT would sell the warrants at an

16 inexpensive price to the three of us in one shape or form,

17 let's put it this way.  And unsell -- we would then unsell

18 those warrants to the Masan Group, essentially, at a higher

19 price.  So, we would make the difference between FPT selling

20 to us and Masan buying from us.

21 Q    Okay.  And what role was Capital Place going to have in

22 this matter?

23 A    It was either Capital Place or, I believe, Kingsway that

24 we were thinking of as a potential company in between the

25 buying and the selling.

Leissner - cross - Agnifilo                    2241

Q    Okay.  So -- so, when we see Roger forwarding the Capital

Place information to Kenanga, is that because Capital Place

was going to -- Capital Place was going to play a role in this

transaction?

A    Capital Place was thought --  we had -- we thought that

maybe Capital Place could be that entity, yes.  And Kenanga

was to open an account --

Q    Okay.

A    -- for Capital Place.

Q    And this transaction was going to be in what currency?

          I mean if it's Vietnamese warrants being bought and

sold, do you know if it was in Vietnamese currency?

A    I don't remember, sir.  I remember dollar amounts that we

talked about at the time, but I don't remember in what

currency it was going to be.

Q    Okay, all right.

          Okay, so this is all going on in March of 2012,

correct?

A    That's right, correct.

Q    Okay.

A    The transaction never completed.

Q    It never happened?

A    It never happened.

Q    Okay.

          MR. AGNIFILO:  All right, let's go forward.  We are

Leissner - cross - Agnifilo                2242

1    going to go forward to August of 2012.

2            We could -- we could break here if Your Honor wanted

3    to, but I could keep going.

4            THE COURT:  We'll break for 15 minutes.

5            Please remember not to discuss the case.  We'll be

6    back at a quarter to 12.

7            (Jury exits.)

8            THE COURT:  I'll see the parties in 15 minutes.

9            MR. AGNIFILO:  Yes, Judge.

10           (Witness steps down.)

11           (Chief Judge MARGO K. BRODIE exited the courtroom.)

12           (Recess taken.)

13           (In open court - jury not present.)

14           (Chief Judge MARGO K. BRODIE entered the courtroom.)

15           THE COURT:  Are we ready?

16           MR. AGNIFILO:  Yes, Judge.

17           THE COURT:  Please bring in the witness.

18           You may be seated.

19           (Pause.)

20           (Witness re-entered the courtroom and resumed the

21   stand.)

22           THE COURT:  I believe both sides were informed that

23   the press is asking for broader -- for a better view of the

24   exhibits.

25           MS. GERAGOS:  Yes, Your Honor.

Leissner - cross - Agnifilo                    2243

1          We're doing our best to try to blow them up --

2          THE COURT:  Okay.

3          MS. GERAGOS:  -- so the press can see them.  We are

4   also uploading all admitted exhibits during the break.

5          THE COURT:  I think the mic is just turned off from

6   the control.

7          MS. GERAGOS:  It says on.

8          MR. AGNIFILO:  It seems to not be working.  The

9   green light is on.

10         (Jury enters.)

11         THE COURT:  Please be seated, everyone.

12         Pierre, I'm not sure the mic system is turned on.

13         THE COURTROOM DEPUTY:  Can you say that again?

14         THE COURT:  I think the mics are off.

15         THE COURTROOM DEPUTY:  Oh, yes.

16         THE COURT:  Please proceed, Mr. Agnifilo.

17   EXAMINATION CONTINUING

18   BY MR. AGNIFILO:

19   Q    All right, before the break, Mr. Leissner, you mentioned

20   the term swap.  I was asking you about getting -- getting

21   money in and out of China, and you said swap.

22   A    Yes.

23   Q    What's a swap?

24   A    It's an exchange of -- of assets, let's say, an exchange

25   of two things, one for the other one.

1  Q    Okay.  And tell me if this is right:

2          You mentioned owning -- you -- you -- you, as a

3  non-Chinese national, you cannot bring money into China

4  without the permission of the government, is that right?

5  A    Other than very small amounts, that's correct.

6  Q    And you can't get money out of China, other than very

7  small amounts, without the permission of the government?

8  A    That's correct.

9  Q    Okay.  So, when -- so, there's no -- there's no

10 investment that you have in mainland China that's in your

11 name, correct?

12 A    That's correct.

13 Q    Because as a non- -- not a Chinese national, you can't

14 have an investment in mainland China in your name without

15 permission from the Government?

16 A    That's correct.

17 Q    Okay.  And so -- so the way -- so, explain to us how you

18 go about having investment in China.

19          MR. AGNIFILO:  Objection, Your Honor.

20          THE COURT:  Sustained.  Specific investment,

21 Mr. Agnifilo?

22          MR. AGNIFILO:  I'm sorry, I didn't?

23          THE COURT:  Specific investment?

24          MR. AGNIFILO:  The investment that we're talking

25 about in this -- in this case.

1    BY MR. AGNIFILO:

2    Q    The investment, you said that you had investment in Grace

3    Vineyard, right?

4    A    When I described it, it was the family at the time.  It

5    wasn't me personally, per se, but it was the family.  So, it

6    was really Judy holding it.

7    Q    Right, because you couldn't hold it in your name?

8    A    That's right.

9    Q    Because it's -- it's -- it's a business in mainland

10   China?

11   A    That's correct.

12   Q    So, you had to hold it -- it was held in Judy's family's

13   name?

14   A    Yes, correct.  And Judy, in particular, it was my

15   understanding.

16   Q    Okay.  Now, do you -- do you recall that in 2012 there

17   was an effort to do an initial public offering of Grace

18   Vineyard Holding?

19   A    Yes.  I can't put my finger on the date, per se, or the

20   year, but yes, in the -- in those years, around 2012, let's

21   say, Judy was contemplating an IPO.

22   Q    Okay.  An IPO of what exactly?

23   A    Of the -- of Grace Vineyard or the two vineyards

24   together --

25   Q    Okay.

Leissner - cross - Agnifilo                  2246

1   A     -- was the contemplation.

2   Q     So -- and this was going to be done on the -- on the Hong

3   Kong Stock Exchange?

4   A     Correct.

5   Q     Okay.  And let me see if I can give you something to

6   orient you as to date.

7          MR. AGNIFILO:  We only have one copy, Your Honor, so

8   I am going to show the Government, and then I will hand it to

9   Mr. Leissner.

10  BY MR. AGNIFILO:

11  Q     Here you go.

12  A     Thank you.

13  Q     Take a look at that, and then I'm just going to ask you a

14  couple of questions.

15         THE COURT:  What's the exhibit number?

16         MR. AGNIFILO:  98, Judge, Defense Exhibit 98.

17  A     Let me read it for a quick second.

18  Q     Take your time.

19         (Pause.)

20  A     Yes, sir.

21  Q     Okay.  So -- so, the IPO that Judy was contemplating was

22  of both vineyards together, correct?

23  A     That's what I recall, at least; yes.

24  Q     Okay.  And this would have been, the vineyard would have

25  been publicly traded on the Hong Kong Stock Exchange?

Leissner - cross - Agnifilo                    2247

1   A    That's right, correct.

2   Q    Okay.

3         And do you recall that that was happening in 2012?

4   A    No, I -- I said that I didn't know the year it was in,

5   but it was around that time, around 2012.  I just can't say

6   '11, '12, '13; that, I just can't remember.

7   Q    Okay.  Can I take that from you, unless you want to still

8   read it?

9   A    No.  I mean I see the date on this document is 2012;

10  otherwise, independently I can't remember it.

11  Q    Do you know what an A1 listing application is in

12  connection with the Hong Kong stock market?

13  A    It's -- there are several steps to take in the listing on

14  any stock exchange, including the Hong Kong Stock Exchange.

15  The A1 is a certain -- is one of the steps in applying to be

16  listed.  It's a submission to the regulator in Hong Kong to

17  proceed with an IPO.

18  Q    Okay.  And do you recall if Grace Wine Holdings Limited,

19  if that company submitted an A1 listing application?

20  A    I believe I remember that, yes.

21  Q    And -- and -- and then at some point -- the IPO never

22  went through, right?

23  A    Well, it did go through at some point, but just not that

24  year.

25  Q    Yes, not that year.  Much later, like after 2012,

Leissner - cross - Agnifilo                    2248

1   correct?

2   A     That's right, correct.

3   Q     But in 2012 there was no IPO?

4   A     That's correct.

5   Q     And at some point it was -- do you recall that the

6   process was sort of withdrawn, it was sort of delisted in

7   about August of 2012?

8   A     I saw -- I saw the document you showed to me just now, I

9   don't remember independently the date.  And it's not a

10  delisting, it's just withdrawing the application.  That I

11  remember as part of the -- the effort at the time.  I can't

12  remember the date.

13

14              (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

Leissner - cross - Agnifilo                    2249

1    BY MR. AGNIFILO: (Continuing.)

2    Q    And you were working with Judy in connection with the

3    potential IPO of Grace Vineyard; correct?

4    A    As her husband, I was giving her advice, yes.  I was

5    helping the family make certain decisions, think about, you

6    know, what it means from an investment banker's perspective.

7    Yes, I was giving the family financial advice in that respect.

8    Q    Okay.  And you gave advice to go forward with the IPO?

9    That was not against your advice?

10   A    No, I think -- along the way, yes, I did tell Judy that

11   it would make sense to list under certain conditions, of

12   course, conditions, for example that the market is receptive

13   to an IPO of this vineyard.  It's a very small company so

14   there are certain things you have to consider when doing it.

15   It's not like Apple doing an IPO.  This was a very small

16   company.  I did give advice, but I was in support in general.

17   Q    Why was it your advice to go forward with the IPO?

18   A    There's many reasons why an IPO can make sense for a

19   company and I discussed all of them with Judy.  One provides a

20   valuation on the company.  So, you know if your company is

21   traded on the Stock Exchange it now has something called a

22   market cap.  It means a valuation of the company.  That's

23   valuable to have especially if in the future she wants to sell

24   the company.  There's the part of raising capital as part of

25   the IPO.  You can now get small investors to participate in

1  the company and provide you capital for that.  There is the

2  participation of employees.  So I think many of those things

3  speak for having an IPO.  And the IPO is actually only good if

4  there is trading in it and the stock prices rises and there's

5  other considerations to take into consideration.

6  Q    And one of the considerations you mentioned was raising

7  capital.  Doing the IPO was raising capital for the vineyard?

8  A    That's correct.

9  Q    And that was one of the considerations.  You wanted to

10 raise capital for the vineyard?

11 A    Yes.

12 Q    Now, you told the jury on your direct testimony that at

13 some point in time a cover story was developed; right?

14 A    Yes.  You mean for Roger's part of the scheme?

15 Q    Yes.  You said that at some point it was you, there was

16 Roger, there was Hwee Bin and this was all around the time of

17 the Master Pong meeting, is that his name?

18 A    I believe so.  I don't really remember but I believe

19 that's right.

20 Q    You remember the name Master Pong now?  You didn't

21 remember it on direct, but was his name Master Pong?

22 A    Yes, I believe so.

23 Q    And this was a meeting with Master Pong; correct?

24 A    Yes.

25 Q    And the first time you ever mentioned any aspect of this

Leissner - cross - Agnifilo                2251

1   cover story was on January 22, 2020 after you had been

2   speaking with the FBI for over a year and a half and the first

3   time you mentioned this was at TL 26, page six?

4           MR. ROLLE:  Objection, Your Honor.

5           THE COURT:  Sustained.

6           Rephrase the question.

7           MR. AGNIFILO:  Yes, yes.  Very well.

8   BY MR. AGNIFILO:

9   Q    Fair to say that you never mentioned this cover story at

10  all to the FBI for the first year and a half that you were

11  talking to the FBI?

12  A    I don't remember when I mentioned it for the first time,

13  sir.

14  Q    Okay.  I am going to show you it's 2606.  January 22,

15  2020.

16          MR. AGNIFILO:  Objection to form.  Judge, I think

17  the question is in history of his meetings did he mention it.

18  He can have him review whatever he would like, but it's more

19  than a page.

20          MR. AGNIFILO:  I can do it differently.  I can do it

21  differently.

22  BY MR. AGNIFILO:

23  Q    Do you remember ever bringing up the cover story prior to

24  January 22, 2020 in your many meetings with the FBI over that

25  year and a half since you first started cooperating?

SN        OCR        RPR

Leissner - cross - Agnifilo                2252

1   A    I don't remember when I brought it up for the first time,

2   sir.

3   Q    You don't remember when you brought it up for the first

4   time?

5   A    That's right.

6   Q    Now, I think you said that you got the grand jury

7   subpoena, right, and then you spoke to Roger?

8   A    Yes.

9   Q    And Roger suggested that you meet with this feng shui

10  master; correct?

11  A    Yes, he did.

12  Q    And I think you also said you that you spoke to Roger

13  about a lawyer named Michael Kim.  You spoke to Low first and

14  then Roger about this lawyer, Michael Kim?

15  A    Yes, sir.

16  Q    Okay.  And you are saying that was after you got the

17  grand jury subpoena?

18  A    That's correct, sir.

19         MR. AGNIFILO:  The grand jury subpoena is in

20  evidence so we can pull it up.  It's TL 02A.  My mistake.  It

21  is a not in evidence.

22         We would offer it as TL 02A, Your Honor.

23         THE COURT:  Is there any objection?

24         Can you put it on the screen so I can see it,

25  Counsel?

Leissner - cross - Agnifilo                    2253

1          MR. AGNIFILO:  We're doing it, Judge.

2          THE COURT:  Let me have the parties at sidebar,

3    please.

4

5          (Sidebar held outside of the hearing of the jury.)

6          (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                         Sidebar                         2254

 1            (The following sidebar took place outside the

 2   hearing of the jury.)

 3            THE COURT:  Why do you want this document before the

 4   jury?

 5            MR. AGNIFILO:  The date.  Just the date.

 6            THE COURT:  Just ask him.

 7            MR. AGNIFILO:  I think he's going to say he doesn't

 8   remember.

 9            THE COURT:  I do not believe you want to put the

10   subpoena in the record.

11            MR. AGNIFILO:  That's fine.

12            THE COURT:  If you tell me you want it in, I will

13   hear from the Government as to the objection.

14            MS. SMITH:  We can stipulate to the date.

15            MR. AGNIFILO:  Let me see.  I can refresh his

16   recollection.

17            (Sidebar ends.)

18            (Continued on next page.)

19

20

21

22

23

24

25
```

Leissner - cross - Agnifilo                    2255

1   BY MR. AGNIFILO:  (Continuing.)

2   Q    Do you recall Mr. Leissner, that you flew into the United

3   States on February 26, 2016 and at that time you were served

4   with a grand jury subpoena?  Do you remember that date?

5   A    No, sir.  That is not right.  I flew out of the United

6   States --

7   Q    My mistake.

8   A    -- on that date and I was subpoenaed at that time.

9   Q    You were served at that time?

10  A    That's right.

11  Q    On September 26?

12  A    February.

13  Q    I'm sorry, let's have a reset.  A reboot.

14       February 26, 2016?

15  A    Yeah, I don't know if it's February 26, but that's the

16  time frame.

17  Q    Okay.  I'm going to show you what's been marked for

18  identification as DX 45.

19       (Exhibit published to witness only.)

20  Q    DX 45 is an e-mail from you to Judy Chan; correct?

21  A    Yes.

22  Q    All right.  We offer it as DX 45?

23       MR. AGNIFILO:  Objection.

24       THE COURT:  What is the basis, counsel?

25       MR. AGNIFILO:  Relevance and extrinsic, Judge.

Leissner - cross - Agnifilo                    2256

1          MR. AGNIFILO:  Can we just go to the -- can we just

2     show Your Honor the third page?

3          THE COURT:  The third page?

4          MR. AGNIFILO:  Yes, Judge.  We're going to put it

5     up.

6          THE COURT:  Is that the information you are seeking?

7          MR. AGNIFILO:  Yes, but the e-mail as well.  The

8     e-mail and the attachment.

9          THE COURT:  I need to see it.

10          (Counsel approaches.)

11          THE COURT:  Ask your questions, counsel.  I'm not

12     going to admit the document.

13     BY MR. AGNIFILO:

14     Q    Do you recall -- let's go to -- I want to ask you -- you

15     got a retainer agreement at some point from Kobre & Kim,

16     Michael Kim, right?

17     A    I assume so, yes, sir.

18     Q    Do you recall that the date of that retainer agreement is

19     February 11, 2016?

20     A    No, I don't, sir.

21     Q    Okay.  We're going to show you page three.

22          MR. AGNIFILO:  Objection to the form, Judge, as

23     well.

24          THE COURT:  Overruled.

25          You can review that document and testify as to

Leissner - cross - Agnifilo                2257

1   whether or not it refreshes your recollection, Mr. Leissner.

2        THE WITNESS:  It doesn't.  I'm sorry.

3   BY MR. AGNIFILO:

4   Q    All right.  You don't recall that whether or not your

5   retainer is dated February 11, 2016?

6   A    That's correct.  I do recall, if I may answer the

7   question on this particular topic, having engaged Kobre & Kim

8   at some point about my Goldman Sachs retainer, the

9   compensation, but I don't remember February 11th, sir.

10  Q    Okay.  So what you recall is that you retained Kobre &

11  Kim in connection with pur Goldman Sachs deferred compensation

12  matter; right?

13  A    Yes.  For two things.  One of them was this.

14  Q    And so what was -- describe to us what the deferred

15  compensation matter was -- describe for the jury what was

16  going on.

17        MR. AGNIFILO:  Objection.

18        THE COURT:  Sustained.

19        MR. AGNIFILO:  Your Honor, may we approach?

20        THE COURT:  Sure.

21        (Sidebar held outside of the hearing of the jury.)

22        (Continued on next page.)

23

24

25

```
                        Sidebar                    2258
```

1          (The following sidebar took place outside the
2     hearing of the jury.)
3          MR. AGNIFILO:  He's lying because this is before the
4     subpoena.  He said that Roger talked to him about getting
5     Michael Kim before the subpoena -- I mean, after the subpoena.
6     He doesn't get the subpoena for another five days.
7          THE COURT:  Okay.  So you now put in the record the
8     date.
9          MR. AGNIFILO:  But he doesn't remember.
10         THE COURT:  The Government will stipulate to the
11    date of the subpoena.  That's not an issue.
12         MR. AGNIFILO:  That part is easy.
13         THE COURT:  So, what is it about this document that
14    you want before the jury?
15         MR. AGNIFILO:  I have to intersect, and I apologize,
16    Your Honor.  Counsel said Michael Kim.  I objected.  Michael
17    Kim didn't send this retainer letter.  Counsel asserted he did
18    in his question.  It is clearly false on this document.  It's
19    untrue.  It was misleading to the witness and the jury.  It
20    says Jonathan Cogan of Kobre & Kim on February 11th sent this
21    letter.  So, that's my objection and I just --
22         THE COURT:  I want to understand what's going on
23    here exactly and what information you are trying to get before
24    the jury.
25         MR. AGNIFILO:  Okay.  He testified on direct that he

```
                         Sidebar                          2259
```

1   spoke to our client --

2            THE COURT:  Right.

3            MR. AGNIFILO:  -- and our client and he spoke about

4   Kobre & Kim and he hired Kobre & Kim after getting the

5   subpoena.

6            THE COURT:  I think his testimony is as to a

7   specific person; correct?

8            MR. AGNIFILO:  Michael Kim.

9            MR. AGNIFILO:  Michael Kim.  He hasn't testified to

10  hiring anybody else.

11           THE COURT:  No, he testified to Michael Kim.  That

12  he was referred to him by both Mr. Ng and Mr. Low.

13           MR. AGNIFILO:  That's not possible.  His testimony

14  on direct is impossible.

15           THE COURT:  Okay.  I do not need you to argue it to

16  me.

17           MR. AGNIFILO:  I'm sorry.

18           THE COURT:  I just need to you tell me what about

19  this document -- what is it that you are trying to get before

20  the jury?

21           MR. AGNIFILO:  So, it's two things.  It's that he

22  engaged Kobre & Kim --

23           THE COURT:  Okay.

24           MR. AGNIFILO:  -- prior to the subpoena date.

25           THE COURT:  Okay.

```
                     Sidebar                          2260
```

1           MR. AGNIFILO:  And prior to being served with the

2   subpoena.

3           THE COURT:  Okay.

4           MR. AGNIFILO:  So then his testimony on direct can't

5   be accurate.

6           THE COURT:  That is your argument to the jury.

7   Again -- okay, based on his testimony is that he engaged them

8   for two different things.

9           MR. AGNIFILO:  But there's only one retainer.

10          THE COURT:  Okay, okay.  Okay.  So what you want the

11  jury to see is this retainer agreement because of the date?

12          MR. AGNIFILO:  I can take everything here out.

13          THE COURT:  Just to show that he, in fact, retained

14  him on that date?

15          MR. AGNIFILO:  Yes, yes.

16          THE COURT:  Okay.

17          MR. AGNIFILO:  He said that he paid them and Judy

18  paid them.  That's what the e-mail shows.  He said who paid.

19  His direct testimony is that I paid them.

20          THE COURT:  So you can cross him on this

21  information.  This I am not putting the subpoena before the

22  jury, but the actual retainer agreement, yes, we can go ahead

23  and admit that.

24          MR. AGNIFILO:  If that's coming in, Judge, we would

25  offer this for completeness.  Counsel is conflating what

Sidebar                                                2261

1   Mr. Leissner was retaining him for.  He could not have

2   retained criminal counsel for a subpoena that the parties just

3   stipulated hadn't been served.  If they want to talk about the

4   retention of February 11th we would offer to complete the

5   context of the e-mail, Judge.

6              THE COURT:  Great, the entire document comes in.

7              (Sidebar ends.)

8              (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Leissner - cross - Agnifilo                2262

1   BY MR. AGNIFILO:  (Continuing.)

2              MR. AGNIFILO:  We offer DX 45.

3              MR. AGNIFILO:  No objection.

4              THE COURT:  It is admitted.

5              (Defense Exhibit 45 received in evidence.)

6              (Exhibit published.)

7   BY MR. AGNIFILO:

8   Q    Let's go to the first page of DX 45.  All right.  This is

9   an e-mail from yourself to Judy Chan; right?

10  A    Yes.

11  Q    And it's dated February 21, 2016; correct?

12  A    Yes.

13  Q    All right.  So this is before you got served with the

14  grand jury subpoena leaving the country on February 26, 2016;

15  right?

16  A    If that was the date, yes.

17  Q    It's five days before; right?

18  A    Yes.

19  Q    Okay.  And what it says here is, Sweetie, please do send

20  me the company and account details of whichever entity we will

21  use.  In the attachment are the details for the lawyer fee,

22  that is $50,000.  Do you see that?

23  A    Yes, sir.

24  Q    And if we look at the third page, we see that the date

25  here is February 11th, 2016; right?

Leissner - cross - Agnifilo                    2263

1   A    Yes.

2   Q    So that's 15 days before you get served with the grand

3   jury subpoena; right?

4   A    Yes, yes.

5   Q    And it says, Invoice for retainer.  Goldman Sachs

6   deferred compensation collection.  Do you see that?

7   A    Yes, sir.

8   Q    Had you retained Kobre & Kim prior to this or after this

9   or in a separate agreement or is this your only retainer

10  agreement, as far as you know?

11            MR. AGNIFILO:  Objection to form.

12            MR. AGNIFILO:  I will ask a different question.

13  Q    This is the retainer.  Let's look at the whole thing.

14  That's the retainer agreement; right?

15  A    Yes, I believe so, yes.

16  Q    Okay.

17  A    It's the wire instructions.

18  Q    Yes.  And you are paying them $50,000; right?

19  A    Yes, sir.

20  Q    And the matter listed here is Goldman Sachs deferred

21  compensation collection; right?

22  A    Yes.

23  Q    Did you then hire them with a separate retainer for the

24  criminal -- for the investigation?

25  A    I hired them for the criminal investigation -- I can't

Leissner - cross - Agnifilo                 2264

1  remember this first part, to be honest.  I only remember the

2  part that I -- that I retained or hired them for the criminal

3  investigation.

4  Q    But that would have had to have been after this because

5  this is before you got the subpoena?

6  A    That's right.

7  Q    Okay.  And this is not in reference to the criminal

8  investigation at all; do you agree with me?

9  A    That's right.

10 Q    This is in regard to the Goldman Sachs deferred

11 compensation collection, right?

12 A    That's correct.

13 Q    And tell the jury what that is.  What's the matter that

14 you're hiring them to do?

15         MR. AGNIFILO:  Objection.

16 Q    In this retainer agreement, what are you hiring them to

17 do?

18         MR. AGNIFILO:  Objection.

19         THE COURT:  Not the details.  So the objection --

20         MR. AGNIFILO:  Let me clarify.

21 Q    I don't want you to tell the jury any communications that

22 you had with any lawyer.  That's not what I'm asking for.  I'm

23 asking why did you hire them?

24 A    To work on getting Goldman Sachs to release the shares

25 that they had retained from prior years, from prior

Leissner - cross - Agnifilo          2265

1    compensation years.

2    Q    Okay.  I think on direct examination you also said that

3    when you got the grand jury subpoena, you spoke to Roger;

4    right?

5    A    Yes.

6    Q    And in addition to referring you to Michael Kim, that he

7    discussed with you a feng shui master correct?

8    A    No, sir, that's incorrect.

9    Q    Go ahead.

10   A    When I got the subpoena from the FBI, I called Jho first,

11   and Jho gave me -- told me to use Michael Kim in the criminal

12   investigation.  Now, I don't recall that my discussion had

13   predated them with respect to the compensation part, but he

14   specifically advised me to retain Michael Kim for the criminal

15   part, which I later did.

16          The discussion with Roger is that I briefed him on

17   the subpoena -- the subpoena and the fact that I was going to

18   work with a lawyer at Kobre & Kim to get that result.  Roger

19   did not and I don't think I testified to that, give me Michael

20   Kim's name.  Jho did.  And later the reason I disengaged with

21   them was because Jho was using Michael Kim's firm as well.

22   Q    Okay.  Let's talk about the feng shui master for a

23   second.  Do you remember being asked what was the purpose of

24   seeing -- this is page 1271 at line 16:

25          "What was the purpose of seeing a feng shui master

Leissner - cross - Agnifilo                2266

1    after you got subpoenaed?"  And you said you were going to

2    seek his advice as to whether or not you would be in trouble.

3    Do you remember being asked that question and giving that

4    answer?

5    A    I don't remember the exact question, but, yes, the reason

6    I was -- that Roger suggested and Hwee Bin suggested it to me

7    is that they had already worked with the feng shui master,

8    given all the press around 1MDB and the issues that we were

9    facing as a result, but post my subpoena Roger really urged me

10   to get a reading done for myself because they had already done

11   their's and that it was specifically to tell us about what the

12   authorities may or may not do, what kind of future this would

13   entail for us, that the reading would first be just a reading,

14   but he also suggested at some point later to have an in-person

15   meeting.

16   Q    Wasn't the reading for you in 2015?

17   A    It may well be because we had -- we had been concerned

18   about -- the first reading you mean?  Because the actual

19   meeting was in 2016.

20   Q    I'm talking about the reading with an R not the meeting.

21   The reading was in 2015, not in 2016?

22   A    I don't remember when we did the several readings, but it

23   certainly was for the purposes of as I just mentioned Roger

24   had done it for himself and Hwee Bin as well throughout the

25   time of the newspaper articles suggesting that the authorities

1   are looking into the matter that, you know, the newspapers

2   criticizing 1MDB and us by extension, et cetera, et cetera.

3   So, the subpoena was just another reason to do a reading.

4   Q    So I'm going to direct your attention -- I'm going to --

5   page 1271 at line 16, you were asked the following question:

6        "And what was the purpose of seeing a feng shui master

7   after you got subpoenaed?"

8   A    Correct.

9   Q    Your answer on line 18 was:  "Was to see -- to ask his

10  advice as to whether or not I would be in trouble or we would

11  be in trouble as part of the scheme and whether this was going

12  to be uncovered or not and what the ramifications may be for

13  our future."

14       Do you remember being asked that question and giving

15  that answer?

16  A    Yes.  And that still holds.

17  Q    Let's look at DX 42 for identification.

18       (Exhibit published to witness only.)

19  Q    You can see this is an e-mail from you to Roger; correct?

20  A    Yes.

21       MR. AGNIFILO:  We offer it, Your Honor, as DX 42.

22       THE COURT:  It is admitted.

23       (Defense Exhibit 42 received in evidence.)

24       (Exhibit published.)

25  BY MR. AGNIFILO:

Leissner - cross - Agnifilo                2268

1    Q    So, the top e-mail here is from January 7, 2016; right?

2    A    Yes.

3    Q    And it is from you to Roger.  Do you see that?

4    A    Yes.

5    Q    Your personal e-mail to Roger's Victoria Court e-mail;

6    correct?

7    A    Yes.

8    Q    You said, I got it in the e-mail regarding the months for

9    action, many thanks again.  Do you see that?

10   A    Yes.

11   Q    Let's go to the e-mail below that and blow that up.  And

12   this is from Roger to you.  It's December 15, 2015; right?

13   A    Yes.

14   Q    Okay.  And it says, the lunar nature calendar starts

15   after Chinese New Year, February 2016 until January 2017.

16   Here you go.  Change of fate, year for the better, like 2014.

17   True.  It's a good year.  Try not to avoid overpromising, but

18   if you do keep your promises, take care what you say or

19   promise.  Then it says, you will have great success in metal,

20   finance, mining, machinery and water, beverage, hotels,

21   chemical-related investments.  Then it says take a team effort

22   approach and partner others.  The next one is there will be

23   jealousy as you would be partnering kings.  Then it says keep

24   a low profile avoid public life and being photoed.  And then

25   it says, You have a great sixth sense, but clouded by women.

Leissner - cross - Agnifilo                    2269

1   They are the source of your burden, but also your success.  It

2   says, Your daughter will guide your decisions especially as

3   you grow older; right?

4   A    Yes.

5   Q    The reading that you were talking about on direct

6   examination is a reading that was done in 2015, not in 2016

7   after you got the subpoena?

8   A    That's not correct, sir.  There was -- Roger and Hwee Bin

9   had undertaken their own readings before and they may well

10  have done a reading for me, which I don't remember prior to

11  this, but we did subsequent readings because now it had become

12  more important to do so because I had been subpoenaed.

13  Q    You agree with me, though, the date of this e-mail we're

14  looking at is December 15, 2015; right?

15  A    Correct.

16  Q    Now, was this the first time you had ever done a reading

17  for Master Pong?

18            MR. ROLLE:  Time frame, Your Honor?

19            MR. AGNIFILO:  December 15, 2015.

20            MR. ROLLE:  Objection to form.

21            THE COURT:  Rephrase.

22            MR. AGNIFILO:  Sure.

23  BY MR. AGNIFILO:

24  Q    Let me ask you a different question.  Do you have an

25  understanding that these readings have to be done at certain

SN        OCR        RPR

1  periods of time?  You can't just do them at any time.  In

2  other words, it has to be done at some point in about

3  September or October, an almanac for the next year comes out.

4  Do you have an understanding of that one way of or the other?

5  A    No, I don't.

6  Q    And do you have an understanding that Chinese New Year is

7  very important to these readings?  Do you have an

8  understanding of that, one way or the other?

9  A    No.  I'm not particularly aware that that's the case,

10 other than the year count that is used is the Chinese year

11 count.

12 Q    Okay.  So what Roger says in his e-mail, The lunar

13 calendar starts after Chinese New Year, February 2016 until

14 January 2017; right?

15 A    Yes.

16 Q    Okay.  And this reading and the date of the e-mail is

17 December 15, 2015 --

18        MR. AGNIFILO:  Objection to the form, reading.

19 Q    What would you like to call it I will call it anything

20 you like?

21        THE COURT:  Rephrase it based on the witness'

22 answer.

23 Q    You said you had multiple readings?

24 A    Yes.  There were several readings that were offered by

25 Roger and Hwee Bin having their own discussions with the

Leissner - cross - Agnifilo                2271

1    master.  There were predictions there, you know, laying out

2    the situation at the time, but also predictions and they had

3    done a few themselves with the master and one meeting I

4    attended myself.

5    Q    You met Master Pong one time?

6    A    That's correct.

7    Q    And I think you were asked on direct examination if you

8    remember the date and you didn't remember the date?

9    A    No, I only remember it was in 2016.

10   Q    Do you remember it being November 11, 2016?

11   A    Since I can't remember the specifics, no, I can't

12   remember the 11th -- November 11th, no.

13   Q    Tell us what you remember about the meeting with Master

14   Pong?

15   A    It was at the Shangri-La La on the executive floor in the

16   conference room attached to that executive floor in Hong Kong.

17   Q    And who was there?

18   A    Roger, Hwee Bin, Master -- the master, Judy and myself.

19   Q    Okay.  And there was -- did the master, Master Pong,

20   speak to you at that meeting?

21   A    Yes, he did but indirectly because he only spoke Chinese.

22   Q    And who was translating?

23   A    Roger translated and Hwee Bin did and Judy as well.  So

24   all three helped me.

25   Q    And one of the main things that Master Pong told you

Leissner - cross - Agnifilo                    2272

1   about at that meeting is how important one of the daughters

2   you had with Judy would be to your future.

3              MR. AGNIFILO:  Objection.

4              THE COURT:  Counsel, ask your next question.

5   Q    Wasn't -- didn't Master Pong mention the importance of

6   your daughter at this meeting?

7              MR. AGNIFILO:  Objection.

8              THE COURT:  Sustained.

9              Ask your next question.

10             MR. AGNIFILO:  Your Honor, can we approach?

11             THE COURT:  Yes.

12

13             (Sidebar held outside of the hearing of the jury.)

14             (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

```
                          Sidebar                         2273
```

1             (The following sidebar took place outside the

2     hearing of the jury.)

3             MR. AGNIFILO:  He's lying about this meeting.  It

4     wasn't about the subpoena.  He decides to go back to Judy.  He

5     starts making overtures to go back to Judy right after the

6     Master Pong meeting.

7             THE COURT:  Can you question him about whatever

8     happened with the daughter?

9             MR. AGNIFILO:  Here is the whole problem --

10            THE COURT:  Okay.

11            MR. AGNIFILO:  -- he goes to this meeting and

12    there's already a reference to this in the e-mail that his

13    daughter is very important to his future.  He goes to the

14    Master Pong meeting.  Master Pong says you're letting women

15    ruin your life.  And I won't get into which one.  I'm trying

16    to be delicate about it.  Your older daughter is your guiding

17    light and if you lose her, you will lose your path.  That's

18    what he said.  That's what the reading is about.  It wasn't

19    about all this other stuff.  It wasn't about the subpoena.  It

20    wasn't about 1MDB.  It was about that and he testified falsely

21    about it when he testified on direct and I'm not trying to be

22    inappropriate and get into family members, but that's what was

23    said.

24            MR. AGNIFILO:  Judge, our objection is for three --

25    you can ask about the substance if you want to say it was

```
                        Sidebar                      2274
```

 1    different substance, as a general matter that's fine.  He said

 2    it was about what he said on direct but we do object to

 3    harassing the witness by raising his children.  As we noted

 4    before trial in limine, we have concerns this is the strategy

 5    and we object.

 6              THE COURT:  The objection is overruled.  I'm going

 7    to allow those questions to be asked.  The point that counsel

 8    is making is that this was the purpose of that particular

 9    meeting and, so, that contrasts with his trial testimony to

10    date and he is allowed to ask about it.

11              MR. AGNIFILO:  My only point, Your Honor, I believe

12    and I think it's a foundational point, the witness doesn't

13    speak Chinese.  He's testified to that repeatedly.  If the

14    question is the point of the meeting it's different than what

15    he understood was being said the at meeting.  So, the point is

16    different what he understood is being said to him by -- in a

17    foreign language translated by his client at the meeting.

18              THE COURT:  He has already testified that he doesn't

19    speak Chinese and that it was being translated.  So I think

20    the record is clear that any information he is testifying to

21    is based on what he was told by these three individuals at the

22    meeting.  Go ahead.

23              (Sidebar ends.)

24              (Continued on next page.)

25

1              THE COURT:  You may proceed.

2    BY MR. AGNIFILO:

3    Q     Mr.  Leissner, I want to focus your attention for a

4    minute on the last entry in this list of topics where it says,

5    Your daughter will guide your decisions, especially as you

6    grow older.  Do you see that?

7    A     Yes, sir.

8    Q     Okay.  One of the things that you were most interested in

9    when you decided to meet with Master Pong on November 11, 2016

10   is what Master Pong meant by that statement; is that fair to

11   say?

12   A     No, that's not fair to say.

13   Q     Isn't that one of the things that was discussed between

14   you, my client, his wife, Judy Chan and Master Pong as you

15   were all at this meeting together, the Master Pong -- I

16   understand he was speaking in Chinese; right?

17   A     Yes.

18   Q     You don't understand Chinese; right?

19   A     That's correct.

20   Q     Okay.  So it was interpreted to you by -- Judy speaks

21   Chinese, right?

22   A     She does.

23   Q     And she was there; right?

24   A     That's correct.

25   Q     Your understanding is that Roger speaks Chinese; right?

Leissner - cross - Agnifilo                2276

1    A    Yes.

2    Q    And your understanding is that Hwee Bin speaks Chinese?

3    A    Of course, yes.

4    Q    And at this meeting, translated to you into English,

5    there was discussion about how your daughter is important in

6    terms of guiding your decisions in the future.  Didn't this

7    come up extensively at the meeting?

8    A    It did not come up extensively.  It was mentioned, you

9    are right.  My daughter Anastasia was mentioned as a person

10   really important in my life but it wasn't an extensive

11   discussion, no.

12   Q    Okay.  And I am -- I just want to ask you a few questions

13   just so I understand, okay?  Wasn't that -- the fact that one

14   of your daughters in particular, you named her, could be an

15   important person in your life going forward, isn't that

16   something you are interested in understanding better from

17   Master Pong at this meeting?

18   A    I don't remember, sir, that that was a particular topic

19   to delve into.  I remember it was one of the things that was

20   mentioned to me, but that was something that I accepted as the

21   truth to be the case because I felt that really since she was

22   born, that she was special in my life.  So, no, I don't think

23   it was an extensive discussions as you described that she was

24   special to me.

25   Q    So I'm not asking anymore if it was extensive.  I'm

1    asking if it was an important discussion to you.

2    A    Yes, she's important to me, yes, of course.

3    Q    Okay, all right.  After the Master Pong meeting in

4    November of 2016 --

5              THE COURT:  Counsel, rephrase the question.  The

6    witness testified he doesn't recall when it was.

7    Q    Take your time.

8              THE COURT:  I'm asking you to rephrase the question.

9    Q    After the meeting, did you have serious considerations of

10   going back to Judy?

11   A    Yes.

12   Q    Okay.  And is that in part because of what you knew to be

13   true and that what Master Pong also said to you at this

14   meeting?

15   A    I don't recall that being the linkage, sir.

16   Q    So, tell me why did you have serious considerations after

17   the meeting of going back to Judy?  This is now late 2016.

18   A    I don't even recall whether it's particularly right --

19   because of the meeting or right after the meeting, it was

20   something that I contemplated for many years during that time.

21   I, at least, can't remember or recall that it was linked

22   directly to the meeting or right after the meeting or the

23   like.  It was an ongoing thing.

24   Q    So I want to make sure I understand the process of having

25   these readings done by Master Pong.  You provide your date of

1    birth and your time of birth; right?

2    A    That's correct.

3    Q    No other information; right?

4    A    That's at least my understanding or memory, yes.

5    Q    And so you provide your date of birth and your time of

6    birth and then Master Pong uses that information to give a

7    reading about your life and things going on in your life?

8    A    Yes.

9    Q    And one of the things, because it's written right here in

10   the e-mail, is that your daughter will guide your decisions

11   especially as you grow older, right?

12        MR. ROLLE:  Objection.

13   Q    That's what it says in the e-mail.

14        MR. ROLLE:  Asked and answered, Your Honor.

15        THE COURT:  He can answer it.

16        Go ahead.

17   A    Yes.

18   Q    Okay.  And you understood that this is -- this is an

19   e-mail coming from Roger, but you understand that Roger is

20   relaying to you one of the readings of Master Pong?

21   A    Yes, from the context here, yes, I believe that to be the

22   case.

23   Q    Okay.  So, this particular part about your daughter

24   resonated with you because you thought that was true as well,

25   for yourself?

1          MR. AGNIFILO:  Objection, Your Honor.

2          THE COURT:  Basis?

3          MR. AGNIFILO:  Asked and answered, 403, Your Honor.

4          THE COURT:  He can answer.

5          Mr. Agnifilo, after this, move on.  Go ahead.

6    A    I'm sorry, can you repeat your question?

7    Q    Absolutely.  So here this being said to you based on

8    Master Pong's reading?

9    A    That's my understanding, yes.

10   Q    You didn't tell Master Pong anything about your daughter;

11   right?

12   A    That's correct.

13   Q    You only gave Master Pong your date of birth and your

14   time of birth; right?

15   A    That's correct.  However, I would have to say, sir, that

16   I gave that information not to Master Pong.  I gave that

17   information to Roger and Hwee Bin.  What information they

18   passed on, I do not know.

19   Q    But your understanding of how the reading is done is that

20   it's based on date of birth and time of birth; right?

21   A    That's my understanding, yes.

22   Q    Okay.  And, so, based on the reading Master Pong writes

23   this; that's your understanding; right?

24   A    Yes.

25   Q    Roger writes this based on the Master Pong reading?

1   A     That's my understanding.

2   Q     Okay.  And my last question on this topic is part of the

3   reason you were so interested in meeting Master Pong in 2016

4   is because this was part of the reading, the part about your

5   daughter?

6   A     No, sir.  The important part was the authorities and our

7   concern around 1MDB.  The other topics around that were

8   axillary, not the main topic that was interesting me.

9

10              (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

1  BY MR. AGNIFILO:  (Continuing)

2  Q    I'm going to move on to a different topic.

3          You discussed on direct examination that at some

4  point, I think it was in October of 2017, there's a meeting

5  between you an Jho Low.  Do you remember talking about that?

6  A    Yes, sir.

7  Q    Okay.  And let me make sure I understand this.  You and

8  Low had conversations about this investigation during a

9  meeting that you and Low had in Hong Kong, right?

10  A    Correct.

11  Q    And I think if I heard you right, you said this meeting

12  between you and Low happened at a Chinese restaurant in a

13  Marriott?

14  A    That's right, correct.

15  Q    In Hong Kong, correct?

16  A    That's right.

17  Q    And I think you said that Low had arranged for a private

18  area in the restaurant where you two can speak in private?

19  A    That's right.

20  Q    And at the time, in late 2017, there were investigations

21  in several different countries into the 1MDB bond situation,

22  correct?

23  A    That is correct, yes.

24  Q    There was an investigation in the United States, right?

25  A    Yes.

Leissner - cross - Agnifilo                    2282

1   Q     You understood there was one in Malaysia?

2   A     Yes.

3   Q     You understood there was one in Singapore?

4   A     Correct.

5   Q     And you understand there was one in Switzerland?

6   A     Yes.

7   Q     And you told Low, you said you told Low, right, when you

8   got the grand jury subpoena, that you got the grand jury

9   subpoena?

10  A     Yes, of course, yes.

11  Q     So this is now October of 2017.  It's more than a year

12  and a half after you got the grand jury subpoena, right?

13  A     That's right.

14  Q     And it's just you and Low at this meeting, correct?

15  A     That's correct.

16  Q     And do you recall, who called for the meeting, was it you

17  or Low?

18  A     I can't remember.  I don't think it was a calling one or

19  the other to meeting, but I think we knew that we would both

20  be in Hong Kong at the same time and we arranged to meet.

21  Q     All right.  And I think you said on direct examination

22  that Low he had told you that he had hired Chris Christie?

23  A     That he had hired or was going to hire him, yes.

24  Q     Chris Christie -- and Low explained that he thought

25  Christie had a relationship with then President Trump,

Leissner - cross - Agnifilo                    2283

1    correct?

2    A    That's correct.

3    Q    And Low told you that there was a deal in place between

4    the U.S. and Malaysia?

5    A    Well, no, that would be going too far.  What I said was

6    that he was talking to the Trump Administration, that he was

7    going to use Chris Christie to do so as well, that he had met

8    Jared Kushner in Beijing or somewhere in China, I believe that

9    is what he said, that's my recollection, and that they had

10   worked on a deal whereby a settlement would be reached and

11   that the Administration was in favor of that at the highest

12   level, however, that at the Department of Justice, that the

13   working team was against it.  So there was no deal in place

14   but he was working on it, he was optimistic that with his

15   contacts and the people he was involving, he could reach that

16   settlement but it had not been reached yet.

17   Q    So let me just unpack some of what you just said.

18        So Low said that Jared Kushner was involved in these

19   discussions, right?

20   A    That he had spoken to him, yes.

21   Q    That Low had spoken to Jared Kushner?

22   A    Yes.

23   Q    Directly, himself?

24   A    Yes.

25   Q    And you said that he met Kushner someplace in China?

1   A     That's what he -- that's what I recall he told me, yes.

2   Q     All right.  And did Low tell you that he and Jared

3   Kushner had some type of either business or personal

4   relationship?

5   A     Not particularly, no, sir.  I think he was just saying

6   that he, that Jared Kushner had agreed to be helpful.  That's

7   all I -- I don't know if there was anything else.  There may

8   have been but I can't remember.

9   Q     And did Low tell you that Jared Kushner happened to be in

10  China so Low met him in China or was there a plan for the two

11  of them to meet in China?

12  A     I don't remember, sir, I'm sorry.

13  Q     Okay.  But at the same time of your meeting with Low,

14  you're saying he had already met with Kushner in China?

15  A     Yes.  Yes.

16  Q     And did he say what he and Kushner had talked about in

17  China?

18  A     This particular settlement.

19  Q     Okay.  And did Low relate to you anything that he had

20  discussed with Kushner in China?

21  A     Well, not necessarily other than the fact that his

22  meeting or his discussion was or included, because I don't

23  know what else was discussed, of course, but it included the

24  settlement discussion whereby at the very senior level in the

25  Administration, there was a willingness to agree to a

Leissner - cross - Agnifilo                2285

1  settlement but I don't know if he himself then or it was the

2  discussion with Kushner that linked at the working level of

3  DOJ not being agreeable to that.  I don't know, you know, if

4  that was coming out of that discussion or independently from

5  Jho.  The first part, the Administration was generally

6  agreeable to work on the settlement, that was from my

7  understanding of that discussion.

8  Q    Okay.  And did Low mention that there was a conversation

9  involving Rex Tillerson?

10 A    Not that I remember, no, sir.

11 Q    And did Low tell you that then President Trump himself

12 was involved directly in these settlement discussions?

13 A    Yes.

14 Q    And what --

15 A    That was certainly what he said, yes.

16 Q    And what did he say exactly about that?

17 A    I think it's so hard to remember the exact words but it

18 was in the context of Trump himself being agreeable to work on

19 the settlement in support of the then Prime Minister Najib.  I

20 think it was the expression of support for Najib rather than

21 anything else that he was willing to consider this, but that's

22 as far as my memory goes.

23 Q    Okay.  So Low tells you that he's involved in these

24 dealings to resolve this situation with a settlement?

25 A    That's right, correct.

Leissner - cross - Agnifilo                2286

1    Q    And this, the settlement specifically around the 1MDB

2    bond deals and the illegality and all the consequences of

3    that, right?

4    A    Yes, it involved a monetary settlement from what he

5    described to settle all outstanding claims or investigations

6    relating to 1MDB's bond issues.

7    Q    Okay.  And does Low tell you something along the lines

8    that if you stay with him, you'll be part of the settlement?

9    A    Yes, he -- well, he implied that the people that stay

10   with him and close to him and don't work with authorities

11   against him would be part of that settlement and that included

12   me.

13   Q    And Roger obviously wasn't there?

14   A    At the meeting?

15   Q    Yes.

16   A    No, he was not.

17   Q    All right.  On direct examination, you talked about

18   certain activities that you engaged in in 2017 around this

19   company called Midas.  Do you remember that?

20   A    That's correct, yes.

21   Q    So I want to ask you some more specific questions about

22   that.

23          You had a shell company called Khaleesi

24   International Limited, is that right?

25   A    At some point, yes.

Leissner - cross - Agnifilo                    2287

1  Q    And how -- did you create Khaleesi International Limited?

2  A    No, my lawyer did.

3  Q    And who's the lawyer again?

4  A    Mitch Barrett.

5  Q    And Mitch Barrett is from where?

6  A    Mauritius.

7  Q    And how did you meet -- Mitch Barrett was your lawyer,

8  correct?

9  A    That's correct.

10  Q    I'm not going to ask you anything about what you and

11  Mitch Barrett talked about.  Okay?

12  A    Yes.

13  Q    How did you meet him?  Who introduced you to him?

14  A    It was done -- at some point in late 2016 or early '17,

15  regarding the potential acquisition of CPC, Century Bank

16  Corporation in Mauritius.

17  Q    Okay.  And so Mitch Barrett created Khaleesi

18  International Limited, right?

19  A    That's right.

20  Q    And that's incorporated in the Seychelles?

21  A    That's right.

22  Q    And if you know, are there reasons to create entities in

23  the Seychelles?

24  A    Not particularly other than, you know, it being a tax

25  efficient place but other than that, it's one of those places

Leissner - cross - Agnifilo                2288

1    where shell companies get created often.

2    Q    Okay.  Now, on March 31, 2017, the name Khaleesi changed

3    to Midas Commodities Agents Limited, correct?

4    A    That's correct.

5    Q    And did you make that change?

6    A    No.

7    Q    Who made the change?

8    A    Mitch did.

9    Q    Mitch did.  And was this on your instruction?

10   A    Yes, I believe -- well, it was in agreement with me.

11   Q    It was an agreement?

12   A    Yes.

13   Q    So fair to say you caused the name change; you caused the

14   change in the name of Khaleesi International Limited to Midas

15   Commodities Agents Limited, right?

16   A    I said I agreed with it.  I don't know that I caused it

17   but I agreed with it.

18   Q    And you owned Midas Commodities Agents, correct?

19   A    Only beneficially, not directly.

20   Q    Through a trust?

21   A    That's correct.

22   Q    And tell the jury how you did it.  How did you own it

23   beneficially through a trust?

24   A    The trust -- I had a call option on the trust shares at a

25   very low price, meaning I could buy the shares in the trust at

Leissner - cross - Agnifilo                    2289

1    any point at almost no, no cost to me.

2    Q    Okay.  So it was controlled by you, correct?

3    A    Yes.

4    Q    But your name wasn't, wasn't on it?

5    A    That's correct.

6    Q    And so, ultimately, you transferred ownership to Kimora

7    Lee Simmons-Leissner?

8    A    That's correct.

9    Q    And you transferred your ownership in Midas to Kimora Lee

10   Simmons-Leissner on May 3, 2017?

11   A    That may be the case but it was only the options, not the

12   actual ownership.

13   Q    The options -- when you say the options, tell us what you

14   mean.

15   A    Well, as I just described, the ownership didn't actually

16   change of the company.  All I changed was that the option that

17   I had on the trust shares, at no cost again, I transferred to

18   her.

19   Q    And you also set up another company called Midas

20   Commodities Agents DE, LLC, right?

21   A    Yes.

22   Q    And why did you create a second Midas Commodities Agents

23   company?

24   A    It was set up for making investments in the U.S. with

25   money from the company.

Leissner - cross - Agnifilo                    2290

1    Q    And, in turn, Midas Commodities Agents DE, LLC owned

2    100 percent of a company called Keyway Pride Limited, LLC,

3    right?

4    A    Correct.

5    Q    And that was a limited liability company in California,

6    correct?

7    A    Correct.

8    Q    All right.  So you had this string of shell companies,

9    right?

10   A    Yes.

11   Q    All right.  And you put them in Kimora Lee Simmons' name,

12   right?

13   A    Beneficially only but yes.

14   Q    Beneficially.  So "beneficially" means that you can't

15   find her name on paper but she beneficially owns the shell

16   companies?

17   A    That's correct.

18   Q    And you used the shell companies to hide money from law

19   enforcement?

20   A    Yes.  It was my intention to protect those assets from

21   investigations that were happening around the world, that's

22   correct.

23   Q    All right.  Because even though you knew that you had

24   committed crimes and that you had proceeds from crime, you

25   wanted to keep that money?

Leissner - cross - Agnifilo                    2291

1    A    Yes, sir.

2    Q    In April of 2017, Midas, which you controlled, received

3    145 million euro, correct?

4    A    Correct.

5    Q    And at that time, that's about $165 million?

6    A    Yes, sir.

7    Q    Okay.  And Midas received this 145 million euro into its

8    bank account in the Bahamas, correct?

9    A    That's right, correct.

10   Q    And Midas' bank account in the Bahamas was held at the

11   Private Investment Bank, right?

12   A    That's correct.

13   Q    Now, you said on direct that you said the money came from

14   a Kuwaiti sheikh named Sheikh Al Sabah, right?

15   A    That's correct again.

16   Q    But you know that the money was actually Jho Low's money?

17   A    Sir, I don't ever have independent verification of it,

18   however, certain parts of the money were to be disbursed on

19   Jho's directions.

20   Q    Had you ever met Sheikh Al Sabah?

21   A    No.

22   Q    And did you really believe that a Kuwaiti sheikh that you

23   never met would have anything, would have these dealings

24   involving 145 million euro with you?

25   A    Well, yes, I had my suspicions, of course, and

1  speculation that it would be Jho's money, but when you asked

2  me was it his, all I can do is speculate as I sit here.  Did I

3  believe it?  Yes, possibly so.

4  Q    And you knew that at least some of this money was from

5  the 1MDB bond deals?

6  A    Again, you're asking me to speculate because I don't know

7  how the money got there.  What I do know is that parts of the

8  money was going to be directed by Jho on, you know, by Jho's

9  direction to me.  Everything else was speculation which, yes,

10 I was speculating, yes, that it could be the case, but that is

11 what it is, it's a speculation.

12 Q    The money that you said Low directed, these involved very

13 large payments, correct?

14 A    Yes, absolutely.

15 Q    And, in fact, one of the payments that Low directed you

16 to make as part of the 145 million Euro involved an interest

17 payment on one of the 1MDB bonds, right?

18 A    That was my understanding, yes.

19 Q    And this interest payment involved a 49, over a

20 49 million euro transfer, do you remember that?

21 A    That's correct, yes.

22 Q    And you transferred the over 49 million euro at Low's

23 direction, correct?

24 A    That's correct again.

25 Q    And did Low tell you that this was in connection with an

Leissner - cross - Agnifilo                 2293

1    interest payment on a 1MDB bond?

2    A    Yes, he told me that it was the case, yes.

3    Q    Okay.  Now, the 145 million euros was in euros and not in

4    dollars because you knew that Low wanted to avoid the U.S.

5    banking system?

6    A    That was my understanding from him, yes.

7    Q    And he told you that specifically, correct?

8    A    Yes.

9    Q    All right.  He said that he was -- he didn't want to do

10   transactions in dollars because he was concerned about United

11   States law enforcement, right?

12   A    Yes, he was concerned about the Federal Reserve Bank, in

13   particular.

14   Q    Okay.  And is it your understanding that the reason this,

15   the 145 million was in euros was because Low didn't want to

16   deal in dollars?

17   A    That's right, correct.

18   Q    So you took 145 million euro into Midas, your shell

19   company from the Seychelles that had a bank in the Bahamas,

20   right?

21   A    Yes.

22   Q    Now, as of May 2017, you transferred your interest in

23   Midas to Kimora Lee Simmons-Leissner, correct?

24   A    As I described it, beneficially.

25   Q    Beneficially.  All right.  And this 145 million euro,

Leissner - cross - Agnifilo                    2294

1    that was Midas' only money?

2    A    Yes.

3    Q    Because Midas didn't do any business, correct?

4    A    Correct.

5    Q    And Midas at your direction moved money to many different

6    other locations and many other different transactions,

7    correct?

8    A    That's correct.

9    Q    And you used fake contracts to paper over these

10   transactions?

11   A    That's correct again, yes.

12   Q    And you used fake contracts that were drafted by this

13   lawyer in Mauritius, Mitch Barrett?

14   A    No, I think they were drafted by Jho and other persons.

15   Q    So Mitch Barrett didn't draft any of those?

16   A    No.

17   Q    They were drafted by Low and who else?

18   A    I don't know who else, but Jho had the blueprint for

19   these.

20   Q    And there's a fake contract to paper over the transfer

21   that was supposedly from the Kuwaiti sheikh to Midas?

22   A    That's correct.

23   Q    And this fake contract was a product supply agreement

24   where supposedly Midas was selling steel and something called

25   bitumen to the Kuwaiti sheikh's company?

Leissner - cross - Agnifilo                2295

1    A    That's correct.

2    Q    But this was, this was all fake; Midas didn't have any

3    steel business or bitumen business, right?

4    A    That's correct, yes.

5    Q    Okay.  And then you and Kimora Lee Simmons directed tens

6    of millions of dollars into investments, correct?

7    A    No, she never did that.  I did.

8    Q    You did that?

9    A    Yes.

10   Q    You put money back into a company called Baby Phat?

11   A    That's correct.

12   Q    What company was that?

13   A    That's the company that my wife used to own and I bought

14   back 70 percent of it.

15   Q    You put money into a volleyball league called AVP?

16   A    That's correct.

17   Q    You put money into an insurance company called

18   Friendsurance?

19   A    Yes, but not from that money, sir.

20   Q    What money went into Friendsurance?

21   A    That was done in 2013 so I don't recall which bonds were

22   used for that.

23   Q    You put money into a cannabis company called PureForm?

24   A    Yes, sir.

25   Q    And did you put money into Capital Place Holdings?

Leissner - cross - Agnifilo                    2296

1  A    Yes.  -- no, sorry, I don't think so, sir.  I don't

2  recall that.  Capital Place Holdings?

3  Q    Yes.

4  A    I don't recall that.

5  Q    All right.  And you bought through Keyway Pride, the

6  shell company owned by Kimora, a $25 million mansion in

7  Beverly Hills, right?

8  A    That was bought from Keyway Pride, yes.

9  Q    So the -- so Keyway Pride actually bought the $25 million

10 home in Beverly Hills, right?

11 A    That's correct.

12 Q    And this was with money that was Low's money?

13 A    Again, you're making that assumption.  I described how

14 that fund flow worked and I had my suspicions but we had that

15 discussion about where the money came from.

16 Q    And your suspicion is that that house in Beverly Hills

17 was Low's money?

18 A    Yes.

19 Q    Because you had no reason to think that Sheikh Sabah

20 would give you a dime, do you?

21 A    Yes.  There was no other business contact with him.

22 Q    And the FBI and the Department of Justice, they let you

23 live in that mansion after your arrest, right?

24 A    Yes, I lived there.

25 Q    They let you keep the mansion, right?

1   A    They haven't forfeited that mansion.

2   Q    They didn't forfeit it, right?

3        As you sit here today, it's still not forfeited,

4   right?

5   A    That's correct.

6   Q    And then you directed more than 15 million euro in at

7   least five different transactions to another Keyway Pride

8   limited company, this one owned by Judy?

9   A    No, sir.  I don't recall that, no.

10  Q    Was there a second Keyway Pride?

11  A    There was a Keyway Pride in Hong Kong, yes.

12  Q    Was there a Keyway Pride that was incorporated in the

13  British Virgin Islands?

14  A    Yes.

15  Q    And who owned that company?

16  A    Judy did.

17  Q    And did you, did you direct more than 15 million euro to

18  move from Midas to the Keyway Pride BVI company owned by Judy?

19  A    No, sir, I don't recall that.

20  Q    Now, everything that you would have moved from Midas came

21  from the same source, right?

22  A    Correct.

23  Q    Now, you testified, I think, on direct examination that

24  you ended up with about 80 million of Jho Low's money from

25  these transactions -- well, let me back up.

Leissner - cross - Agnifilo                    2298

1              You ended up with $80 million from these

2    transactions, correct?

3    A     That statement is correct, yes.

4    Q     And of -- you used 25 million on the Beverly Hills house,

5    right?

6    A     That's right.

7    Q     Okay.  You made investments of various businesses,

8    correct?

9    A     Yes, sir.

10             By the way, that money is to be repaid is my

11   understanding.

12   Q     To be repaid?

13   A     Yes.

14   Q     To be repaid to who and when?

15   A     The agree -- well, to the sheikh.

16   Q     To the sheikh?

17   A     Yes.

18   Q     So you think the sheikh is waiting on this money from

19   you?

20   A     There was an arbitration request for that money, yes.

21   Q     And where is the money?

22   A     It's as you described it just now, made into, put into

23   investments.

24   Q     Do you have any intent to pay the sheikh the money?

25   A     Well, it has to be -- it can only be done once assets are

Leissner - cross - Agnifilo                2299

1  sold and, two, as the resolution worked with my lawyers with

2  any of these matters that I talked about here.

3  Q    So as you sit here today, you fully intend to do what you

4  need to do to pay the sheikh back his money?

5  A    I would be guided by my lawyers, sir.

6           (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2300

1          THE COURT:  Mr. Agnifilo, are we going to break for

2    lunch?

3          MR. AGNIFILO:  Yes, we can stop for lunch.

4          THE COURT:  Ladies and gentlemen, please do not

5    discuss the case.  Please enjoy your lunch.  Please be back at

6    a quarter to 2.

7          (Jury exits.)

8          THE COURT:  You may be seated.

9          Mr. Agnifilo, I just wanted a sense of how much

10   longer you're going to be.

11         MR. AGNIFILO:  I'm going to really try hard to

12   finish today and not speak too fast while I'm doing it but I'm

13   going to try very hard to finish today.

14         THE COURT:  I was hoping you would finish and we

15   would have some other testimony today.

16         MR. AGNIFILO:  I know, I know, Judge.

17         THE COURT:  Okay.  All right.  I'll see the parties

18   back at a quarter to 2.

19

20

21

22

23

24

25

1                           AFTERNOON SESSION

2                   (In open court; jury present.)

3               THE COURT:  Please be seated.

4               I hope you enjoyed your lunch.

5               Mr. Agnifilo?

6               MR. AGNIFILO:  Yes.  Thank you, Judge.

7               (The witness, TIM LEISSNER, resumed the stand.)

8   CROSS-EXAMINATION

9   BY MR. AGNIFILO:

10  Q    Good afternoon, Mr. Leissner.

11  A    Good afternoon.

12  Q    Do you know someone named Ghanim bin Sayed?

13  A    Ghanim Al Sayed, yes.

14  Q    And who is -- it's GHI -- I just want to make sure we're

15  talking about the same person, G-H-I-N-A-M, bin Sayed?

16  A    No, I don't think that's correct.  I think you're talking

17  about Ghanim, G-H-A-N-I-M?

18  Q    That's right.

19  A    Al Sayed?

20  Q    Yes, that's exactly.  Who is that?

21  A    He is a business partner of mine that I had known for a

22  few years.

23  Q    Okay.  And is he from Kuwait?

24  A    No.  He's from Qatar.

25  Q    From Qatar?  Okay.  And at some point, you were going to

Leissner - cross - Agnifilo                    2302

1   try and transfer assets out of Kimora's name to Ghanim bin

2   Sayed?

3   A    Ghanim Al Sayed, yes.

4   Q    Tell us what you were going to do.

5   A    The intention was to effectively sell the holding

6   companies that owned the assets that I had funded over the

7   years to him or to one of his Hong Kong entities for

8   consideration, meaning for money.  That was the basic idea,

9   yes.

10  Q    And Ghanim -- is that how I say his name?

11  A    Yes.

12  Q    And Ghanim was business partners with someone named

13  Sheikh Hamad bin Khalifa Al Thani?

14  A    Yes.

15  Q    Former Prime Minister of Qatar?

16  A    That's correct as well.

17  Q    And Ghanim had an entity called Newland Limited?

18  A    That's correct.

19  Q    What was Newland Limited, what was it?

20  A    As far as I understand, it was just a holding company

21  that was going to hold these assets that I was going to

22  transfer into it.

23  Q    Tell me if this is right:  You and Kimora decided that

24  she was going to sell her rights to all of the investments

25  that you made, including the Keyway Pride California which

Leissner - cross - Agnifilo                 2303

1    owned the $25 million Beverly Hills house, to Ghanim for

2    $170 million?

3    A    It wasn't she and her.  I had worked on that transaction,

4    sir.  I had put this together, but I mean, essentially, yes,

5    it was involving all the assets I had funded over the years

6    into Newland in Hong Kong.

7    Q    And this was all to get the assets away from the United

8    States?

9    A    There were several considerations.  One, of course, was

10   what you described as being a, an asset protection.  The way

11   that you described it doesn't actually work.  The assets were

12   in the United States so the assets don't move.  The ownership

13   was transferred offshore or the intention was that the

14   ownership was being transferred offshore.  The assets

15   themselves stay where they are.

16   Q    In May of 2018, did you and Kimora go, were you in

17   Switzerland?

18   A    Yes, sir.

19   Q    And at the time, were you researching banks in

20   Liechtenstein?

21   A    That's correct as well, yes.

22   Q    And why were you researching banks in Lichtenstein in May

23   of 2018?

24   A    To hold the consideration that if Newland was actually

25   buying those assets from me, that the consideration could be

Leissner - cross - Agnifilo                    2304

1    invested in Liechtenstein.

2    Q    Okay.  And the advantages of being investigated in

3    Liechtenstein is that you would do it in a trust?  How would

4    you do it?

5    A    Many different ways.  Trust is one way of doing it, yes.

6    Q    How were you thinking about doing it?

7    A    It was potentially a trust.  We never got there at the

8    end in our discussions but a trust was one of the

9    considerations.

10   Q    Okay.  And do you remember doing -- you checked, you did

11   Google research on or about May 17, 2018 into a bank called

12   LGT Bank Qatar, do you remember doing that?

13   A    What's the bank's name?

14   Q    LGT Bank in Qatar.

15   A    Maybe so.  I can't remember that.

16   Q    Okay.  Do you know --

17   A    LGT is a Liechtenstein bank, not a Qatari bank.

18   Q    LGT is a bank that's controlled by the Principality of

19   Liechtenstein, correct?

20   A    That's my understanding, yes.

21   Q    And you were doing research on LGT Bank in Liechtenstein,

22   correct?

23   A    I don't remember doing that research, sir.

24   Q    Okay.  Let me show you -- hold on.  Just for

25   identification, it's Defense Exhibit 97.

1          I'm just going to ask you to look at the second page

2     there.

3          (Pause.)

4     Q    So the only question is -- take a look at it.

5     A    Yes, sir.

6     Q    All right.  So the question is only -- so I asked you if

7     you remembered doing internet research or Google research off

8     your phone into LGT Qatar and you said you didn't remember?

9     A    Yes.

10    Q    Okay.  Does that refresh your recollection one way or the

11    other?

12    A    I'm sorry, sir, no.

13    Q    All right.  No problem.  Well, while you have it, hold on

14    for a second.

15    A    Yes.

16    Q    Do you remember doing research into different

17    Liechtenstein banks?

18         In other words, you were just looking at what banks,

19    what options do I have in Liechtenstein by way of banks?

20    A    Yes.

21    Q    Okay.  What do you remember researching about that?

22    A    First of all, which banks were available in Liechtenstein

23    and just informing myself about them because I actually had

24    never done business there so I was just trying to get a

25    general education who's in Liechtenstein, you know, and who,

Leissner - cross - Agnifilo                    2306

1    are they big, small, what are they known for, et cetera, more

2    general research really.

3    Q    And why Liechtenstein of all countries?

4    A    It was one of those countries that I felt was a safe

5    place for that cash to go especially in a trust form.

6    Q    And without getting too much into the details, they have

7    a tradition of bank secrecy?

8    A    Yes, a fairly good tradition.

9    Q    Okay.  And what do you mean by a good tradition?  It's a

10   rigorous bank secrecy tradition, correct?

11   A    That's right.

12   Q    Meaning that the banks can't tell people outside the bank

13   about their customers?

14   A    I'm sure that's a very big oversimplification.  It is a

15   very sound system of bank secrecy.  I don't know sitting here

16   today the exact rules that would apply for international

17   inquiries or the like, but in terms of jurisdictions, it's

18   certainly one of those that is better known for its secrecy.

19   Q    Okay.  So you didn't want a bank in the United States.  A

20   bank in the United States would do you no good in this regard.

21   A    Again, the intention was not to have it in the United

22   States, yes.

23   Q    Right.  Right.  And you didn't even opt for a bank in

24   Switzerland which also has a tradition of bank secrecy, am I

25   right?

1   A    It does, yes.

2   Q    You opted for Liechtenstein and is that because you

3   thought Liechtenstein had greater bank secrecy even than

4   Switzerland?

5   A    Yes, I believe so.

6   Q    Okay.  I can take that from you.

7        Now, did you and Kimora actually travel to

8   Liechtenstein?

9   A    Yes, we did.

10  Q    Okay.  And you went to Vaduz, the capital?

11  A    Yes.

12  Q    And what did you and Kimora do when you were in Vaduz,

13  Liechtenstein?

14  A    We met with lawyers and potential trust companies or

15  trustees in the country and I think we also met with one or

16  two banks.

17  Q    Okay.  And what exactly was the plan?  What were you

18  going to do in Liechtenstein, you and Kimora?

19  A    Well, sorry, what were we going to do in Liechtenstein?

20  You mean, post those meetings?

21  Q    Yes.  You're having meetings with lawyers and banks and

22  all of that.

23  A    Right.

24  Q    What's the plan?

25  A    Well, the intention was that if we were to get this

1   consideration from Newland as part of the transaction that we

2   described earlier, that either all or part of that money could

3   be invested with one of the banks in Liechtenstein.

4   Q    And do you recall how long you and Kimora were in

5   Liechtenstein?

6   A    One day.

7   Q    And how much money were you planning on putting in this

8   trust structure or whatever structure was going to be in

9   Liechtenstein?  How much money are we talking about?

10  A    I think 140, $150 million.

11  Q    And where was that money at the moment?  In other words,

12  when you and Kimora went to Liechtenstein, where was the

13  money?

14  A    It was still in the assets that we talked about

15  transferring or selling to Newland.  So the money was nowhere.

16  It was only the assets.

17  Q    It was in assets?

18  A    That's correct.

19  Q    You would have to sell the assets?

20  A    That was the intention.

21  Q    Okay.  And then pool together all the money?

22  A    That's right.

23  Q    And then put it in a bank in Liechtenstein?

24  A    That's correct.

25  Q    Now, you didn't tell the FBI anything about what you just

Leissner - cross - Agnifilo                    2309

1   told all of us until your ninth meeting with the FBI, does

2   that sound right?

3   A    I don't know, I don't know which time, which day, the

4   number of the meeting, no, I don't remember that.

5   Q    Okay.  Do you remember telling the FBI about what you

6   just told us for the first time on June 27, 2018?  Only if you

7   remember.

8   A    I don't remember.

9   Q    Okay.  So just so we're clear, you met with the FBI and

10  the U.S. Attorney's Office on June 11th, the day after you

11  were arrested, right?

12  A    That's correct.

13  Q    On June 12th, the next day, right?

14  A    Yes.

15  Q    Then you were taken to Brooklyn on June 13th and then you

16  met again with them on June 14th, right?

17  A    I believe so.

18  Q    You met on the 15th?

19  A    I don't remember.

20  Q    The 18th, the 19th, the 20th, the 21st and the 26th?

21  A    We met -- I believe so, we met on all these days.

22  Q    And then you met with them on the 27th and tell me if you

23  remember this.

24          The FBI had certain of your cell phones, right?

25  A    Yes.

1  Q    Okay.  And during the interview you had on the 27th, they

2  showed you on your cell phones certain documents that were

3  relevant to what you've just been discussing here for the jury

4  for the last 45 minutes or so, Midas and Khaleesi and all that

5  stuff, right?

6  A    Yes.

7  Q    And they confronted you with these documents that were on

8  your phone, correct?

9  A    Yes.

10  Q    And did you tell the FBI the truth even then?

11  A    At that time, I was still trying to hide the truth but

12  about certain aspects.  I was trying to protect my family at

13  that time but as I had described, I think, at the very outset

14  of your cross, I did want to turn over a chapter in my life

15  and decided that the only right course was to give full

16  disclosure on everything I had done all my life.

17  Q    The first thing that you told the FBI was that you

18  learned about the Kuwaiti sheikh from the people at a bank

19  called Century Bank; do you remember telling that to the FBI?

20  A    Yes.

21  Q    Is that true?

22  A    I remember -- I don't remember the exact words I used but

23  I remember trying to disguise the sheikh for some time.

24  Q    So that, that's not true; you didn't learn about the

25  sheikh from the people at that bank?

1  A    No.

2  Q    You learned about the sheikh from Low, right?

3  A    Yes, he made the introduction.

4  Q    You lied to the FBI about who owned Midas, didn't you, in

5  the beginning?

6  A    Yes.

7  Q    You told the FBI that Midas had a parent company called

8  Al Muneriteen?

9  A    I don't remember what I said at the time.  I think I just

10 described my situation.  I was trying to protect my family so,

11 yes, I had not come out with that, with the exact details of

12 it until that date, that day itself.

13 Q    All right.  So when you say you were trying to protect

14 your family --

15 A    Yes.

16 Q    -- you didn't want to lose the property that you had

17 bought with stolen money, right?

18 A    Not necessary just the property, sir, but I was just

19 trying to protect the family.  I couldn't quite -- at that

20 time, I couldn't quite see to the property only but just, in

21 general, I was trying it protect the family.

22 Q    You were very concerned about the $25 million house in

23 Beverly Hills, right?

24 A    I think that's the same question.  It wasn't specific to

25 the house, no.

Leissner - cross - Agnifilo                     2312

1    Q    I'm not saying it was specific.  That was one of your

2    major concerns though, correct?

3    A    It was really just to protect the family.  I think

4    everything included.

5    Q    But you're talking protecting the family in terms of

6    assets and wealth and property, correct?

7    A    That's correct.

8    Q    Okay.  You don't have to protect the family from the FBI,

9    right?

10   A    No.

11   Q    Okay.  You have to protect the family, in your words,

12   from the truth?

13   A    At that time, that's how I felt, yes, but I did, you have

14   to realize, sir, that I did come around and told the truth

15   right that same day and we, I turned over my chapter right

16   there.

17   Q    Do you remember telling the FBI that you didn't know that

18   Khaleesi had any connection with Midas?

19   A    I don't remember that, sir.

20   Q    In the beginning, you said that?

21   A    It may be but I don't remember it.

22   Q    And Khaleesi changed its name to Midas, right?

23   A    That's correct.

24   Q    And you knew that because you ordered that that be done?

25   A    I didn't order it but I agreed to it.

1  Q    You told the FBI initially you didn't know what the

2  purpose of Khaleesi was, do you remember that?

3  A    No, I don't remember that.

4  Q    Did you come up with the name Khaleesi?

5  A    Yes, I did.

6  Q    And that's a character from what show?

7  A    "Game of Thrones."

8  Q    And that's where you got the name, right?

9  A    That's correct.

10 Q    You lied to the FBI about who controlled Midas, do you

11 remember that?

12 A    Not in particular, not in particular, but just the

13 circumstances, yes.

14 Q    Do you remember telling the FBI initially that Midas was

15 run by Mitch Barrett?

16 A    Well, that is, that was the case, sir, but I was

17 controlling it, I was controlling it.  "Run by" is a different

18 story but I was controlling it.

19 Q    He was the lawyer and you were controlling it?

20 A    That's right.

21 Q    Who came up with the idea of the Kuwaiti sheikh?

22 A    I don't know if it's an idea, sir.  He was -- he is a

23 real person and he had the accounts where the money was coming

24 from.  It's not an idea that somebody has to come up with.

25 Jho made the introduction to him.

1  Q    When you say the introduction, had you -- you said you

2  never met the sheikh?

3  A    That's correct.

4  Q    So when you said Jho made the introduction, tell us what

5  you mean?

6  A    Jho introduced me to a lawyer that worked for the Sheikh

7  who did all the paperwork for him to set the fake agreement up

8  that we had discussed before the break.

9  Q    Now, do you have any knowledge based on what you saw,

10  heard, understood, that the Sheikh even knows anything about

11  this?

12  A    Other than I had letters from the lawyer that said that

13  he actually had and his company, as far as I did my research

14  on, actually it was his company, had, was in good standing.  I

15  don't remember the lawyers but there was a legal letter that

16  was written on behalf of the Sheikh that I had.

17  Q    Now, you knew that Low had many connections in Kuwait,

18  correct?

19  A    Yes, I knew this from 2009 onwards.

20  Q    Okay.  And what was your understanding, generally, of

21  what Low's connections were with powerful people in Kuwait?

22  A    That, in fact, he was close to Sheikh Al Sabah and he had

23  gotten him with Ghanim onto the board of 1MBD early on,

24  advisory board of 1MDB, that was the relationship Jho had and

25  he had communicated that to Roger and myself that he had

Leissner - cross - Agnifilo                 2315

1   gotten them and that was in the context of getting other board

2   members as well.  So my understanding was that he had a

3   relationship that he had used for 1MDB with Sheikh Al Sabah

4   before.

5   Q    And did you have an understanding of how much of the

6   145 million euro, roughly $165 million, was 1MDB money?

7   A    No, I have no idea, sir.

8   Q    Low and you never discussed it?

9   A    No, we did not.

10  Q    All right.  You testified on direct examination that you,

11  that you made phone calls at the direction of the FBI,

12  correct?

13  A    That's correct, sir.

14  Q    And you testified that you did not make a recording of, a

15  controlled recording with Roger, correct?

16          MR. AGNIFILO:  Objection.

17          THE COURT:  Sustained.  Rephrase your question.

18          MR. AGNIFILO:  Sure.

19  Q    Did you make a controlled recording with Roger?

20  A    No.

21  Q    And I think you testified about something along the lines

22  that his phone could have been compromised?

23  A    That's correct.

24  Q    Is that a discussion you had with the FBI?

25  A    I think I had this conversation with the FBI also giving

1   them the same rationale that I had given before in this

2   courtroom, that upon Rogers' arrest or detention in Singapore,

3   he and I had gotten concerned that maybe his phone was being

4   monitored at least by the Singapore authorities.

5   Q    And you're saying you told that to the FBI?

6   A    I think I told them exactly what I just said.

7   Q    Do you remember having this discussion, having a

8   discussion with the FBI -- one second -- the day after you got

9   arrested, June 11, 2018, where you were asked specifically the

10  last time you had spoken with Roger?  Do you remember being

11  asked that question?

12  A    No, I don't remember.

13  Q    And do you remember the answer you gave was April 18th?

14  A    No, I don't remember that.

15  Q    So just to orient ourselves, this is an interview on June

16  11th, you were asked when did you last speak with Roger and

17  you said April 18th?

18          MR. AGNIFILO:  Objection.

19          THE COURT:  What's the basis?

20  Q    I'm going to show you the handwritten notes marked --

21          MR. AGNIFILO:  Objection, Your Honor.  If he wants

22  to refresh, he can show the witness.

23          MR. AGNIFILO:  I'm going to show him.

24  Q    It's TL-12B, page 11.  It's the highlight.

25          (Pause.)

Leissner - cross - Agnifilo                    2317

1   A    I don't remember this, sir.

2   Q    Okay.  So let me ask you the question.

3        Do you remember telling the FBI on June 11th that

4   the last time you had spoken with Roger Ng was April 18th?

5   A    No, sir, I don't remember.

6   Q    Now, in regard to that particular meeting -- I can take

7   that from you.

8        Do you remember an FBI agent at that particular

9   meeting, it's the first meeting, the first meeting you have

10  with the FBI, it's the day that you get arrested --

11  A    Yes.

12  Q    -- that an agent was taking handwritten notes on lined

13  paper.  Do you remember that?

14  A    No, sir.

15  Q    Do you remember being asked the last time you spoke to

16  Roger?

17  A    Not in particular that question.  I mean, there's been so

18  many questions.  That one in particular, I can't put my finger

19  on it.

20  Q    Now, you made recordings with Jho Low, correct?

21  A    I made one -- you mean with the FBI?

22  Q    Yes.  Right now, I'm just asking controlled calls that

23  you made with the FBI.

24  A    Yes, we made one call to Jho.

25  Q    And you spoke to him?

Leissner - cross - Agnifilo                     2318

1   A    Yes, sir.

2   Q    And you made several calls to HuiBin, correct?

3   A    I recall two calls.

4   Q    And did you ever ask, Hey, is Roger there?

5        MR. ROLLE:  Objection.

6        THE COURT:  Sustained.

7   Q    So when did you tell the FBI that you thought that

8   Roger's phone could be compromised by the Singapore

9   government?  When did you say that?

10  A    I don't know, sir.  We did definitely have that

11  discussion at some point over the years but when exactly, I do

12  not know.

13  Q    Okay.  You said you definitely had it at some point over

14  the years?

15  A    Yes.

16  Q    Don't you remember it was in the first meeting when you

17  were specifically asked by the FBI who do you think you can

18  make calls against?

19       MR. ROLLE:  Objection.

20       THE COURT:  Rephrase the question, Counselor.

21       MR. AGNIFILO:  Sure.

22  Q    My question -- and I'm asking because it's the first

23  meeting you had with the FBI -- during the first meeting,

24  isn't that when the FBI said are there people that you could

25  call?

1    A    I don't remember that, sir, sorry.

2    Q    Okay.  I'm going to show this to you again.  12B,

3    page 11.

4             MR. AGNIFILO:  Objection.  Asked and answered.  Same

5    document.

6             THE COURT:  You can show him the document.

7    A    Where do I look now, sir?

8    Q    Here.

9             (Pause.)

10   A    Sorry.  Can you ask your question again, please?

11   Q    Sure.

12            Do you remember being asked by the FBI in your first

13   interview at the FBI if there were certain people that you

14   could make calls to?

15   A    I don't remember that it was my first meeting.  I do

16   remember having a conversation with them at some point about

17   the people I could place calls to.  That I do remember.

18   Q    Okay.  And do you remember one of the people you said you

19   thought you could place calls to was Roger?

20   A    Yes.

21   Q    Okay.  And do you remember that one of the people you

22   said you could place calls to was Low?

23   A    Yes.

24   Q    And you said that you, you placed one call to Low, right?

25   A    That's correct.

Leissner - cross - Agnifilo                2320

1    Q    And you placed zero calls to Roger, right?

2    A    That's right.

3    Q    I'll take that.

4         All right.  We're going to talk for a couple of

5    minutes only about Jasmine Loo.

6    A    Okay.

7    Q    Did you and Jasmine Loo have any kind of romantic

8    relationship?

9    A    No, sir.

10   Q    Never?

11   A    No, we didn't have a romantic relationship.  We were very

12   close friends but not a romantic one.

13   Q    Do you remember telling the FBI that you had dates with

14   her?

15   A    No, sir.  I was -- we were working intensely, intensively

16   together but, sorry, if you refer to dates as romantic, no.

17   Q    Well, I'm only referring to dates the way you're

18   referring to dates.  Let me ask you this question.

19        Do you remember at one point in one of the

20   interviews the FBI asked about different girlfriends that you

21   had, do you remember that?

22   A    Not that particular, sir, no.

23   Q    You don't remember that?

24   A    Not that particular question, no.

25   Q    And that you brought up Jasmine Loo and said that you had

Leissner - cross - Agnifilo                2321

1    dates with her, do you remember that?

2    A    No, I don't.

3    Q    Do you remember on the day after Christmas 2012 --

4          THE COURT:  Counselor, if you have a document to

5    refresh him.

6          MR. AGNIFILO:  I do.  I do.  It's DX-2701 for

7    identification.

8    Q    Take a look at that to yourself and just look up when

9    you're done.

10          (Pause.)

11    A    Yes, sir.

12    Q    Okay.  Do you remember Jasmine sending you romantic song

13    lyrics from a Kenny Rogers song the day after Christmas 2012?

14    A    I don't remember that, sir.

15    Q    No?

16    A    No, I don't.

17    Q    Have you ordered her flowers through the years?

18    A    I don't recall that either, sir.  She was certainly

19    really a great friend, a close friend and also an important

20    client.  I don't remember if I ordered flowers for her.

21    Q    She once loaned you $750,000?

22    A    She was one, yes, that's correct.

23    Q    And there were a lot of people who loaned you money?

24    A    Yes.

25    Q    And you were very close to her for a very long time,

Leissner - cross - Agnifilo                    2322

1   correct?

2   A   Several years, sir.

3   Q   You and she traveled all over the world together?

4   A   Well, we had business to go to.  I mean, she was a very

5   significant client, sir, yes.

6   Q   You traveled to Abu Dhabi many, many times, right?

7   A   Yes.

8   Q   And you traveled to London many, many times?

9   A   Yes, not particularly with her but, yes, to these places,

10  I traveled, and she was there too, yes.

11  Q   You were with her at Low's birthday party in 2012, right?

12  A   She was there too, yes.

13  Q   And you went with her to New York or you were with her in

14  New York, right?

15  A   Yes.

16  Q   You went with her to Qatar, right?

17  A   I don't remember the Qatari trip that we had seen on the

18  e-mails so I don't know if I actually went there.

19  Q   All right.  I'm going to show you, just because I never

20  showed you anything to refresh your recollection or not on the

21  dates question, so I'm going to show you TL-12, page 35.

22          (Pause.)

23  A   Yes, sir.  Sorry, can you repeat your question?

24  Q   Sure.

25          Do you remember telling the FBI that you went on

Leissner - cross - Agnifilo                    2323

1   dates with Jasmine but they were friendly?

2   A    I don't remember that statement, sir.  Also, you have to

3   understand that in the German translation, a date is not what

4   you'd understand necessarily here.  She was a dear friend and,

5   yes, and I worked with her extremely closely so we had many

6   meetings and she was a friend so, yes, but I don't remember

7   this particular statement.

8   Q    Okay.  So I want to understand your last answer.  What do

9   you mean then by dates?

10  A    For me, it's even a meeting, discussing business or

11  being, you know, being a friend and having a coffee together,

12  for example, that I would have with many different of my

13  friends including Roger and others so she was no different

14  than that.

15              (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

Leissner - cross - Agnifilo                    2324

1   EXAMINATION CONTINUES

2   BY MR. AGNIFILO:

3   Q    So, I think on direct examination you testified that at

4   one point Roger had loaned you money, right?

5   A    Yes, sir.

6   Q    Okay.  And do you remember that this was a -- about

7   $240,000 and it was in July of 2014?

8   A    No, I believe that was me giving money to him, that

9   amount that you're talking about.  I'm a little confused here.

10  Q    Okay.  Do you remember money coming in from something

11  called Kingfisher?

12         And if you don't, I'll show you something to refresh

13  your recollection.

14  A    No, I don't remember that.

15         MR. AGNIFILO:  It's 5281.

16         THE COURT:  DX or GX?

17         MR. AGNIFILO:  No, actually, it's DX.  DX-5281.

18         THE COURT:  Thank you.

19  A    Right, I don't recall this.

20  Q    So, you don't recall getting $240,000 from Roger in the

21  early part of July 2014?

22  A    No, sir.

23  Q    Okay.  And do you recall paying him back about a week

24  later on July 15th, 2014?

25  A    Not particularly.  I do remember giving him money in --

SN        OCR        RPR

1  yeah, in 2014, but my recollection was different from what

2  you're talking about.

3  Q    Okay.  I'm going to show you, just to establish dates or

4  maybe to refresh your recollection, DX-5283.

5           (Pause.)

6  A    Yes, sir.

7  Q    Okay.  And so, do you recall sending him money back in

8  July, mid-July 2014?

9  A    No, sir.  I don't remember sending him, the way that you

10 phrase it, back money.

11          At some point, and I can't put my finger on the

12 date -- the date or the year, I did make up part of the

13 difference in a bonus that Roger had felt he had deserved more

14 at Goldman, and I paid him some of the difference in that.

15 But I don't remember this particular payment.

16 Q    Wasn't Roger already gone from Goldman in the summer of

17 2014?

18 A    Yeah, but it doesn't mean he didn't get a bonus in 2014

19 for 2013.

20 Q    Aren't you referring to something that happened in 2011?

21 A    It may well be, I'm just giving you the answer to your

22 question.

23          So, as I said, I prefaced it with I don't know which

24 year that was --

25 Q    Okay.

1    A      -- or which date.

2    Q     All right, I can take that from you.

3           All right, we are going to talk about something

4    called Celsius now for a few minutes.

5    A     Okay.

6    Q     And we are going to start by looking at DX-5128 for

7    identification.

8           Do you see that?  That's an e-mail.  It looks like

9    it's from your Yahoo address to your Goldman Sachs address on

10   top?

11   A     Yes, sir.

12          MR. AGNIFILO:  We offer it as 5128.

13          THE COURT:  I take it there are no objections?  It's

14   admitted.

15          MR. AGNIFILO:  No objection.

16          (Defense Exhibit 5128 was received in evidence.)

17          (Exhibit published.)

18          MR. AGNIFILO:  Okay.

19   BY MR. AGNIFILO:

20   Q     Okay, so the top e-mail, like you said, is your Yahoo

21   address to your Goldman e-mail address.

22          Do you see that?

23   A     Yes, sir.

24   Q     And below that there is an e-mail from someone named John

25   Fieldly.

W. Name - direct/cross - Atty                    2327

1           Do you see that?

2   A     Yes, sir.

3   Q     Tell us who John Fieldly is.

4   A     At the time of this e-mail, he was the chief financial

5   officer of Celsius, the energy drink company.  He today is the

6   CEO.

7   Q     And so, Celsius -- Celsius is still around, right, you

8   can buy Celsius in the stores?

9   A     Yes, you can.

10  Q     Okay.  And it's -- how do you describe it, like an energy

11  drink, it's a healthy drink?

12  A     It's a healthy energy drink, correct.

13  Q     Healthy energy drink, okay.

14          And this is from John Fieldly.  It's to you.  It's

15  copied to Russell Simmons, someone at Rush Communications, and

16  then it looks like someone named David Gerry and David Gold,

17  right?  Do you see that?

18  A     Yes.

19  Q     And it says:  Good morning, Tim.  I hope your travels are

20  going well.  Following up on Monday's e-mails as I am having

21  our attorney start to prepare the required documents.  And

22  then he talks about a purchase agreement.

23  A     Yes.

24  Q     What's going on here?  Tell us just what's happening

25  here.

W. Name - direct/cross - Atty                    2328

1  A    I was contemplating at the time making an investment in

2  Celsius and Mr. Fieldly was leading the charge of putting that

3  into agreement form.

4  Q    Okay.  So -- so, what investment specifically were you

5  looking to make in Celsius as of February of 2015?

6  A    As of February -- as of February 2015, it was not quite

7  clear what the investment would look like, but it was supposed

8  to be a few million dollars of equity -- an equity investment,

9  meaning buying shares from the company.

10 Q    All right, and we see that this e-mail is from February

11 the 26th, 2015, right?

12 A    Correct.

13 Q    Okay.

14       MR. AGNIFILO:  Let's go to the next e-mail for

15 identification, which is 5130.

16 BY MR. AGNIFILO:

17 Q    And that's one of these calendar entries that we've seen

18 a lot over the last few days, right?

19 A    Yes, sir.

20       MR. AGNIFILO:  We offer it as 5130.

21       MR. AGNIFILO:  No objection.

22       THE COURT:  It's admitted.

23       MR. AGNIFILO:  Okay.

24       (Defense Exhibit 5130 was received in evidence.)

25       (Exhibit published.)

1   BY MR. AGNIFILO:

2   Q    This is a meeting between you and Roger for February

3   the 26th, 2015, right?

4   A    Yes, correct.

5   Q    It's the same -- same date exactly as the e-mail from

6   John Fieldly that we just looked at, right?

7   A    That's right.

8   Q    All right, let's look at the next document for

9   identification, which is 5131.

10            This is an e-mail from you to Roger on top?

11   A    Yes.

12   Q    Okay.

13            MR. AGNIFILO:  We offer it as 5131.

14            MR. AGNIFILO:  No objection.

15            THE COURT:  Admitted.

16            (Defense Exhibit 5131 was received in evidence.)

17            (Exhibit published.)

18   BY MR. AGNIFILO:

19   Q    Okay, so if we look at the bottom.

20            MR. AGNIFILO:  Let's go to the bottom of this page.

21   Q    It looks like you're sending Roger -- well, what are you

22   remembering Roger there, what is that?

23   A    I think it looks like Roger is sending it to me and

24   Boon Kee.

25   Q    Oh, you're right, you're right.  Roger is sending it to

1    you.

2            What is it?

3    A    It looks like an article -- yeah, a PDF of an article.

4            MR. AGNIFILO:  And then let's --

5    BY MR. AGNIFILO:

6    Q    And it says -- it refers to Celsius, it looks like, in

7    the article, right?

8    A    Yes, correct.

9            MR. AGNIFILO:  All right, let's go to the e-mail

10   above it.

11   Q    You ask Roger:  You like it?

12           Right?

13   A    Yes.

14           MR. AGNIFILO:  And let's go to the e-mails above.

15   There you go, perfect.

16   Q    Okay, all right, going up, starting at the e-mail there

17   on the bottom.  Roger asks you:  The CEO has a stake?

18           Right?

19   A    Correct.

20   Q    And -- and you understand he wants to know that because

21   when considering an investment, it's important to know if the

22   CEO has a stake in the investment, correct?

23   A    Well, yes, that, and it's an indication if the CEO

24   actually believes in the company.

25   Q    And then you respond:  Yes, but small.  Right?

W. Name - direct/cross - Atty                    2331

1   A    Yes.

2   Q    Okay.  And then on top you say:  Solina is in and will

3   distribute in China.  This is big.

4            Right?

5   A    Yes, sir.

6   Q    Is that a reference to Solina Chau?

7   A    Yes, it he is.

8   Q    Okay.  Now, what's the significance of the fact that

9   Solina Chau is in and will distribute in China?

10  A    Well, she was running the -- she was running a company or

11  a venture company called -- venture capital company called

12  Horizons Ventures, which was managing part of the Li Ka Sheng

13  Foundation at that time, probably the richest man in Asia.

14  And he owned a company called Watson's, probably still owns

15  it, that owned Schumacher chains and -- and pharmacies

16  around -- around Asia, in particular, China and Hong Kong.

17  Q    Okay.  So when you're saying to Roger, Solina is in and

18  will distribute in China, is Solina an officer of the company?

19           What's Solina's connection to the company, if any?

20  A    The reference here, the connection is that if she can

21  bring Celsius, which at that time was only being sold in the

22  U.S. and Sweden, essentially, if she could open the Chinese

23  market for distribution there, it could be a very -- very

24  significant move for Celsius.

25  Q    Got it, okay.

W. Name - direct/cross - Atty                    2332

1          MR. AGNIFILO:  All right, let's go to the next

2   exhibit for identification, which is 5236.

3   BY MR. AGNIFILO:

4   Q    And you see on top there, that's an e-mail from you to

5   someone named Osman Eralp.

6          How do you pronounce his last name?

7   A    *EE-RALP*.

8   Q    *EE-RALP*, Osman Eralp, right?

9   A    Yes.

10         MR. AGNIFILO:  Okay, we offer 5236.

11         MR. AGNIFILO:  No objection.

12         THE COURT:  It's admitted.

13         (Defense Exhibit 5236 was received in evidence.)

14         (Exhibit published.)

15  BY MR. AGNIFILO:

16  Q    Let's go to the e-mail on the bottom.  Okay.

17         All right, who is Rich Slomovitz?

18  A    Rich was the -- the business manager and accountant for

19  Russell Simmons.

20  Q    Okay.  And he says here, the subject is:  Docs for

21  signature, ADD Series 2 financing, right?

22  A    That's correct.

23  Q    What does that mean?  What's going on there?

24  A    So, I had agreed to invest in Russell Simmons's new

25  venture.  If you recall, he was the founder of a record label

W. Name - direct/cross - Atty                2333

1  called Def Jam in the '80s and '90s.  He had subsequently sold

2  that and in or around 2014, 2015, he was establishing a

3  company called ADD, All Def Digital, which was supposed to be

4  the Def Jam on the digital platform.  And I had agreed to go

5  into business with him at that time through a company called

6  Nu Horizons.

7  Q    Okay.  And if we look at the e-mail from Rich Slomovitz,

8  he says, starting with "as to funding," he says:

9         As to funding, I'll leave it to Osman and Tim as to

10 whether he puts in $3 million and gets repaid the 200,000 or

11 whether he just sends another 2.8 million.

12        Do you see that?

13 A    Yes.

14 Q    Okay.  And then on the bottom, right where it says Osman,

15 the last part of that paragraph:

16        It says:  Osman, Tim should wire the money to Nu

17 Horizons, not to ADD.  Same account info as he wired to last

18 month.

19        Do you see that?

20 A    Yes, sir.

21        MR. AGNIFILO:  All right, let's go to the e-mail

22 above it.

23 BY MR. AGNIFILO:

24 Q    And here Osman is e-mailing you and also asks you, he

25 says:  Tim, are you comfortable wiring through Nu Horizons?

W. Name - direct/cross - Atty                    2334

1            Right?

2   A    Yes.

3            MR. AGNIFILO:  And then go to the one above that.

4   Q    You say:  Yes, that's not a problem.

5   A    Right.

6   Q    Okay.

7            MR. AGNIFILO:  And then go to the one above that.

8   BY MR. AGNIFILO:

9   Q    Osman to you.  Just a quick question.  Would it be

10  possible to wire 500,000 earlier?  If not, Russell, Rich and I

11  can arrange another very interim bridge.

12           Do you see that?

13  A    Yes, sir.

14  Q    And then you on to respond:  Yes, that would be ok.  Will

15  this week work?

16           Right?

17  A    Yes, sir.

18           MR. AGNIFILO:  All right, let's look now at an

19  e-mail from two days later.  It's 5237 for identification.

20  BY MR. AGNIFILO:

21  Q    And you can see that's an e-mail on top from you to

22  Roger, correct?

23  A    Correct.

24           MR. AGNIFILO:  We offer it as 5237.

25           MR. AGNIFILO:  No objection.

1           THE COURT:  It's admitted.

2           (Defense Exhibit 5237 was received in evidence.)

3           (Exhibit published.)

4           MR. AGNIFILO:  All right, let's see if we can -- all

5    right, there you go, it's the whole thing.

6    BY MR. AGNIFILO:

7    Q    All right, it's from you, it's to Roger, it's March

8    the 11th, 2015.  Right?

9    A    Yes, sir.

10   Q    It says:  Dear Roger, The wiring for Nu Horizons for

11   purposes of the investment into Celsius is as follows.

12           And then has bank information, correct?

13   A    Yes.

14   Q    As it relates to your $500,000, I will guarantee you the

15   principal amount of the investment.

16           Right?

17   A    Correct.

18   Q    So, you were discussing here an investment into Celsius,

19   correct?

20   A    Yes.

21   Q    Okay.  And -- and -- and not only that, you're also

22   guaranteeing him the principal amount of the

23   500-thousand-dollar investment, right?

24   A    Yes.  By the way, the -- the -- the investment is into

25   Nu Horizons as it is here stated to, but yes, that is correct.

1  Q    Right, but you understand he's going to be getting

2  Celsius shares?

3  A    No, he wouldn't.

4  Q    He would be getting Nu Horizon shares?

5  A    Correct, or -- or a loan given -- given -- guaranteeing

6  this investment, but it's certainly funding Nu Horizons.

7  Q    Okay.  There's no talk, you agree with me there's no talk

8  in this e-mail about a loan, right?

9  A    Well, other than the fact it's a guarantee, you know,

10 down there.  But it was funding Nu Horizons, whether, you

11 know, in loan or equity format, you know, it doesn't state

12 here.

13 Q    Okay.  So, I just want to be precise in what we're

14 saying.  I want to look at the top e-mail.

15       The wiring for Nu Horizons for purposes of the

16 investment into Celsius; right?

17 A    Right.

18 Q    Okay.

19       MR. AGNIFILO:  All right, let's go to the next

20 e-mail.  That's 5238.

21 BY MR. AGNIFILO:

22 Q    And on top there is -- it's from Boon Kee to yourself and

23 to Roger, correct?

24 A    Yes, sir.

25 Q    Okay.

W. Name - direct/cross - Atty                   2337

1           MR. AGNIFILO:  We offer it as 5238.

2           MR. AGNIFILO:  No objection.

3           THE COURT:  It's admitted.

4           (Defense Exhibit 5238 was received in evidence.)

5           (Exhibit published.)

6           MR. AGNIFILO:  All right.

7  BY MR. AGNIFILO:

8  Q    All right, let's start at the bottom because I think it

9  starts with the e-mail we just looked at just now.

10          Okay, so that's the e-mail we just looked at now?

11 A    Yes, sir.

12 Q    Okay.  And let's look at the e-mail above it.

13          MR. AGNIFILO:  Objection, Judge.  He

14 mischaracterizes the document.

15          THE COURT:  He mischaracterized?

16          MR. AGNIFILO:  I don't believe it's exactly the same

17 e-mail.

18          THE COURT:  Oh.

19          Counsel, do you want to take a look at this and the

20 prior e-mail?

21          MR. AGNIFILO:  Sure, hold on one second.

22          (Pause.)

23          MR. AGNIFILO:  All right.  So, let's do this.

24          Can we put both of them up side by side?  We'll

25 compare them.

1        So, we can put this -- actually, we can put this

2   next to 5237.  Okay, all right.

3        So, let's -- let's highlight the last short

4   paragraph on the one on the right and make that bigger.  I am

5   trying to get a lot of razzle dazzle.

6        THE WITNESS:  I think I can read it.

7   BY MR. AGNIFILO:

8   Q    Okay.  So, in 5237, the first e-mail, you say:  As it

9   relates to your $500,000, I will guarantee you the principal

10  amount of the investment.

11       Right?

12  A    Yes, sir.

13  Q    Okay.  And if we look at the e-mail as it continued up,

14  that part is gone, right?

15  A    Yeah, maybe so.

16  Q    Okay.  And then from Roger, Roger writes to you and to

17  Boon Kee --

18       MR. AGNIFILO:  We can get rid of the one on the

19  right.  There you go.

20       Okay, now we are going to look at the one from Roger

21  above that.  There you go, yes, that's it.

22  BY MR. AGNIFILO:

23  Q    All right, so, it's from Roger.  It's to Boon Kee copying

24  you, right?

25  A    Yes, sir.

W. Name - direct/cross - Atty                    2339

1    Q    Okay.  And Roger says:  BK -- Boon Kee -- payment details

2    for Celsius.  Right?

3    A    Yes.

4    Q    Begin forwarded message, and then that other e-mail is

5    attached to it, right?

6    A    Yes, sir.

7    Q    All right.

8             MR. AGNIFILO:  Let's go to the one above it.

9    BY MR. AGNIFILO:

10   Q    So, Boon Kee says to Roger and you:  Do you have the

11   investment/consortium related docs?  Thanks.

12             Right?

13   A    Yes.

14   Q    And -- and what are -- what are investment consortium

15   related docs, what is she talking about there?

16   A    In the context of this, I can't tell if it's one of two

17   things, sir.  One is the Nu Horizons agreement, the operating

18   agreement for Nu Horizons, or whether she's referring to the

19   consortium forming to invest in Celsius.

20   Q    Okay.  But she's talking about an investment in Celsius,

21   is that right?

22   A    Yes.

23   Q    Okay.  All right, and then you write back:  Will send you

24   the LOI, letter of intent, in a minute.

25             Right?

1   A    Yes.

2          MR. AGNIFILO:  Okay, let's go to the next document,

3   that's 5242.

4   BY MR. AGNIFILO:

5   Q    Do you see it there?

6   A    Yes.

7   Q    All right.  It's from yourself.  It's to Osman Eralp and

8   Rich Slomovitz, correct?

9   A    That's correct.

10         MR. AGNIFILO:  We offer it, Judge.

11         MR. AGNIFILO:  No objection.

12         THE COURT:  Admitted.

13         (Defense Exhibit 5242 was received in evidence.)

14         (Exhibit published.)

15  BY MR. AGNIFILO:

16  Q    Okay, let's go to the e-mail on the second page, on

17  March 9th from Osman Eralp to you.

18         Okay, this is the e-mail we looked at maybe five

19  minutes ago, right?

20  A    Yes.

21  Q    All right.  And he's asking if you can wire the $500,000

22  earlier, correct?

23  A    That's right, correct.

24  Q    Okay.

25         MR. AGNIFILO:  Let's go to the one above it.

W. Name - direct/cross - Atty                    2341

BY MR. AGNIFILO:

Q    And that was your response, you said:  Yes, that would be
ok.  Will this week work?

         Right?

A    Right.

         MR. AGNIFILO:  All right, let's go to the one above
that.  And if we can get that whole thing on there.

BY MR. AGNIFILO:

Q    Okay, what you write to Osman Eralp here is:  The 500,000
should be in by tomorrow my bank told me.  Sender will be
coming from my accountant Roger Ng.  Please look out for it.

         Right?

A    Yes, sir.

Q    Okay.  Roger Ng was not your accountant, right?

A    That's correct.

Q    But you're telling Osman Eralp that Roger Ng is your
accountant here, right?

A    That's right.

Q    And that's because you want Osman to believe this is your
money?

A    Yeah, I don't -- I don't recall the context of it, sorry.

Q    Because the only way this can be your money and have it
come from Roger Ng, or one of the ways, is for Roger to be
your accountant?

A    That's certainly one of the ways.

1    Q    And so you wrote here that Roger Ng is your accountant,

2    right?

3    A    Yes.

4    Q    And so you're saying to Osman Eralp that this $500,000 is

5    your money and it's coming from your accountant?

6    A    Yes, possibly so.  I don't remember the context, but

7    that -- you know, it reads like that.

8    Q    Other than that, other than telling Osman Eralp that this

9    is your money and that Roger's your accountant, what else

10   could you mean?

11   A    I don't know, only to try to disguise my relationship

12   with Roger.  But other than that, I can't think of it.

13   Q    And the way you would disguise your relationship with him

14   when $500,000 is coming in is to tell him he's your

15   accountant?

16   A    Yes; possibly so, yes.

17   Q    You actually think that's the reason you did it?

18   A    No, I say those two are, you know, possible reasons.

19   Q    All right.  So, one possibility is you're lying to Osman

20   Eralp that this is your money?

21   A    Right.

22   Q    And it's coming from your accountant?

23   A    Yes.

24   Q    That's one possibility?

25   A    Yes.

W. Name - direct/cross - Atty                    2343

1   Q    And the other possibility is you're actually just trying
2   to not let him know who Roger is to you?
3   A    Yes, correct.
4   Q    Okay.  And of the two, which is it?
5   A    Well, again, I don't remember in the context of this, but
6   it could be either one, very -- very simply.
7   Q    It could be what?
8   A    It could be either one of them.
9   Q    It could be either one?
10  A    Yes.
11  Q    Okay.  So, what you're telling this jury is that the
12  reason you put my accountant Roger Ng could be because you
13  don't want to tell Osman who he is to you?
14  A    One thing, yeah, that's one of the reasons.
15  Q    And you want the jury to believe that?
16            THE COURT:  Counsel --
17            MR. AGNIFILO:  Okay, Judge.
18            THE COURT:  Next question.
19            MR. AGNIFILO:  Very good.
20  BY MR. AGNIFILO:
21  Q    Osman responds to your e-mail and says, it just says:
22  Subject:  Docs for signature.
23            Thank you, Tim, I will certainly do that.  Rich, can
24  you advise both of us when the money hits Nu Horizons?  Right
25  after financing, I'll schedule a meeting of the newly

1    streamlined board.

2            Do you see that?

3    A    Yes, sir.

4            MR. AGNIFILO:  Let's go to the one above that.

5    BY MR. AGNIFILO:

6    Q    Rich Slomovitz e-mails to Osman and to you.  It says:  Hi

7    Tim, the $500,000 has hit our account.  I'll send it across to

8    ADD.  Thank you very much.  Rich.

9            Right?

10   A    Yes.

11   Q    That's Roger's money, right?

12   A    Yes.

13           MR. AGNIFILO:  Top e-mail in that chain.  If we can

14   just -- I think we might be missing a little bit on the right.

15   BY MR. AGNIFILO:

16   Q    That's from you, it's to Osman and to Rich Slomovitz:

17   Sure, let's do that, but I think Russell might be out of town

18   for spring break.  We could do this Friday if we want -- if we

19   want to, everyone in LA.  I am ok either way.  By the way,

20   there will be two more $500,000 tranches coming over in the

21   next two days.  We can decide if we want to keep those in

22   Nu Horizon for now or send them along to ADD.

23           Right?

24   A    That's correct.

25   Q    Okay.  And when we -- when we leave this series of

1  e-mails, you have not told either Osman or Rich that the

2  $500,000 is Roger's money?

3  A    That's correct.

4  Q    Now, do you recall that on March the 23rd, 2015, $500,000

5  came in from -- from Boon Kee's husband into the Nu Horizons

6  Investment Group bank account?

7  A    I don't remember the exact date, but around that time,

8  yes.

9  Q    Okay.  And then the next day $500,000 came in from --

10  from Roger?

11  A    Again, I don't remember the exact date, but yes, around

12  that time.

13  Q    That's fine.  I'm going to show you something just to see

14  if it refreshes your recollection, which is 5213, page 27.

15  A    Yes, sir.

16  Q    Okay.  And the question is only you said you couldn't --

17  around that time, but you didn't remember the specific dates.

18          Does that help your recollection with the specific

19  dates?

20  A    No, other than what's here.  But yes, I remember the

21  timeframe is about right.

22  Q    Okay.  All right, we are going to look at Defense

23  Exhibit 5244 for identification.

24          Okay, can you see that okay?

25  A    Yes.

1    Q    All right.  That's an e-mail from someone named Wendi Ng

2    to you and to Roger?

3    A    Yes, correct.

4              MR. AGNIFILO:  We offer it, Your Honor.

5              MR. AGNIFILO:  No objection.

6              THE COURT:  It's admitted.

7              (Defense Exhibit 5244 was received in evidence.)

8              (Exhibit published.)

9    BY MR. AGNIFILO:

10   Q    All right, if you remember, before we talk about this

11   particular exhibit, there was discussion in the last e-mail

12   about a trip to LA.

13             Do you remember that?

14   A    Not particularly, but okay, let's assume that.

15   Q    All right, let's look at this now.

16             This is -- it's from -- do you know who Wendy Ng is?

17   A    She was my assistant in Singapore at Goldman Sachs.

18   Q    Okay.  And it's to -- it's to you and it's to Roger,

19   correct?

20   A    Yes, that's correct.

21   Q    It says:  Hi Roger, as per Tim's request, here are the

22   best available rate for the following hotels from 24 -- from

23   March 24 to 27.

24             Do you see that?

25   A    That's right, yes.

W. Name - direct/cross - Atty                    2347

1   Q     Then there's two hotels listed, do you see that?

2   A     Yes.

3   Q     Okay.  No booking has been made.  Please advise your name

4   per passport and credit card detail if you would like me to

5   book either of them.

6           Do you see that?

7   A     Yes, sir.

8   Q     Okay.

9           MR. AGNIFILO:  Let's go to the next e-mail, which is

10  5245.

11  BY MR. AGNIFILO:

12  Q     That's -- that's an e-mail from Chris Lai to yourself and

13  Russell Simmons and a few others, and Roger?

14  A     Correct.

15          MR. AGNIFILO:  We offer it as 5245.

16          MR. AGNIFILO:  No objection.

17          THE COURT:  It's admitted.

18          (Defense Exhibit 5245 was received in evidence.)

19          (Exhibit published.)

20  BY MR. AGNIFILO:

21  Q     And Chris Lai was who?

22  A     Chris Lai was with Horizons Ventures.  He was working on

23  the Celsius investment for Horizons Ventures.

24  Q     Okay.  And Chris Lai is writing to you, copying Russell

25  Simmons and Roger, do you see that?

SAM    OCR    RMR    CRR    RPR

W. Name - direct/cross - Atty                2348

1   A    Yes, sir.

2   Q    And it says:  Hey, Russell, Roger and I are enjoying a

3   cigar in South Santa Monica.  Let us know if you're up to

4   hanging out tonight.  Chris.

5          Do you see that?

6   A    Yes, I can see that.

7   Q    And the e-mail below, you say:  Russell, what are you

8   doing for dinner?  Roger and Chris would like you join you as

9   you are the fun member of the investor group.

10          Right?

11  A    Yes.

12          MR. AGNIFILO:  All right, let's go to the next page,

13  5246 for identification.

14  BY MR. AGNIFILO:

15  Q    That's an e-mail from Chris Lai to Roger copying you?

16  A    Yes, sir.

17          MR. AGNIFILO:  We offer it as 5246.

18          MR. AGNIFILO:  No objection.

19          THE COURT:  It's admitted.

20          (Defense Exhibit 5246 was received in evidence.)

21          (Exhibit published.)

22  BY MR. AGNIFILO:

23  Q    Just to follow up very quickly.

24          Chris Lai says:  Hi Roger, it was nice meeting you

25  last night.  Please see below for my contact details.  Don't

SAM     OCR     RMR     CRR     RPR

1   hesitate to reach out if you have any questions about Celsius.

2          Right?

3   A    Correct.

4          MR. AGNIFILO:  All right, let's go to 5248.

5   BY MR. AGNIFILO:

6   Q    On top of 5248 there's an e-mail from Rich Slomovitz to

7   you and to Osman, correct?

8   A    Yes.

9          MR. AGNIFILO:  Okay, we are going to go to the

10  second page.

11         THE COURT:  Do you want to admit it?

12         MR. AGNIFILO:  Oh, I'm sorry, Judge, I missed that

13  step.  Yes, we offer 5248.

14         MR. AGNIFILO:  No objection.

15         THE COURT:  It's admitted.

16         (Defense Exhibit 5248 was received in evidence.)

17         (Exhibit published.)

18  BY MR. AGNIFILO:

19  Q    Okay, so this is Rich Slomovitz -- no, wait.  This is

20  Rich Slomovitz to yourself and to Osman, correct?

21  A    Yes, sir.

22  Q    And it says:  Hello Tim, the next $500,000 came in, so

23  I'm now holding 1.5 million.

24         Right?

25  A    Yes.

W. Name - direct/cross - Atty                2350

1           MR. AGNIFILO:  All right, let's go to the one above

2    it.

3    BY MR. AGNIFILO:

4    Q    You say:  Hi Rich, I'm not sure how the funds are

5    required at the moment.  But ideally for me, I would like to

6    keep 1 million back, as I might need to for two weeks for

7    something else, but I'm not sure yet.  Would that be possible?

8    Many thanks, Tim.

9           Do you see that?

10   A    Yes, sir.

11          MR. AGNIFILO:  All right, let's go to the one above

12   it.

13   BY MR. AGNIFILO:

14   Q    And Slomovitz says to you and to Osman:

15          Hi Tim, I believe that we expect to close on the

16   overall transaction any day now.  Before I check in with John

17   at ADD, are you suggesting that I hold back 1 million of what

18   you've already sent to Nu Horizons or just that it may be a

19   couple of weeks before you send the remaining funds to close

20   the round?

21          He asked you that, right?

22   A    That's correct.

23   Q    All right.

24          MR. AGNIFILO:  Let's go to the one above that.

25   BY MR. AGNIFILO:

W. Name - direct/cross - Atty          2351

1  Q    And you respond:  Many thanks, Rich.  I was going to ask
2  you to keep 1 million of the money already sent back and then
3  I would fund the total required on April 15th.  I might need
4  the 1 million for something else in the short term.  Either
5  way, the 2.8 million, 3 million minus the 200,000 from before,
6  will all be funded by April 15th.
7        Right?
8  A    Correct, sir.
9        MR. AGNIFILO:  And then the e-mail on top.
10 BY MR. AGNIFILO:
11 Q    It says:  Ok, I checked in with John P and, when we
12 close, as long as I will be able to send the 500,000 of the
13 1.15 million being held, they'll be fine to wait for the 15th
14 for the remaining funds.
15        Right?
16 A    Yes, sir.
17 Q    Okay.  So, what's, basically, happening is you're being
18 permitted to hold onto the million dollars?
19 A    That's right, correct.
20        MR. AGNIFILO:  All right, let's look at 5249 for
21 identification.
22 BY MR. AGNIFILO:
23 Q    This is an e-mail from Roger to you on top, correct?
24 A    Yes, sir.
25        MR. AGNIFILO:  We offer it as 5249.

W. Name - direct/cross - Atty                    2352

1          MR. AGNIFILO:  No objection.

2          THE COURT:  It's admitted.

3          (Defense Exhibit 5249 was received in evidence.)

4          (Exhibit published.)

5   BY MR. AGNIFILO:

6   Q    So, Michael Hopf, who is Michael Hopf at Celsius; what's

7   his job, what's his role there?

8   A    He was the head of international at that time, so the

9   international business at Celsius.

10  Q    So, Michael Hopf writes to Roger:

11          Hello Roger, it was a distinct pleasure to meet you

12  during our recent visit Los Angeles and share the exciting

13  opportunities before us for Celsius and this new venture.

14  During our time together, we briefly discussed those markets

15  in Asia that you felt would accept English labels.  If you

16  could further advise me of your knowledge by market in this

17  regard, we could begin to understand the areas where we could

18  look to immediate distribution.  Pending, of course,

19  appropriate regulatory approval and distributor

20  identification.  Look forward to your response, Roger, and a

21  mutually successful time together as we work to take Celsius

22  to new heights.

23          Right?

24  A    That's correct.

25  Q    And then Roger forwards that on to you, on top ?

W. Name - direct/cross - Atty                2353

1   A    Yes, sir.

2   Q    What's your understanding, what's happening here?  What's

3   Michael Hopf saying to Roger?

4   A    Roger had ideas of bringing Celsius to Asia, certain

5   markets outside of China, particularly Malaysia, Indonesia,

6   perhaps, Singapore, and that he was going to be helpful to

7   Celsius to enter those markets.

8        And Michael Hopf being in charge of international,

9   was -- was trying to engage on that topic.

10        MR. AGNIFILO:  One second.

11        THE WITNESS:  Sure.

12        (Pause.)

13  BY MR. AGNIFILO:

14  Q    All right, we talked a few minutes ago about the fact

15  that you kept a million dollars back, right?

16  A    Yes, sir.

17  Q    All right.  And what did you do with that million

18  dollars?

19  A    I took the million dollars out for a short period of time

20  to put a downpayment on a house in Los Angeles.

21  Q    And which house was that?

22  A    (No response.)

23  Q    If we're talking about -- if we're talking about April of

24  2015.

25  A    Sorry, I don't recall which -- we were looking at several

W. Name - direct/cross - Atty                2354

1  properties.  I don't know which one this was, in particular.

2  Q    Okay.  And what was the -- what was the million dollars

3  used for, in particular?

4  A    An escrow downpayment, an escrow payment.

5  Q    Okay.

6        MR. AGNIFILO:  All right, let's look at 5251.

7  BY MR. AGNIFILO:

8  Q    And what we're looking at is we're looking at an e-mail

9  from yourself -- I'm sorry, from Rich Slomovitz to you,

10 correct, on top?

11 A    Yes, that's correct.

12 Q    All right.

13        MR. AGNIFILO:  Let's go to the first e-mail in this

14 chain, bottom of the second page.

15        THE COURT:  Are you offering it, counsel?

16        MR. AGNIFILO:  Oh, I'm sorry, Judge.  Yes.  Yes,

17 yes.  5251.

18        MR. AGNIFILO:  No objection.

19        THE COURT:  It's admitted.

20        (Defense Exhibit 5251 was received in evidence.)

21        (Exhibit published.)

22        MR. AGNIFILO:  Actually, it's going to be the

23 second-to-last e-mail -- no, no, third to last e-mail.  Okay.

24 BY MR. AGNIFILO:

25 Q    So, this is April 1st, you're saying to Rich Slomovitz:

1          Hi Rich.  As mentioned below, I will need to use

2    some of my funds for a deposit on my house, but will make the

3    full contribution by April 15th.  Hence, could you please wire

4    the 1 million to the following?

5          Right?

6    A    Yes.

7    Q    You don't tell Rich that some of that's Roger's funds,

8    right?

9    A    No, correct, but what I'm saying here is I am going to

10   put back that money into Nu Horizons in a short period of

11   time.

12   Q    Okay, but I want to -- I want to look at the word before

13   funds.

14          Hi Rich, as mentioned below, I will need to use some

15   of my funds, right?

16   A    Yes, that's right.

17   Q    Those aren't all your funds, they're not your funds at

18   all?

19   A    Well, they're -- but now they're Nu Horizons' funds,

20   correct.

21   Q    Where did they come from?

22   A    From Roger and Boon Kee and others.

23   Q    You don't say to Rich that the money is from Roger and

24   Boon Kee and others, right?

25   A    No, correct, but that's because I'm going to make -- put

1    the money back again, as well.

2    Q    Okay, but I'm not asking for your reason just yet, I'm

3    just asking you what you're telling Rich.

4    A    Yes, sorry.

5    Q    I will need to use some of my funds, right?

6    A    That's right.

7    Q    For a deposit on my house, right?

8    A    Yes, sir.

9              MR. AGNIFILO:  Let's go to the next e-mail.

10   BY MR. AGNIFILO:

11   Q    Slomovitz says to you:  Got it and will -- and will put

12   through.

13             THE COURT:  Counsel.

14   Q    I need an address for you to set up the wire.  Thanks.

15             Right?

16             MR. AGNIFILO:  Sorry, Judge.

17             THE COURT:  Please proceed.

18             MR. AGNIFILO:  Oh, okay.

19   BY MR. AGNIFILO:

20   Q    Got it and will put through.  I need an address for you

21   to set up the wire.  Thanks.

22             Right?

23   A    That's correct.

24   Q    All right.

25             MR. AGNIFILO:  Let's go to the top e-mail.

1  BY MR. AGNIFILO:

2  Q    Rich says to you:  Tim, the reference number for this

3  wire is, a long reference number.  The wire is coming from the

4  Nu Horizons account at JPM, JPMorgan Chase.  It should hit the

5  escrow account today.  Best of luck with the new house.

6           Right?

7  A    Yes, sir.

8           MR. AGNIFILO:  Let's look at 5252.

9  BY MR. AGNIFILO:

10 Q    This is an e-mail between you and Jasmine Loo, right?

11 A    Yes.

12          MR. AGNIFILO:  We offer it as 5252.

13          MR. AGNIFILO:  No objection.

14          THE COURT:  It's admitted.

15          (Defense Exhibit 5252 was received in evidence.)

16          (Exhibit published.)

17 BY MR. AGNIFILO:

18 Q    All right, let's look at the bottom e-mail.

19 A    Yes, sir.

20 Q    All right.  And that's from you to Jasmine Loo, correct?

21 A    Correct.

22 Q    And it says:  Please find the below.  There is an

23 investor presentation and the sale and purchase agreements for

24 both newly-issued shares, $10 million, and an existing

25 convertible, $4.3 million.  We are buying the shares at $0.86

1   per share, and the last traded price was a dollar-41 per

2   share.  So, you are deeply in the money.

3           Do you see that?

4   A    Yes.

5   Q    Tell me if this is right:

6           What you're, essentially, doing here is you're

7   offering Jasmine the ability to buy in at 86 cents per share

8   when the existing price is a dollar-41 a share, right?

9   A    That's correct.

10          MR. AGNIFILO:  Let's look at --

11  BY MR. AGNIFILO:

12  Q    All right, now at one point in -- so, we're now, we're

13  now going to leave Celsius and we are going to Sentient.

14          Tell us what Sentient is.

15  A    Sentient is an artificial intelligence company based in

16  the U.S., but founded in -- in Hong Kong and the U.S.  And it

17  was -- it had established two businesses.  One was an

18  artificial intelligence trading platform, and the other one

19  was, effectively, an artificial intelligence optimization

20  platform.

21

22          (Continued on the following page.)

23

24

25

1   BY MR. AGNIFILO:   (Continuing.)

2   Q    Before we get to -- I neglected to ask you one more

3   question.

4   A    Yes, sir.

5   Q    Do you recall Roger sending another 5 -- I'm sorry,

6   another $250,000 on or about May the 29th of 2015?

7   A    Not in particular, sir.  Sorry, no, I don't remember

8   that.

9            MR. AGNIFILO:  This is 5213 at page 33 and I'm

10  showing it to Mr. Leissner.  Thank you.

11           (Exhibit published to witness only.)

12  A    Yes, sir.

13  Q    Okay.  Do you remember another $250,000 Roger paying in

14  on May the 29th?

15  A    Not particularly, but I see it here now, so that's

16  correct.

17  Q    Do you remember Boon-Kee also paying in another $250,000?

18  It may not be on that document.

19  A    Yeah, it could be as well.

20  Q    Hang on a second.  Let me do one thing.

21           MR. AGNIFILO:  Now, I'm going to show the witness

22  5213, page 32.

23           (Exhibit published to the witness only.)

24  Q    And then take a look at that and I'm going to ask you the

25  same question about Boon-Kee paying $250,000.

1    A    Boon Kee's husband, but, yes, I see it here.

2    Q    In connection with Sentient, do you remember asking Roger

3    for a loan -- now this is a loan, in September of 2015?

4    A    In connection with Sentient?

5    Q    Well, let's back up.  Do you remember you and Roger

6    talking about a loan in September of 2015, in or around that

7    time period?

8    A    Yes, I believe so, that I was asking him for money,

9    that's right.

10   Q    Okay.  And do you recall the specific date that the loan

11   came in?

12   A    No.

13   Q    All right.  I'm going to show you what's been marked for

14   identification as 5282.

15            (Exhibit published to the witness only.)

16            (Counsel approaches.)

17   Q    Do you remember a $500,000 loan in September of 2017?

18   A    I don't -- sir, I don't remember it being a loan.  I

19   thought it was an investment, buying a stake that I held in

20   Sentient.

21   Q    All right.  Do you remember that CK, who we discussed

22   earlier in the day, Roger's brother-in-law, sent you $1

23   million in October of 2015?

24   A    Yes, I believe I remember that.

25   Q    Okay.

Leissner - cross - Agnifilo                    2361

1   A    October, I don't know, but yes around that time.

2   Q    All right.  I'm going to show you what's been marked as

3   Defense Exhibit 5214, page 77.

4            (Counsel approaches.)

5            (Exhibit published to witness only.)

6   A    Yes.

7   Q    Okay.  And I don't think we discussed this yet.  Why did

8   CK send you $1 million?

9   A    I don't remember it as well, sir.  I don't remember

10  why -- you know, what the reason was for him sending it.

11  Q    Okay.  Now, I think you talked earlier in your testimony

12  that you were -- CK was a lawyer; right?

13  A    That's right.

14  Q    Did you ever send him any money in legal fees?

15  A    No, I don't think so.

16  Q    Okay.  And you can't tell us why he gave you $1 million?

17  A    No, I don't remember the circumstances of that, sir.

18  Q    Do you remember if you ever paid him back?

19  A    No, I don't remember.

20  Q    In 2015 you were having a rough time financially, right?

21  You had a lot of expenses?

22  A    Yes, sir.

23  Q    Okay.  Let's discuss -- what are the homes?  Let's start

24  with homes.  What are the homes that you owned in 2015?

25  A    The New York apartment and -- yeah, only the New York

Leissner - cross - Agnifilo                2362

1   apartment.  My wife, of course, had a house in Beverly Hills,

2   but I only was -- owned that property in New York.

3   Q    And who paid for the house in Beverly Hills?

4   A    She had done it herself.

5   Q    And --

6   A    Many years before, by the way.

7   Q    And the apartment in New York, I think you indicated was

8   a very expensive apartment?

9   A    18 million.  Judy or Capital Place Holdings had paid for

10  it.

11  Q    And did you have a yacht at this point in 2015?

12  A    Yes, that's correct.

13  Q    And what were you paying for the yacht?

14  A    The yacht I think was 15 million.

15  Q    And you financed the yacht or no?

16  A    Only through C1 which we had discussed before, but that

17  was subsequent to the purchase.

18  Q    And in 2015, you were married at this point to Kimora?

19  A    Yes, sir.

20  Q    And when did you get -- when did the divorce go through

21  with Judy?

22  A    In October of 2014.

23  Q    But you were -- were you still supporting Judy

24  financially?

25  A    No, she was supporting herself.

Leissner - cross - Agnifilo                    2363

1    Q    So you were only supporting Kimora?

2    A    Yes, as far as I remember, yes.

3    Q    And you borrowed a lot of money around this time period,

4    2015; correct?

5    A    That's -- yes, to Nu Horizons and some of it myself as

6    well.

7    Q    But there's nothing -- there's nothing you can tell us to

8    shed light on why CK, Roger's brother-in-law, gave you $1

9    million in 2015?

10   A    I don't remember the specific circumstances, no, sir.

11   Q    All right.  Let's go forward with Sentient.

12   A    Sure.

13   Q    Okay.  We're going to look at 5258 for identification.

14        (Exhibit published to witness only.)

15   Q    And on top of that is an e-mail from Roger to you; right?

16   A    Yes, sir.

17   Q    Okay.

18        MR. AGNIFILO:  We offer that as 5258, Judge.

19        MR. AGNIFILO:  No objection.

20        THE COURT:  It is admitted.

21        (Defense Exhibit 5258 received in evidence.)

22        (Exhibit published.)

23   BY MR. AGNIFILO:

24   Q    All right.  Let's look at the bottom e-mail.  That's from

25   you.  It's to Roger.  The subject is, sample draft agreement.

1    It says, Dear Roger:  Please find the attachment.  Very simple

2    draft for you to acquire the 50 percent I hold in Sentient.

3    Do you see that?

4    A    Yes, sir.

5    Q    Let's go to the e-mail above that one.  And you say here,

6    This is the version that includes the transfer of the economic

7    rights straight away.  This way, you get to have all the gains

8    if they do sell soon.  Thanks again, chief.  That's from you

9    to Roger; correct?

10   A    Yes.

11   Q    And let's go to the top e-mail.  This one is from Roger,

12   to you?

13   A    Yes.

14   Q    Okay.  And it says, Hi, Tim.  I have made some amendments

15   as shown in marked-up changes.  Namely, the entity is a BVI

16   entity as opposed to LLC.  Also attached the executed

17   indicative term sheets, and he talks about other things about

18   an agreement that's attached to this e-mail; correct?

19   A    Yes.

20   Q    Okay.  Let's go to the agreement.  Okay.  Take a chance

21   to read it over and then I will ask you a few questions about

22   it.

23   A    Can we scroll down, sir?

24   Q    Yes.

25   A    Thank you.  (Reviewing.)

1          Can we scroll if possible?

2   Q    Yes, let's get the whole thing.

3   A    Okay.

4   Q    And then there's a second page.  Let's show you the

5   second page too.

6   A    Yes.

7   Q    So, what's going on here?

8   A    I'm selling Roger half of the stake that I had invested

9   in Sentient, which when I had invested in it, it was Genetic

10  Finance and I'm selling him half of that stake.

11  Q    And do you recall that he made you the loan, the loan

12  that we talked about a few minutes ago, and then you had asked

13  him for another loan and he said to you in essence, I don't

14  want to loan you a million dollars so can we work out this

15  agreement?

16          MR. AGNIFILO:  Objection to the form.

17  Q    If that's the way you remember it.

18  A    I only remember the fact that he bought that stake.  I

19  don't remember the loan discussion.  I remember that he bought

20  that stake for $1 million.

21  Q    And have you paid Roger back any money at all since 2015?

22  A    Well, he holds the stake here that we're talking about,

23  but I have not paid any other money other than just selling

24  him the stake.

25  Q    And the investment that he made in Celsius, what happened

1    to that?

2    A    He made the investment to Nu Horizons, sir.  That's still

3    outstanding.

4    Q    Didn't you put that money into the escrow of your house?

5    A    I did use some of that money for the he is escrow.

6    However, in two weeks or less than two weeks paid that money

7    back into Nu Horizons for funding of ADD.

8    Q    Didn't you transfer the entire stake into Keyway Pride?

9    A    My shareholdings in Nu Horizons, yes.

10   Q    So when you talk about all of this asset protection --

11   remember, you talked about asset protection earlier today?

12   A    Yes.

13   Q    You talked about going to Liechtenstein.  You talked

14   about selling all the assets to different businessmen from

15   different Middle Eastern countries; right?

16   A    Yes.

17   Q    Part of the assets you are talking about protecting is

18   the money Roger gave you?

19   A    Well, again, his money went into Nu Horizons.  Nu

20   Horizons was part of the pool of assets which was -- which was

21   sold and then because the back at some point again.  So that

22   transaction that you referred to earlier on today with Hong

23   Kong has been unwound.

24   Q    So where are the funds?

25   A    Well, the money is still at -- Nu Horizons is still an

Leissner - cross - Agnifilo                2367

existing company, sir.

Q    You've had seven years to pay him?

A    Yes, sir.  First of all there was never a repayment
schedule established at the time and also he has never, to my
recollection, asked me for the money back.

Q    You saw the e-mails we just went through.  You told them
it was an investment through Nu Horizons into Celsius; right?

A    Yeah, I saw the e-mails, sir the investment is in Nu
Horizons and it still is in Nu Horizons.  Nu Horizons is an
existing company as we speak today.

Q    And so tell the jury everything about your existing plans
as you sit here today to pay that man back the money that you
took from him.  Go ahead.

A    It's more complicated than that, sir.  As you can
imagine, we are in this courtroom for a reason.  If I can pay
him back, I will have to -- any payment back has to be
discussed with my lawyers and has to be discussed in the
context of what we're going through here right now.  But if
that works out, I will pay it back, but I have to work with my
lawyers.  As I'm sitting here today, I can't say how and when
that would happen.

Q    So just before we broke for lunch I asked you if you
intended to pay the sheik back, the Kuwaiti sheik, and you
said you were going to listen to the advice of your lawyers.

A    And it's the same in this instance.

Leissner - cross - Agnifilo                    2368

1  Q    We have a jump ball between the Kuwaiti sheik and Roger?

2         MR. AGNIFILO:  Objection.

3         THE COURT:  Sustained.

4         Counsel.

5  BY MR. AGNIFILO:

6  Q    Isn't it true that Roger's $1.25 million investment would

7  be worth $50 million today?

8  A    I don't think so, sir.

9  Q    So what do you think that his $1.25 million investment

10  from 2015 would be worth today?

11  A    I would not be in a position to give you that answer

12  right now.  ADD, which was one other company that we invested

13  in failed and went bankrupt, for example.

14  Q    I think on direct examination, didn't you say that your

15  stake in Celsius was $2 million?

16  A    The shares of -- 3.3 million shares is worth over around

17  $200 million.

18  Q    So let's -- so 3.3 million shares is $200 million.

19  Shares were -- what were they, 89 cents a share?

20  A    When we invested in 2015, yes.

21  Q    89 cents.  I'm terrible at math, as we all know now.  89

22  cents a share, $125 million, I'm hoping someone does this math

23  for me, that's why I'm speaking slowly.  We're going to try

24  and figure out how many shares $125 million buys at 89 cents a

25  share and -- I think it's 86 cents a share.

Leissner - cross - Agnifilo                2369

1    A    When we invested in Celsius, it was 89 cents.

2    Q    We'll do 89?

3    A    But your math would not be accurate because you are not

4    taking into account ADD.

5    Q    What are the shares worth nowadays?

6    A    We would have to look it up now, but somewhere around 45,

7    48.

8    Q    50,062,500?

9    A    Again, it's a very simplified way of doing the math.  If

10   you ask me if that's correct, it is not.

11   Q    As we sit here today and you've established that the

12   Government has not taken the 25 Beverly Park house; correct?

13   A    Correct.

14   Q    Have you spent any money out of your own pocket, a single

15   dime, in forfeiture as you sit here today?

16   A    I have forfeited my interests in the Celsius shares.

17   That's real money.

18   Q    It sure is.  How about the Sentient, 2 million -- was

19   there a $2 million investment into Genetic Finance from

20   Capital Place Holdings in 2014?

21   A    That's correct.

22   Q    That's $2 million?

23   A    That's right.

24   Q    Have you had to forfeit that?

25   A    No, sir.

Leissner - cross - Agnifilo                2370

1  Q    Friendsurance -- the 2 million Euro investment into

2  Friendsurance from Capital Place Holdings in 2015?

3  A    No.

4  Q    Was there an investment from Friendsurance?

5  A    Yes, there was.

6  Q    What was it?

7  A    2 million euros in Friendsurance from Capital Place.

8  Q    Has that been forfeited?

9  A    No, sir.

10 Q    The only thing you are claiming is forfeited is the

11 property that my client has over a $50 million interest in;

12 right?

13 A    The only thing that I forfeited is my Celsius shares.

14 Q    In terms of assets, you borrowed a lot of money from a

15 lot of people and you paid a lot of people back, right?  We'll

16 go by name.  David Bonderman, who was that?

17 A    He was a -- he is a very big investor in the private

18 equity space.

19 Q    And did you borrow $2 million from David Bonderman?

20 A    Yes, I did, sir.

21 Q    He's a big investor --

22         MR. AGNIFILO:  Objection, Your Honor.

23         THE COURT:  404 or 403?

24         MR. AGNIFILO:  404 and 403, Judge.

25         MR. AGNIFILO:  Can I just follow up with the next

Leissner - cross - Agnifilo                    2371

1   question?

2           THE COURT:  Go ahead.

3   BY MR. AGNIFILO:

4   Q    You paid him back, right?

5           MR. AGNIFILO:  Objection.

6           THE COURT:  Sidebar.

7           (Sidebar held outside of the hearing of the jury.)

8           (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

```
                         Sidebar                        2372
```

1           (The following sidebar took place outside the

2    hearing of the jury.)

3           THE COURT:  What's the basis for your objection?

4           MR. AGNIFILO:  Your Honor, the basis is I'm not sure

5    what -- his propensity to repay his creditors is, the

6    probative value of that is.

7           THE COURT:  What I understand Mr. Agnifilo to be

8    doing is to be arguing that basically he owes Mr. Ng all of

9    this money.  He hasn't repaid him and he doesn't plan to and

10   this is why he's testifying here today.

11          MR. AGNIFILO:  Understood, Judge.  So our objection

12   was both 404 and 403 that we've spent an hour talking about

13   this debt that he says exists and he has said repeatedly what

14   his plans are.

15          THE COURT:  It's probative if he, in fact, owed

16   other people money and paid them back and not Mr. Ng.  Why

17   shouldn't the jury know that?

18          MR. AGNIFILO:  I think going into the details of

19   every creditor he may have in history is 403 and the extent

20   should be limited.

21          THE COURT:  I do not know he's going this to every

22   one of them.

23          MR. AGNIFILO:  No, about six.

24          THE COURT:  Okay.  The objection is overruled.

25          How much longer do you have?

```
                         Sidebar                      2373

1            MR. AGNIFILO:  Half an hour.  I really mean it.

2    Half an hour from the moment that I start.

3            THE COURT:  It's almost time.  I thought you were

4    finishing today.

5            MR. AGNIFILO:  I'm so close, Judge.

6

7            (Sidebar ends.)

8            (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SN        OCR        RPR

Leissner - cross - Agnifilo                    2374

1          THE COURT:  You any proceed.

2          MR. AGNIFILO:  YOU You borrowed $2 million from

3   David Bonderman and you paid him back, right?

4   A    That's correct.

5   Q    You borrowed money from -- is it Ken Siazon?

6   A    Yes, sir.

7   Q    Did you pay him back?

8   A    Yes, sir.

9   Q    You borrowed money from Kent Ho?

10  A    Yes, sir.

11  Q    You paid him back?

12  A    Yes, sir.

13  Q    You borrowed money from Judy's father, right, do you

14  remember?

15  A    Not particularly, sir.  If you refresh me, perhaps.

16  Q    To pay for the apartment in New York, does that ring a

17  bell?  You needed help paying for the New York apartment?

18  A    That was Capital Place, sir.

19  Q    Was that his money in Capital Place, the father, Judy

20  father's money?

21  A    No, that was Capital Place's money, sir.

22  Q    Did you borrow $500,000 from Ujin Timan?

23  A    Yes, sir.

24  Q    Did you pay that back?

25  A    No, sir.

SN       OCR       RPR

1  Q    When did you borrow the money from Ujin Timan?

2  A    Probably in 2014, '15 or '16, something like that.

3  Q    And do you remember the money, the million dollars that

4  you got from Roger's brother-in-law was a loan, he loaned you

5  the money?

6  A    I don't remember the circumstances.  You asked the

7  question.  I don't remember it.

8  Q    And you don't remember paying him back?

9  A    That's right.

10         THE COURT:  Counsel, I'm going to end here today.

11         MR. AGNIFILO:  Yes, Judge.

12         THE COURT:  Members of the jury, we are going to end

13  for today.  Please remember don't discuss the case.  Don't let

14  anyone discuss it with you and don't read anything about the

15  case.  I will see you tomorrow morning at 9:30.  Have a good

16  night.

17         (Jury exits.)

18         THE COURT:  Please be seated, everyone.

19         (Witness leaves the stand.)

20         THE COURT:  Close the door, please.

21         So, Mr. Agnifilo, there are a number of bank records

22  that you used but you didn't offer.

23         MR. AGNIFILO:  Correct.

24         THE COURT:  Is there a reason you didn't offer them?

25         MR. AGNIFILO:  I think they're going to be coming in

Leissner - cross - Agnifilo                    2376

1    through subsequent Government witnesses.

2              THE COURT:  Got it.  I wanted to be sure you weren't

3    mistaken as to my 608 ruling and that you were not offering

4    these because of that.

5              MR. AGNIFILO:  No, I believe most of them, not all

6    of them, are going to come in on the Government's case.

7              THE COURT:  Okay.  Just making sure of that.

8    Anything else we need to discuss?

9              MR. AGNIFILO:  Yes, we would move to strike

10   Mr. Agnifilo's question about the phone call and this was our

11   concern all along.

12             THE COURT:  Which phone calls?

13             MR. AGNIFILO:  The question about the controlled

14   phone call.  Mr. Agnifilo represented to the Court, to us, he

15   was not going to ask about content.  He then, in fact, did

16   exactly that.  We did object so we would ask to strike his

17   question from the record, Your Honor.

18             THE COURT:  Explain to me why.

19             MR. AGNIFILO:  I believe it was an improper

20   question.  I believe it violated Your Honor's ruling which is

21   the reason we moved, Judge.

22             THE COURT:  Why don't you tell me what specific

23   answer or question you are looking to strike, because I think

24   I am not quite following you.

25             MR. AGNIFILO:  We can identify it specifically in

Leissner - cross - Agnifilo                    2377

1  the transcript.  I know we have the realtime.  The question
2  was when you called Hwee Bin, you didn't ask to speak to Roger
3  and we objected.
4          THE COURT:  I thought I sustained that objection.
5          MR. AGNIFILO:  You did, Your Honor.
6          THE COURT:  Okay.
7          MR. AGNIFILO:  And so we were just asking, as we had
8  on a prior occasion on cross, to strike that question from the
9  record, Judge.
10         THE COURT:  If I sustained the objection, why do I
11 need to strike the question?
12         MR. AGNIFILO:  We are just being consistent with the
13 only other question we had moved to strike and we're doing the
14 same here, Judge.
15         THE COURT:  I think if there was an answer it's
16 proper for you to move to strike, but a question isn't
17 evidence and so the fact that I sustained the objection, why
18 isn't that enough?
19         MR. AGNIFILO:  If that should suffice, Your Honor,
20 and we will be sure it's redacted if it's asked for by the
21 jury, but we wanted to preserve that and make our motion.
22         THE COURT:  Okay.
23         MR. AGNIFILO:  I understand -- I don't -- honestly,
24 I don't think I was violating the Court's ruling at all.  I
25 wasn't asking about the substance of the conversation in the

1   least.  I was asking something that he didn't do which is very

2   much not the substance of the conversation, which I think in

3   light of the direct that the Government elicited that

4   suggested that it would have been fruitful to speak to Roger,

5   but that they didn't call Roger because his phone was

6   compromised.

7          A logical question and one that does not go to the

8   substance of any phone call is if you wanted to speak to

9   Roger, there's another thing you could have done by calling

10  Hwee Bin.  At the end of the day, I asked the question.  Your

11  Honor thought it was not an appropriate question and Your

12  Honor sustained the objection.

13         THE COURT:  I sustained the objection and if I

14  recall correctly it was to the form of the question because

15  then you ultimately did ask him whether or not he called

16  Roger.

17         MR. AGNIFILO:  Right.

18         THE COURT:  Maybe I am confused as to what the

19  Government, but if I don't understand something correctly, let

20  me know and I will address it tomorrow.  I believe the

21  question that you are objecting to that I sustained the

22  objection, so I'm not sure there's anything further that we

23  need to do as to that.

24         MS. SMITH:  Your Honor, we just wanted to raise one

25  issue and talk a little bit about timing.  Just to give Your

Leissner - cross - Agnifilo                    2379

1   Honor an update, we are in the process of working out the

2   visa -- the status for Ms. Lim to come into the United States.

3   That timing does depend on when she will testify because there

4   may be a window that we need to sort of -- a 14-day window

5   that we need to have her in, which would be what the time

6   period would be most likely.

7            THE COURT:  Is that a period that can't be extended?

8            MS. SMITH:  It's possible but it's helpful if we get

9   a general sense of when that's going to be.  I sort of wanted

10  to put on the record that we are making a lot of progress and

11  we are very close, but that we do need to get a sense of the

12  timing as much as possible and we're going to game that period

13  out.

14           THE COURT:  Will it be 14 days from the time she

15  enters the country or 14 days from the time you give her

16  whatever notice it is that you have to give her?

17           MS. SMITH:  We may be able to extend it beyond that

18  but that's sort of the time period.  That's from when she

19  enters.  I'm putting the logistical issues on the record and

20  we're going to work with defense counsel on that, but it

21  obviously does depend a little bit on timing and it would be

22  helpful to have a sense --

23           THE COURT:  Well, it sounds like Mr. Agnifilo has 20

24  more minutes of cross or maybe ten now or none at all?

25           MR. AGNIFILO:  I give the Court full license to hit

Leissner - cross - Agnifilo                    2380

1  me with an object from the bench if I'm not finished -- I will

2  be finished within 20 minutes.

3          THE COURT:  Mr. Agnifilo will be done by 10:00 in

4  the morning.  How long does the Government intend to redirect?

5          MR. AGNIFILO:  I would like to do it in under an

6  hour, Judge.

7          THE COURT:  That means we move on and then how many

8  witnesses do you think you can present tomorrow?  Who are you

9  presenting and how long do you expect them to be?

10          MS. SMITH:  So, we gave defense counsel a list of

11  six potential witnesses for this week.  We're going to

12  regroup.  We have a witness that has to go on tomorrow.  It's

13  a very short witness from J.P. Morgan Chase.

14          THE COURT:  Okay.  So it sounds like we can fit that

15  person in.

16          MS. SMITH:  Yes.  We also have another witness that

17  we're going to need to -- two more witnesses that we need to

18  get on and off the stand by the end of the day on Thursday.

19  That's Patrick Kidney who's in from London and another witness

20  Robert Pepitone who is the chips witness.  We were not able to

21  get a stipulation on that.  So we will be calling that witness

22  and we've given the defense three other witnesses and we're

23  going to sort of re-jigger and see which one, if we call any

24  one of them tomorrow, we'll try to get those three in a row

25  depending on how long we project them to be.

Leissner - cross - Agnifilo                    2381

1          THE COURT:  Mr. Agnifilo, do you expect recross of

2     Mr. Leissner?

3          MR. AGNIFILO:  I think it will be relatively -- I

4     think it will be relatively short.  If the Government is going

5     to go for an hour, it will be shorter than that.

6          THE COURT:  All right.  Hopefully we will move

7     forward with some additional witnesses tomorrow.  That will be

8     the hope and that way we will have a better sense of what to

9     tell the jury on Thursday since some of them are concerned

10    about the speed of the trial.  Okay?

11         MR. AGNIFILO:  Thank you, Your Honor.

12         MS. SMITH:  Thank you.

13         THE COURT:  Have a good night everyone.

14

15     (Matter adjourned until 9:30 a.m., Wednesday, March 9, 2022.)

16

17                          - ooOoo -

18

19

20

21

22

23

24

25

2382

1                              <u>I N D E X</u>

2

3       <u>WITNESS</u>                                          <u>PAGE</u>

4         **TIM LEISSNER**

5             CONTINUED CROSS-EXAMINATION

6             BY MR. AGNIFILO                         2171

7

8       <u>E X H I B I T S</u>

9

10         Defense Exhibit 2704                        2171

11

12         Defense Exhibit 1230                        2182

13

14         Defense Exhibit 1238                        2184

15

16         Defense Exhibit 1231                        2185

17

18         Defense Exhibit 1235                        2189

19

20         Defense Exhibit 5101                        2196

21

22         Defense Exhibit 5106                        2198

23

24         Defense Exhibit 5100                        2199

25

SN          OCR          RPR

                                                                      2383

1

2         Defense Exhibit 5102                              2200

3

4         Defense Exhibit 5103                              2201

5

6         Defense Exhibit 5104                              2202

7

8         Defense Exhibit 1174                              2233

9

10        Defense Exhibit 2201                              2236

11

12        Defense Exhibit 1175                              2238

13

14        Defense Exhibit 45                                2262

15

16        Defense Exhibit 42                                2267

17

18        Defense Exhibit 5128                              2326

19

20        Defense Exhibit 5130                              2328

21

22        Defense Exhibit 5131                              2329

23

24        Defense Exhibit 5236                              2332

25

                        SN        OCR        RPR

```
                                                                 2384

 1

 2       Defense Exhibit 5237                           2335

 3

 4       Defense Exhibit 5238                           2337

 5

 6       Defense Exhibit 5242                           2340

 7

 8       Defense Exhibit 5244                           2346

 9

10       Defense Exhibit 5245                           2347

11

12       Defense Exhibit 5246                           2348

13

14       Defense Exhibit 5248                           2349

15

16       Defense Exhibit 5249                           2352

17

18       Defense Exhibit 5251                           2354

19

20       Defense Exhibit 5252                           2357

21

22       Defense Exhibit 5258                           2363

23

24

25
```