2385

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,          : 18-CR-00583(MKB)
                                   :
          -against-                :
                                   :
                                   : United States Courthouse
NG CHONG HWA, also known as        : Brooklyn, New York
"Roger Ng,"                        :
                                   :
          Defendant.               : Wednesday, March 9, 2022
                                   : 9:30 a.m.
                                   :
- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE MARGO K. BRODIE
United States CHIEF DISTRICT JUDGE

A P E A R A N C E S :

For the Government: BREON S. PEACE, ESQ.
                    United States Attorney
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201
                BY:  ALIXANDRA ELEIS SMITH, ESQ.
                    DREW GODFREY ROLLE, ESQ.
                    DYLAN A. STERN, ESQ.
                    Assistant United States Attorneys


                    U.S. DEPARTMENT OF JUSTICE
                     Criminal Division - Money Laundering
                    and Asset Recovery Section
                     1400 New York Avenue, NW
                     Room 7113
                     Washington, DC 20530
                BY:  JENNIFER AMBUEHL, ESQ.

Court Reporter:    **SOPHIE NOLAN**
                   225 Cadman Plaza East/Brooklyn, NY 11201
                   NolanEDNY@aol.com
*Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription*

2386

1    A P P E A R A N C E S:   (Continued)

2

3    For the Government:   U.S. DEPARTMENT OF JUSTICE
                           Criminal Division - Fraud Section
4                          700 13th Street, NW
                           10th Floor
5                          Washington, DC 20005
                      BY:  BRENT S. WIBLE, ESQ.
6

7    For THE DEFENDANT:    BRAFMAN & ASSOCIATES, P.C.
                           256 Fifth Avenue
8                          2nd Floor
                           New York, New York 10001
9                     BY:  MARC A. AGNIFILO, ESQ.
                           TENY ROSE GERAGOS, ESQ.
10                         ZACH INTRATER, ESQ.
                           JACOB KAPLAN, ESQ.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SN        OCR        RPR

Leissner - cross - Agnifilo                    2387

1              (In open court.)

2         (The Hon. Margo K. Brodie, presiding.)

3              (Defendant present.)

4      (The following occurs outside the presence of the jury.)

5         THE COURT:  Good morning, everyone.  Are you ready

6    to proceed?

7         MR. AGNIFILO:  Yes, Your Honor.

8         MR. ROLLE:  Yes, Judge.

9         THE COURT:  Please call the case.

10         THE COURTROOM DEPUTY:  Criminal cause for trial,

11   docket number 18-cr-538, *United States of America versus Ng*.

12         THE COURT:  And the same appearances for both sides.

13         Please bring in the jury.

14         (Witness takes the stand.)

15         (Jury enters.)

16         THE COURT:  Please be seated, everyone.

17         Good morning, members of the jury.

18         THE JURY:  Good morning.

19         THE COURT:  I hope you had a good night.  We're

20   going to continue the testimony by Mr. Agnifilo.

21         Mr. Leissner, you are still under oath.

22   **TIM LEISSNER**,

23       called as a witness, having been previously duly

24       sworn, was examined and testified as follows:

25   CONTINUED CROSS-EXAMINATION

1    BY MR. AGNIFILO:

2    Q    Good morning, Mr. Leissner.

3    A    Good morning.

4    Q    I have about 20 minutes more of questioning and then I

5    will sit down.  Do you recall that you had a Nokia telephone?

6    A    Yes, many years ago.

7    Q    Yes.  And do you recall that in your Nokia telephone, you

8    had listed as -- for the number for Rohana Rozhan, Roger?

9    A    This might be the case, maybe.  I can't recall per se,

10   but it might be possible.

11   Q    Do you recall having in your phone falsely listed the

12   contact as being Roger when, in fact, that was a different

13   person?

14   A    I don't recall that, sir, per se, but --

15   Q    I'm going to show you, just to refresh your recollection

16   if it does, Defense Exhibit 95 for identification.

17              (Exhibit published to witness only.)

18              (Counsel approaches.)

19   A    Thank you.

20   Q    Look at the third and fourth entries down.

21   A    (Reviewing.)  I can make it out, yes.

22   Q    And do you recall that you had Roger in your phone as

23   Roger Ng?  Do you recall that?

24   A    No, not particularly, sir.

25   Q    Okay.  Do you recall having Roger listed as two different

Leissner - cross - Agnifilo                    2389

1    numbers in your phone?

2    A    Sorry, also no.

3    Q    That's fine, we'll move on.

4         Did you present Judy Chan with a divorce petition

5    that you were divorcing Kimora in March of 2016?

6    A    Yes, sir.

7    Q    And was that a legitimate divorce petition or something

8    that you had falsified?

9    A    Falsified.

10   Q    And you agree that over the course of your testimony, you

11   testified that you had made many, many fake contracts between

12   companies to explain different money transfers between banks;

13   correct?

14             MR. ROLLE:  Objection.

15             THE COURT:  One moment.

16             MR. ROLLE:  Misstates the testimony, Judge.

17             THE COURT:  Restate the question, Counsel.

18             MR. AGNIFILO:  I'm sorry, I didn't hear you.

19             THE COURT:  Rephrase the question.

20             MR. AGNIFILO:  Yes, yes.

21   BY MR. AGNIFILO:

22   Q    Is it fair to say that you and others have made

23   contracts, fake contracts, between companies to explain

24   different money transfers between banks?

25   A    Yes, sir.

Leissner - cross - Agnifilo                    2390

1   Q    And you did this in connection with transfers out of the

2   Capital Place account; correct?

3   A    Well, others did and I passed those agreements on to

4   Judy.  I think my role in that was just to transfer.

5   Q    Right.  So my question is, you and others; whether you

6   made it, whether someone else made it, this is something you

7   did with others; correct?

8   A    With Capital Place, yes; that's correct, yes.

9   Q    And you did it with others in regard to money transfers

10  concerning the World Merit account as well; is that fair to

11  say?

12  A    Yes, sir.

13  Q    And you did it in connection with others in connection

14  with the money transfers in regard to this series of transfers

15  with 145 million euros for the Kuwaiti sheikh; correct?

16  A    That's correct again, yes.

17  Q    And so you were involved in creating these false

18  agreements dozens of times, fair to say?

19  A    Well, I don't know the numbers, sir, but on multiple

20  occasions I have participated in that, yes.

21  Q    And you always did this with other people; correct?

22  A    Yes, sir.

23  Q    Sometimes it was Low; right?

24  A    That's correct.

25  Q    Sometimes it was Eric Tan; right?

Leissner - cross - Agnifilo                    2391

1    A    Yes, sir.

2    Q    And sometimes it was with Judy Chan, correct?

3    A    Again, with her it was just -- a she was more -- she was

4    only the recipient of those agreements.

5    Q    Understood.  And the purpose of these fake contracts was

6    always to mislead the bank as to the nature and the purpose of

7    money transfer, correct; that was the purpose?

8    A    Yes.

9    Q    You have not pleaded guilty to bank fraud; correct?

10   A    No, sir.

11   Q    You have not pleaded guilty to bank fraud on C1 Bank that

12   we discussed yesterday; correct?

13   A    Again, that's correct.

14   Q    And you understand that not pleading guilty to bank fraud

15   is a benefit to you; is that fair to say?

16   A    I don't -- I don't know if it's a benefit or not.  I know

17   for the guilty charges I took -- I don't know if that's a

18   benefit or not, sir.

19   Q    Do you understand one way or the other that if you did

20   plead guilty of bank fraud you could face greater punishment

21   than you are facing now?

22   A    I believe so.  I'm not a lawyer, sir, but I believe so.

23   Q    And do you understand that if you pled guilty to bank

24   fraud you could have to pay back the money that's involved in

25   the bank fraud?

Leissner - cross - Agnifilo                 2392

1    A    I'm not a lawyer, sir.  It's hard for me to comment on

2    your question.

3    Q    You committed immigration fraud as well, is that true?

4    A    Could you be more specific in that respect, sir?

5    Q    Sir, in 2017 you applied to be a lawful permanent

6    resident of the United States of America?

7    A    That's correct.

8    Q    And your application to do so was not truthful; is that

9    fair to say?

10   A    Yes, at least a part that I recall, yes, you are right.

11   Q    Okay.  And in your estimation what part of the

12   application was not truthful?

13   A    I believe it was a question whether or not either I had

14   committed or I had been convicted of a crime outside of the

15   United States, something along those lines.

16   Q    And you didn't indicate that you had any involvement in

17   the 1MDB bond matters; correct?

18   A    That is correct, yes.

19   Q    And at the time that you applied to be a lawful permanent

20   resident of the United States, you knew that that was a matter

21   that was under investigation by the FBI?

22   A    I had been subpoenaed by that time, yes.

23   Q    In 2016; correct?

24   A    That's correct.

25   Q    And you applied to be a lawful permanent resident in

Leissner - cross - Agnifilo                2393

1    2017?

2    A    That's correct.

3    Q    And so you specifically knew that this was something that

4    the United States Government was investigating; correct?

5    A    That's correct, yes.

6    Q    And you were not truthful in your application to be a

7    lawful permanent resident to the United States in regard to

8    what you did and what you knew of that matter, fair to say?

9    A    That's correct, yes.

10   Q    Okay.  Now, do you remember testifying on direct

11   examination at page 1302 between lines two and four and on

12   line two, you were asked a question:

13           "Question:  As a result of your guilty plea do you

14   understand that you will be deported?

15           "Answer:  That's my understanding."

16           Do you remember being asked that question and giving

17   that answer?

18   A    Yes, sir.

19           MR. AGNIFILO:  Let's pull up GX 3001 in evidence.

20           (Exhibit published.)

21   Q    Okay.  This is your cooperation agreement between

22   yourself and the United States; correct?

23   A    That is correct, sir.

24   Q    Can we go to paragraph 19?  This is paragraph 19 of that

25   document.

Leissner - cross - Agnifilo                    2394

1    A    Yes, sir.

2    Q    And it says:  If the defendant requests, and in the

3    Offices' judgment the defendant's deportation to Germany or

4    Brazil at the conclusion of his sentence in connection with

5    this case would pose a significant threat to the defendant's

6    safety, an S-1 -- sorry, an S visa relief and S visa relief is

7    warranted, the offices will recommend to the U.S. Department

8    of Justice that the defendant, and if appropriate, other

9    individuals be issued an S visa classification.

10             Do you see that?

11   A    Yes.

12   Q    So you don't know at all that you're going to be deported

13   based on your guilty plea?

14   A    It is my understanding and I think it was made clear by

15   the judge when I pled guilty that I would be deported.

16   This -- my understanding, I'm not a lawyer reading this but it

17   had been explained to me by my lawyers at the time.  It only

18   is the case if it poses a significant threat to my safety and

19   then maybe I could apply for a visa which I don't know sitting

20   here today if it's going to be granted or not.  So my

21   assumption is that I would be deported and it was made clear

22   at the my guilty plea hearing at the time.

23   Q    When you testified on direct you just said that it was

24   your understanding you would be deported?

25   A    That's right.

Leissner - cross - Agnifilo                2395

Q    You didn't mention anything about an S visa?

A    It's my understanding that I would be deported -- so if
it warranted maybe there is an S visa but my understanding is
I would be deported as I sit here today.

Q    You became a lawful -- has your application to be a
lawful permanent resident been disqualified because it was
false, to your knowledge?

A    When I -- I believe so, actually.  I think there is --
again, I'm not a lawyer in this respect, but my Green Card has
been revoked.  That's my understanding.  I do not have my
Green Card anymore for example.

Q    But you have not had to plead guilty to immigration
fraud; right?

A    I did not, sir.

Q    And you agree that on many occasions you lied to the FBI
in the proffer sessions.  We covered that; right?

A    On several occasions I did, at the beginning, to minimize
my involvement.  We had this discussion, yes.

Q    And you have not had to plead guilty to lying to the FBI;
correct?

A    I corrected my statements, sir, and so we have gone
through all the truth and facts as it relates to this case.

Q    My question is, have you pled guilty to lying to the FBI?

A    No, sir.

Q    You pled guilty to two crimes; right?

Leissner - cross - Agnifilo                    2396

1    A    That's correct.

2    Q    You pled guilty to the crime of conspiring with others to

3    pay foreign officials to help Goldman Sachs get or retain

4    business; correct?

5    A    Yes.

6    Q    All right.  And your understanding is that that is what

7    you did that made you guilty of the Foreign Corrupt Practices

8    Act conspiracy count; correct?

9    A    Yes, sir.

10   Q    And, specifically the business was in connection with the

11   1MDB bond deals that you talked about at length to this jury;

12   correct?

13   A    That's my understanding, yes, sir.

14   Q    Okay.  And the second crime that you pled guilty to is

15   money laundering in connection with the proceeds of the 1MDB

16   bond deals; correct?

17   A    That's correct.

18   Q    You did not plead guilty with regard to anything

19   involving accounting within Goldman Sachs; correct?

20   A    That's correct.

21   Q    You did not plead guilty to circumventing or avoiding the

22   accounting controls of Goldman Sachs; right?

23   A    That's correct.

24   Q    Now, is it your understanding that part of your deal

25   between yourself and the Government is that the Government

Leissner - cross - Agnifilo                    2397

1    will not prosecute Judy Chan?

2    A    Absolutely not my understanding, no, sir.

3    Q    You know that Judy Chan has moved in and out of the

4    United States during the pendency of this case; correct?

5              MR. ROLLE:  Objection, Your Honor.

6              THE COURT:  Sustained.

7    BY MR. AGNIFILO:

8    Q    Let me back up for a second.  You and Judy still speak

9    from time to time; correct?

10             MR. ROLLE:  Objection.

11             THE COURT:  Sustained.

12   BY MR. AGNIFILO:

13   Q    You -- a couple of things that we haven't covered:  In

14   2015 while you were still employed at Goldman Sachs -- what

15   was your position in 2015 at Goldman Sachs?

16   A    I was a participating managing director and a partner and

17   chairman of Southeast Asia at the time.

18   Q    And in 2015 you were working for a company called

19   Wildcat; correct?

20   A    Yes, sir.

21   Q    And you were being paid over $41,000 a month in

22   connection with your employment at Wildcat; right?

23   A    That's correct.

24   Q    And this is something you didn't tell Goldman Sachs

25   about, right?

Leissner - cross - Agnifilo                    2398

1   A    That's correct, yes.

2   Q    And Wildcat is sort of the family business of a man named

3   Bonderman; correct?

4   A    Correct.

5   Q    And Bonderman also runs TPG; is that right?

6   A    That's right.

7   Q    And is TPG the company where you got Najib Razak, the

8   former prime minister's daughter a job?

9   A    I didn't get her a job.  I introduced her to them, but

10  that's the TPG.

11  Q    And they hired her to your knowledge?

12  A    That's correct.

13  Q    And also while you were working at Goldman Sachs you were

14  being paid to be of the board of Celsius; right?

15  A    Yes, sir.

16  Q    So, I want to end my questioning of you this morning with

17  something that you said and ask you if it was true.

18       Do you remember saying to John Fieldly on June 8,

19  2018, I think Roger is being caught in a bad crossfire here?

20  A    I don't remember that, sir.

21  Q    All right.  I am going to show you -- specifically do you

22  remember sending that to him in a text?

23  A    No, sir, I don't remember that.

24  Q    All right, that's fine.  I'm going to show you what's

25  been marked for identification as DX 2706.

Leissner - cross - Agnifilo                    2399

1                   (Exhibit published to witness only.)

2                   (Counsel approaches.)

3    A    (Reviewing.)

4              Yes, sir.

5    Q    So let me give you a little bit of context.  Do you

6    remember having text communications with John Fieldly on June

7    8, 2018?

8    A    No, sir, I don't recall.  I mean, I have communicated

9    with John on text messages, but June 8 is too specific a time

10   that I can't remember.  I don't know.

11   Q    It's two days before you were arrested.

12   A    I realize that, sir, but it doesn't mean make remember

13   this.

14   Q    And do you remember saying to John Fieldly on June 8, I

15   think Roger is being caught in a bad crossfire here?

16   A    No, sir, I can't remember that.

17             MR. AGNIFILO:  Your Honor, we offer this.

18             THE COURT:  What is the Government's position?

19             MR. ROLLE:  We would object.  The excerpt is

20   probably fine, Judge, but to the remainder of the document --

21             THE COURT:  So it's admitted, only that specific

22   text.

23             MR. AGNIFILO:  Could we do the context so -- there's

24   really only maybe two entries.

25             MR. ROLLE:  Could we have a quick sidebar and we can

Leissner - cross - Agnifilo                    2400

1    sort it out?

2                THE COURT:  Yes.

3                (Sidebar held outside of the hearing of the jury.)

4                (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                         Sidebar                        2401
```

1              (The following sidebar took place outside the

2    hearing of the jury.)

3              THE COURT:  So these are a number of text messages.

4              MR. AGNIFILO:  We don't need what's after it.  I

5    think all I have want to show is that they're discussing,

6    Malaysia said to plan arrest of Low and ex-Goldman banker Ng.

7    Government and Economy, The Business Times.

8              So all we would be looking to do, Judge, is put up

9    that blurb and then that statement and we can do the -- we can

10   excise the rest of it.

11             MR. ROLLE:  We're fine with all the John Fieldly

12   messages on the page coming in.  There were some --

13             THE COURT:  There were what?

14             MR. ROLLE:  There were other messages who weren't

15   with John Fieldly at the time.

16             THE COURT:  I see.

17             MR. ROLLE:  The John Fieldly is fine and there's no

18   content for the Kimora Lee Simmons ones, so it's fine from our

19   perspective, the John Fieldly.  Just redact it.

20             THE COURT:  I take it you have no objection to it.

21   So the parties will agree to the portion that should be

22   redacted.

23             MR. AGNIFILO:  Yes.

24             (Sidebar ends.)

25             (Continued on next page.)

Leissner - cross - Agnifilo                    2402

1   (Continuing.)

2          THE COURT:  DX 2706 is admitted without objection

3   and as agreed to redaction.

4          MR. AGNIFILO:  Yes, Judge.

5          (Defense Exhibit 2706 received in evidence.)

6          (Exhibit published.)

7   BY MR. AGNIFILO:

8   Q    So what we see here -- remind us who John Fieldly is,

9   again.

10  A    He is the CEO of Celsius right now.  In 2018 he may --

11  yeah, I believe he was already the CEO of Celsius.

12  Q    Okay.  And at the time what was your position?  This is

13  2018 in June.  What was your position at Celsius?

14  A    I had none anymore.

15  Q    And if you see here -- and just to establish that number,

16  the one that's highlighted, that 347 number, that's you;

17  right?

18  A    That was my number at the time, yes.

19  Q    So you are communicating here with John Fieldly; correct?

20  A    Yes, sir.

21  Q    And so let's go through the part of this that we see

22  here.  We see a text from John Fieldly -- let me just move it

23  over so we can see the date.  So, this is a communication

24  between you and Fieldly on June 8, 2018; right?

25  A    Yes.

Leissner - cross - Agnifilo                    2403

1    Q    And you would be arrested two days later; correct?

2    A    That's correct.

3    Q    All right.  So Fieldly says, Hello, Tim.  Hope all is

4    well, about to board flight to Beijing.  This is hitting the

5    news and is concerning.  Will be in China 3 p.m. on Saturday.

6    Let me know when you have time to talk over the weekend,

7    right, talk soon.  John; right?

8    A    Right.

9    Q    And then there's an entry, Malaysia said to plan arrest

10   of Low and ex-Goldman banker Ng.  Government and Economy, The

11   Business Times; right?

12   A    Yes.

13   Q    And then you write to John Fieldly, Let's discuss.  I

14   think Roger is being caught in a bad crossfire here.  Do you

15   see that?

16   A    Yes, sir.

17   Q    You would start speaking to the FBI three days after

18   writing that to John Fieldly; correct?

19   A    Yes, sir.

20   Q    And at the time -- on June 8, 2018, you weren't speaking

21   to John Fieldly to try to get a better deal in connection with

22   something; you were speaking to him as a business colleague;

23   right?

24   A    Yes, I was just talking to him as a businessperson, yes.

25   Q    You had nothing to gain or nothing to lose from making

Leissner - redirect - Rolle                    2404

1   this statement to John Fieldly; correct?

2   A    At this stage to the outside world there was a gain in

3   the sense that none of us was going to reveal the scheme that

4   we had entered several years before.

5   Q    But you choose to say something.  John Fieldly doesn't

6   say to you I insist that you make a comment about Roger Ng.

7   You decide on your own to write what you wrote and you decided

8   to write on your own, Let's discuss.  I think Roger is being

9   caught in a bad crossfire here; correct?

10  A    That's correct.

11           MR. AGNIFILO:  I have nothing else, Judge.  Thank

12  you.

13           THE COURT:  Thank you.

14           Redirect?

15           MR. ROLLE:  Yes, Your Honor.

16  REDIRECT EXAMINATION

17  BY MR. ROLLE:

18  Q    Let's put back Defense Exhibit 2706 that we were just

19  looking at.  Mr. Leissner, you were just talking about John

20  Fieldly.

21  A    Yes, sir.

22  Q    And he was described as a businessperson; right?

23  A    Yes, correct.

24  Q    Who was he?

25  A    He was the CEO of Celsius.

Leissner - redirect - Rolle                2405

1   Q     The chief executive officer of Celsius?

2   A     Yes.

3   Q     He ran the company?

4   A     Yes.

5   Q     The Lloyd Blankfein of Celsius?

6   A     Yes.

7         THE COURT:  Slow down, Mr. Rolle.

8   Q     In 2018, what was your position at Celsius in

9   relationship with Celsius?

10  A     I didn't have a -- I didn't have a role at Celsius

11  anymore, sir.  I was of course still a large shareholder of

12  Celsius.

13  Q     What was the defendant's position at Celsius on that day

14  in that message?

15  A     I believe he still was running the Asian operations.  He

16  was the MD at that time for Asia.  I think so, at least.  I

17  can't remember the exact timings here.

18        MR. ROLLE:  And if we could publish Defense Exhibit

19  2706 from the ELMO.

20        (Exhibit published.)

21  Q     So he was an employee of Celsius?

22  A     That's right, that's my recollection, sir.

23  Q     And if we -- we'll zoom in a little bit so we can see.

24  So John Fieldly, the CEO of Celsius, sends you the news

25  article, right?

Leissner - redirect - Rolle                    2406

1  A    That's right.

2  Q    And he says to you, This is hitting the news and is

3  concerning?

4  A    Right.

5  Q    You didn't text this article to John Fieldly, did you?

6  A    No, I did not.

7  Q    He sent it to you?

8  A    That's right.

9  Q    And you didn't even work for Celsius?

10  A    That's right.

11  Q    Why did you understand he was sending it to you?

12  A    Because several reasons, of course.  One, I had

13  introduced Roger into Celsius.  I had helped him get that job

14  essentially.  I was at the time co-chairman of Celsius when I

15  did that.  So I was instrumental in hiring Roger into Celsius.

16  Two, the -- I was a shareholder still at the time and so they

17  would -- John many times would bounce issues, ideas, thoughts,

18  to me whether it was banking or in finance related or just

19  business related.  And, 3, he is clearly having a concern and

20  would like to have my views on this, given my close

21  relationship with Roger, but also the whole situation that was

22  clear to him around 1MDB and the Malaysia situation.

23  Q    And counsel asked you the question that you chose to give

24  an answer to John Fieldly.  Do you remember that question?

25  A    He asked it, yes.

Leissner - redirect - Rolle                    2407

1   Q    The CEO of the company has raised an article and said

2   it's concerning; right?

3   A    That's right.

4   Q    Could you blow him off, the CEO of Celsius?

5   A    No.

6   Q    And at the time that you proposed the defendant for a

7   position at Celsius, did you tell John Fieldly that you were

8   in a bribery and money laundering conspiracy with the

9   defendant?

10  A    No.

11  Q    Why didn't you tell him?

12  A    Why didn't I tell him?

13  Q    Yes.

14  A    Because Roger wouldn't have gotten a job and it would

15  have caused me an issue as well.  All the people involved in

16  the scheme maintained secrecy for as long as we possibly

17  could.

18  Q    And as of June 8, 2018, were you friends with the

19  defendant still?

20  A    Yes, of course.

21  Q    Had you been friends since he joined Goldman Sachs?

22  A    Yes, sir.

23  Q    Had you told anyone that he committed crimes with you?

24  A    No, sir.

25  Q    So, when you responded to John Fieldly and said, Let's

1  discuss, I think Roger is being caught in a bad crossfire

2  here, well, A, was that the truth that he was caught in the

3  bad crossfire?

4  A    Of course it's not true, sir.  This is still maintaining

5  the same cover or the same position that we've had over many

6  years by now; that there was nothing wrong, we were not

7  involved in the scheme; that, in fact, there wasn't a scheme

8  around 1MDB.

9  Q    So at this point in time you are still protecting the

10  defendant, to the CEO of the company that he worked for?

11  A    Yes.

12  Q    Two days later you got arrested by the FBI?

13  A    Yes, sir.

14  Q    And two days later do you remember telling the truth

15  about the scheme?

16  A    We started telling the truth about the scheme, yes.

17  Q    And do you remember for the first time saying that the

18  defendant was at a meeting in London where he discussed the

19  scheme?

20  A    I don't remember the specific dates, sir, but yes, I did

21  disclose that to the prosecution and the FBI.

22  Q    So, on June 8th you were still protecting the defendant.

23          MR. AGNIFILO:  Your Honor, I'm objecting to the

24  leading.

25          THE COURT:  Rephrase the question, Mr. Rolle.

1    Q     June 8th --

2             THE COURT:  And is your Mike on?

3             MR. ROLLE:  It is, Judge.

4             THE COURT:  Okay.

5    BY MR. ROLLE:

6    Q     What happened between June 8th and June 11th when you

7    said that he was caught in the crossfire to you saying we were

8    at a meeting in London in a criminal scheme?

9    A     I was arrested in that time.

10   Q     And why did you protect the defendant in your meeting

11   with the Government?

12   A     Because now I realized that the time had come to tell the

13   truth and that it was time to close one chapter and open a new

14   chapter and it was the Government that I was talking to.  I

15   wasn't talking to John Fieldly anymore.  I was talking to the

16   Government and I think that was the right time to start

17   telling the truth.

18   Q     So over the course of almost three weeks you've described

19   in detail your relationship with the defendant?

20   A     Yes, sir.

21   Q     And the scheme that you were involved in with him?

22   A     Yes, sir.

23   Q     You were asked questions about every aspect of that?

24   A     Yes, sir.

25   Q     You described Jho Low as a mastermind in this scheme?

Leissner - redirect - Rolle                    2410

1   A    I might not have used those words, but he clearly was the

2   person who put the whole scheme together.

3   Q    And you were asked on cross-examination numerous

4   questions about your relationship with Jho Low.  Do you

5   remember those questions?

6   A    Of course, sir.

7   Q    And between 2009 and 2012, who was the person in direct

8   communication with Jho Low from Goldman Sachs?

9   A    That was Roger.

10  Q    You were asked on cross-examination about all of the

11  things you did personally with Jho Low, numerous questions

12  about that; right?

13  A    That's correct, yes.

14  Q    Including questions about what you did with Jho Low

15  between 2015 and 2018 that didn't have anything to do with the

16  defendant; right?

17  A    That's correct.

18  Q    I would like to clarify a few things.

19  A    Sure.

20  Q    At Goldman Sachs, who proposed Jho Low for a private

21  wealth management account in 2009?

22  A    That was Roger.

23  Q    Who first brought the Kazit Gold, Jho Low-linked

24  transaction to Goldman Sachs in 2010?

25  A    That was Roger.

Leissner - redirect - Rolle                    2411

1    Q      Who proposed Jho Low again for a private wealth

2    management account in 2011?

3    A      That was Roger as well.

4    Q      Who told you about the favors Jho Low wanted done for the

5    prime minister of Malaysia during those years, like the

6    charity?

7    A      That was Roger, sir.

8    Q      Who brought 1MDB into Project Magnolia?

9    A      Again, that was Roger.

10

11                   (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Leissner - redirect - Rolle                    2412

1    BY MR. ROLLE:  (Continuing.)

2    Q    Who from Goldman Sachs attended the February 2012 meeting

3    in London at Jho Low's apartment?

4    A    Roger and myself.

5    Q    Who led the discussion of the deal structure at that

6    meeting at Jho Low's apartment?

7    A    That was Roger.

8    Q    Who from Goldman Sachs attended your very first meeting

9    in Abu Dhabi with Jho Low on Project Magnolia?

10   A    Roger, Andrea and myself.

11   Q    Who from Goldman Sachs flew all the way to the L'Ermitage

12   in Beverly Hills to meet with Jho Low on Project Magnolia?

13   A    Roger and myself.

14   Q    Who from Goldman Sachs flew to Singapore to meet Jho

15   Low's personal banker and bankers at BSI to talk about Project

16   Magnolia?

17   A    Again Roger and myself.

18   Q    Ultimately who did you pay $35 million in kickbacks to

19   when all of these three deals were said and done?

20   A    Roger and Hwee Bin.

21   Q    Now, everything you just described was a crime?

22   A    Yes, sir.

23   Q    Much of what you described, all of it, violated some

24   Goldman Sachs policy?

25   A    That is correct, sir.

Leissner - redirect - Rolle                    2413

1   Q    Why were you comfortable doing all of these things with

2   the defendant?

3   A    We were very close and we trusted each other, sir.

4   Q    You talked about side deals you had undertaken with the

5   defendant?

6   A    Several side deals, yes, sir.

7   Q    You were asked questions about Vietnamese warrants as a

8   side deal on cross-examination?

9   A    Yes, sir.

10  Q    Why were you comfortable pursuing side deals making money

11  outside of Goldman Sachs with the defendant?

12  A    We had a long-standing working relationship, friendship,

13  and we trusted each other.

14  Q    If you could pull up Government's Exhibit 2514 for

15  identification.  Do you recognize this document?

16  A    Yes.

17  Q    Is it an e-mail?

18  A    It is an e-mail.

19  Q    Did you receive it?

20  A    Yes, sir.

21  Q    What is the date?

22  A    November 12, 2011.

23          MR. ROLLE:  We offer this.

24          MR. AGNIFILO:  No objection.

25          THE COURT:  Admitted.

Leissner - redirect - Rolle                    2414

1          (Government Exhibit 2514 received in evidence.)

2    BY MR. ROLLE:

3    Q    The subject line is what, Mr. Leissner?

4    A    Signet's presentation 11/11/11, no capital structure

5    slide PDF.

6    Q    There is an attachment.  If we could good to page two of

7    the attachment, the second slide I should say.  What does this

8    presentation relate to?

9    A    This was the, I think I described it before, a very small

10   company with assets, oil and gas assets, in Africa.

11   Q    If we go to the next page, and keep scrolling.  Your name

12   is in this?

13   A    Yes.

14   Q    You were asked questions about being the chairman of

15   Signet on cross?

16   A    Yes.

17   Q    You served on the board, you recall now?

18   A    Yes.

19   Q    That wasn't disclosed to Goldman Sachs.

20   A    That was not, sir.

21   Q    Your investment in Signet, was that disclosed to Goldman

22   Sachs?

23   A    No, sir.

24   Q    Did the defendant know about that investment?

25   A    Yes.

Leissner - redirect - Rolle                2415

1    Q    Did he know about your position on the board?

2    A    Yes, sir.

3    Q    Can we go to the first e-mail we looked at.  What did you

4    tell the defendant here on November 12, 2011 about this

5    presentation?

6    A    I'm saying:  FYI, please don't show this with the page

7    with my name on it.  Will delete that in the next day.

8    Q    Why did you tell him that?

9    A    Because presumably I didn't want that to be a known fact,

10   I did not disclose that to Goldman Sachs.

11   Q    What e-mail address did you send it to?

12   A    His private e-mail.

13   Q    Why did you do that?

14   A    Because I didn't want to be caught by Goldman Sachs

15   e-mail surveillance, is what I believe it to be now.

16   Q    At the time did you trust that the defendant wouldn't

17   tell Goldman Sachs about this side deal that clearly was

18   happening?

19   A    Yes, I trusted him.

20   Q    We can take that down.

21        Counsel asked you on cross-examination about Roger

22   being your "so-called friend," do you remember him using those

23   words?

24   A    Yes, he used those words.

25   Q    Was the defendant your friend?

Rivka Teich

Leissner - redirect - Rolle                    2416

1   A    Yes, he was.

2   Q    While you were at Goldman Sachs, were you friends?

3   A    Yes, sir.

4   Q    After he left, the defendant left, Goldman Sachs, were

5   you friends?

6   A    Yes, sir.

7   Q    As you just mentioned at Celsius, did you help him get

8   the position there?

9   A    I did MD for Asia.

10  Q    Do you remember on cross-examination you were asked a lot

11  of questions about your many personal affairs?

12  A    Yes, sir.

13  Q    And you were asked about those affairs on direct

14  examination too?

15  A    Yes, sir.

16  Q    Did you answer all of those questions about your affairs

17  and your personal life?

18  A    Yes, I did.

19  Q    Why did you come here and tell this jury about those

20  affairs in your personal life?

21  A    Because it's my agreement that I would appear and testify

22  to all the truths, not just selectively, regarding for example

23  the transactions.  I came prepared to -- yeah, to tell

24  everything as painful as that may be.

25  Q    You hid your affairs from certain people in your life?

Leissner - redirect - Rolle                              2417

1    A    All the time.

2    Q    Did you hide them from the defendant?

3    A    No, sir.

4    Q    If we could pull up Government Exhibit 2374?

5              THE COURT:  In evidence?

6              MR. ROLLE:  For identification, your Honor.

7    Q    Do you recognize this document?

8    A    It's an e-mail.

9    Q    An e-mail that you received?

10   A    Yes, sir.

11   Q    Is the defendant on this e-mail?

12   A    Yes, he is.

13             MR. ROLLE:  We offer it, your Honor.

14             THE COURT:  What is the number?

15             MR. AGNIFILO:  We don't have it.

16             THE COURT:  What is the exhibit number?

17             MR. ROLLE:  Government's Exhibit 2374 for

18   identification.

19             MR. AGNIFILO:  If we could see the whole thing on

20   the screen.

21             That's fine.  No objection.

22             THE COURT:  Admitted.

23             (Government Exhibit 2374 received in evidence.)

24   BY MR. ROLLE:

25   Q    So the top e-mail is from the defendant, right, his

1   personal e-mail address?

2   A    Yes.

3   Q    Let's go to the first e-mail in the chain.  What is the

4   date, sir?

5   A    June 30, 2013.

6   Q    Who are you married to at that point?

7   A    Judy.

8   Q    Judy Chan?

9   A    Yes.

10  Q    Who this e-mail from?

11  A    Kimora.

12  Q    Kimora Lee Simons?

13  A    Yes.

14  Q    What is the subject?

15  A    Your wifey.

16  Q    She writes:  Love you.  Right?

17  A    Yes, sir.

18  Q    What do you with that e-mail?

19  A    I'm forwarding it on to Boon-Kee and Roger.

20  Q    You forwarded it to Boon-Kee Tan and Roger?

21  A    Correct.

22  Q    You say:  What so you guys say?  Go for it?

23  A    Yes, sir.

24  Q    Had you just met Ms. Simmons at this point?

25  A    Three months ago, yes.

Leissner - redirect - Rolle                    2419

1  Q    Why are you forwarding this e-mail from her about your

2  wifey to the defendant and Boon-Kee?

3  A    Because I wanted their support.  I wanted them to get

4  their support.

5  Q    The defendant knew you were married to Judy Chan?

6  A    Yes, he did.  He was aware.

7  Q    If we scroll up in this the chain.  Boon-Kee Tan says:

8  For sure.  Shall I get Lala to clear BSC/conflict this is

9  Friday?

10  A    Yes.

11  Q    What is BSC?

12  A    Business selection.

13  Q    And conflicts?

14  A    Those are Goldman Sachs terms to clear transaction,

15  basically.

16  Q    What do you know Boon-Kee Tan to be saying?

17  A    It's a joke between us; whereby, she's saying that, she's

18  saying of course, for sure I should go with Kimora.  And she

19  makes a reference to a Goldman Sachs process whereby you

20  choose a transaction basically.  So she's referring to

21  choosing Kimora, or making an analogy to the Goldman Sachs

22  process.

23  Q    Business selection is where you choose which deals you're

24  going to do?

25  A    And if you have a conflict, that's right.

Leissner - redirect - Rolle                    2420

1    Q    Here, which person are you going to choose in your

2    personal life?

3    A    Yes.

4    Q    And the defendant responds?

5    A    Good thing we don't have John McG, which is John McGuire,

6    involved here.  He would probably want to involve BIG too.

7    Q    What is he talking to?

8    A    Inside joke, to say that, referring to the Goldman Sachs

9    process whereby you select a transaction and vet the parties,

10   BIG would be vetting the parties.

11   Q    The parties in this e-mail are?

12   A    Judy and Kimora.

13   Q    And there is a reference he says he probably would want

14   to involve BIG too.  We've heard a lot about the BIG?

15   A    Business Intelligence Group.

16   Q    What was their role in your actual business at Goldman

17   Sachs?

18   A    To vet, effectively, to examine the parties involved to

19   see if we would be able to do business with them.

20   Q    So he's joking about BIG getting involved to review --

21   A    To review the two parties.

22   Q    You were asked a few minutes ago about saving Rohana

23   Rozhan's number in your phone as Roger?

24   A    Yes, sir.

25   Q    If you save someone's name in your phone as another name,

Rivka Teich

1    if Rohana would call you, what would it show up as?

2    A    As Roger.  I did this on other occasions too with

3    different names to disguise who is actual calling or texting

4    you.

5    Q    In those years, if Judy Chan had seen Roger showing up on

6    your phone, what did you understand would have happened?

7    A    She would have thought that Roger was calling me rather

8    than Rohana.

9    Q    Why would that be acceptable to you instead of Rohana?

10   A    Then Judy wouldn't know that's Rohana calling.

11   Q    During those years, did the defendant know you were

12   having an affair with Rohana Rozhan?

13   A    Yes, he did.

14   Q    To your knowledge, did he ever tell Judy?

15   A    No, he never told Judy.

16   Q    You were asked about that affair numerous times on

17   cross-examination, right?

18   A    Yes, sir.

19   Q    Do you recall at some point testifying on

20   cross-examination, you began to say Judy knew from 2005

21   onwards that I was having an off/off and on relationship with

22   Rohana?

23   A    Yes, sir.

24   Q    Can you explain what you meant by that?

25   A    Yes.  I was initially trying to hide the affair with

Leissner - redirect - Rolle                          2422

1    Rohana from Judy in the early years.  I first met Rohana in

2    2003.  I think the relationship started shortly thereafter,

3    late 2003 early 2004.  But in 2005, Rohana learned that my

4    second daughter, Angelina, was being born.  And she decided to

5    call Judy at that time and reveal that we've had this affair.

6    So Judy learned just around the time of my daughter's birth

7    that I was having this affair for a period of time.

8    Q    From that point on she knew, as far as you understood it?

9    A    Yes, sir.

10   Q    Through time, Judy Chan became aware of other

11   relationships you maintained with other women?

12   A    Yes, she did learn about Elia and other people as well.

13   Q    Did you have conversations with her about leaving her for

14   any of these other women?

15   A    I did, yes, sir.

16   Q    You were asked numerous questions about the London

17   meeting in February 2012.  Do you recall those questions?

18   A    Yes, sir.

19   Q    That was a meeting at which you described bribes,

20   kickbacks with Jho Low and the defendant?

21   A    Yes, sir.

22   Q    You were asked numerous questions on cross-examination

23   about when that London meeting really took place.  Do you

24   remember those questions?

25   A    Yes, sir.

Leissner - redirect - Rolle                    2423

1   Q    Do you remember being asked about almost every trip you

2   took to London in 2012?

3   A    Yes, sir.

4   Q    You were asked if it happened in January or April or

5   March?

6   A    Right, correct.

7   Q    If we could pull up Government's Exhibit 1745, which is

8   in evidence.  What is the date of this e-mail?

9   A    February 26, 2012.

10  Q    From Jasmine Loo to you and the defendant?

11  A    Yes.

12  Q    Can we look at the attachment?  What was this again, sir?

13  A    This is the structural chart as to the various parties

14  involved in Project Magnolia, and how the money was being

15  raised from Goldman Sachs, what kind of structure we employed

16  within 1MDB, but also within the IPIC site with the guarantee

17  position in it.  So it's a detailed, very detailed, outline of

18  Project Magnolia right here.

19  Q    It was hand drawn on a blank sheet of paper.

20  A    That's correct.

21  Q    You received this the very day of your meeting London?

22  A    That's correct, sir.

23  Q    February 26, 2012?

24  A    Yes, sir.

25  Q    As you've explained, who from Goldman Sachs and 1MDB were

Leissner - redirect - Rolle                    2424

1   there?

2   A    From Goldman Sachs it was Roger and myself.  From 1MDB it

3   was Jasmine, and by extension Nik Faisal, and SRC, and there

4   was of course Jho Low as well.

5   Q    If we can go to the e-mail again for a moment.  Let's put

6   that to one side if we can, Mr. Youkilis.

7           I'd like to pull up Defense Exhibit 2169 in

8   evidence, if we can zoom in on 2169.  Do you remember seeing

9   this document on cross-examination?

10  A    Yes, sir.

11  Q    It's an e-mail chain between you and Hazem Shawki?

12  A    Yes, sir.

13  Q    That was a Middle Eastern banker for Goldman Sachs?

14  A    That's correct.

15  Q    The date of these e-mails is February 23?

16  A    Yes, sir.

17  Q    And your e-mail, which is the second from the top, tell

18  me if I read this right:  I'm seeing Jho on Sunday in London.

19  A    Yes, sir, that's correct.

20  Q    That was February 23, Thursday?

21  A    That's right.

22  Q    So Sunday is how many days away?

23  A    Three days, four days away.

24  Q    So the 26th of February?

25  A    Yes.

Leissner - redirect - Rolle                    2425

1    Q    2012?

2    A    Yes, sir.

3    Q    That's when the meeting happened?

4    A    That's correct.

5    Q    On direct you testified about your first trip to Abu

6    Dhabi on Project Magnolia, right?

7    A    That's correct.

8    Q    You testified a few minutes ago that was with the

9    defendant and Andrea Vella for Goldman Sachs?

10   A    Correct.

11   Q    Who else was there when you met with Jho Low?

12   A    Jho Low, and Jasmine was there too.

13   Q    You met with them at Emirates Palace?

14   A    Correct, in the lobby.

15   Q    You were asked a number of questions on cross-examination

16   about, like London, those trips to Abu Dhabi?

17   A    Yes, sir.

18   Q    You were asked whether the defendant was there for any of

19   these meetings in Abu Dhabi?

20   A    Yes, sir.

21   Q    To be clear, was the defendant present in Abu Dhabi for

22   your first meeting with Jho Low?

23   A    Yes, sir.

24   Q    In Abu Dhabi?

25   A    In Abu Dhabi.

Leissner - redirect - Rolle                    2426

1   Q    After that first trip, did you have multiple meetings in

2   Abu Dhabi?

3   A    Yes, sir.

4   Q    Did they happen in quick succession?

5   A    Very, very quick succession.  It was really multiple

6   trips, yes.

7   Q    If we could pull up Defense Exhibit 2202 in evidence.

8   Tell me if you remember seeing this document on

9   cross-examination?

10  A    Yes, sir.

11  Q    This was the Blackberry SMS you said?

12  A    Yes, correct.

13  Q    Welcoming you to the united Arab Emirates?

14  A    Yes.

15  Q    It was sent March 3rd, 2012, right?

16  A    It's March 5, yes.

17  Q    Received March?

18  A    Yes.

19  Q    Does that say March 3rd, 2012?

20  A    Yes.

21  Q    This is when you arrive in Abu Dhabi on March 3rd 2012?

22  A    That's right, correct.

23  Q    Did you coordinate with Jasmine Loo ahead of that meeting

24  in Abu Dhabi?

25  A    I don't specifically recall that, but she did act as a

1   coordinator for many of these meetings.

2   Q    When you coordinated with Jasmine in general, was the

3   defendant involved with coordinating with Jasmine?

4   A    Yes.

5   Q    I'd like to show you Government Exhibit 1770 for

6   identification.  Do you recognize that?

7   A    Yes, sir.

8   Q    Is it an e-mail you received?

9   A    An e-mail I received, yes.

10  Q    What is the date?

11  A    March 3rd, 2012.

12  Q    March 3rd 2012?

13  A    That's correct.

14        MR. ROLLE:  We offer it, your Honor.

15        MR. AGNIFILO:  No objection.

16        THE COURT:  So admitted.

17        (Government Exhibit 1770 received in evidence.)

18  Q    So the top e-mail is from Jasmine Loo to you and the

19  defendant?

20  A    That's correct.

21  Q    The subject is:  Acknowledgment letter?

22  A    Yes, sir.

23  Q    What does Jasmine Loo write to you and the defendant on

24  March 3rd?

25  A    She writes:  I think we left out the signing part for

Leissner - redirect - Rolle                    2428

1  1MDB.  This should be more agreeable so that it is both 1MDB

2  and IPIC committing.  Please bring this version, any changes

3  we will update when here.

4  Q    What did you understand her to mean "will update when

5  here"?

6  A    She means to update the document, the acknowledgment

7  presumably, when in Abu Dhabi.

8  Q    That's because you were in Abu Dhabi with Jasmine Loo and

9  the defendant?

10  A    That's correct.

11  Q    I'd like to show you Government's Exhibit 2249 for

12  identification.  Do you recognize this document?

13  A    Yes, sir.

14  Q    An E-mail you received?

15  A    Yes, sir.

16        MR. ROLLE:  We offer if, your Honor.

17        MR. AGNIFILO:  No objection.

18        THE COURT:  Admitted.

19        (Government Exhibit 2249 received in evidence.)

20  Q    This e-mail is a forward from you to the defendant,

21  right?

22  A    That's correct.

23  Q    From your personal account?

24  A    Yes, sir.

25  Q    What are you forwarding to the defendant?

1   A    It's called letter of intent Aabar.  I believe that's

2   what it is.

3   Q    You're forwarding a message you just received from

4   Jasmine Loo to you?

5   A    That's correct.

6   Q    And the dates, the date you forwarded it to the defendant

7   is March 3rd, 2012?

8   A    That's correct.

9   Q    You say:  Have the letterhead with me.

10  A    Yes.

11  Q    Do you remember what you were doing here?

12  A    I think we were preparing a letter coming from Goldman

13  Sachs that we wanted to have excluded by 1MDB and IPIC to

14  essentially commit to doing this transaction.

15  Q    So you were in Abu Dhabi, you go and meet with Jho Low,

16  right?

17  A    That's right.

18  Q    The defendant is there?

19  A    Yes.

20  Q    Andrea Vella is there?

21  A    Correct.

22  Q    You went there to talk about Project Magnolia?

23  A    Yes.

24  Q    Just a week after you were in London, you go to Abu Dhabi

25  and have another meeting with Jho Low?

Leissner - redirect - Rolle                    2430

A    Yes, sir.

Q    The same characters were there?

A    Roger Jasmine, myself; the only addition, effectively, is Andrea.

Q    We can take that down.

        I want to take a moment on committees at Goldman Sachs.  You were asked some questions about that on cross-examination?

A    Sure, yes.

Q    You recall being shown minutes of committee meetings?

A    Yes, sir.

Q    If we could pull up Defense Exhibit 2396 in evidence. For efficiency, these are the minutes of a Project Maximus committee meeting, right?

A    Yes, sir.

Q    Specifically the firm-wide suitability meeting?

A    That's correct.

Q    You were shown this document on cross?

A    Yes.

Q    Can we scroll down to the bottom?  You were shown -- keep scrolling down so we can see all the names.

        You were shown this and asked about this as an attendee list?

A    Yes, that's how it was shown to me.

Q    Do you recall being asked that the defendant wasn't

Leissner - redirect - Rolle                    2431

1   listed on this attendee list?

2   A    That's correct.

3   Q    Now, is the entire deal team of Project Maximus listed on

4   this document?

5   A    No, sir, only the people that would be presenting.

6   Q    So Andrea, Tim Leissner, Cyrus Shey, those are not only

7   the bankers working on Project Maximus?

8   A    We had clearly a few more, maybe ten more or so.

9   Q    Going to the first page, again, this was August of 2012?

10  A    That's correct.

11  Q    Besides committee minutes, there are committee memos that

12  exist too?

13  A    That's correct, yes.

14  Q    If we could pull up Government's Exhibit 811 in evidence.

15  This is one of those memos?

16  A    Yes, sir.

17  Q    Did you see this on cross-examination?

18  A    No, sir.

19  Q    If we could look at the full -- there is a lot more names

20  on this?

21  A    Yes.

22  Q    Who are all these people?

23  A    Those are all people that are part of the deal team,

24  including the control side and the business side.

25  Q    Is the defendant on this list?

Leissner - redirect - Rolle                    2432

1    A    Yes, he's listed under coverage, FICC Roger Ng.

2    Q    This is the same deal for the minutes we looked at?

3    A    Yes, sir.

4    Q    Why is the defendant listed on this committee memo?

5    A    He was part of the team very much, so he was the coverage

6    banker for 1MDB.

7    Q    You testified about -- you were shown documents and asked

8    about personnel from Goldman Sachs who are in New York?

9    A    Yes, sir.

10   Q    Do you recall being asked about the role of Goldman

11   Sachs' New York headquarters in reviewing and approving these

12   transactions?

13   A    Yes, sir.

14   Q    What was the role again?

15   A    New York headquarter for committee was also the center of

16   the committee; meaning, that's where the committee was

17   essentially located.  Yes, we had participants from all around

18   the world, but the nucleus and the headquarters of committee

19   is New York.

20

21            (Continued on the following page.)

22

23

24

25

Leissner - redirect - Rolle                    2433

1    (Continuing.)

2           MR. ROLLE:  If we could pull up Defense

3    Exhibit 2323, which I believe was admitted at the time.

4           (Exhibit published.)

5           THE COURT:  One second.

6           Was this admitted, Mr. Agnifilo?

7           MR. AGNIFILO:  It was, we're just trying to get the

8    date.

9           THE COURT:  Okay.

10          MR. AGNIFILO:  March 3rd, Judge.

11          THE COURT:  Okay.

12   EXAMINATION CONTINUING

13   BY MR. ROLLE:

14   Q    And do you recognize this e-mail?  It's a long chain.

15   A    Yes.

16          MR. ROLLE:  If we could scroll down, I think, just

17   to the bottom e-mail and make that bigger.  Thank you.

18   BY MR. ROLLE:

19   Q    That e-mail you saw on cross-examination, right?

20   A    Yes, correct.

21   Q    It's from Wassim Younan, who was part of the deal team --

22   A    Correct.

23   Q    -- on Project Magnolia?

24   A    Yes, he was.

25   Q    To David Viniar, Michael Sherwood, Stephen Scherr and

Leissner - redirect - Rolle                    2434

1   Fran Bermanzohn?

2   A    That's right.

3   Q    Who was David Viniar?

4   A    David Viniar was the CFO, the chief financial officer of

5   Goldman Sachs.

6   Q    Of the whole company?

7   A    Of the whole company, yes.

8   Q    Where did he work?

9   A    In New York.

10  Q    And Michael Sherwood, who was that?

11  A    He was the head of Goldman Sachs International, the

12  chairman for Goldman Sachs International.

13  Q    And Stephen Scherr?

14  A    Stephen Scherr was the head of Global Capital Markets at

15  that time.

16  Q    And where did he work?

17  A    He was in New York, as well.

18  Q    And I don't know if you recall Fran Bermanzhon.

19       Do you remember who that is was, it says Legal?

20  A    She was -- she was, I think, the head of compliance

21  globally, sir, is my recollection.

22  Q    Do you know where she worked?

23  A    New York.

24  Q    So, Wassim Younan is posting these.

25       These are pretty senior people at the Goldman Sachs

SAM     OCR     RMR     CRR     RPR

Leissner - redirect - Rolle                    2435

1   group?

2   A    Those were probably the most senior people that would be

3   more involved on a day-to-day basis.  Both, of course, Gary

4   Cohn and Lloyd Blankfein also got involved.  But in terms of

5   more day-to-day things, Capital Committee and things like

6   that, those were the people.

7   Q    At Goldman Sachs did you guys use the word post?

8   A    Yes, sir.

9   Q    What does it mean to post?

10  A    To post, especially important people or committee

11  members, is to give them, essentially, a heads-up on

12  transactions before there was formal approval process

13  commenced.

14          So, to post this group of people, or any group of

15  people, means that you pre -- pre-empt the actual formal

16  process by going to them first.

17  Q    Now, you were asked questions --

18          MR. ROLLE:  We can take that down, Mr. Youkilis.

19  Thank you.

20  BY MR. ROLLE:

21  Q    You were asked questions on cross-examination about

22  discussing Jho Low on e-mails within Goldman Sachs.

23          Do you remember that?

24  A    Yes, sir.

25  Q    You testified throughout your testimony about, at times,

1  hiding Jho Low's involvement on e-mail?

2  A    Yes, sir.

3  Q    Now, were those efforts focused on Jho Low's key

4  decision-making authority at 1MDB, in terms of what you were

5  hiding?

6  A    Very much so, yes.

7  Q    And why, again, were you trying to hide that?

8  A    Because we were talking about a government institution

9  here where an outsider, not part of the corporate structure or

10 the governing structure, essentially, held all the power and

11 all the control was with him.  And that connection came from

12 his relationship with the Prime Minister.

13         Even before the scheme started, that was the reason

14 we kept that away from Goldman Sachs.  When the scheme

15 started, of course, the sensitive -- sensitivity only

16 increased because now we knew we were commencing, "we" being

17 Roger and I at Goldman Sachs, we knew that we were engaging in

18 criminal activity that we didn't want anybody to uncover.

19 Q    So, you tried not to e-mail with Jho Low around Project

20 Magnolia, Maximus or Catalyze?

21 A    Any 1MDB-related business going forward, that's right.

22 Q    Who in Goldman Sachs were you trying to hide that from

23 over e-mail?

24 A    From the control function, sir.  Yes, it was really them

25 who would have stopped us in the tracks to pursue this

Leissner - redirect - Rolle                2437

1   transaction had they known about Jho Low.

2   Q    Now, you believed years later you were going to be fired

3   by Goldman Sachs after the Bank Havilland letter, right?

4   A    That's correct.

5   Q    How did they find that letter again?

6   A    They did e-mail surveillance on a separate, different

7   transaction regarding an Indonesian project.  They went

8   through all the deal team's e-mails.

9   Q    So, Goldman Sachs could review your e-mails?

10  A    All the time, and that's one of the things we knew would

11  happen -- could happen, would happen.

12          MR. ROLLE:  If we could pull up Defense Exhibit 2481

13  in evidence.

14          (Exhibit published.)

15  BY MR. ROLLE:

16  Q    Do you remember seeing this document on

17  cross-examination?

18  A    Yes, sir.

19  Q    This was a summary about Jho Low that you sent to Goldman

20  Sachs's executive office --

21  A    Yes, sir.

22  Q    -- in 2012?

23  A    Yes, sir.

24  Q    None of these people are in the control function, are

25  they?

SAM    OCR    RMR    CRR    RPR

Leissner - redirect - Rolle                2438

1   A    No, sir.

2   Q    Joseph Porter?

3   A    No, they're in the executive office.

4   Q    And just read this.  You can take your time, but tell me

5   where in the summary it says the word 1MDB.

6            (Pause.)

7   A    Nowhere, sir.

8   Q    And by that point, how many of the 1MDB bond deals had

9   you done?

10  A    We had done two of those, Project Magnolia and Project

11  Maximus.

12           MR. ROLLE:  You can take that down.

13  BY MR. ROLLE:

14  Q    You were asked questions on cross-examination about your

15  connections to a company called Lazard?

16  A    Yes, sir.

17  Q    And what was Lazard?

18  A    Lazard was a and is a very prominent investment bank

19  focused mostly on the advisory side of the business, as well

20  as asset management.  But it's really emanating mergers and

21  acquisitions, advisory and restructuring work.

22  Q    You were asked questions on cross-examination about you

23  seeking a position with Lazard at some point?

24  A    I was, yes.

25  Q    And, in fact, at some point you recall you were seeking a

1    position at Lazard?

2    A    That's correct, yes, sir.

3    Q    Did you ever join Lazard?

4    A    No, sir.

5    Q    And you talked about on cross-examination looking for

6    opportunities at other entities, as well?

7    A    That's correct, sir.

8    Q    That included something called Polo?

9    A    Yes, sir.

10   Q    Do bankers at Goldman Sachs ever look for other jobs and

11   leave Goldman Sachs to go to other investment banks?

12   A    All the time.  I mean through anybody's career, it is a

13   very common thing to -- to be recruited to competing

14   organizations.

15   Q    You were also asked questions on cross-examination about

16   Lazard's involvement in the 1MDB business.

17        Do you remember those questions?

18   A    Yes, sir.

19   Q    Do you recall being asked:  So, the first advisory that

20   you brought the 1MDB deal to was Lazard; do you remember being

21   asked that question?

22   A    Yes.

23   Q    In response you started to explain something about a

24   conflict at Goldman Sachs?

25   A    Yes.

1    Q    Could you just explain what you meant?

2    A    Yes, sir.

3             As a full service investment bank, we have different

4    sides of the business.  Clearly, in the instance of 1MDB we

5    were doing two parts of that business.

6             One was we were being the advisor for the

7    acquisition of the Tanjong assets.  With that, we have the

8    fiduciary responsibility to our client.

9             At the same time we were also going to be the

10   underwriter of the bonds.  With that, you know, we were

11   effectively taking our own risk and our own risk position

12   because we were using our own money, effectively, to fund

13   1MDB.  That position is in conflict with the advisory mandate

14   by nature because, on the one hand, we have a fiduciary

15   responsibility to the client; on the other side, the funding

16   side, we are now interested in our own risk rather than our

17   client.

18             MR. ROLLE:  If we could pull up Defense Exhibit 2106

19   in evidence.

20             (Exhibit published.)

21   BY MR. ROLLE:

22   Q    On cross-examination you were shown this document, a

23   January 19, 2012 e-mail chain with Jeffrey Rosen at Lazard?

24   A    Yes.

25   Q    And you were asked a lot of questions about taking 1MDB

Leissner - redirect - Rolle                2441

1    business to Lazard?

2    A    Yes, sir.

3    Q    Did you take 1MDB business to Lazard?

4    A    No.  Ultimately, they were not involved in any of these

5    businesses.

6    Q    And you were shown this e-mail, and it doesn't have the

7    defendant on it, right?

8    A    That's right.

9    Q    And counsel even asked you if you saw the defendant's

10   name on it?

11   A    No, he did not ask.

12   Q    Was the defendant aware of your discussions with Lazard

13   about 1MDB?

14   A    Yes.

15            MR. ROLLE:  I'd like to take a look for

16   identification at Government Exhibit 2504, 2509 and 2526.

17   BY MR. ROLLE:

18   Q    We can bring them up one at a time and you can tell me if

19   you recognize them, sir.

20   A    Yes, sir, this is an e-mail that I received.

21   Q    That's 2504.

22            If we go to 2509.

23   A    The same, an e-mail that I received or sent with Roger.

24   Q    2526, do you recognize that?

25   A    Yes.  It's the same thing, e-mail between Roger and

SAM    OCR    RMR    CRR    RPR

Leissner - redirect - Rolle                    2442

1   myself.

2   Q    Do you recognize all these as e-mails that you were on?

3   A    Yes, sir.

4   Q    And the defendant was on them, too?

5   A    Yes.

6   Q    Did you see any of these on cross-examination?

7   A    No, sir.

8          MR. ROLLE:  Your Honor, we offer 2504, 2509 and

9   2526.

10          MR. AGNIFILO:  One second, Judge.

11          (Pause.)

12          MR. AGNIFILO:  I thought 2509, the one -- this one

13   was put in as a different exhibit.  We're just checking.

14          In any event, Judge, we don't -- we don't object.

15   They can come in.

16          THE COURT:  2504, 2509 and 2526?

17          MR. ROLLE:  That's correct, Your Honor.

18          THE COURT:  They're admitted.

19          (Government Exhibits 2504, 2509 and 2526 were

20   received in evidence.)

21          MR. ROLLE:  Thank you.

22          And if we could publish them.  I don't want to make

23   it hard on everybody, it's pretty small, but if we could try

24   to pull them up together.

25   BY MR. ROLLE:

Leissner - redirect - Rolle                    2443

1  Q    But first, Mr. Leissner, what are all these e-mails

2  related to?

3  A    They are related to Lazard's involvement around 1MDB as

4  an advisor.

5            MR. ROLLE:  If we just zoom in on 2504 at the top.

6  BY MR. ROLLE:

7  Q    And in this e-mail you're forwarding to the defendant at

8  his personal e-mail address?

9  A    That's right, correct.

10 Q    And the e-mail chain is about Lazard's involvement in

11 1MDB business?

12 A    Yes, sir.

13 Q    And what did you ask the defendant to do?

14 A    Can you let Jasmine know that she has to clarify how they

15 wanted to run this with Lazard?

16 Q    You were asked a lot of questions about your relationship

17 with Jasmine Loo --

18 A    Yes.

19 Q    -- on cross?

20 A    Yes.

21 Q    Did the defendant have a relationship with Jasmine Loo?

22 A    Yes, he was also very close to her.

23 Q    Did you ever buy jewelry for Jasmine Loo?

24 A    No, sir.

25 Q    Did you ever go jewelry shopping with Jasmine Loo?

Leissner - redirect - Rolle                    2444

1   A    No, sir.

2   Q    And if we look at 2509, that's part of the same e-mail

3   chain, right, also about Lazard's involvement in the 1MDB

4   business?

5   A    Yes, sir.

6        MR. ROLLE:  Thanks.

7   BY MR. ROLLE:

8   Q    Now, you were also asked questions on cross-examination

9   about another 2012 project involving Jho Low related to

10  something called Salamander Energy?

11  A    Yes, sir.

12  Q    Do you remember those questions?

13  A    Yes.

14       MR. ROLLE:  If we could pull up Defense Exhibit 2108

15  in evidence.

16       (Exhibit published.)

17       MR. ROLLE:  If we can just zoom right in.  There we

18  go; perfect.

19  BY MR. ROLLE:

20  Q    This was, again, the conversations that you had with

21  Jeffrey Rosen at Lazard?

22  A    Correct.

23  Q    And the top e-mail is about a presentation to Sheikh

24  Mansour and they have a pretty good idea of the agenda profile

25  of Salamander.

Leissner - redirect - Rolle                    2445

1           You're talking about Salamander Energy, right?

2    A    That's correct, sir.

3    Q    And this was something Jho Low was interested in?

4    A    That's right.

5    Q    And do you recall that while looking at this document on

6    cross you were asked about bringing all of these deals to the

7    attention of Lazard?

8    A    That's correct, yes.

9    Q    And you remember being asked:  You'd agree with me, Roger

10   is not on this e-mail; right?

11   A    That's correct.

12   Q    And he's not on this e-mail?

13   A    That's correct.

14   Q    Now, was the defendant aware of your conversations around

15   Salamander and the involvement of Jho Low at the time?

16   A    Yes, sir, he was.

17   Q    Was he directly involved in those discussions?

18   A    Yes, he was as well.

19           MR. ROLLE:  If we could pull up for identification,

20   Government Exhibits 2532, 2527, 2528, 2529 and 2530.

21   BY MR. ROLLE:

22   Q    And we'll do the same thing, and you can look at each of

23   them and tell me if you recognize them.

24   A    Yes, sir, that's an e-mail that I'm on.

25   Q    2527 now.  Do you recognize that?

SAM      OCR      RMR      CRR      RPR

Leissner - redirect - Rolle                    2446

1  A    Yes, sir.  Again, an e-mail that I'm on.

2  Q    2528.

3  A    The same, an e-mail that I'm on as well.

4  Q    2529.

5  A    The same thing, an e-mail that I'm on.

6  Q    And 2530.

7  A    And, again, an e-mail I'm on.

8  Q    And was it just you on these e-mails that you're looking

9  at now?

10 A    No, sir.

11 Q    Was the defendant also on these e-mails?

12 A    Yes, sir.  He's on every one that you have pulled up just

13 now, he's on it as well.

14       MR. ROLLE:  Your Honor, we offer --

15 BY MR. ROLLE:

16 Q    Well, first, you weren't shown any of these documents on

17 cross-examination, were you?

18 A    No, sir.

19       MR. ROLLE:  We offer 2532, 2527, 2528, 2529 and

20 2530, Your Honor.

21       MR. AGNIFILO:  Your Honor, I have no objection, but

22 can we have a sidebar very briefly?

23       THE COURT:  Sure.

24       (Sidebar held outside the hearing of the jury.)

25       (Continued on the following page.)

SAM     OCR     RMR     CRR     RPR

```
                          Sidebar                        2447
```

1                (The following sidebar took place outside the

2      hearing of the jury.)

3                THE COURT:  Yes.

4                MR. AGNIFILO:  Your Honor, the objection is -- I

5      think it's important that, and I understand what Mr. Rolle is

6      trying to do, but he's certainly -- I think, he's playing a

7      little fast and loose with the Fifth Amendment right for us

8      not to present evidence by constantly saying the defense

9      didn't show you this on cross.  I think it's -- it's an

10     inference that is starting to cross a line.

11               We don't have an obligation to show him anything on

12     cross.  I mean the cross was six days, as it was, and I think

13     that what I would ask is that Your Honor instruct the jury,

14     that I don't -- as the Court said in the beginning, that the

15     defense has no obligation to present any evidence.  Because I

16     think the way Mr. Rolle is framing the questions, I think he

17     is violating our right to not present evidence.

18               I understand his point.

19               THE COURT:  The defense has the right not to present

20     evidence, but the defense did in this case.  And what the

21     Government is now doing on redirect is addressing the evidence

22     that was presented.  It's within the right of them to attack

23     the evidence that you attempted to present to the jury.

24               I don't believe the Government is crossing the line

25     by asking the witness about whether or not he was asked

Sidebar                                              2448

1   certain questions or shown certain documents that are related

2   to a specific issue that was raised by the defense on

3   cross-examination.

4              MR. AGNIFILO:  And also, it's still his witness.  I

5   mean every question is a leading question.  So, we have a

6   standing objection to the leading.

7              THE COURT:  Okay.

8              And, Mr. Rolle, be mindful of the leading questions.

9              I mean I will instruct the jury during my

10  instructions that the defense has no obligation, but here what

11  you're talking about is addressing evidence that was presented

12  by the defense, which the Government is allowed to do.

13             MR. AGNIFILO:  Thank you.

14             (Sidebar concluded.)

15

16             (Continued on the following page.)

17

18

19

20

21

22

23

24

25

Leissner - redirect - Rolle                2449

1          (In open court - jury present.)

2          THE COURT:  Please continue, Mr. Rolle.

3          MR. ROLLE:  Thank you, Your Honor.

4          We offer at this point all the exhibits, and I can

5    read the numbers again.

6          THE COURT:  I'll admit them.  They are Government

7    Exhibit 2532, 2527, 2528, 2529 and 2530.

8          MR. AGNIFILO:  No objection.

9          (Government's Exhibits 2532, 2527, 2528, 2529 and

10   2530 were received in evidence.)

11         MR. ROLLE:  If we can just pull up just one of them.

12   They're all in evidence.

13         (Exhibit published.)

14   BY MR. ROLLE:

15   Q    This is -- what's the top e-mail, sir?

16   A    It's from me to a group of people regarding Salamander

17   Energy.

18   Q    And the group of people include who?

19   A    Jho Low, Roger, Szen, the brother of Jho, and Seet who

20   was his financial analyst, and Kerann Gan.

21   Q    This is about the Salamander Energy project that you were

22   asked questions about?

23   A    That's correct, yes, sir.

24   Q    And all the e-mails that you just were shown and

25   recognize, what did those all relate to?

Leissner - redirect - Rolle                    2450

1   A    All of them were relating to the Salamander potential

2   acquisition by Jynwel in connection with, perhaps, some of the

3   Abu Dhabi entities.

4            MR. ROLLE:  Now, we can take that down.

5   BY MR. ROLLE:

6   Q    In the course of your testimony you've seen e-mail

7   addresses that the defendant used, non-Goldman Sachs e-mail

8   accounts?

9   A    Yes, sir.

10  Q    And which non-Goldman Sachs e-mail accounts do you recall

11  the defendant using?

12  A    His own Roger.Ng1, the Queensgate one, the Victoria Court

13  one, and I think there was a variation on Roger Ng, as well,

14  that he used.

15  Q    On cross-examination yesterday you talked about at length

16  how you created a fake e-mail account to communicate with your

17  wife?

18  A    Yes, sir.

19  Q    You were asked about that on direct examination too;

20  right?

21  A    Yes.

22  Q    Do you have any idea if the defendant or his wife ever

23  did that in connection with the criminal scheme?

24            MR. AGNIFILO:  Objection to the form of the

25  question.

SAM    OCR    RMR    CRR    RPR

Leissner - redirect - Rolle                    2451

1          MR. ROLLE:  I could try to rephrase, Your Honor.

2          THE COURT:  I'm not sure I understand Mr. Agnifilo's

3   objection.  One second.

4          Why don't you ask about each individually?

5   BY MR. ROLLE:

6   Q    Mr. Leissner, are you aware if in the course of the

7   criminal scheme you described that the defendant was ever

8   involved in using fake e-mail accounts impersonating other

9   people; if you know?

10  A    No, sir, it doesn't come to me at the moment.

11  Q    And are you aware, do you have any knowledge of whether

12  the defendant's wife ever used a fake e-mail account

13  impersonating another person?

14  A    Again, I'm not remembering that, sir.

15  Q    Now, on cross-examination you were asked whether you

16  recalled the defendant had a, I think the word was, a serious

17  bike accident.

18          Do you remember being asked about that?

19  A    Yes, sir.

20  Q    In 2012, I think, was the question?

21  A    Yes, sir.

22  Q    What do you remember about the defendant and a bike

23  accident in 2012?

24  A    I don't remember the exact year.  I think I testified to

25  that too, but I do remember Roger having a bike accident, a

Leissner - redirect - Rolle                    2452

1   bicycle accident in Kuala Lumpur, I believe.

2   Q     In Kuala Lumpur?

3   A     Yes.

4         MR. ROLLE:  I want to pull up two exhibits for

5   identification, and I just want to confirm what their numbers

6   are.

7         (Pause.)

8         MR. ROLLE:  2509 and 2510 for identification.

9   BY MR. ROLLE:

10  Q     And on cross-examination, I think you were asked about

11  this bike accident in connection with meetings that were

12  happening around 1MDB?

13  A     Yes, I believe so.

14  Q     And whether the defendant attended meetings?

15  A     That's correct, yes.

16  Q     Do you recognize these two --

17        MR. YOUKILIS:  Different exhibits.

18        MR. ROLLE:  One moment, Your Honor.  Thank you.

19        (Pause.)

20  Q     In terms of what you remember about that, and we'll come

21  back to this in a moment, do you recall the defendant missing

22  1MDB meetings or work after any bike accident?

23  A     No, I don't remember that, sir.  No.

24  Q     You were asked questions on cross-examination about how

25  you -- in 2015, you were seeking a loan against a yacht?

SAM     OCR     RMR     CRR     RPR

Leissner - redirect - Rolle                2453

1    A    Yes, sir.

2    Q    And that was a yacht that you purchased with criminal

3    proceeds?

4    A    Yes, sir.

5    Q    And on cross-examination we looked at in great detail, I

6    think, a summary document that you prepared?

7    A    Yes, sir.

8    Q    And what was the purpose of the summary document, again?

9    A    To, essentially, get an overview of the assets that I

10   controlled to seek a loan or loans against -- with support of

11   those assets, effectively.

12             MR. ROLLE:   If we could pull up Defense Exhibit 1231

13   and 1238 in evidence.

14             If we could pull them both up, please, Mr. Youkilis.

15             (Exhibit published.)

16   BY MR. ROLLE:

17   Q    So, do you remember seeing these documents?

18             MR. ROLLE:   And we can zoom in on --

19   A    Yes, sir.

20             MR. ROLLE:   -- the e-mails at the top.

21   A    Yes, I did -- I do recall.

22   Q    1231 is an e-mail from you to Leon Batchelor?

23   A    That's right, correct.

24   Q    And it attaches a summary of assets document?

25   A    Correct; yes, sir.

SAM     OCR     RMR     CRR     RPR

Leissner - redirect - Rolle                    2454

1   Q    And who was Leon Batchelor again?

2   A    He was a broker trying to help me find financial

3   institutions who would lend against the yacht.

4   Q    And on 1238 it's an e-mail from Stephane Bigiere?

5   A    Correct.

6   Q    At Fairmont.com?

7   A    Yes.

8   Q    Who was that?

9   A    He was, I think -- well, he was an employee of the hotel

10  I was staying at, the Fairmont Hotel in Switzerland.

11  Q    You were at a hotel in Switzerland when you got this

12  e-mail?

13  A    Yes, sir.

14  Q    And if we just look at the attachments to both of these

15  documents.  We were looking at them on cross.

16          (Exhibit published.)

17  BY MR. ROLLE:

18  Q    This is that summary that you were testifying about?

19  A    Yes, sir.

20  Q    Let's go to the second page of the summary on each of

21  these.

22          MR. ROLLE:  If you keep scrolling down to the

23  signature line.

24  Q    And we looked at these really closely on cross, right?

25  A    We did, yes.

Leissner - redirect - Rolle                    2455

1   Q    And you couldn't recall specifically, but you thought it

2   was possible you didn't sign Chee Khang's name to this?

3   A    That's right, correct.

4   Q    He wasn't in Switzerland with you?

5   A    No, he wasn't.

6   Q    And if we look, one of them doesn't have -- there's some

7   blank spaces on the one of the left, right?

8   A    Yes, sir.

9   Q    But then they're filled in on the one on the right?

10  A    Yes.

11  Q    And I think those are two different e-mail addresses?

12  A    That's right.

13  Q    One of them Capital Advisors, what was that?

14  A    That was my -- my -- in my e-mail.

15  Q    And the second one, whose e-mail address was that?

16  A    That was CK's e-mail.

17  Q    Did you create that e-mail address?

18  A    No, sir, that was his actual e-mail.  We had used it on

19  other projects, as well.

20  Q    And the phone number, plus 60, what area code or country

21  code is that?

22  A    That's Malaysia, sir.

23  Q    And you were explaining on cross-examination Chee Khang

24  Lim's involvement in this.

25        I'm sorry, Chee Khang Lim is who, again?

SAM      OCR      RMR      CRR      RPR

Leissner - redirect - Rolle                    2456

1   A    The brother-in-law of Roger, and he had -- he was a

2   lawyer.  He had worked with us, for example, on the Vietnamese

3   side deal, effectively.

4   Q    And you were asked on cross-examination that -- how that

5   Chee Khang was made aware to you?

6   A    Yes, yes.

7   Q    How was Chee Khang Lim made aware to you in the context

8   of this summary of assets?

9   A    Well, Roger had suggested him to help me find a

10  loan against those assets -- to help me find fund -- do

11  fundraising effectively, which included, you know, an assets

12  list statement.

13  Q    So at this point, if we look at the actual assets listed

14  here, what money did you use to purchase all of these assets?

15  A    Most of them with proceeds from the scheme.

16  Q    And so, you were creating this to give to banks to rely

17  on it and give you money?

18  A    Yes, sir.

19  Q    Were you going to reveal that these were assets purchased

20  with the proceeds of a scheme?

21  A    No, sir.

22  Q    And was -- did you -- after the defendant suggested you

23  talk to Chee Khang Lim, did you?

24  A    Did I what?  Sorry.

25  Q    Did you speak to Chee Khang about this?

Leissner - redirect - Rolle                    2457

1    A    Yes.

2    Q    After the defendant suggested him to you?

3    A    Yes.

4    Q    And what did you talk to Chee Khang about?

5    A    About seeking a loan against those particular assets, or

6    at least using those assets to support a loan.

7    Q    And you testified on cross-examination that Chee Khang

8    was aware of what was happening with this document and with

9    the loans?

10   A    That's correct, sir.

11        MR. ROLLE:  If we could pull up -- well, the top

12   part of DX-1231, which is on the left.

13        (Exhibit published.)

14   BY MR. ROLLE:

15   Q    Again, that was from you to Leon Batchelor, who was

16   helping you with this?

17   A    That's correct, right.

18   Q    And one of the banks you went to was C1 Bank?

19   A    That's right.

20   Q    And Chee Khang is not on this e-mail?

21   A    No, he's not.

22        MR. ROLLE:  If we could pull up Government

23   Exhibit 2533 for identification.

24

25        (Continued on the following page.)

SAM      OCR      RMR      CRR      RPR

1   BY MR. ROLLE:  (Continuing.)

2   Q    Do you recognize this?

3   A    Yes, sir.

4   Q    What is it?

5   A    It's an e-mail I received.

6           MR. ROLLE:  Your Honor, we would offer Government

7   Exhibit 2533.

8           MR. AGNIFILO:  No objection, Judge.

9           THE COURT:  It is admitted.

10          (Government Exhibit 2533 received in evidence.)

11          (Exhibit published.)

12  BY MR. ROLLE:

13  Q    This e-mail is September 8, 2015?

14  A    Yes.

15  Q    And the summary documents we were looking at were dated

16  in August, late August of 2015?

17  A    That's correct, sir.

18  Q    Who is this e-mail to?

19  A    That is from me to Leon Batchelor again.

20  Q    Who is copied on it?

21  A    CK Lim is copied on it.

22  Q    Why did you copy CK Lim?

23  A    Because he was helping me.  He was going to help me on it

24  or be a coordinator or just another person to help me,

25  assisting me in this effort.

Leissner - redirect - Rolle                    2459

1   Q    This is the e-mail address that you put in the summary of

2   assets that you created?

3   A    That's correct, sir.

4   Q    And in Leon Batchelor's e-mail to you, could you read the

5   second bullet?

6   A    C1 Bank asked for a copy of your biography/CV.  Does CK

7   have one on file for you?

8   Q    And the CK is a reference to Chee Khang?

9   A    That's correct.

10  Q    And a few minutes ago you said this wasn't the first time

11  you had ever worked with Chee Khang?

12  A    Correct.

13  Q    When had you done that before?

14  A    At least I recall the Vietnamese transaction where we

15  were contemplating with Boon-Kee to buy warrants from FBT

16  Group and selling them on to the Masan Group.

17  Q    And that was outside of Goldman Sachs business activity;

18  right?

19  A    That's correct.

20  Q    It violated Goldman Sachs's policies?

21  A    Yes, sir.

22  Q    And what was Chee Khang's involvement in those side

23  deals?

24  A    He helped to draft some of the documents required for

25  that side deal.

Leissner - redirect - Rolle                2460

1    Q    If we could show you Government Exhibit 2531 for

2    identification.

3              (Exhibit published to witness only.)

4    Q    Do you recognize this document?

5    A    Yes, sir.

6    Q    What is it?

7    A    An e-mail that I'm on and received and sent.

8    Q    What's the date?

9    A    June 9, 2012.

10   Q    Was this after Project Magnolia closed?

11   A    Yes.

12             MR. ROLLE:  We offer Government Exhibit 2531, Your

13   Honor.

14             MR. AGNIFILO:  No objection.

15             THE COURT:  It is admitted.

16             (Government Exhibit 2531 received in evidence.)

17             (Exhibit published.)

18   BY MR. ROLLE:

19   Q    The subject line is Project Discovery?

20   A    Yes, sir.

21   Q    And the top e-mail is from you to the defendant at his

22   personal e-mail address?

23   A    Correct.

24   Q    Also to Boon-Kee Tan?

25   A    Correct.

SN        OCR        RPR

Leissner - redirect - Rolle                    2461

1  Q    And Chee Khang Lim?

2  A    That's right.

3  Q    And looking at the Chee Khang Lim address in the e-mail

4  underneath is that the same e-mail address we looked at from

5  2015?

6  A    Yes, it is, sir.

7  Q    And do you remember what this Project Discovery was

8  about?

9  A    Not without reading the document, sir.

10 Q    If we could scroll down to the first e-mail in the chain

11 from Alex Lee to John Shrimpton talking about a project called

12 Project Discovery.

13 A    Yes, sir.

14 Q    And if we scroll up it's forwarded to you by Shrimpton?

15 A    Yes, sir.

16 Q    And then scrolling further up --

17 A    Yup.

18 Q    -- you forwarded it to who?

19 A    To Roger, Chee Khang, Boon-Kee and -- yeah.

20 Q    And what do you tell them?

21 A    Guys, this is a new one.  I want to seek your views.  MM

22 is very keen to buy John Shrimpton stake in Dragon Capital.

23 Together with tag-alongs this would be a 45 percent stake.  MM

24 cannot do this and needs help to acquire it.  Given our

25 experience we should really think about this hard.  BK had the

Leissner - redirect - Rolle                    2462

1    idea that we do an upfront fee to cover costs, say 500 K plus

2    a success fee.  Your views are welcome.  Best, Tim.

3    Q    What are you proposing to them?

4    A    To do yet another side deal where we would help somebody

5    buy a stake in Dragon Capital which was a fund manager and

6    then we would receive fees for that.

7    Q    And one of the fees that you mentioned is an upfront fee?

8    A    Yes, the half a million dollars would be an upfront fee.

9    Q    And they it says plus a success fee?

10   A    That's right.  Success fee is when you actually do the

11   transaction.

12   Q    And that would be in addition to the half a million

13   dollars?

14   A    Yes.

15   Q    Let's scroll up further in the chain.  Who -- do you have

16   an understanding of what MM was?

17   A    I believe that was -- I can't remember his name per se,

18   but I believe that was the Masan Group at the time.  Masan

19   Group CEO.

20   Q    Masan I think you mentioned before was one of the

21   entities in that Vietnamese deal --

22   A    That's correct.

23   Q    -- Where you were trying to hide Masan from another

24   party?

25   A    That's right.

Leissner - redirect - Rolle                    2463

1    Q    Not that that Vietnamese deal didn't happen?

2    A    Correct.

3    Q    Chee Khang Lim says, Given the earlier experience,

4    suggest we get a firm mandate from MM before we start

5    presenting to the seller.

6    A    Correct.

7    Q    Do you have an understanding, reading this, what the --

8    given the earlier experience?

9    A    Yes, because obviously the earlier Vietnamese deal hadn't

10   concluded, hadn't succeeded, therefore we had spent quite a

11   bit of time on a transaction that didn't conclude and we

12   didn't make any money essentially.  So I think the reference

13   both from me and him here are both referring to the fact that

14   the transaction didn't conclude and we didn't make any fees.

15   Q    Scroll up to the next e-mail.  Boon-Kee responds --

16   A    Agree.

17   Q    And the defendant responds to Boon-Kee there; right?

18   A    Yes, correct.

19   Q    What is his response to this side deal you have proposed?

20   A    I think MM will negotiate the same manner as he did on

21   the recent deal.  Makes sense to get him to sign terms up

22   front 500 K and/or carry, if possible.  Also Dragon Capital is

23   an investment bank with licenses across a few countries

24   including Vietnam.  Is this the same one?

25   WWW.DragonCapital.com.

Leissner - redirect - Rolle                    2464

1    Q    The 500 K and/or carry, what does that mean?

2    A    The 500 K is again the upfront fee and, and/or carry

3    means we would actually get a position in that acquisition;

4    meaning rather than getting cash, get part of the shares or

5    part of the equity upside here.

6    Q    Is that better than a success fee?

7    A    It was -- I mean, it depends a little but under the

8    circumstances, I think in this instance Roger is saying that

9    because also we, being Roger, Boon-Kee and I, had been

10   thinking about setting up on your own investment bank for Asia

11   or southeast Asia in particular.  So I recall that this is a

12   little bit a reference to maybe we could be part of an

13   investment bank and that could be the platform to start after

14   Goldman Sachs.

15   Q    And so none of this, any side deals, did you tell Goldman

16   Sachs about this?

17   A    That's correct.

18   Q    You didn't tell them about this one either?

19   A    No.

20             MR. ROLLE:  We can take that down.

21   Q    You were asked yesterday questions about this entity, Nu

22   Horizons.

23   A    Yes, sir.

24   Q    That was an investment vehicle you talked about?

25   A    Yes, correct.

Leissner - redirect - Rolle                    2465

1  Q    You started that while you were still at Goldman Sachs?

2  A    Yes, it was started actually by Russell Simmons who was

3  then my business partner in Nu Horizons, but yes, sir.

4  Q    You were asked questions about money that the defendant

5  wired to Nu Horizons for investment in Celsius.  Do you

6  remember those questions?

7  A    Right.

8  Q    And that money wasn't invested in Celsius?

9  A    That's correct.

10 Q    And Nu Horizons existed at the time?

11 A    Yes.

12 Q    Does it still exist as we sit here today?

13 A    Yes, it does.

14 Q    And that money was wired to Nu Horizons by the defendant

15 in 2000 -- what year was it?

16 A    2015.

17 Q    So, after he wired that money into Nu Horizons, in the

18 seven years since that's happened, when was the first time you

19 heard from the defendant or his representatives about that

20 investment into Nu Horizons?

21 A    I mean, I think -- I can't recall any time other than

22 yesterday being asked about it.  Unless you have something to

23 refresh my memory, I can't remember.

24 Q    Your recollection is the first time was from this podium?

25 A    Yes.

Leissner - redirect - Rolle                    2466

1    Q    On cross-examination?

2    A    Yes.

3    Q    Now, if we could pull up Government Exhibit 2421, the

4    Excel.  I think it may be 2421-A?

5              THE COURT:  In evidence?

6              MR. ROLLE:  It is in evidence, Your Honor.

7              And if we could publish that to the jury as well,

8    Your Honor.

9              (Exhibit published.)

10   Q    This is the spreadsheet we've been looking at?

11   A    Yes, sir.

12   Q    And just to -- remind us again what is recounted in this

13   spreadsheet in the out going remittance tab?

14   A    In the outgoing remittance is the wires going out from

15   the bank that Capital Place had.  These are monies leaving

16   Capital Place to different destinations which are listed here.

17   Q    The first one was the 17 and a half million sent to the

18   defendant on June 13, 2012?

19   A    That's correct, yes, sir.

20   Q    On cross-examination you were asked about most of these

21   transactions listed here; right?

22   A    That's right, correct, yes, sir.

23   Q    And you were asked questions about the payments you

24   directed out of Capital Place as part of the criminal scheme.

25   Do you remember those questions?

Leissner - redirect - Rolle                    2467

1    A    Yes, sir.

2    Q    And some of these are reflected here in this Excel?

3    A    Yes, sir.

4    Q    With these entities -- like you were asked about Cloud 9,

5    Koay Ying Ying, Turquoise Coats?

6    A    Yes, sir.

7    Q    And you were asked if you knew who the beneficial owners

8    of these shell companies were?

9    A    Yes, that's correct.

10   Q    And did you know the identity of who the beneficial

11   owners were?

12   A    No, Jho or Eric never told me who they were.

13   Q    At the time you were sending money to these shell

14   companies, why were you doing that?

15   A    Well, that was the agreement to -- as part of the

16   criminal scheme that I offered my service to Jho to unlock the

17   delay that we were facing in late March -- late May and June

18   of 2012 where Roger and I were expecting payment as agreed in

19   London at the time and so I was just -- I was offering my help

20   to expedite Roger and I getting our money.

21   Q    And what did you understand the payments you were

22   making -- what did you understand those payments were for?

23   A    Those were the bribes and kickbacks as part of the

24   scheme, sir.

25   Q    And so who did you understand were the shell companies?

SN        OCR        RPR

Leissner - redirect - Rolle                    2468

1   A    Those would be part -- those would be people that were on

2   the list in one shape or form, whether specifically named or

3   in general terms, that were on the list that Jho had to show

4   to Roger and I in London.

5   Q    At the time that you directed those transfers, that was

6   your understanding of who these shell companies were?

7   A    That was my understanding and my belief, yes, sir.

8   Q    You didn't know the name of the person that beneficially

9   owned it?

10  A    That's correct.

11  Q    For the defendant's shell company, did you know?

12  A    Yes, sir.

13  Q    And how did you know that?

14  A    Because Roger had instructed me to make those payments.

15  Q    You were shown fake agreements that were sent to you?

16  A    Yes, sir.

17  Q    And those were related to some of these transfers, if we

18  actually go to the incoming remittance tab, something called

19  Affinity Equity?

20  A    Right, correct, sir.

21  Q    We saw fake documents that were sent to you that talked

22  about Affinity Equity; right?

23  A    Correct, sir.

24  Q    And none of that was real?

25  A    That's right, it wasn't.

Leissner - redirect - Rolle                     2469

1   Q    And that was to paper over this money coming into Capital

2   Place in part?

3   A    That's right, correct.

4   Q    And what did you understand these fake agreements you

5   were receiving, what was their purpose?

6   A    The purpose was to hide the fact where the origin was for

7   this money and make it look to the banks in particular or

8   anybody else wanting to look at these transactions that there

9   were legitimate business reasons for either receiving or

10  sending money.

11  Q    And you made, as we saw, an outgoing remittance -- at the

12  time of this document's creation you made numerous payments --

13  directed numerous payment out of Capital Place?

14  A    Yes, sir.

15  Q    Including to the defendant?

16  A    Yes, sir.

17  Q    Did every payment that you directed, did it have a fake

18  agreement that you were aware of and you had seen?

19  A    No, not every one, no.

20  Q    Did you ever talk to the defendant about making fake

21  documents?

22  A    Well, I think I testified that there was the idea created

23  of a -- of a story, if it was to come for Roger.  I don't

24  recall ever seeing or having an agreement with Roger or Hwee

25  Bin with respect to, as you call it, papering over his

Proceedings                                    2470

1    remittances.

2              MR. ROLLE:  Your Honor, I have about 15 minutes,

3    maybe even a little less, I don't know if we want to take a

4    break now but we are at a shifting point to the last two

5    topics.

6              THE COURT:  I am sure the jurors are ready for a

7    break.  We will take our 15 minute morning break and come back

8    at a quarter to 12.  Please remember not to discuss the case.

9              (Jury exits.)

10             (Witness steps down.)

11             (In open court.)

12             THE COURT:  I will see the parties at a quarter to.

13             (Recess taken.)

14             (In open court.)

15             MR. AGNIFILO:  Your Honor, can I be heard on

16   something very briefly.

17             THE COURT:  Go ahead.

18             MR. AGNIFILO:  The Government brought out a few

19   minutes ago that Mr. Leissner was first made aware that Mr. Ng

20   had some claim against money and he was confronted with this

21   on the witness stand.  The truth is we told the Government

22   about this in September of 2021 and we actually even sent the

23   Government the, Roger is my accountant e-mail, specifically

24   in -- specifically in 2021 and the Government confronted

25   Mr. Leissner with the accountant e-mail on September 21, 2021.

Proceedings                                    2471

1   So I am concerned that the Government knows the truth.

2              THE COURT:  About what, though.  The accountant

3   e-mail, if I recall, was where he referred to the money coming

4   from Mr. Ng as coming from his accountant.

5              MR. AGNIFILO:  That's right.

6              THE COURT:  Okay.

7              MR. AGNIFILO:  So it is an absolutely unfair

8   inference to give the jury that somehow we, on the defense

9   side, brought this up for the first time yesterday because we

10  brought it up to the Government.

11             THE COURT:  But that's not what I understand the

12  issue to be.  I mean, maybe I am missing something.  But if I

13  understood, the question on redirect was whether or not Mr. Ng

14  has made a demand for the money, for the return of the money.

15             MR. AGNIFILO:  The problem -- and the -- first of

16  all, the answer is there are conversations about it.  But, no,

17  there has been no formal demand.  And we did send the

18  Government a notice with respect to the shares and I think

19  that has been already officially filed.  We made a claim.

20  Mr. Ng has made a claim to ownership of the shares that we

21  claim were stolen by Mr. Leissner and the Government knows

22  that, and, so --

23             THE COURT:  So, as best as I recall the testimony,

24  Mr. Leissner has testified that it was an investment in the

25  company and the company is still there.  Your position is that

Proceedings                                                    2472

1    you demanded the return of the money?

2           MR. AGNIFILO:  No, no --

3           THE COURT:  You said that it's Mr. Ng's money and I

4    don't think there's any dispute as to that or the witness has

5    not testified that it's not.  And so I understood the

6    Government to be asking did Roger ask you back for that money

7    in other words because of, I assume, you are questioning as to

8    whether or not he paid the money back.

9           MR. AGNIFILO:  So, the part that's misleading is

10   that we learned in discovery that Leissner falsely told other

11   people in the company that the money was Leissner's money and

12   not Ng's money and that's why the money is coming from my

13   accountant.

14          THE COURT:  Correct.

15          MR. AGNIFILO:  We had no idea that happened until we

16   got the discovery.  So when we got the discovery we saw

17   Leissner is stealing the money which is our position.

18          THE COURT:  Okay.

19          MR. AGNIFILO:  That Leissner is stealing the money.

20          THE COURT:  Got it.

21          MR. AGNIFILO:  When we learned in September of last

22   year that -- it's August -- that Leissner is stealing the

23   money because -- and we know he's stealing the money because

24   he's lying about the source of the money.  He knows it's

25   Roger's money and he knows it's his money and we told the

Proceedings                                        2473

1    Government and the reason we told the Government is because,

2    A, we wanted to be transparent; and, B, we thought the

3    Government might not know it and we were hoping that the

4    Government would do the right thing with the information.

5              THE COURT:  But I am not following you.  I am just

6    not following you.  Because Mr. Leissner has admitted that

7    that money came from Mr. Ng.

8              MR. AGNIFILO:  Yes.

9              THE COURT:  The fact that he lied to people in the

10   company as to the source and that the money came from him, how

11   does that -- why is it that what the Government did in terms

12   of questioning him makes that problematic?  The jury has all

13   the information before it.  The jury has before it the fact

14   that the money was from Mr. Ng, the fact that Mr. Leissner

15   lied about the source of the money to the people he was

16   investing with in New Castle, I believe; right?

17             MR. AGNIFILO:  Nu Horizons.

18             THE COURT:  And now based on the Government's

19   redirect, the Government has said to Mr. Leissner at least

20   he's testified that the money -- no one has demanded the money

21   back from him.  There is no inconsistency there.

22             MR. AGNIFILO:  But there's something that's

23   misleading.  And what's misleading is that we had

24   conversations -- we can't reach out to Mr. Leissner.  We can't

25   make a demand for the money.

Proceedings                                    2474

1          THE COURT:  Well, Mr. Leissner has an attorney.  Of

2     course you could.  Let's talk about that.  Let's not keep the

3     jury waiting.  We need to finish this testimony today but we

4     can talk about it during lunch and to the extent you believe

5     there's something that needs to be corrected in the record we

6     can figure out how to do that.

7          MR. AGNIFILO:  Fine.

8          THE COURT:  But I think I am -- I think I might be

9     missing the point you are trying to make.  I am simply looking

10    at what evidence is in the record before the jury and I don't

11    believe there is anything distorted in the question that was

12    asked because as far as Mr. Leissner knows, at least his

13    testimony is Roger did send the money, there is no question

14    about that.  He lied as to the source of the money, to the

15    folks that he invested the money with.  He owes this money.

16    There was never any agreement as to when to pay it back and no

17    one has ever asked him to pay it back and he also testified

18    that the company is still a functioning company and that Roger

19    owns shares or whatever it is in the company.  Am I

20    misunderstanding the testimony?

21         MR. AGNIFILO:  It's -- we'll go forward with the

22    cross and we'll clarify it.

23         THE COURT:  We'll discuss it further.  I don't want

24    to keep the jury waiting anymore right now, but I think we

25    will have time to talk about it during the lunch break.

Proceedings                                    2475

1          MR. AGNIFILO:  Very good.

2          THE COURT:  Okay.

3          (Witness takes the stand.)

4          (Jury enters.)

5          THE COURT:  Please be seated, everyone.

6          You may continue.

7          MR. ROLLE:  Thank you, Your Honor.

8          (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Leissner - redirect - Rolle                2476

1   BY MR. ROLLE:  (Continuing.)

2   Q    Mr. Leissner, earlier this morning you were answering

3   questions about a serious bike accident?

4   A    Yes, sir.

5   Q    And I believe you testified this morning that you don't

6   recall the defendant missing meetings or work after a bike

7   accident to your memory?

8   A    That's correct.

9        MR. ROLLE:  If we could pull up Government Exhibit

10   1995 for identification and 1998 for identification.

11        (Exhibit published to witness only.)

12   BY MR. ROLLE:

13   Q    Can you see those, sir?

14   A    Yes, sir.

15   Q    Do you recognize those documents?

16   A    Yes, those are e-mails that I have received or were

17   copied on.

18        MR. ROLLE:  Your Honor, we would offer Government

19   Exhibits 1995 and 1998.

20        MR. AGNIFILO:  No objection, Your Honor.

21        THE COURT:  They're admitted.

22        (Government Exhibits 1995 and 1998 received in

23   evidence.)

24   BY MR. ROLLE:

25   Q    If we could enlarge the date, January 3, 2012.  It's an

1  e-mail from the defendant to a group including you?

2  A    That's correct, sir.

3  Q    Let's go to the third e-mail from the top.  That's also

4  January 3, 2012?

5  A    Yes, sir.

6  Q    What did the defendant say in that e-mail that you are

7  copied on?

8  A    It says, Gents.  I can't make this and probably don't

9  need to -- crashed my bicycle.  Do go ahead.  Let me know what

10  I need to do on asset swap side or outright sale, Roger -- R.

11  Q    I didn't hear the end?

12  A    That's R for Roger.

13  Q    Sorry.  So he's referencing having crashed his bicycle on

14  June 3, 2012 -- sorry -- January 3rd?

15  A    January, that's right.  In or thereabouts, yes.

16  Q    He says, go ahead -- is this about a meeting or work at

17  Goldman Sachs?

18  A    Yes.  Sunway was a client of ours and he was asking about

19  a meeting.

20  Q    And he was asking what to do on the asset swap side?

21  A    Or an outright sale.  Those are particulars for that

22  particular client.  I can't recall what it refers to, but

23  those are terms for a potential transaction.

24  Q    This is just work?

25  A    Yes.

SN        OCR        RPR

1          MR. ROLLE:  If we look at the 1998, Mr. Youkilis.

2          (Exhibit published.)

3   Q    So that was January 3rd.  I want to know what the date of

4   this e-mail is.

5   A    January 8, 2012.

6   Q    So five days later; right?

7   A    Correct.

8   Q    And it's from the defendant to you and some other folks?

9   A    Yes, correct, sir.

10  Q    And it's -- the subject is meeting with UDA and MOF

11  Malaysia?

12  A    Yes, correct.

13  Q    MOF, Ministry of Finance?

14  A    Yes, correct.  I don't know what UDA stands for.

15  Q    What did the defendant say in this e-mail?

16  A    Hi David.  Our meeting is at 10 a.m. tomorrow, tom is

17  tomorrow.  Would you like to meet 15 minutes before so we can

18  give you a download?

19  Q    This is a an e-mail ahead of a meeting?

20  A    Yes, correct.

21  Q    Five days after that bike accident he was talking about a

22  meeting?

23  A    Yes, correct.

24          MR. ROLLE:  That can come down.

25  Q    And this morning counsel asked you a question about

Leissner - redirect - Rolle                2479

1   whether you pled guilty to, I think he said anything involving

2   accounting within Goldman Sachs or accounting controls at

3   Goldman Sachs.  Do you remember those questions?

4   A    Yes, sir.

5   Q    Those questions didn't say -- reference the FCPA or the

6   Foreign Corrupt Practices Act did it?

7   A    Correct.

8   Q    And what you pled guilty to, as you testified, was

9   conspiring to violate the Foreign Corrupt Practices Act with

10  others?

11  A    Correct.

12  Q    And that's for the scheme involving the defendant, Jho

13  Low and others?

14  A    Yes, that's correct.

15  Q    And you said today as well that you're not an attorney,

16  you're not a lawyer.

17  A    That's right.

18  Q    Do you recall sitting here today all of the technical

19  legal language that was included in the Foreign Corrupt

20  Practices Act charge that you pled guilty to?

21  A    Sitting here today, I can't remember all of them, no,

22  sir.

23  Q    All of the legal terminology and whatnot?

24  A    Correct.

25         MR. ROLLE:  Your Honor, may I approach the witness?

Leissner - redirect - Rolle                2480

1          THE COURT:  Yes, you may.  You don't need to ask

2    permission.

3          MR. ROLLE:  Thank you, Judge.

4          (Counsel approaches.)

5    Q    I'm going to hand the witness what's marked as Government

6    Exhibit 4000, the charging document with his name and I'm

7    going to ask you to take a look at this.  Read it yourself.

8    Don't read it out loud.  And directing your attention to page

9    18 and I have noted with a red mark subparagraph B on page 19.

10   A    Yes.

11   Q    And subparagraph C on page 20.  Take a look at that.

12   Read it to yourself and let me know when you finish.

13   A    Thank you.  (Reviewing.)

14        Yes, sir.

15   Q    Have you had a chance to look at that?

16   A    Yes, sir.

17   Q    Having look at subsection B on page 19 does that refresh

18   your recollection about the technical, legal language of the

19   Foreign Corrupt Practices Act charge that you pled guilty to?

20   A    Yes, sir, it does help.

21   Q    Does it refresh your memory that you pled guilty to

22   violating the Foreign Corrupt Practices Act in two ways, not

23   just one?

24   A    Yes, sir.

25   Q    And that included both bribing government officials;

Leissner - redirect - Rolle                    2481

1    right?

2    A     That's correct.

3    Q     And concealing that scheme from Goldman Sachs; right?

4    A     It does, yes.

5    Q     And looking at the technical legal language that you said

6    refreshed you, do you recall that the technical legal language

7    of the Foreign Corrupt Practices Act that you pled guilty to

8    was knowingly and willfully circumventing or causing to be

9    circumvented a system of internal accounting controls at

10   Goldman Sachs, contrary to the FCPA?

11            MR. AGNIFILO:  I'm going to object to the continued

12   leading of his own witness, Judge.

13            THE COURT:  Okay.  You can answer the question.

14   A     Yes, it refreshes my memory.

15   Q     And that's what you pled guilty to in part?

16   A     Yes, sir.

17   Q     And, in fact, as you have testified, and you were asked

18   questions on cross-examination about committees and

19   concealing, did you, in fact, conceal the bribery money

20   laundering scheme from Goldman Sachs's internal committees who

21   needed to approve these deals?

22            MR. AGNIFILO:  Objection to the form of the

23   question.  It's accounting controls, not committees.

24            THE COURT:  Okay.

25   Q     Did you do that to those?

SN        OCR        RPR

Leissner - redirect - Rolle                    2482

1   A    Yes, I did.

2   Q    And in what ways did you do that?

3   A    In several ways, sir.  Of course, never mentioning it in

4   any forum such as committee or memos to committee, avoiding

5   the internal Goldman Sachs e-mail system, not using telephones

6   in the Goldman Sachs system, keeping it on our private whether

7   e-mails or phones and also not talk to any of our control or

8   audit functions within Goldman Sachs about any of this.

9   Q    And you talked about the committees who had senior people

10  from New York involved in those committees?

11  A    Yes, sir.

12  Q    You lied about all of that in the course of those

13  committee meetings?

14  A    I did, sir.

15  Q    And who was required to authorize the 1MDB transactions

16  before the money could go to 1MDB?

17  A    It had to be capital committee in conjunction and working

18  together with the suitability committee but capital committee

19  is the final authority.

20  Q    And why did you lie to that capital committee at the end

21  of the day?

22  A    Because had I not lied or others on the transactions had

23  we not lied, the committee would have not approved the

24  transactions, the deals would not have happened and,

25  therefore, no money would have been paid to 1MDB.

Leissner - redirect - Rolle                2483

1   Q    On cross-examination you were asked questions about

2   meetings that you had with the Government in the course of

3   your cooperation.  Do you recall those questions?

4   A    Yes, sir.

5   Q    And you had those meetings as part of your cooperation?

6   A    Yes, absolutely, sir.

7   Q    At those meetings were you asked questions?

8   A    Many questions, yes.

9   Q    And did you answer those questions?

10  A    Yes, sir.

11  Q    Did you choose what questions were going to be asked of

12  you?

13  A    Never, so, no.

14  Q    Did you know what questions were going to be asked of

15  you?

16  A    No, sir.

17  Q    Did anyone tell you how to answer the questions?

18  A    No, sir.

19  Q    Did the Government ever show you FBI reports about those

20  meetings?

21  A    No, it was never shown to me, no, sir.

22  Q    Did the Government ever show you FBI agent's notes about

23  those meetings?

24  A    No, sir.

25  Q    On cross-examination and on direct examination, you have

1    seen records, shell company names that were sent to you by

2    Eric Tan or Jho Low; right?

3    A    Right, sir.

4    Q    And you sent money to these shell companies, right?

5    A    Yes, sir.

6    Q    During your meetings with the Government, did the

7    Government ever show you bank records for those shell

8    companies you were sending money to?

9    A    No, not to my recollection, sir.

10   Q    Did the Government ever show you other people's bank

11   records, third parties'?

12   A    No, sir.

13   Q    Did the Government ever show you e-mail accounts from

14   other people that weren't you?

15   A    No, sir.

16   Q    Did the Government ever show you text messages between

17   other people that didn't involve you and weren't you?

18   A    No, sir.

19   Q    Now, you talked about and testified about that meetings

20   with the Government and you said initially you minimized your

21   conduct?

22   A    Yes, sir.

23   Q    And, again, how did you minimize your conduct?

24   A    By trying to shift some of the blame onto others and not

25   fully accepting responsibility that I have since taken.

Leissner - redirect - Rolle                    2485

1  Q    And that included saying the defendant gave you the

2  wiring instructions and not Jho Low, is that part of it?

3  A    Yes, that's what I recall now having seen some of those

4  evidence that was shown to me.

5  Q    And, in fact, you got the wiring instructions from whom?

6  A    From Jho or Eric Tan.

7  Q    And for the defendant's kickbacks where did you get the

8  wiring instructions?

9  A    From Roger directly.

10 Q    Now at some point -- you said the word initially in all

11 the questions you were asked about the minimization?

12 A    Yes, sir.

13 Q    When did you stop minimizing?

14 A    Throughout the course of our 2018 meetings that we had.

15 Q    And when you stopped minimizing, what did you start

16 doing?

17 A    Laying out all the facts of the truth as they happened in

18 the preceding years and months.

19 Q    And you said those meetings in 2018 are when that

20 happened?

21 A    Yes, sir.

22 Q    And did all of that happen before you signed your

23 cooperation agreement?

24 A    Yes, sir.

25 Q    Before you pled guilty?

1   A    Yes, sir.

2   Q    You testified about how you spent the money that you

3   obtained through the criminal scheme.  Do you remember being

4   asked about that on cross-examination?

5   A    Yes, sir.

6   Q    You testified also about how you spent money that you

7   obtained from a Kuwaiti sheikh?

8   A    Yes, sir.

9   Q    And that was in 2017?

10  A    Yes, correct, sir.

11  Q    And you spent the money from each of these buckets in

12  part by investing it, is that part of it?

13  A    Yes, correct, sir.

14  Q    Did you buy other things, too?

15  A    Real estate, you know, just normal spending, vacations

16  and things like that.

17  Q    And you were asked on cross-examination whether you had

18  been ordered to forfeit certain assets; right?

19  A    Yes, sir.

20  Q    As part of your guilty plea and cooperation agreement,

21  what have you agreed to forfeit?

22  A    As part of the agreement, I agreed to forfeit $43.7

23  million, sir.

24  Q    And apart from the agreement, what have you agreed to

25  give up?

1  A    I've agreed to give up my interest in the Celsius shares.

2  Q    Let's talk about those shares for a moment.  When you

3  were arrested in June of 2018, did you have an interest in

4  those Celsius shares?

5  A    Yes, sir.

6  Q    How much were they worth at the time when you were

7  rested?

8  A    I think not -- just south of $20 million.

9  Q    Less than $20 million?

10 A    Less than $20 million, yes.

11 Q    And it was after that arrest -- it was after you pled

12 guilty?

13 A    Yes.

14 Q    You agreed to that $43.7 million forfeiture?

15 A    That's correct, sir.

16 Q    That's a money judgment?

17 A    Yes, correct.

18 Q    And you still had the interest in the Celsius shares at

19 that point; correct?

20 A    Correct.

21 Q    In 2021, what happened to the Celsius shares?

22 A    The value significantly increased.

23

24              (Continued on the following page.)

25

1  EXAMINATION CONTINUES

2  BY MR. ROLLE:

3  Q     And what happened to the shares in terms of whose

4  property they were, what happened to them?

5  A     Well, they were released to my wife as part of my -- my

6  bond, effectively.

7  Q     And were they then seized?

8  A     Yes, sir.

9  Q     Who seized them?

10 A     The Government did.

11 Q     Did anyone tell you about the fact that the shares were

12 going to be seized?

13 A     No, sir.

14 Q     Did they tell you about that before it happened?

15 A     No, sir.

16 Q     Did the government notify you before it seized those

17 shares?

18 A     No, sir.

19       MR. ROLLE:  If we could pull up what's in evidence

20 as Government Exhibit 3002.

21 Q     What was this again, sir?

22 A     That's me giving up my interest in the Celsius shares.

23 Q     And it says:  I, Tim Leissner, hereby consent to the

24 forfeiture to the United States of all right, title and

25 interest in 3,325,942 shares of stock in Celsius Holdings Inc.

Leissner - redirect - Rolle                    2489

1  held in JPMorgan Chase Bank brokerage account number ending in

2  700 -- 7002 in the name of Kimora Lee Simmons.

3             That was your wife?

4  A    Correct.

5  Q    They were at the time in her brokerage account?

6  A    That's correct, sir.

7  Q    And then it goes on to say:  That were seized pursuant to

8  a seizure warrant issued on or about March 5th, 2021 by the

9  Honorable Peggy Kuo, United States Magistrate Judge, for the

10 Eastern District of New York.

11            In March of 2021, how much were the Celsius shares

12 worth, approximately?

13 A    I think in March --

14 Q    You said today how much they were worth as you sit hee?

15 A    Roughly 200 million.  I think it probably has gone up and

16 down over those -- that timeframe, but March, probably about

17 the same.  A year ago it was probably about the same.

18 Q    What was the highest share price of Celsius?

19 A    110, sir.

20 Q    Sorry?

21 A    110.

22 Q    And was that in 2021?

23 A    Yes, at the end, December 2021.

24 Q    How much was your stake worth at its highest share price

25 ?

Leissner - redirect - Rolle                    2490

1    A    About 330 million.

2    Q    $330 million?

3    A    That's right.

4    Q    And the Government seized these shares?

5    A    Yes.

6    Q    And you signed this document, and what does this document

7    mean?

8    A    It means that I have given up all my interest in those

9    shares, sir.

10             MR. ROLLE:  If we could pull up Government

11   Exhibit 3001.

12             (Exhibit published.)

13   BY MR. ROLLE:

14   Q    This is your cooperation agreement?

15   A    Yes, sir.

16   Q    You looked at this earlier this morning, right?

17   A    Yes, sir.

18             MR. ROLLE:  Can we look at -- zoom in on it through

19   the end of pages 1 into 2.

20   BY MR. ROLLE:

21   Q    There is a series of lettered paragraphs, A through H.

22   A    Yes, sir.

23   Q    Do you see those?

24   A    Yes.

25   Q    What -- what does it list here in your agreement?

Leissner - redirect - Rolle                2491

1   A    It lists the specific penalties -- sorry, yeah, penalties

2   against me as relates to the money laundering charge.

3   Q    The penalties that you face as a result of your guilty

4   plea?

5   A    That's correct.

6   Q    So, for the money laundering, there's -- there's a line

7   item here, I think it's d, it says maximum fine.

8        What does that say?

9   A    It says maximum fine 500,000 or twice the value of the

10  monetary instrument or funds involved in the transfer,

11  whichever is greater.

12  Q    Whichever is greater, right?

13  A    That's right.

14  Q    You've testified about getting more than $60 million for

15  the 1MDB bond transaction scheme, right?

16  A    That's correct.

17  Q    And with receiving more through the Kuwaiti ship?

18  A    That's correct.

19  Q    So, on the 1MDB bond transactions alone, that's up to

20  $120 million in a fine?

21  A    Yes, sir.

22  Q    And what's your understanding about who decides if there

23  is going to be a fine?

24  A    My understanding is that that's up to -- to the judge.

25  Q    Up to the judge?

1   A    Yes, sir.

2   Q    And that would be determined when?

3   A    At my sentencing.

4   Q    And does your cooperation agreement have anything to do

5   with a fine?

6   A    No, sir.

7   Q    If we look at paragraph 9 of this cooperation agreement,

8   what's this paragraph relate to?

9           (Exhibit published.)

10  A    It relates to me help or assisting in making sure that my

11  forfeiture becomes real or, you know, is taken, in fact.

12  Q    Is actually paid, right?

13  A    Is actually paid, yes.

14  Q    So, if we look at the last sentence that says:  The

15  defendant further agrees not to assist -- well, sorry.  I am

16  going to back up one sentence.

17          The defendant agrees not to file any petitions for

18  remission, restoration or any other assertion of ownership or

19  request for return relating to any property against which the

20  Government seeks to execute the forfeiture money judgment in

21  any administrative, judicial, civil or criminal, proceeding.

22          Do you see that?

23  A    Yes, sir.

24  Q    What does that prohibit you from doing?

25  A    Basically, that I can't -- can't try to get out of paying

Leissner - redirect - Rolle                2493

1    my forfeiture, you know, by legal means.

2    Q    And then it continues on:

3         The defendant further agrees not to assist any

4    person or entity in the filing of any claim or petition

5    seeking remission or contesting the forfeiture of any property

6    against which the Government seeks to execute the entry and

7    payment of the forfeiture money judgment in any administrative

8    or judicial proceeding.

9    A    Correct.

10   Q    It says agrees not to assist any person.  What do you

11   understand that sentence to mean?

12   A    It means that I can't work or help anybody to, again, try

13   to circumvent the forfeiture, effectively.

14            MR. ROLLE:  You can take that down.

15   BY MR. ROLLE:

16   Q    Sir, as you sit here today, you face up to how much time

17   in prison?

18   A    Twenty-five years, sir.

19   Q    And the agreement we just looked at, does that govern

20   your conduct?

21   A    It does, yes, sir.

22   Q    What happens to this agreement that we looked at if you

23   lie?

24   A    It -- it gets ripped up, you know, it becomes void.

25            MR. ROLLE:  No further questions, Your Honor.

Leissner - recross - Agnifilo                2494

1           THE COURT:  Mr. Agnifilo.

2           MR. AGNIFILO:  Yes, Judge.

3   RECROSS-EXAMINATION

4   BY MR. AGNIFILO:

5   Q    Mr. Leissner, the one who determines whether or not you

6   lie is the Government, right?  You understand that, right?

7   A    No, I don't understand that, sir.

8   Q    No.

9   A    I have to tell the truth and that's it.  The truth is the

10  truth.

11  Q    But the one who determines -- do you think that us here

12  on the defense have a vote in whether or not someone

13  determines that you told the truth or not?

14          Do you think we have a vote?

15  A    No, sir.

16  Q    We don't have a vote.  You know that, right?

17  A    Yes.

18  Q    You know that the Government, and only the Government, is

19  the arbiter of whether or not you told the truth?

20  A    I don't know who -- what you mean with an arbiter, sir.

21          I have to tell the truth, that's -- that's all I

22  know about this.

23  Q    Someone has to determine whether you told the truth.

24          This agreement is between you and the Government,

25  right?

Leissner - recross - Agnifilo                    2495

1   A    That's correct, sir.

2   Q    The cooperation agreement is not between you and the

3   Court, right?

4   A    No.

5   Q    It's between you and the Government, right?

6   A    That's correct.

7   Q    And in the agreement, in the cooperation agreement

8   between you and the Government, it says you have to tell the

9   truth, right?

10  A    Yes, sir.

11  Q    And you understand the one who decides whether or not you

12  tell the truth are the people sitting at this table closest to

13  you, right?

14  A    Sir, there is no deciding on the truth.  The truth is the

15  truth.  So, I don't -- maybe you could rephrase the question

16  then, perhaps.

17  Q    All right, we're going to pull up the cooperation

18  agreement.

19          MR. AGNIFILO:  Give me one second.  Thank you.

20          (Exhibit published.)

21  BY MR. AGNIFILO:

22  Q    Let's look at the cooperation agreement, which is

23  Government Exhibit 3001, and we're going to look at page 10.

24          Okay, let's look at paragraph 16.

25          MR. AGNIFILO:  That's fine right there.  Okay.

Leissner - recross - Agnifilo                    2496

1    Q     And paragraph 16 says:  The defendant must at all

2    times -- the defendant must at all times give complete,

3    truthful and accurate information and testimony, and must not

4    commit, or attempt to commit, any further crimes.  Should it

5    be judged by the Offices -- and by Offices you understand that

6    to be the Government, right?

7    A     That's right.

8    Q     Should it be judged by the Offices that the defendant has

9    failed to cooperate fully, has intentionally given false,

10   misleading or incomplete information or testimony, has

11   committed or attempted to commit any further crimes, or has

12   violated -- otherwise violated any provision of this

13   agreement, the defendant will not be released from his plea of

14   guilty and will not be released from any forfeiture

15   obligations contained in this agreement, but the Offices will

16   be released from their obligations under this agreement.

17          Right?

18   A     Yes, sir.

19   Q     So, you understand that it's the Government, and the

20   Government alone, that decides whether or not you

21   intentionally gave false, misleading or incomplete

22   information; right?

23   A     It is -- it is as judged by the Offices.  If they -- if

24   the Offices judges that I failed to do so, as it says here,

25   they will be released from that obligation.

Leissner - recross - Agnifilo                    2497

1   Q    Right.  So, it's the Government that decides whether or

2   not you gave false, misleading or incomplete information or

3   whether the Government decides that you didn't, right?

4         That's what this agreement says?

5   A    I think that's a lot of words missing -- wordsmithing.  I

6   only know that I have to give the truth and the complete truth

7   as the first sentence says.

8   Q    You talked a lot about side deals.

9         To your knowledge, did Roger Ng make a single dime

10  from any of these deals that you say are side deals, a single

11  dime?

12  A    Not that I can think of right now, sir.

13  Q    Okay.  You were asked questions on redirect examination

14  about the fact that you were cheating on Judy and that Roger

15  knew.

16        Do you remember those?

17  A    Yes.

18  Q    Judy was your wife, right?

19  A    Correct.

20  Q    You got married to Judy, right?

21  A    Yes.

22  Q    When you got married to Judy, you made vows to Judy,

23  right?

24        MR. ROLLE:  Objection.

25        THE COURT:  What basis?

Leissner - recross - Agnifilo                    2498

1              MR. ROLLE:  Relevance, Judge.

2              THE COURT:  Overruled.

3    BY MR. AGNIFILO:

4    Q    Right?

5    A    I made those vows, yes.

6    Q    Judy looked to you as her husband, right?

7    A    Yes, sir.

8    Q    Judy trusted you, the way a wife trusts a husband, right?

9    A    Yes, sir.

10   Q    What was Roger to Judy?

11   A    He was only --

12             THE COURT:  Sustained.

13             What did you ask?

14             MR. AGNIFILO:  What was Roger to Judy?

15             THE COURT:  Oh, I see.  Never mind, you can answer.

16   A    He was a friend of mine.

17             MR. AGNIFILO:  I want to pull up Government

18   Exhibit 1745.  It's in evidence.

19             (Exhibit published.)

20             MR. AGNIFILO:  No, no, I'm sorry.  Let's go to the

21   second page, the chart, the handwritten chart.  Let's see if

22   we can orient that, turn it on its side a little bit.  Okay.

23   Q    At some point you were shown this chart while you were

24   meeting with the Government, correct?

25   A    Yes.  I had seen this chart before, yes.

Leissner - recross - Agnifilo                    2499

1  Q    Okay.  And this is a chart that's made by -- was made by

2  Jasmine, right?

3  A    Sorry, sir, I don't know who made the chart.  It's

4  certainly forwarded by her.

5  Q    Okay.

6         MR. AGNIFILO:  Let's just go to the e-mail that is

7  attached to this chart.

8         (Exhibit published.)

9  BY MR. AGNIFILO:

10 Q    And Jasmine sends this to you and to Roger.  She says:

11 Does this work?

12        Do you see that?

13 A    Yes, sir.

14        MR. AGNIFILO:  All right, let's go back to the

15 chart.

16 Q    And I think you said at some point you were shown this

17 chart in the course of your meetings with the Government;

18 correct?

19 A    Yes, sir.

20 Q    And in this chart, this is not the bribery chart that you

21 talked about that Low made in London, right?

22 A    The one with the names on it and the boxes?

23 Q    Yes.

24 A    No, that's not.

25 Q    Okay.  So -- so -- well, let's look at this chart and

Leissner - recross - Agnifilo                    2500

1   let's remember what you said about the Low chart for a second.

2           The Low chart first, you said you were very clear

3   that the Malaysians were listed on the left?

4   A    Yes, sir.

5   Q    Do you remember you said that?

6   A    Yes.

7   Q    And I think, if I remember right, you said that the

8   Malaysians were listed on the left and the top entry was Najib

9   Razak and Rosmah, right?

10  A    It was Najib Razak was PM -- PM/Rosmah.

11  Q    And in addition to being the PM, Najib was the Minister

12  of Finance, right?

13  A    That's correct.

14  Q    Okay.  And underneath the Minister of Finance were

15  different 1MDB officials who were going to be getting bribes

16  too, correct?

17  A    Yes.

18  Q    And then under that were other Malaysian government

19  officials that were going to be getting bribes as well, right?

20  A    Yes, but it wasn't the Finance Ministry, it was

21  PM/Rosmah.

22  Q    Okay.  Let's talk about the Abu Dhabi side of the chart

23  that Low made in his apartment during the meeting.  Right?

24  A    Yes.

25  Q    Okay.  On the right side was the Abu Dhabi people, right?

Leissner - recross - Agnifilo                2501

1    A     Correct.

2    Q     Okay.  And the Abu Dhabi people were led on the top right

3    by Sheikh Mansour, right?

4    A     Correct.

5    Q     Then there was Khadem Al-Qubaisi, right?

6    A     Correct.

7    Q     Right.  Then there was Mohamed Badawy Al-Husseiny, right?

8    A     That's right.

9    Q     And then there were other entries, right?

10   A     Correct, to the right there was Ambassador Yousef

11   Al-Otaiba, he was to the right of that chart.  And then below

12   that was entries for, generically, IPIC in particular.

13   Q     Okay.  And the Government -- so, in cross-examination I

14   asked you questions that you had never mentioned that bribery

15   chart in almost the first three years, thirty-months months to

16   be exact --

17             MR. ROLLE:  Objection.

18   BY MR. AGNIFILO:

19   Q     -- of when you started cooperating with the FBI?

20             MR. ROLLE:  Objection, beyond the scope.

21             THE COURT:  There was no redirect with regard to the

22   other.

23             MR. AGNIFILO:  All right, let me a different

24   question.

25             THE COURT:  Sure.

Leissner - recross - Agnifilo                    2502

1  Q    You got the idea, you got the idea for the bribery chart

2  in Low's apartment from being shown this chart in your

3  preparation with the Government, isn't that true?

4  A    No, absolutely not, sir.

5  Q    So, then what prompted you, what prompted you to bring up

6  a bribery chart thirty-four months after you started

7  cooperating?

8           MR. ROLLE:  Objection.  Same objection.

9           THE COURT:  Sustained.  It's beyond the scope.

10 BY MR. AGNIFILO:

11 Q    You said when you were just answering questions with the

12 Government that Roger hasn't come forward in seven years to

13 demand his money back from 2015, right?

14 A    That's correct, sir.

15 Q    Okay.  You never told Roger to this day with your mouth,

16 you never told Roger that you had diverted the investment

17 money that he gave to you, correct?

18 A    I didn't divert the money, sir.

19 Q    Did you buy Celsius shares with it?

20 A    Not with that money.  He made an investment in Nu Horizons

21 and that was where the money went.

22 Q    You understood, I don't want to go back through all the

23 e-mails, he was investing in Celsius through Nu Horizons; you

24 knew that?

25 A    It was one of the considerations, sir, that Nu Horizons

Leissner - recross - Agnifilo                    2503

1  was making at that time, yes.

2  Q     You took him to the Celsius investor group meeting in Los

3  Angeles?

4  A     Well, that meeting included ADD.  It included Russell

5  Simmons, so he got the down low on ADD at the time too, which

6  was an investment -- he had a meeting also on ADD, All Def

7  Digital, which was represented by Russell Simmons.  So, that

8  was an investment that Nu Horizons had already made at that

9  time.

10  Q     Did you tell Roger, did you tell Roger that you falsely

11  told other people that he was your accountant?  Did you ever

12  tell him that?

13              MR. ROLLE:  Objection, beyond the scope.

14              THE COURT:  Overruled.

15  BY MR. AGNIFILO:

16  Q     Did you tell him that?

17  A     No.

18  Q     But you wrote that in an e-mail that we saw yesterday,

19  right?

20  A     That's correct.

21  Q     Okay.  And you understand that that e-mail and other

22  e-mails came over to Roger and his lawyers in discovery; you

23  know that, right?

24              MR. ROLLE:  Objection, objection.

25              THE COURT:  Sustained.

Leissner - recross - Agnifilo                2504

1   Q    Other than getting the e-mail, itself, however we got it,

2   how would Roger --

3              MR. ROLLE:  Objection.

4              THE COURT:  Sustained.

5   Q    How would Roger know?

6              MR. ROLLE:  Objection.

7              THE COURT:  Sustained.  Counsel.

8              MR. AGNIFILO:  Your Honor.

9              THE COURT:  Counsel.

10  BY MR. AGNIFILO:

11  Q    You didn't tell Roger that -- what you had put in the

12  e-mail about the accountant, right, you never told him?

13  A    That's correct.

14  Q    You never sent him an e-mail saying, Roger, just so you

15  know, I falsely stated you were my accountant and here's why I

16  did it; you never told him that either, right?

17  A    I did not, sir.

18  Q    You never told him at all, right?

19  A    Correct.

20  Q    Talking now about Roger's brother-in-law, Chee Khang, CK.

21             You had CK's e-mail address as of 2012, right, we

22  just saw e-mails about that this morning, right?

23  A    Yes, sir.

24  Q    Okay.  You agree that you were committing fraud against

25  C1 Bank in connection with funding, right?

SAM     OCR     RMR     CRR     RPR

Leissner - recross - Agnifilo                    2505

1   A     Yes, I told -- I didn't tell the truth to C1 Bank.

2   Q     Okay.  And you -- you are telling this jury, and you just

3   said on redirect, that you may, but you may not, have signed

4   CK's name to those letters that we looked at.  Right?

5   A     Correct.

6   Q     And you don't know whether you did or whether you did

7   not, right?

8   A     That's right, I can't recall putting the signature on

9   myself.  That's right.  It may well have happened, though.

10  Q     Isn't it true, you used CK and those letters to commit

11  the fraud on C1 Bank, isn't that true?

12  A     Not those letters, no, sir.  The -- the -- where I lied

13  to C1 Bank was in relation to a scheme and 1MDB.  The letter,

14  itself, no.  Those were assets I owned.  Those are not -- or

15  controlled.

16  Q     The point is you did -- you did with C1 Bank what you did

17  with the Havilland letter, it wasn't from CK, you forged his

18  signature and you sent that letter as though CK had sent it,

19  but you know that CK didn't send it; isn't that true?

20  A     I don't know what you're asking, sir.

21        CK was involved with me and he helped me to get

22  those -- that bank loan.  I lied to C1 Bank about 1MDB, and I

23  admit that.  I take responsibility for it.  But CK was working

24  with me on getting -- obtaining that loan.

25  Q     Can you show us one e-mail between you and CK about that

Leissner - recross - Agnifilo                2506

1   loan in 2015?

2   A     Well --

3   Q     One e-mail between you and CK in 2015 that lays out

4   assets, that's specific --

5   A     No, I had a conversation with him.  I don't have access

6   to that e-mail, sir, as you know.  I had conversations with

7   him and he was copied, as you saw, and on the redirect just

8   now on the e-mail with the broker.

9           I don't think he ever objected to that e-mail.

10  Unless you can show me otherwise, I don't think he ever

11  objected to that.  That was his e-mail.

12  Q     And that was in September of 2015?

13  A     I don't recall what it said on there, but it was in 2015.

14  Q     Do you remember that it was after the letter?

15          So, let me break down what -- and ask you a couple

16  questions.

17          You wanted C1 Bank to believe that you had a lawyer

18  involved in this situation that was sending a letter, a

19  lawyer's letter, with your list of assets; you didn't want to

20  do it yourself, right?

21  A     No, sir.  No, sir, I -- it wasn't my intention to have a

22  lawyer, per se, sending the letter.  CK had agreed to help me

23  with it, that's why that letter was written that way.

24  Q     If you -- if you wanted to just send a list of assets

25  under your own letterhead or under your own name, you could

SAM     OCR     RMR     CRR     RPR

1  have done that, right, but you didn't do that?

2  A     Yeah, Roger and CK had offered to help, so I got their

3  help.

4  Q     So tell me about how Roger -- where were you and Roger

5  when Roger offered CK's help?

6  A     Sir, I'm sorry.  I don't remember where Roger was, but we

7  had this conversation and Roger suggested that CK would help

8  me.

9  Q     Then why did you have to -- then why did you or maybe you

10  didn't, forge his signature?

11        Why wouldn't you be sure as you sit here today CK

12  definitely, absolutely, signed that letter as my lawyer?

13        Why can't you tell the jury that?

14  A     Because I was trying to get this loan real quick.  I was

15  just trying to be expedient about it.  I was, as you see, I

16  was actually traveling in Switzerland, so I was on the road

17  all the time at that time.  It was just maybe not convenient,

18  that's why I don't recall either.  I was just in a -- in a

19  hurry at the time.

20  Q     You forged CK's signature.  You forged it.  You signed it

21  without telling him.

22        You signed it yourself as though he signed it?

23  A     Sir, are you making a statement or asking me a question?

24  Q     It's a question.

25        Did you forge CK's signature?

Leissner - recross - Agnifilo                    2508

1   A    I already answered that before, I believe.

2   Q    That you don't know?

3   A    Correct.

4   Q    And that's the best we're going to get on this?

5            MR. ROLLE:  Objection.

6            THE COURT:  Sustained.

7   BY MR. AGNIFILO:

8   Q    You made well then much more than $60 million in

9   connection with your criminal activity, right?

10  A    Well, that was what I took out of Capital Place, and it

11  was the 60 million.

12  Q    Okay.  In excess of 60 million?

13  A    Yes.

14  Q    You're forfeiting 43.7 million, right?

15  A    Well, I agreed to also forfeit my interest in the Celsius

16  shares, sir.

17  Q    But in terms of the monetary amount that's actually

18  written in the documents, we looked at them earlier today, the

19  number is 43.7 million, right?

20  A    That's correct, sir.

21  Q    So, what's the $16.3 million for that you're getting to

22  keep?

23  A    Sir, I don't think I'm getting to keep that.

24            As I just mentioned, my interest is much greater

25  than that.  And also, I don't know how the 43.7 was

SAM     OCR     RMR     CRR     RPR

1    determined.  I agreed to forfeit that in 2018.

2    Q    I mean you told -- you told the Government, you've been

3    telling the Government all along that the number was

4    $60 million, right?

5    A    That's -- that's what I testified to, yes, sir.

6    Q    Right.  And so, having told the Government that the

7    number is $60 million, the number of the forfeiture amount is

8    $43.7 million.

9            You agree with that, right?

10   A    That's what's on the -- in the cooperation agreement.

11           Again, I forfeited more than that.  So, I feel I

12   have actually forfeited way in excess of twice that amount

13   that you're referring to.

14   Q    In terms of -- I'm just talking about the monetary amount

15   in the agreement.

16           It's 43.7 million, right?

17   A    Yes.

18   Q    Yes or no?

19   A    Yes, that's what's in the agreement.

20   Q    On redirect examination you -- you brought up your

21   daughter Angelina, right?

22           MR. ROLLE:  Objection.

23           THE COURT:  Overruled.

24   BY MR. AGNIFILO:

25   Q    Right?

Leissner - recross - Agnifilo                    2510

1    A    Yes.

2    Q    And this was in connection with why you decided to, what,

3    be truthful with Judy and other women in your life, is that --

4    is that why that was brought up?

5    A    It was in the connection with Judy finding out about

6    Rohana, sir.

7    Q    Didn't you tell Rohana that Angelina wasn't your

8    daughter?

9                   MR. ROLLE:  Objection.

10                  THE COURT:  Sidebar.

11                  (Sidebar held outside the hearing of the jury.)

12

13                  (Continued on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

```
                         Sidebar                     2511
```

1              (The following sidebar took place outside the
2     hearing of the jury.)
3              THE COURT:  That issue was discussed in the context
4     of him explaining why and how Judy became aware of his
5     relationship with Rohana.
6              So, where are you going with this?
7              MR. AGNIFILO:  He -- they brought it up as though
8     this was something that caused him to be truthful, and the
9     actual fact --
10             THE COURT:  No, it was brought up specifically to
11    ask when or how Judy became aware of the relationship.  And he
12    made it clear that she's the one who called Judy and told Judy
13    once they found out that Judy was pregnant.
14             MR. AGNIFILO:  But the truth is, is that he was
15    telling Rohana that this was not his daughter.  That's --
16             THE COURT:  Okay.
17             MR. AGNIFILO:  That's a lie that he -- which I
18    didn't get into on our case until they brought it up on
19    redirect.
20             THE COURT:  But they didn't bring that up.  They
21    brought up the issue of how and whether Judy knew of his
22    relationship.
23             So, now you want to introduce this information to
24    show what?
25             MR. AGNIFILO:  That -- that he's continuing to lie.

                SAM      OCR     RMR     CRR     RPR

Sidebar                                    2512

1    He didn't come clean and become honest.

2              THE COURT:  Lie about what, though?  Lie about what?

3              MR. AGNIFILO:  His paternity and the fact that a

4    daughter is his daughter.

5              THE COURT:  That's not the issue that was raised on

6    redirect.  The issue on redirect was with regard to whether or

7    not Judy knew he was having a relationship with Rohana and how

8    she found out.

9              Do you have evidence to challenge that?

10             MS. GERAGOS:  Yes, I have that right here.

11             Sorry, continue.

12             MR. ROLLE:  Judge, just to note for the record,

13   whether -- whether -- whatever he said to Rohana, whatever it

14   may be in the world, is not probative of whether Rohana told

15   Judy, which is the only reason the Government asked and the

16   only basis to situate us in time about when she found out.  He

17   could have told her anything under the sun, but it's not

18   probative of whether Rohana told Judy.

19             MR. AGNIFILO:  The problem, though, Judge, is they

20   bring these things up as though they're these light-bulb

21   moments where he's going to be truthful, and that's misleading

22   because he's not truthful after that.  He's continuing to lie.

23             THE COURT:  You get to argue whatever you want to

24   this jury, but you don't get to argue in your

25   cross-examination, which I have given you lots of leeway with

Sidebar                                                      2513

1    this witness.  You've done it over and over and over again.

2    It is not proper.  You argue to the jury, not to the witness.

3              MR. AGNIFILO:  I'll ask him the question and --

4              THE COURT:  But what is it you're asking him?

5              His testimony is Judy found out because Rohana

6    called and told her.  And she did that because Rohana found

7    out Judy was pregnant.

8              What about that do you want to attack?

9              MR. AGNIFILO:  It's not a matter of attacking.

10             THE COURT:  Whatever he told Rohana about his wife,

11   whether he disowned the child, whether he disowned that was

12   his child or not, how is that probative of any of that which

13   was asked on redirect?

14             MR. AGNIFILO:  It's probative -- it's probative of

15   his credibility because he's continuing to lie about the

16   overall situation.

17             That's all I'm trying to get at.

18             THE COURT:  But why didn't you ask him about -- I

19   don't even know if it would be allowed, but it's not in

20   response to the question that he was asked on redirect.

21             That's why I'm limiting you.  I'm limiting you to

22   dealing with what was addressed on redirect.

23             MR. AGNIFILO:  All right.  All right, Judge, I

24   understand.

25             THE COURT:  Okay?

Sidebar                                          2514

1        MR. AGNIFILO:  Okay.

2        (Sidebar concluded.)

3

4

5

6        (Continued on the following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Liessner - recross - Agnifilo                    2515

1            (In open court - jury present.)

2            THE COURT:  Please proceed, Mr. Agnifilo.

3            MR. AGNIFILO:  Yes, thank you.

4   EXAMINATION CONTINUING

5   BY MR. AGNIFILO:

6   Q    Do you know when Roger's bike accident was?

7   A    I think I testified I don't remember when that was.  I

8   remember he had a bike accident.

9   Q    Do you remember if it was in the end of 2011 or the

10  beginning of 2012, do you remember what year?

11  A    No, I don't.  Sorry, sir.

12  Q    Do you remember him being on medical leave until, at

13  least, the beginning of the second week of January?

14  A    No, sir.  The only reference I see, or in my memory, was

15  the e-mail that was shown to me before where he mentions it.

16  But I don't independently remember his bike accident, the

17  timing, the timing of his bike accident.

18  Q    I just have one, one final couple questions for you.

19            You talked on redirect examination about the fact

20  that neither Low nor Eric Tan or anybody else told you

21  specifically who you were making these payments to, correct?

22  A    That's correct, sir.

23  Q    And suffice it to say, obviously, you didn't know and you

24  didn't tell Roger that you were making these payments as you

25  were making them, correct?

1    A    Well, I have to clarify that question because, yes, at

2    the beginning, at the outset of agreeing with Jho that I would

3    make these payments, Roger and I spoke and he was in agreement

4    that I would offer my -- my -- my SPV or my shell company to

5    do such transfers.  I did not tell him about the exact

6    entities that the money went to.

7    Q    Did you ever ask Roger to use his SPV to make these

8    transfers?

9    A    I -- I can't remember having that discussion with him,

10   sir.

11   Q    Did you ever tell Roger:  Hey, I'm -- I'm -- I'm the

12   partner here, you're my employee, you use your SPV?

13        Did you ever have anything like that with him?

14   A    That was the not the relationship we had in the first

15   place, sir.

16   Q    Did you ever -- but you -- you agree, you decided that

17   you would bear the risk, it would be your company that was

18   sending these payments out, right?

19   A    Obviously, that's what happened, yes, sir.

20   Q    And that was a decision you made, correct?

21   A    That's correct.

22        MR. AGNIFILO:  Your Honor, I have nothing else.

23        THE COURT:  I take it there's nothing further?

24        MR. ROLLE:  No, Judge.

25        THE COURT:  You are excused.

Liessner - recross - Agnifilo                2517

1             (Witness steps down.)

2             THE COURT:  Does the Government have another witness

3    to call?

4             MR. ROLLE:  Yes, Your Honor.  We would call Paul

5    Garofallou, G-A-R-O-F-A-L-L-O-U.

6             THE COURT:  Please bring the witness in.

7             MR. ROLLE:  Yes, Your Honor.

8             (Pause.)

9             (Witness enters and takes the stand.)

10            THE COURT:  Will the agent please have a seat while

11   the witness is sworn?

12            And, Mr. Rolle, please have a seat until the witness

13   is sworn in.

14            MR. ROLLE:  Yes, Your Honor.

15            THE COURT:  Can you please move down to the mic,

16   sir?

17            Will you swear him in?

18            Please stand and raise your right hand.

19            THE COURTROOM DEPUTY:  Do you solemnly swear or

20   affirm that the answers and testimony you are about to give

21   the Court will be the truth, the whole truth, and nothing but

22   the truth?

23            THE WITNESS:  I do.

24            (Witness sworn.)

25            THE COURT:  Please proceed, Mr. Rolle.

Liessner - recross - Agnifilo                2518

1          MR. ROLLE:  Thank you, Your Honor.

2          THE COURT:  If you can please spell your last name

3     for the record.

4          THE WITNESS:  Yes, G-A-R-O-F-A-L-L-O-U.

5          THE COURT:  Thank you.

6          MR. ROLLE:  May I proceed, Your Honor?

7          THE COURT:  You may.

8

9          (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SAM     OCR     RMR     CRR     RPR

1    **PAUL GAROFALLOU**,

2        called as a witness by the Government, having been first

3        duly sworn/affirmed by the Courtroom Deputy, was examined

4        and testified as follows:

5    DIRECT EXAMINATION

6    BY MR. ROLLE:

7    Q    Good morning, sir.

8            MR. ROLLE:  If you could -- at this point, Your

9    Honor, we'd ask if the witness could remove his mask to

10   testify?

11   Q    Who do you work for?

12   A    JP Morgan Chase.

13   Q    What's your position at JP Morgan Chase?

14   A    I'm a vice president.  Technically my -- my title is a

15   U.S. dollar clearing product manager.

16   Q    And --

17           THE COURT:  Can you pull the mic closer to you,

18   sir --

19           THE WITNESS:  Sure.

20           THE COURT:  -- so that we can hear you?

21           MR. ROLLE:  Sorry.

22   BY MR. ROLLE:

23   Q    What did you say your position was at JP Morgan Chase?

24   A    I'm a vice president.  Technically, my position is called

25   U.S. dollar clearing product manager.

Garofallou - direct - Rolle                    2520

1    Q    How long have you worked at JP Morgan Chase?

2    A    Since June of 1985.

3    Q    And JP Morgan Chase is the bank we would know as Chase?

4    A    Correct.

5    Q    How long have you been working, I think you said U.S.

6    dollar clearing, how long have you done that?

7    A    I would say somewhere in -- in 2003.

8    Q    And what is U.S. dollar clearing?

9    A    U.S. dollar clearing is just another name for wire

10   transfer or funds transfer.

11   Q    And what are your responsibilities as a member of the

12   U.S. dollar clearing team at JP Morgan?

13   A    Well, as a product manager, you're obviously supposed to

14   work with clients and try to improve the product in any way

15   that you can, also bringing in revenue, as well, at the same

16   time.

17   Q    And where are you based?

18   A    In Tampa, Florida.

19   Q    What is a correspondent bank?

20   A    A correspondent bank is -- is a term used when one bank

21   will provide banking services to another finance -- financial

22   institution.  This is typically where an international bank

23   will need to process U.S. dollars and will need a bank in

24   country in order to provide those services for them.

25   Q    Does JP Morgan Chase offer correspondent banking services

SAM     OCR     RMR     CRR     RPR

Garofallou - direct - Rolle                2521

1    to -- to foreign banks?

2    A    Yes.

3    Q    And you mentioned foreign bank in your example.

4         Why would a foreign bank need or want JP Morgan

5    Chase's correspondent bank services?

6    A    So, by way of example, let's say I'm a company in Austria

7    and I am doing technical work and I work with Microsoft.  So

8    now, I need to satisfy an invoice to -- to pay Microsoft, and

9    I am going to have to do that in U.S. dollars.  Given that I'm

10   based in Austria, I'm not able to clear those funds locally, I

11   would need a bank in country who has the ability to process

12   those dollars.

13        So, I would have an account with the bank in

14   Austria, that bank in Austria might maintain a relationship

15   with a U.S. bank, that would be the correspondent bank

16   relationship, and they would be providing those services to

17   that bank.

18   Q    So, in general, how does the process work when someone

19   with a bank account outside of the United States wants to send

20   U.S. dollars to another person who has a bank account outside

21   of the United States?

22   A    So, they would typically use whatever process or

23   application that bank would have in order to move funds.  They

24   would then execute a transaction in dollars.  Basically,

25   sending a message to their bank saying:  I want you to debit

Garofallou - direct - Rolle                    2522

1   my account and I want you to execute a wire to such-and-such

2   bank in such-and-such country.

3   Q    And so, are there other -- could you identify sort of who

4   the parties would be in this example who are trying to send

5   from a foreign bank account of Person A to a foreign bank

6   account of Person B, where do the correspondent banks fit in?

7   A    So, typically, in U.S. dollar clearing terminology, as I

8   mentioned, a company in Austria who is executing a

9   transaction, this would be the originating party.  They would

10  ask their bank to execute that transaction.  That bank would

11  be the ordering bank.

12         They would maintain the relationship with the --

13  with the correspondent bank in the U.S., JP Morgan, Citibank,

14  et cetera.  They would ask that bank or would send a message

15  to that bank asking them to execute a -- a payment on their

16  behalf.  That correspondent bank would be an intermediary bank

17  because we're, basically, passing funds from one bank to

18  another.

19         The bank that we are paying could be one of two

20  banks.  It could be an intermediary bank, if we don't maintain

21  the relationship for the final beneficiary bank.

22         So, let's say, in the example I provided Microsoft

23  has an account with bank ABC.  Bank ABC might have a JP Morgan

24  account; if they do, then we would pay that account.  They

25  would be the beneficiary bank, and then Microsoft would be the

SAM       OCR       RMR       CRR       RPR

1    final beneficiary.

2              In the case where we don't maintain the

3    relationship, let's say, we have to pay Citi for that -- for

4    that bank.  Citi would be the intermediary bank, that would

5    still be the beneficiary bank, and then Microsoft would still

6    be the final beneficiary.

7    Q    So, the beneficiary in your example, that's Person B, the

8    person to whom Person A is trying to send the money to?

9    A    Correct.  They're the final recipient of the funds.

10   Q    So, how did -- how do the banks know where the money is

11   supposed to go?

12   A    Well, again, we may maintain a relationship with that

13   beneficiary bank.  In that case, we would pay them directly on

14   our books.

15             We also have access to many resources to find out

16   which banks maintain a relationship with which New York

17   correspondent bank.

18             So, there's a wide variety of resources that we have

19   to determine what path to pay.

20   Q    And what -- what is the SWIFT message, SWIFT message?

21   A    SWIFT is a telecommunications process.  It's not a

22   process, it's a messaging service.  It's a secure messaging

23   service that's typically used between banks to send

24   authenticated messages, or encrypted messages, so that they

25   can instruct to move funds.

Garofallou - direct - Rolle                    2524

1    Q    Is there a standardized format for SWIFT messages?

2    A    In the U.S. dollar clearing space there are typically

3    two -- two structures.  One is called an MT103.  This is

4    sometimes called a commercial payment.  With this, one party

5    to the transaction would be a nonfinancial institution.  So,

6    it could be an individual, it could be a corporation.

7           The other standard is called an MT202.  This is

8    sometimes called a treasury payment.  This is where both

9    parties to the transaction, or all parties to the transaction,

10   are a financial institution.  Typically, these are used in

11   settlements of letters of credit, foreign exchanges, et

12   cetera.

13   Q    Are you familiar with these types of payment instructions

14   based on your work at JP Morgan Chase?

15   A    Yes.

16   Q    What is CHIPS?

17   A    So, when processing payments within the United States, if

18   I don't maintain a relationship of the beneficiary bank, if I

19   have to pay another correspondent bank, I would do so in one

20   of two ways.

21          One, either using Fed Wire, which is the Federal

22   Reserve Bank process by which we can move funds between two

23   financial institutions, or the other option is called CHIPS.

24   CHIPS is actually a private organization and there are only, I

25   think, 44 or 45 members.  These are typically the --

Garofallou - direct - Rolle                    2525

1  New York's largest banks.  And it's, again, it's just another

2  way to execute payment.  Similar to Fed Wire.

3  Q    How does CHIPS help JP Morgan Chase execute the payment

4  in the correspondent bank example that you just gave?  Where

5  does CHIPS fit in?

6  A    Where does it fit in?

7  Q    Into that --

8  A    They're, basically, just a clearing house.  So, if I'm

9  paying Citibank through CHIPS, CHIPS is nothing more than a

10 clearing station for those funds.  So, they'll take them in

11 and then they will pay Citibank.

12 Q    So, they help get --

13 A    They help facilitate the execution of the wire.

14 Q    And for the correspondent bank transactions that you

15 talked about, are those money transfers happening inside the

16 United States?

17 A    Yes.

18 Q    You used the word "in country" a couple of times.

19 A    Correct.  Both CHIPS and Fed Wire are domestic, domestic

20 services.

21 Q    Now, does JP Morgan Chase maintain records relating to

22 its correspondent bank business?

23 A    Yes.

24 Q    Records of transactions it completes as a correspondent

25 bank?

Garofallou - direct - Rolle                    2526

1  A    Yes.

2  Q    Are you familiar with the JP Morgan Chase systems that

3  capture that information?

4  A    Yes.

5          MR. ROLLE:  If we could pull up Government

6  Exhibit 1860, which is in evidence.  And I'd like to just

7  scroll down maybe a third of the page to where it says SWIFT

8  message.

9          (Exhibit published.)

10 BY MR. ROLLE:

11 Q    Can you see that on your screen, sir?  And you should

12 have one right next to you, too?

13         PROSPECTIVE JUROR:  Yes.

14 Q    Do you recognize the information, the type of information

15 that's listed here?

16 A    Yes.

17         MR. ROLLE:  And if we could scroll down a little

18 further on this exhibit.

19         THE COURT:  What exhibit number is this, Mr. Rolle?

20         MR. ROLLE:  This is 1860 in evidence.

21         THE COURT:  When was it entered?

22         MR. ROLLE:  I believe it was entered, if we can pull

23 up the date, through the last witness' testimony at some

24 point.

25         THE COURT:  By which witness?

1           (Pause.)

2           MR. ROLLE:  So, Your Honor, we would offer it then

3    at this point.

4           MR. AGNIFILO:  We have no objection.

5           THE COURT:  It's admitted.

6           (Government's Exhibit 1860 was received in

7    evidence.)

8           (Exhibit published.)

9    BY MR. ROLLE:

10   Q    And you recognize the kinds of information listed here?

11   A    Correct.

12   Q    And what is it?

13   A    Yes.

14   Q    What kind of information?

15   A    This is a -- if you scroll to the top, I believe this is

16   a MT103, a SWIFT MT103.

17          MR. ROLLE:  And if we scroll further down,

18   Mr. Youkilis.

19   Q    What's listed here, it says 54A?

20   A    Correct.  So, this is a message, basically, stating that

21   the funds will be processed or received through JP Morgan

22   Chase in New York.

23   Q    And do you recognize if this is a JP Morgan Chase record

24   of any kind?

25   A    You mean the actual document, itself?

Garofallou - direct - Rolle                    2528

1    Q    The actual SWIFT message we were looking at.

2    A    No, it is not.

3    Q    But you recognize the type of information listed?

4    A    I do.

5    Q    And this piece here, there's the address of 4 Metrotech

6    Center, 8th floor, Brooklyn?

7    A    Correct.

8    Q    Is that an address for any JP Morgan Chase operations?

9    A    It was the funds transfer U.S. dollar clearing operation

10   site, and I think we -- we moved to Tampa, Florida in 2001.

11   Q    So, by 2012 the U.S. dollar clearing work and the

12   correspondent work, that wasn't happening at the Metrotech

13   address?

14   A    No, it was not.

15   Q    Did JP Morgan Chase still maintain operations at that

16   Metrotech address?

17   A    Yes.

18   Q    Does it still maintain operations there today?

19   A    Yes.

20

21              (Continued on the following page.)

22

23

24

25

SAM      OCR      RMR      CRR      RPR

Garafallou - direct - Rolle                    2529

1    BY MR. ROLLE:  (Continuing.)

2    Q    If we could pull up on this document.  Sorry, on this

3    document look there in 32A and B.  What is the information

4    there?

5    A    32A is the field that denotes the value date, meaning the

6    date that the payment should be executed.  Next is the U.S.

7    dollar symbol, the funds transfer will be U.S. dollars.  And

8    finally the amount of the transfer.

9         32B indicates the original amount and currency that

10   was instructed.

11        So again by way of example, when the originator

12   sends the message to the bank to say execute a payment on my

13   behalf, this is the amount and currency that would have been

14   debited from their account.

15   Q    In line 20 there is something that says Trust BNY then a

16   series of numbers?

17   A    Correct.  In every message in a there is a field 20 that

18   denotes the reference number of the sending institution.

19   Q    I'd like to pull up for identification Government's

20   Exhibit 254F.  Do you recognize that document, sir?

21   A    Yes.

22   Q    What is it?

23   A    This is a copy of a completed transaction that JP Morgan

24   had executed.

25        MR. ROLLE:  Your Honor, we offer Government's

Garafallou - direct - Rolle                    2530

1   Exhibit 254F.

2              MR. AGNIFILO:  No objection.

3              THE COURT:  Admitted.

4              (Government Exhibit 254F received in evidence.)

5   BY MR. ROLLE:

6   Q    Looking at this, there is a credit reference and it says,

7   again, Trust BNY, then is that the same numbers we saw on the

8   other document?

9   A    Correct.

10  Q    What is this document?  This is a JP Morgan record?

11  A    Correct, of an executed transaction.

12  Q    This is the JP Morgan Chase version of the same

13  transaction we were looking at?

14  A    It's a copy of the executed transaction.  If you're

15  asking if this is an actual SWIFT message, no.  This is

16  basically just a summary of the executed transaction.

17  Q    It reflects that JP Morgan Chase did in fact execute that

18  $907,500,000 transfer?

19  A    Correct.

20  Q    Is there anything on here that would tell us whether

21  CHIPS, what you described earlier, whether that was used --

22  A    Under the field transaction type.

23  Q    Where it says CHC?

24  A    Correct.

25  Q    Further down, debit party, it says MBR/0001?

Garafallou - direct - Rolle                    2531

1    A    Correct, for transactions executed through CHIPS.  As I

2    mentioned, there are approximately 44 or 45 members of CHIPS.

3    So CHIPS is not open publicly to every bank within the United

4    States, it's a private organization only for 40 to 45 members.

5    The identifier used in the execution of a CHIPS payment

6    between two member banks is that symbol MBR, then 001 would

7    indicate that this belongs to Bank of New York.

8              MR. ROLLE:  Just a few more documents to admit, but

9    I don't want to keep anyone from lunch.

10             THE COURT:  We'll break for lunch 45 minutes.  Come

11   back quarter to 2.  Enjoy your lunch and remember not to

12   discuss your case.

13             (Jury exits the courtroom.)

14             THE COURT:  I'll see the parties at a quarter to.

15             (Lunch recess.)

16

17

18

19

20

21

22

23

24

25

Garafallou - direct - Rolle                    2532

1                    AFTERNOON SESSION

2              (Time noted:  1:50 p.m.)

3                    (In open court.)

4              (Jury enters the courtroom.)

5              THE COURT:  Please be seated.  We're going to

6    continue with testimony.  Mr. Rolle.

7              MR. ROLLE:  Thank you, your Honor.

8    BY MR. ROLLE:

9    Q    If we pull up Government's Exhibit 254C for

10   identification.  Do you recognize this document, sir?

11   A    Yes.

12   Q    What do you recognize it be?

13   A    This is a settled transaction through JP Morgan Chase.

14   Q    This record would have been created at or near the time

15   of that transaction?

16   A    Correct.

17             MR. ROLLE:  We offer Government's Exhibit 254-C at

18   this time.

19             MR. AGNIFILO:  No objection.

20             THE COURT:  Admitted.

21             (Government Exhibit 254-C received in evidence.)

22   BY MR. ROLLE:

23   Q    Sir, this looks similar to the document we were looking

24   at before lunch in terms of its format?

25   A    Correct.

Garafallou - direct - Rolle                    2533

1    Q    This is a different transaction, though?

2    A    Yes.

3    Q    And just the same question as to this, are we able to

4    determine if this transaction was settled via the CHIPS entity

5    you described earlier?

6    A    Yes.

7    Q    How does JP Morgan record that fact on this document?

8    A    By the transaction type, CHP.  Also, if we go down to the

9    credit party, I believe, you will see MBR, similar to what we

10   saw before in this case.  We paid Citibank New York and their

11   member number is 0008.

12   Q    The account party for this transaction, there is

13   something that also says CHP with some numbers, it says BSI?

14   A    Yes.

15   Q    What is this information?

16   A    This is an identifier that is used in CHIPS payments.  So

17   in this example BSI has an account with Citibank.  If BSI were

18   to have an account with multiple correspondent banks, they

19   would have a unique account number at each one of those banks.

20   To simplify the process in making these transactions they have

21   created a Universal ID, CHIPS UID, a universal identifier.

22   This number would represent BSI's account number at any bank

23   where they maintained a correspondent bank relationship.

24   Q    The Bene field?

25   A    Could you repeat that?

Garafallou - direct - Rolle                    2534

1    Q    The field Bene?

2    A    Yes.

3    Q    That's beneficiary?

4    A    Correct.

5    Q    For this transaction, who was that the beneficiary with

6    the account at BSI?

7    A    Aabar Investments PJS.

8    Q    PJS Limited?

9    A    Yes.

10   Q    If we could pull up a series and see if you recognize

11   these Government for identification:  254A, 254B, 254D, 254E

12   for identification.

13              We'll start with A, do you recognize that?

14   A    Yes.

15   Q    If we could go to B, do you recognize that?

16   A    Yes.

17   Q    D?

18   A    Yes.

19   Q    And E?

20   A    Yes.

21   Q    What are all of these documents?

22   A    These are basically what we were looking at in the prior

23   exhibits but in a different format, in an Excel format.

24   Q    They are records of JP Morgan Chase?

25   A    Correct.

Garafallou - direct - Rolle                    2535

1          MR. ROLLE:  We offer 254A, B, D and E at this time.

2          MR. AGNIFILO:  No objection, your Honor.

3          THE COURT:  Admitted.

4          (Government Exhibits 254-A, B, D, E received in

5     evidence.)

6     BY MR. ROLLE:

7     Q    Starting with Government's Exhibit 254A, this is a

8     spreadsheet.  You said this reflects the same type of

9     information we saw on that single-page document?

10    A    Correct.

11    Q    Each of the rows on here, are they different

12    transactions?

13    A    Yes, each of the rows, yes.

14    Q    If we go to line two, Mr. Youkilis, and move to column S.

15    We see listed there the MBR then some numbers?

16    A    Correct.

17    Q    That's the same identifier you talked about before?

18    A    Yes, in this case it's HSBC.

19    Q    That notes it's a CHIPS transaction?

20    A    Correct.

21    Q    If we look at column X.  We see the CHP, is that the

22    universal CHIPS account number you described before?

23    A    Correct.

24    Q    If we look down, those identifiers are used sort of

25    throughout this document if it that's the kind of transaction

1  it was?

2  A    Yes.

3  Q    If we look at line four on this, row four, that's also

4  CHIPS transaction in X?

5  A    Correct that's the CHIPS UID for Singapore Limited.

6  Q    Nomura?

7  A    Yes.

8  Q    And line five in the same column, also a CHIPS

9  transaction?

10 A    Correct.

11 Q    Also Nomura?

12 A    Yes.

13 Q    If we could go to 254B.  This document is the same kind

14 of information; is that right?

15 A    Correct.

16 Q    Each row is a different transaction?

17 A    Yes.

18 Q    If we could look at column T, in this spreadsheet the

19 CHIPS number is listed in column T?

20 A    Yes.

21 Q    And in column Y?

22 A    Yes.

23 Q    Look at, for example, row six -- row eight, either one.

24 A    Yes.

25 Q    That's the same notation for CHIPS universal ID?

Garafallou - cross - Intrater                2537

1   A    Correct, in this case the one for Credit Suisse in
2   Zurich.
3   Q    If we go to Government's Exhibit 254E, same information?
4   A    Yes.
5   Q    Going to column AA, is that the CHIPS universal ID?
6   A    Yes.
7   Q    This time for BSI?
8   A    Yes.
9            MR. ROLLE:  One moment, your Honor.
10           No further questions at this time, your Honor.
11           THE COURT:  Cross.
12  CROSS-EXAMINATION
13  BY MR. INTRATER:
14  Q    Good afternoon.  I'm Zach Intrater.  I am representing
15  Roger Ng.
16           You've been working JP Morgan Chase since 1985,
17  correct, thirty-six years?
18  A    Yes.
19  Q    They offered you a grandfather clock at some point?
20  A    Yes, there are tombstones for every five years or so.
21  Q    You testified about correspondent banking and clearing,
22  right?
23  A    Yes.
24  Q    You met with the Government a couple of times, at least
25  you spoke to the Government a couple of times, in preparation

1    for your testimony here today; is that right?

2    A     Yes.

3    Q     I think one time you spoke to them in February, does that

4    sound, right?

5    A     Yes.

6    Q     Again you spoke to them just a few days ago, maybe

7    March 4?

8    A     Yes.

9    Q     Do you recall being shown GX1860 on direct?  It was one

10   of the documents that they showed you.  I'll bring it up for

11   you, if that's okay?

12   A     If it is one of the exhibits that were shown, yes.

13   Q     Understood.  Do you recall this document?

14   A     Yes.

15   Q     Do you remember the Government showing you this document

16   during your meeting on March 4?

17   A     Yes.

18   Q     They showed you that one too?

19   A     This one that I'm looking at?

20   Q     Yes.

21   A     Yes.

22   Q     They showed it to you on March 4 and they showed it to

23   you just now, correct?

24   A     Correct.

25   Q     Do you recall on page two of this document they

Garafallou - cross - Intrater                2539

1   highlighted for you JP Morgan Chase Metrotech Center in

2   Brooklyn?

3   A     Yes.

4   Q     Do you remember telling them on March 4 that this

5   transaction had nothing to do with Brooklyn; in other words,

6   no part of this transaction took place in Brooklyn, right?

7              MR. ROLLE:  Objection to what the witness previously

8   said.

9              THE COURT:  Okay.  Why don't you rephrase your

10  question.

11  Q     Do you recall telling the jury on direct that no part of

12  this transaction took place in Brooklyn?

13  A     I don't think I stated it happened in Brooklyn.  I stated

14  that we moved operations in 2001.  And then the gentleman

15  asked me if they had operations there, I said yes.

16  Q     But no part of the transaction at issue with this

17  document, this $907 million wire, no of that took place at JP

18  Morgan operations in Brooklyn, right?

19  A     Correct.

20  Q     You told them that on March 4 also, right?

21  A     Yes.

22  Q     But they highlighted that word Brooklyn for you

23  nonetheless on your direct testimony.  Do you remember that?

24             MR. ROLLE:  Objection.

25             THE COURT:  Sustained.

Garafallou - cross - Intrater                    2540

1      MR. INTRATER:  Nothing further, Judge.  Thank you.

2      THE COURT:  Redirect?

3      MR. ROLLE:  No, Your Honor.

4      THE COURT:  You're excused.  Thank you.

5      (Whereupon, the witness was excused.)

6      THE COURT:  Call your next witness.

7      MS. AMBUEHL:  The Government calls Robert Pepitone

8      THE COURT:  Please bring in your witness.

9      (Witness takes the witness stand.)

10     THE COURTROOM DEPUTY:  Please raise your right hand.

11          (Witness sworn.)

12     THE WITNESS:  I do.

13     THE COURT:  Have a seat and spell your last name for

14 the record.

15     THE WITNESS:  Robert Pepitone, R-O-B-E-R-T,

16 P-E-P-I-T-O-N-E.

17     THE COURT:  Thank you.  Please pull the mic towards

18 you.  It's a new cover on the mic, just put it close to you so

19 we can hear you clearly.

20 **ROBERT PEPITONE**, called as a witness, having been first duly

21          sworn/affirmed, was examined and testified as

22          follows:

23 DIRECT EXAMINATION

24 BY MS. AMBUEHL:

25 Q    Mr. Pepitone, where do you work?

Garafallou - cross - Intrater                    2541

1    A    The Clearing House.

2    Q    What is the Clearing House?

3    A    The Clearing House was formed in 1853.  It's the oldest

4    bank-owned payment system in the United States.

5    Q    When you say it's bank-owned, what do you mean by that?

6    A    It's a private company and it's owned by 24 the world's

7    largest banks.

8    Q    In general, what does the Clearing House do?

9    A    Provides payment services for participants.

10   Q    What are its participants, what does that mean?

11   A    So the there are owners of the Clearing House, which are

12   usually banks, as I mentioned large global banks.  And there

13   are participants of each of the products.  Each product will

14   have its own -- not members -- but they are called

15   participants.  So they are either depositories, like with

16   CHIPS you have to be a depository institution or a foreign

17   agency or foreign branch operating in the U.S.

18   Q    Let's come back to that.  You said the participants

19   aren't members but are they sometimes colloquially referred to

20   as members of CHIPS?

21   A    It's common.  But there is a differentiation between what

22   is an owner bank, could also be a participant of one of the

23   products.  Or a participant themselves, which are not owner

24   banks but there are other banking institutions.

25   Q    Let's come back to you for a little bit.  What is your

1    title at the Clearing House?

2    A    Vice President, senior product manager of the CHIPS

3    product.

4    Q    Where does the Clearing House have offices?

5    A    They have offices in New York, North Carolina, Texas.  I

6    think that's really the main offices where we operate out of.

7    But we have data centers where the systems are located and

8    process transactions.  And those are in, currently, in North

9    Carolina and Pennsylvania.

10   Q    Where were the data centers located from 2012 to 2015?

11   A    We had a New York City data center, and a North Carolina

12   data center.

13   Q    Where was your New York data center located?

14   A    It was 33 Street and Tenth Avenue.

15   Q    You mentioned that the Clearing House has a variety of

16   different products, how many products do they have?

17   A    They have four main payment products.  An example is our

18   APM product, which is an ACH product, you may be familiar

19   with, that's how people get their payroll checks deposited

20   into their accounts.

21          We have an SVP co-product, which is a small value

22   payments product, and it processes check images.  If you

23   deposit a check through your cash machine or through a branch,

24   those checks all collect and settle through the Clearing

25   House's product.

Garafallou - cross - Intrater                    2543

1           We also have an RTP product, which is our newest

2      product.  It's a real time payment product transactions,

3      settles in about five seconds.  So that's the newest

4      technology that is out there as far as payment goes.  And all

5      payments RTP payments are purely domestic, meaning only in the

6      United States.  And as I said they settle in about five

7      seconds.  The largest value payment you can process on RTP is

8      $100,000.

9  Q    Okay.  Do you have another product called CHIPS?

10 A    CHIPS is the product that I manage.

11 Q    What does CHIPS stand for?

12 A    The Clearing House Interbank Payment System.

13 Q    What are your responsibilities with regard to CHIPS?

14 A    Well, I'm a senior product manager.  I'm responsible for

15     the strategy of the product, the budgeting of the product.  I

16     oversee or I'm a main stakeholder in all projects related to

17     the product.  And I represent the Clearing House on various

18     payment committees and forums globally.

19 Q    Can you give us the sense of the type of payments that

20     CHIPS handles through that product?

21 A    On an average day we process just over 500,000

22     transactions, for a total of about $1.8 trillion.

23 Q    Fair to say that these are high-value payments?

24 A    Correct.

25 Q    More than 100,000 that are managed from the other

1   product?

2   A    It processes payments of lower values also.  So about

3   20 percent of the payments are over 100,000 and goes into the

4   billions.

5   Q    Among other things, does CHIPS provide a method to pay

6   correspondent banking payments?  Is that an easy way to think

7   of it?

8   A    Yes.

9   Q    Are there other entities that provide services similar to

10  the CHIPS payment product?

11  A    Yes.  The Federal Reserve has a Fed Wire product, that's

12  our main competitor in the U.S. dollar clearing space.

13  Q    You mentioned CHIPS is owned by over 20 banks, who can

14  use the CHIPS product?

15  A    CHIPS owners, but not all the owners are CHIPS

16  participants.  And so about 14 of the 24 owner banks that are

17  CHIPS participants, an example of them is JP Morgan Chase,

18  Citibank, Deutsche Bank, Wells Fargo.  But there are also

19  non-owner banks that process payments.  So an example would be

20  Standard Charter Bank, Societe Generale, Bank of China.

21  Q    Approximately how many participating banks does the CHIPS

22  product have?

23  A    Forty-three participants.

24  Q    Are all participating banks U.S. banks?

25  A    As I mentioned before, they either have to be -- have a

1    location in New York so they are U.S. banks.

2    Q    Do you have to be a participating bank to use the CHIPS

3    product?

4    A    Yes, you do.

5    Q    Can non-participating banks process United States dollar

6    payments through CHIPS so long as they are making their

7    payment through a participating member bank?

8    A    Right.  So that's the correspondent banking aspect of it.

9    Where only the participants are allowed to transfer, process

10   payment orders in the United States between the CHIPS banks,

11   but their accounts can process payments through them and pass

12   the payments through.

13   Q    You mentioned that from 2012 to 20151 of the data centers

14   that CHIPS had, one was located in Manhattan, where were the

15   other data centers located?

16   A    Greensboro, North Carolina was the other place.

17   Q    In what circumstances did CHIPS use this Greensboro,

18   North Carolina server to process transactions?

19   A    So CHIPS practices good risk and redundancy and recovery

20   regularly.  So the way we operate typically is on a quarterly

21   basis.  We relocate the production processing system from one

22   location to another.  So that's a normal behavior when we move

23   it on that quarterly date where we test with the banks.  We

24   actually leave the production application where we move the

25   location to.

1            So when we operate out of there until the next test.

2    Or we also use it as a precautionary measure in prevention of

3    experiencing weather events, like a hurricane coming up the

4    East Coast.  Because both of our data centers are on the East

5    Coast so we would shift the application from one location to

6    another.

7            So you may see that on anticipation of an event

8    coming up the East Coast, we may move the location from North

9    Carolina to New York.  And as it regresses, we move the

10   location back down to North Carolina.

11   Q    From 2012 to 2015, which of those two locations was

12   CHIPS' primary location for its servers?

13   A    We used to call the primary -- New York was always the

14   primary; the secondary site was North Carolina.  Today we

15   operate differently and we call it two primary sites.

16   Q    How does the CHIPS participating bank communicate with

17   the a CHIPS product?  How does it instruct CHIPS where to send

18   payments?

19   A    Each bank must have a payments application in order to

20   initiate and receive payments.  We have a standard format that

21   we use for the processing of payments.  And the banks connect

22   to the Clearing House via a telecommunications line provided

23   by third-party service providers like AT&T, Verizon, companies

24   like that.

25   Q    So those third-party service providers provide a link to

1    the CHIPS servers, whether it be in New York or North

2    Carolina?

3    A    That's correct.

4    Q    You mentioned CHIPS processed the transactions in New

5    York or North Carolina from 2012 to 2015, depending on certain

6    circumstances; is that correct?

7    A    That's correct.

8    Q    Sitting here today, I know it's a long time ago, do you

9    recall with specificity when CHIPS was using its

10   Manhattan-based facilities on any given day from 2012 to 2015?

11   A    No, I don't recall.

12   Q    To your knowledge, does CHIPS currently maintain business

13   records showing which facilities it used to process

14   transactions on any given day between 2012 to 2015?

15   A    No, we don't keep track of that.

16   Q    Did you previously testify in an unrelated 2019 Court

17   proceeding as to the dates when CHIPS was using its

18   Manhattan-based facilities from 2012 to 2015?

19   A    Yes, I did.

20   Q    At the time you testified, did you refer to a document

21   that the Clearing House had created?

22   A    Yes, I did.

23   Q    During that proceeding did you testify truthfully and

24   accurately?

25   A    Yes, I did.

Garafallou - cross - Intrater                 2548

1    Q    Mr. Youkilis, if you could show the witness Government's

2    Exhibit 3003.

3           Mr. Pepitone, it should be in your binder but also

4    displayed on the screen.  And this is for identification

5    purposes only.

6    A    I see this.

7    Q    Do you recognize this?

8    A    Yes, I do.

9    Q    At the time you testified in that earlier proceeding, did

10   you refer to this exhibit?

11   A    Yes, I did.

12   Q    At the time of your prior testimony, did you testify

13   based on the information contained in this exhibit?

14   A    Yes, I did.

15   Q    Does this exhibit show when CHIPS was using its

16   Manhattan-based facilities from 2012 to 2015?

17   A    Yes, it does.

18          MS. AMBUEHL:  At this time, your Honor, I ask that

19   under Rule 803(5), we ask that the witness be allowed to read

20   the information relating to the dates CHIPS was using its

21   Manhattan-based facilities to the jury.

22          MR. INTRATER:  We object and ask for a sidebar.

23          (Continued on the next page.)

24

25

```
                           Sidebar                        2549
```

1              (Sidebar conference.)

2              MR. INTRATER:  I see Ms. Smith has the book, which

3     means we're already in trouble.  That's okay.  We'll Sally

4     forth nonetheless.

5              There is no document.  CHIPS doesn't have the

6     records.  So what we are relying on, I assume, is this

7     witness's prior recollection.  I'm just trying to understand

8     how it is that the Government is trying to move this document

9     into evidence when CHIPS doesn't possess this document.

10             THE COURT:  If I understand, they are not trying to

11    move the document.  They are trying to put the information.

12    In go ahead.

13             MS. AMBUEHL:  Your Honor, Mr. Pepitone adopted this

14    statement during his prior testimony.  We established that

15    they don't have a business record, because otherwise we could

16    potentially move to admit that business record.  So he used

17    this chart to aid his testimony and adopted those statements.

18    And now we do not have additional business records and he does

19    not recall, which we established through questioning, that he

20    does not remember the specific dates on which CHIPS was using

21    its Manhattan-based facilities during this time period.  He's

22    confirmed that the information that he intends to read into

23    the record is the same that he recalls and adopted in that

24    2019 proceeding.

25             THE COURT:  What rule are you relying on?

```
                          Sidebar                        2550
```

1        MS. AMBUEHL:  Federal Rule of Evidence 803(5) past

2   recollection recorded.

3        MS. SMITH:  Subsection B:  Was made or adopted by

4   the witness when the matter was fresh in the witness's memory.

5        THE COURT:  Okay.

6        MR. AGNIFILO:  I don't believe this fits that

7   exception.  The document is not his past recollection

8   recorded.  It's the recording by a different party that he

9   once used to refresh his recollection at a prior trial.  But

10  it's not as though he made this record, he knows it's accurate

11  and he can't remember it now.

12        There is a step that exists in the current situation

13  that you don't have.  And a past recollection recorded

14  situation where someone says, I wrote these things down when

15  it was fresh in my mind and now I can't remember it, but I

16  wrote it down back then but I -- or I knew it was accurate

17  back then.  He doesn't have firsthand knowledge of this at

18  all.

19        What it seems like he's about to do is to testify

20  based on a document that he had no hand in creating, that he

21  doesn't know is accurate based on any of his firsthand

22  knowledge.

23        There might be another way to do this.  We don't

24  want to have evidence lectures for our own sake, but I don't

25  think this is the way to do it.

```
                        Sidebar                        2551
```

1          MS. AMBUEHL:  Your Honor, 803(5) specifically

2   addresses statements that the witness adopts.  It does not

3   require that the witness have written it down him or herself.

4          And this is a document that CHIPS created.  During

5   that prior testimony, his recollection was refreshed.  He

6   reviewed the chart and he adopted the statements in the chart.

7          I can prepare -- we have a copy of the testimony if

8   defense counsel wants to compare his testimony to the chart it

9   was adopted from.

10          THE COURT:  Okay.

11          MS. SMITH:  That testimony was provided to defense

12   counsel as 3500, so they've had that.

13          THE COURT:  This is 803 --

14          MR. INTRATER:  (5).

15          MS. SMITH:  I'll put on the record that he testified

16   about this twice previously.

17          THE COURT:  So the document itself was created by

18   the business where he works?

19          MS. AMBUEHL:  Correct.

20          THE COURT:  To aid in his testimony during that

21   prior trial.

22          MS. AMBUEHL:  Correct.

23          THE COURT:  And was adopted by him then and is being

24   used now since that's in effect the only business record.

25          MR. INTRATER:  But I don't know that was established

Sidebar                                                2552

1   in the prior testimony.  I don't know if any of that was

2   established in the prior testimony.

3            THE COURT:  You're just trying to read in the dates.

4            MS. AMBUEHL:  Correct, just the New York dates.  We

5   can read all of them if defense counsel prefers.

6            MS. SMITH:  To put on the record the two prior

7   trials was FIFA before Chen, and the Boustani trial before

8   Kuntz.  Both testimony was provided to defense counsel.

9            THE COURT:  Do you have the prior testimony?

10           MS. SMITH:  It's been provided, they have it.

11           THE COURT:  Showing that this was done.

12           Okay, I'm going to allow it.  And obviously you can

13  cross him as to the basis for his knowledge and all of that.

14  I'll give you a lot of leeway with that.

15           MR. INTRATER:  Thank you, Judge.

16           THE COURT:  As far as challenging the accuracy of

17  the information.

18           (End of sidebar conference.)

19           (Continued on the next page.)

20

21

22

23

24

25

Pepitone - direct - Ambuehl                    2553

1           (In open court.)

2           THE COURT:  Government's Exhibit 3003 is admitted.

3   Please proceed, counsel, for purposes as discussed at

4   sidebar.

5           MS. AMBUEHL:  Thank you, your Honor.

6           (Government Exhibit 3003 received in evidence.)

7   BY MS. AMBUEHL:

8   Q    Mr. Pepitone, will you please read for the jury when

9   CHIPS was using its New York facility to process transactions

10  from January 2012 to early 2015?

11  A    Okay.  So in 2012 from January 1st, 2012 through

12  January 15, 2012.  From January 21, 2012 to September 16,

13  2012.  From October 20, 2012 to October 28, 2012.  Then from

14  November 3rd, 2012 through December 31, 2012.

15          In 2013 from January 1st, 2013 to March 24, 2013.

16  From March 30, 2013 to September 15, 2013.  From September 21,

17  2013 to October 20, 2013.  Then from October 26, 2013 to

18  December 31, 2013.

19          In 2014 from January 1st, 2014 to March 9, 2014.

20  From March 15, 2014 to June 8, 2014.  From June 14, 2014 to

21  October 19, 2014.  From October 25, 2014 to December 31, 2014.

22          And in 2015 from January 1st, 2015 through March 20,

23  2015.

24  Q    From 2012 to 2015, your New York facilities were located

25  where?

Pepitone - cross - Intrater                    2554

1  A    33rd Street Manhattan.

2          MS. AMBUEHL:  No further questions, your Honor.

3          THE COURT:  Cross-examination?

4          MR. INTRATER:  Yes.  Thank you, your Honor.

5  CROSS-EXAMINATION

6  BY MR. INTRATER:

7  Q    Good afternoon, Mr. Pepitone.

8  A    Good afternoon.

9  Q    My name is Zach Intrater.  I'm one of the lawyers

10 representing Roger Ng.  Have you ever met Roger Ng?

11 A    No.

12 Q    To your knowledge, has Roger Ng ever sent a wire over the

13 CHIPS network?  Just to your knowledge.

14 A    No, I'm not aware of any.

15 Q    To your knowledge, has Roger Ng ever received a wire over

16 the CHIPS network?

17 A    Not to my knowledge.

18 Q    To your knowledge, again to your knowledge, has Roger Ng

19 ever sent or received a wire to or from the United States at

20 all?

21 A    Not to my knowledge.

22 Q    How did you come to court today?  In other words, why did

23 you come?

24 A    I was asked to testify on behalf of the CHIPS product.

25 Q    Who asked you?  The Government?

Pepitone - cross - Intrater                    2555

1    A    Government.

2    Q    I'm not trying to provide answers to you, I just saw you

3    pointing.   Sorry, Judge.

4         How many times have you spoken to the Government

5    just for this case in preparation for your testimony today?

6    A    Maybe three times.

7    Q    Have you ever spoken to me?

8    A    No.

9    Q    Have you ever spoken to anybody representing Roger Ng?

10   A    No.

11   Q    This is not, as you testified on direct, this is not the

12   first time that you have testified in court about the Clearing

13   House; is that right?

14   A    That's correct.

15   Q    About how many times have you testified about the

16   Clearing House previously?

17   A    Two previous times.

18   Q    Just two?

19   A    That's correct.

20   Q    The Clearing House is owned by about to dozen banks; is

21   that right?

22   A    That's correct.

23   Q    There is another group of banks who can also use the

24   Clearing House, correct?

25   A    That's correct.

Pepitone - cross - Intrater                     2556

1    Q    So total about 40 institutions?

2    A    The Clearing House has, as I said, four different

3    products.  One of their products, one of the products, like

4    the APM product, has over 100 participants.  But CHIPS only

5    has 43.

6    Q    Okay.  Let's talk about CHIPS then.

7              This is a basic question, I apologize.  What is a

8    wire transfer?  What actually happens in the real world when a

9    wire transfer is made?  Can you explain that to the jury,

10   please?

11   A    Sure.  Basically a funds transfer is a movement of money

12   as part of a larger transaction, say a trade deal where

13   somebody purchases something from somewhere else or some other

14   company.  And then while the goods are moving, the payment

15   follows a path back to the originator, back to the beneficiary

16   of the bank or the company that's selling the product.  Do you

17   want an example?

18   Q    I'd like to propose an example to you, and you can tell

19   me if I'm misrepresenting anything of course.

20             You said a movement of money.  I just want to break

21   that part down a little bit.  There is not cash or gold being

22   physically transported, right?

23   A    Not physically.

24   Q    So what I'm asking is, what actually happens?  Like, what

25   does it mean to have a wire transfer?

1          MS. AMBUEHL:  Objection, your Honor.  Beyond the

2   scope.

3          THE COURT:  I'll allow it.  Go ahead.

4   A    So I'll talk in legal terms.  A funds transfer is the

5   movement of money related to a transaction from one point to

6   another.  There are multiple payment orders that take place in

7   the movement of money from one point to the other.  Where the

8   Clearing House is involved is it receives a payment

9   instruction, or payment order, one of its participants -- we

10  call it a sending participant -- to credit or pay the

11  receiving participant.  So that's one piece of the movement of

12  money.

13  Q    I don't want to interrupt you.  I want to get to that

14  part.  But my specific question is, you keep saying the

15  movement of money, what is actually moving?

16  A    So it's a -- actually it's a message that moves.  We

17  process payment messages.  The actual accounting for or the

18  movement of money takes place at the banks that are sending

19  and receiving payment.

20  Q    What is the message?  How does the message move?

21  A    Electronically.

22  Q    Okay.  What happens, if you know?

23  A    If a bank creates a payment instruction and sends the

24  payment instruction to the Clearing House, we will process the

25  instruction.  When an instruction typically takes place, it

1   involves a sending participant and a receiving participant, on

2   behalf of a beneficiary and an originator of payment.

3   Q    What is the instruction?  What is it made of?

4   A    It's information on how to process a transaction.

5   Q    Okay.  What is the information?  What is the information?

6   A    Information is parties to the transaction and the amount

7   of the transaction.

8   Q    But how is it communicated?  What does it mean?

9            MS. AMBUEHL:  Objection, your Honor.

10           THE COURT:  Counsel, where are you going with this?

11           MR. INTRATER:  I'm trying to understand what happens

12   in the real world.

13           MS. AMBUEHL:  Can we have a sidebar?

14           (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

```
                            Sidebar                      2559
```

1          (Sidebar conference.)

2          MR. INTRATER:  We don't believe there is any

3    connection to the Eastern District of New York in this case.

4          THE COURT:  You've made that clear in your motion.

5          MR. INTRATER:  Right.  What we're trying to

6    establish is that nothing actually happened here.  So what I

7    want to try to figure out from this witness, because I think

8    what the Government is going to try to use is these CHIPS

9    messages as the foundation of their venue because they have

10   nothing else, that something happened in the Eastern District

11   of New York.

12          And as your Honor knows, that has to happen in the

13   Eastern District of New York and it has to be foreseeable to

14   the defendant that that is happening in the Eastern District

15   of New York.  And I'm trying to establish through the

16   cross-examination of this witness that they can't establish

17   that.  They don't know in fact what is happening.  And that

18   nothing actually happened here.

19          THE COURT:  I don't know who is going to testify to

20   what, but I know this witness hasn't talked about anything

21   other than how CHIPS operates.  So he might not be the right

22   witness for your question.  I'm not sure.

23          MR. INTRATER:  Maybe he can say he doesn't know.

24   That's what I'm trying to get to.

25          MS. SMITH:  This is a custodial witness for which

```
                          Sidebar                     2560
```

 1   CHIPS is processing for New York.  The defense is well aware

 2   that we're calling an expert witness who was noticed on

 3   correspondent bank wires.  He's more than welcome to do this

 4   whole thing with that expert.  This is not the appropriate

 5   witness to do it through, especially the scope of cross.  They

 6   can do it on their own case.

 7            MR. INTRATER:  I would say, this whole thing

 8   honestly is a constitutional requirement, Judge.  It has been

 9   a part of the case the whole time.

10            THE COURT:  We know what the legal issues are.

11   Let's deal with the factual issues for the jury.  Where do you

12   want to go with this witness?

13            MS. SMITH:  For the record, venue is not a

14   constitutional issue.  Jurisdiction has been established.  I

15   know we've had this argument a number of times, but it's

16   completely inappropriate to do this.

17            THE COURT:  Let's not have a legal discussion at

18   sidebar.  That's outside the scope of what we need this

19   witness to do.

20            MR. INTRATER:  I agree with that, Judge.

21            MR. AGNIFILO:  I think the whole thing can be

22   settled with:  Do you know if this information is passed

23   electronically from one place to another.  I think.

24            MR. INTRATER:  I'll ask that one question.

25            MS. AMBUEHL:  He testified to that on direct.

Sidebar                                              2561

1          THE COURT:  He can ask.  You can do that.

2          MR. INTRATER:  Then I'll be done.

3          (End of sidebar conference.)

4          (Continued on the next page.)

Sidebar                                                          2562

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (In open court.)

2                MR. INTRATER:  May I proceed, your Honor?

3                THE COURT:  You may.

4    BY MR. INTRATER:

5    Q    Mr. Pepitone, I know you don't work for Chase, but let's

6    cut to the chase.  The information that is being passed, what

7    you just talked about, that's an electrical impulse; is that

8    accurate?

9    A    Yes, it's a series of electrical impulses.

10   Q    Let's get to what happens in one of these CHIPS

11   transfers.  There is a party, a person or a company, that owes

12   money, right?

13   A    Yes.

14   Q    And if it's okay with you, and with the Court, I'd like

15   to call that party, the party that owes the money, let's call

16   that party Bob.  Then there is a party that is owed money,

17   right, and that's a company or a person, right?

18   A    Right.

19   Q    Let's call that party Susan.  So Bob owes money to Susan.

20   Now that transaction is going to happen over the CHIPS

21   network, right?

22   A    Right.

23   Q    So Bob has a bank and Susan has a bank, right?

24   A    CHIPS Bob is a bank and Susan is a bank.

25   Q    But Bob is a bank and Susan is a bank, but those two

Pepitone - cross - Intrater                    2564

1   banks they don't owe the money to each other, they have

2   clients that owe the money to each other?

3   A      Right.

4   Q      Let's make up names for the clients.

5   A      Okay.  John is the client or has an account at Bob Bank.

6   Q      So John has the account at Bob Bank, okay.

7   A      And who is the --

8   Q      Susan.

9   A      So Mary has an account at Susan Bank.

10  Q      You got four different entities here, right?  You've got

11  the senders bank, you've got the receivers bank, you've got

12  the sender of the money, and you've got the receiver of the

13  money, right?

14  A      Right.

15  Q      Then you have the Clearing House.  And Clearing House

16  owns the CHIPS system, right?

17  A      Yes.

18  Q      And CHIPS processes this payment.  The payment is

19  processed between Bob Bank and Susan Bank on behalf of John

20  and Mary?

21  A      Right.

22  Q      You testified on direct that CHIPS in 2012, '13, '14, had

23  two different locations, right?

24  A      Yes.

25  Q      One is in New York and the other is in North Carolina?

Pepitone - cross - Intrater                    2565

1    A    Right.

2    Q    At different times during that period 2012 to 2014 the

3    payments were processes either in New York or in North

4    Carolina, right?

5    A    Correct.

6    Q    You talked about how CHIPS decides when to use one of its

7    locations or the other location.  Do you remember talking

8    about that on direct?

9    A    Yes.

10   Q    Let's talk about what the four entities Bob, Susan, John,

11   and Mary, what they know about where the transactions --

12              MS. AMBUEHL:  Objection, your Honor.

13              THE COURT:  Basis?  You can give me the rule number.

14              MS. AMBUEHL:  403, 401.

15              THE COURT:  Relevance?

16              MS. AMBUEHL:  Asking about hypothetical knowledge of

17   hypothetical parties.

18              THE COURT:  I'm going to give counsel some leeway

19   here.  Try to get there a little faster.

20              MR. INTRATER:  I'm going to get there as fast as I

21   can, but I'll speak slowly.

22   Q    What do the banks that are sending or receiving a

23   transaction, if you know, what information does the Clearing

24   House provide them before the transaction takes place about

25   where the transaction is being processed, if any?

Pepitone - cross - Intrater                    2566

A      Well, they know, each bank knows what site they are

processing out of because they are connected to the site.

              (Continued on next page.)

Pepitone - cross - Intrater                2567

1    BY MR. INTRATER:   (Continuing.)

2    Q    Okay.  And how about the businesses that are doing those

3    transactions, if you know?

4    A    I imagine that, I wouldn't know if they knew or not.

5    Q    Does CHIPS provide any information itself to, not the

6    financial institutions but the parties to the transaction?

7    A    No.

8    Q    No information provided?

9    A    Nope.

10   Q    Okay.  And, so CHIPS does not itself provide any

11   information to the parties of any of those transactions, the

12   $1.7 trillion that's taking place every day.  The parties are

13   not informed by CHIPS of where those transactions are being

14   processed?

15   A    That's correct.

16           MR. INTRATER:  Your Honor, I have nothing further.

17   Thank you so much.

18           THE COURT:  Redirect?

19           MS. AMBUEL:  No further questions, Your Honor.

20           THE COURT:  Thank you, you're excused.

21           (Witness excused.)

22           THE COURT:  Can the Government call its next

23   witness.

24           MS. AMBUEL:  The Government calls Mr. Martin

25   Sullivan.

```
                    Sullivan - direct - Ambuel          2568
```

 1              (Witness takes the stand.)

 2              THE COURTROOM DEPUTY:  Raise your right hand.

 3              (Witness sworn/affirmed.)

 4              THE COURTROOM DEPUTY:  Have a seat.  Please state

 5      and spell your name for the record.

 6              THE WITNESS:  Martin Sullivan, M-A-R-T-I-N

 7      S-U-L-L-I-V-A-N.

 8              (Continued on the next page.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sullivan - direct - Ambuel                2569

1    **MARTIN SULLIVAN**, called by the Government, having been

2              first duly sworn, was examined and testified

3              as follows:

4    DIRECT EXAMINATION

5    BY MS. AMBUEL:

6    Q    Good afternoon, Mr. Sullivan.

7    A    Good afternoon.

8    Q    You should have a binder available for you.

9    A    I do.

10   Q    Mr. Sullivan, where do you work?

11   A    I work for the U.S. Attorney's Office in the Eastern

12   District of New York.

13   Q    What is your position?

14   A    Special agent.

15   Q    How long have you been a special agent?

16   A    I've been a special agent since July of 1999.

17   Q    And how long have you worked with the U.S. Attorney's

18   Office?

19   A    Since October of 2015.

20   Q    Where were you before the U.S. Attorney's Office as a

21   special agent?

22   A    I was with the U.S. Department of Housing and Urban

23   Development Office of Inspector General.

24   Q    And what type of investigations have you handled as a

25   special agent?

Sullivan - direct - Ambuel                    2570

1   A    Investigate allegations of financial crimes involving

2   bank fraud, wire fraud, mail fraud, investment fraud,

3   securities fraud and others.

4   Q    Do you have any specialized training or certificates?

5   A    I do.

6   Q    What is it -- what are they?

7   A    I'm also a certified fraud examiner.

8   Q    And do you have experience reviewing business

9   communications, travel itineraries, receipts, expense reports

10  and travel records as part of being a special agent?

11  A    Yes, I do.

12  Q    Where do you live?

13  A    I live in New Jersey.

14  Q    Did you grow up in New Jersey?

15  A    I did not.

16  Q    Where did you grow up?

17  A    Here in Brooklyn.

18  Q    Were you involved in the investigation of the defendant,

19  Roger Ng?

20  A    Yes.

21  Q    In what way?

22  A    I helped with the collection and aggregation of records

23  in the very beginning and towards the end, the last few

24  months, I have also helped in different stages of trial

25  preparation.

Sullivan - direct - Ambuel                    2571

1   Q    You were not the case agent on the investigation, were

2   you?

3   A    No, I was not.

4   Q    So, you had a few instances of assistance and then you

5   had your preparation for your testimony today; is that

6   correct?

7   A    That's correct.

8   Q    And in preparation for your testimony today, have you had

9   an opportunity to review documents relating to Roger Ng, Jho

10  Low and Tim Leissner and others?

11  A    Yes, I have.

12  Q    Did you review flight records, hotel records, cab and

13  restaurant receipts, U.S. and foreign border records and

14  e-mail communications relating to Roger Ng, Jho Low,

15  Tim Leissner and others?

16  A    Yes, I did.

17  Q    As part of your preparation for your testimony, have you

18  identified certain days during Project Magnolia where Roger

19  Ng, Jho Low and Tim Leissner were on certain days?

20  A    Yes.

21  Q    Before we begin, I would like to show you two sets of

22  documents for admission into evidence.  I think you should

23  have a Redweld.  Is there a Redweld?

24          I'm showing you what's been marked as Government

25  Exhibits 2825, 2826, 2831 and 2836.  Are these true and

Sullivan - direct - Ambuel                2572

1  accurate copies of records obtained from Jet Aviation?

2  A    Yes.

3  Q    For exhibits 2831-A to 2138-H, have you had an

4  opportunity to confirm that these are accurate extracts from

5  Government Exhibit 2831?

6  A    Yes.

7  Q    Do all of these exhibits, Government Exhibit 2825, 2826,

8  2831-A to 2831-H and 2836 all relate to the travel of the

9  defendant, Jho Low and/or Tim Leissner?

10 A    Yes.

11       MS. AMBUEL:  Your Honor, I would like to move into

12 evidence at this time Government Exhibit 2825, 2826, 2831-A to

13 -C, 2831-D, with a redaction that's been discussed with the

14 defense and 2831-E to -H.

15       MR. AGNIFILO:  Judge, the only records we have are

16 2138-A through H.

17       THE COURT:  Why don't I give you -- give a minute

18 for the Government to give you a copy so you can review it.

19 The defense doesn't have a copy.

20       MS. SMITH:  We will pull one up for them.  We have

21 produced them.

22       THE COURT:  Can you give them a copy now so they can

23 review it to determine if there are any objections to the

24 record?

25            (Pause in proceedings.)

1          MR. AGNIFILO:  We've had a chance to look at the

2     documents and we have no objection.

3          THE COURT:  Government Exhibits 2825, 2826, 2831-A

4     through H with the redactions that have been agreed to by the

5     parties and 2836 are all admitted.

6          (Government Exhibits 2825, 2826, 2831-A through H

7     with the redactions that have been agreed to by the parties

8     and 2836 received in evidence.)

9     BY MS. AMBUEL:

10    Q    Mr. Sullivan, take a look at Tabs 52 and 53 for

11    identification, Government Exhibits 2871 and 2872?

12         THE COURT:  You are now showing him additional

13    documents?

14         MS. AMBUEL:  Another tranche of documents.  I am

15    moving to admit, Your Honor.

16         THE COURT:  I see.

17         (Exhibit published to witness only.)

18    BY MS. AMBUEL:

19    Q    Are these true and accurate copies of records obtained

20    from Edmiston, a super yacht broker?

21    A    Yes.

22         MS. AMBUEL:  Your Honor, I move into evidence

23    Government Exhibit 2871 and 2872.

24         THE COURT:  Is there any objection?

25         MR. AGNIFILO:  No objection.

Sullivan - direct - Ambuel                    2574

1          THE COURT:  They're admitted, 2871 and 2872.

2          (Government Exhibits 2871 and 2872 received in

3    evidence.)

4    Q    I'm going to show you one more document for

5    identification, Mr. Sullivan.

6          MS. AMBUEL:  Mr. Youkilis, pull up tab one,

7    Government Exhibit 55 for identification.

8          (Exhibit published to witness only.)

9    BY MS. AMBUEL:

10   Q    Can you identify this, Mr. Sullivan?

11   A    Yes.

12   Q    What is it?

13   A    This is a map showing four separate locations and events

14   that happened on specific days with specific individuals.

15   Three of those individuals are identified and captured in the

16   photographs on the map itself.

17   Q    Is this map a summary of information that you expect to

18   testify about today?

19   A    Yes.

20   Q    Have you confirmed that the information contained in this

21   map is accurate?

22   A    Yes.

23   Q    Do you believe it would aid the jury in understanding

24   your testimony?

25   A    Yes, I do.

Sullivan - direct - Ambuel                2575

1          MS. AMBUEL:  Your Honor, I move to designate

2    Government Exhibit 55 as a demonstrative aid and to show it to

3    the jury.

4          MR. AGNIFILO:  We have no objection, Judge.

5          THE COURT:  It is admitted for that purpose.

6          (Government Exhibit 55 received in evidence.)

7          (Exhibit published.)

8    BY MS. AMBUEL:

9    Q    Let's walk through each of these meetings in 2012

10   chronologically.  And, Mr. Sullivan, do each of these meetings

11   relate to a specific Goldman Sachs project?

12   A    Yes.

13   Q    What project was that?

14   A    Magnolia.

15   Q    Okay.  The first one appears to be the London meeting.

16   Who was at that meeting?

17   A    Jho Low, Roger Ng and Tim Leissner.

18   Q    Were there others at that meeting as well?

19   A    Yes.

20   Q    Have you just focused on three individuals for the

21   purposes of this chart?

22   A    Yes.

23   Q    When did that meeting take place?

24         MR. AGNIFILO:  Your Honor, I'm going to object to

25   the meeting.  We just know who was in a city.  If we want to

Rivka Teich

Sullivan - direct - Ambuel                2576

1    keep it to city, I'm good.

2              THE COURT:  Why don't you focus on the location,

3    counsel.

4              MS. AMBUEL:  Absolutely.

5    BY MS. AMBUEL:

6    Q    Were those three individuals listed there in London on

7    that date?

8    A    Yes.

9    Q    What does the picture show?

10   A    The picture shows a residence that's been identified as 1

11   Stratton Street in London, England.

12   Q    And have you identified travel by these three individuals

13   Jho Low, Roger Ng and Tim Leissner in Abu Dhabi, The United

14   Arab Emirates?

15   A    Yes.

16   Q    Who was there?

17   A    Jho Low, Roger Ng and Tim Leissner.

18   Q    And on what dates did they overlap?

19   A    This was March 3rd and 4th of 2012.

20   Q    What does that picture show?

21   A    This is a picture of the Emirates Palace in Abu Dhabi

22   which is a hotel.

23   Q    And was the third location where they overlapped for the

24   purposes of this chart in Los Angeles, California?

25   A    Yes.

                        Sullivan - direct - Ambuel            2577

1    Q    Who was there in Los Angeles, California?

2    A    Jho Low, Roger Ng and Tim Leissner.

3    Q    And when were they there?

4    A    The dates were March 25 and 26, 2012.

5    Q    And what does that picture show?

6    A    It shows the picture of the L'Ermitage Hotel.

7    Q    Was there a time that they overlapped for purposes of

8    this chart in Singapore?

9    A    Yes.

10   Q    Who was there in Singapore?

11   A    Jho Low, Roger Ng, Tim Leissner and others.

12   Q    What days were they there?

13   A    April 21, 2012.

14   Q    That's the date that they all overlapped in Singapore?

15   A    Correct.

16   Q    And what does that picture show?

17   A    It shows the symbol of BSI.

18   Q    Is BSI a bank?

19   A    It is.

20   Q    And during the course of preparing this chart for these

21   four locations, did you also identify meetings that occurred

22   on each of these dates and each of these locations?

23   A    Yes.

24   Q    Let's go ahead and start with the London travel, but

25   before I do that, I would like to show you a set of records

Sullivan - direct - Ambuel                    2578

1   that are Goldman Sachs -- obtained from Goldman Sachs.  I'm

2   going to list them for you.  Tab 40, Government Exhibit

3   1027-B-1; Tab 41, Government Exhibit 1031-A-01; Tab 49,

4   Government Exhibit 1035; Tab 43, Government Exhibit 1045-A;

5   Tab 50, Government Exhibit 1035-A.  Government Exhibit 1047-A.

6   A     Which tab is that?

7   Q     45.

8   A     Okay.

9   Q     Tab 3, Government's Exhibit 1107-A-01; Tab 4,

10  Government's Exhibit 1107-A-03; Tab 25, Government Exhibit

11  1113-A-01; Tab 58-A, Government Exhibit 1113-A-02; Tab 27,

12  Government Exhibit 1113-A-03; Tab 14, Government Exhibit

13  1114-A; Tabs 32 through 35, which are Government Exhibits

14  1117-A-01; Government Exhibit 1117-A-02; Government Exhibit

15  1118-A-01; Government Exhibit 1118-A-03; Tab 61, which is

16  Government Exhibit 1349-A-01; Tab 63, Government Exhibit

17  1349-A-02; Tab 2, which is Government Exhibit 1349-A-03; Tab

18  8, Government Exhibit 1350-A-01; Government Exhibit 16-A; Tab

19  16-A, Government Exhibit 1352; Tabs 26, 16, 20, 29, 50 and 19

20  which are Government Exhibits 1352-A-1 through 6; Tab 37,

21  Government Exhibit 1354-A-01; Tab 37-A, Government

22  Exhibit-1355-A-01?

23          MR. AGNIFILO:  Review that number.

24          MS. AMBUEL:  1355-A-01.

25  Q     Tab 66, Government Exhibit 1361-A; Tab 64, Government

Sullivan - direct - Ambuel                2579

1   Exhibit 1453; 16-B, Government Exhibit 1453-A-01; and Tab 21,

2   Government Exhibit 2831-C.

3          It's a mouthful but are all of those records

4   receipts and reports relating to reimbursement for travel

5   submitted to Goldman Sachs on behalf of Roger Ng, Tim Leissner

6   and Andrea Vella?

7   A    Yes.

8          MS. AMBUEL:  Your Honor, I would move to admit these

9   exhibits that I just listed and I can reread them.

10          THE COURT:  You need to provide the Court with a

11   list of all of those exhibits.

12          MS. AMBUEL:  That what I would suggest as well so

13   can we move to admit them at the end of the day then?

14          THE COURT:  Is there any objection, Counsel, or do

15   you need time to review them?

16          MR. AGNIFILO:  Could we have a three-minute sidebar

17   logistically?

18          THE COURT:  Sure

19          (Sidebar held outside of the hearing of the jury.)

20          (Continued on next page.)

21

22

23

24

25

```
                         Sidebar                    2580
```

1          (The following sidebar took place outside the

2    hearing of the jury.)

3          MS. GERAGOS:  When you say -01 and -03, are they

4    pages?

5          MS. AMBUEL:  They're subexhibits marked subexhibits.

6          THE COURT:  So I stopped writing because it wasn't

7    clear whether it was 116 and plus 116-A-1, so it was just very

8    hard to keep track.

9          MS. AMBUEL:  I'm sorry.  And the chart was not

10   organized how I expected it to be.  So we have exhibits that

11   are labeled a four digit number, four digit number-A which are

12   receipts associated with the reports and then for some of the

13   reports, the receipt packages, because they were voluminous we

14   marked subexhibits.  So we've had him identify all of those.

15   We can provide a list that shows the exhibits that we are

16   moving to admit so that you can confirm and cross reference.

17         THE COURT:  Does counsel have the actual exhibits?

18         MS. GERAGOS:  We have the broader exhibits.  The

19   broad receipts, the one that we've been putting in through

20   Mr. Leissner.  We don't have the -01.

21         MS. SMITH:  To make this clear, the Government

22   produced maybe a month and a half ago all of the team's

23   records which are the expense reports for Mr. Ng, Mr. Leissner

24   and Mr. Vella.  For each record, there's a report and a set of

25   receipts that go with it which the defense has been using

Sidebar                                    2581

1   throughout.  The receipts are sometimes hundreds of pages

2   because they have to attach all the hotels.  So we didn't want

3   the binder to be hundreds of pages.  Say it's 1000-A, we've

4   marked a page of it so we're dealing with smaller pages.

5          MR. AGNIFILO:  It's not so much a matter -- do you

6   think you have, like, an hour?  Here is the request; we

7   thought this was going to come in through Goldman Sachs.  We

8   had no idea they were going to put Goldman Sachs internal

9   records in through someone other than Goldman Sachs because

10  they told us they were going to call a Goldman Sachs witness.

11         MS. AMBUEL:  We still are.

12         MR. AGNIFILO:  I don't care about that at the end of

13  the day.  I want to be prepared to cross-examine this

14  gentleman in a cogent fashion.  So I am very happy for this to

15  go forward however the Government sees fit.  I would rather

16  start my cross-examination tomorrow, which might happen

17  naturally.

18         MS. AMBUEL:  It's going to happen.

19         MR. AGNIFILO:  I will catch up and we'll figure it

20  out.

21         THE COURT:  Will it help if the Government were to

22  provide just a copy of your tranche of exhibits to counsel so

23  that way they will have exactly what you are using?

24         MS. SMITH:  We expected the recross to go a little

25  longer so we didn't expect to have this witness on today but I

```
                    Sidebar                      2582
```

1   have them all electronically.  I'm trying to e-mail them.

2          THE COURT:  That will be great.

3          MR. AGNIFILO:  As long as I can cross tomorrow, I'll

4   be good.

5          THE COURT:  I am going to admit the records and

6   we'll move forward and you'll provide them with a list.

7          (Sidebar ends.)

8          (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sullivan - direct - Ambuel                2583

1    (Continuing.)

2              THE COURT:  On consent, the records are all

3    admitted.

4              (Government Exhibits 1027-B-01, 1031-A-01, 1035,

5    1035-A, 1045-A, 1047-A, 1107-A-01, 1107-A-03, 1113-A-01,

6    1113-A-02, 1113-A-03, 1114-A, 1117-A-01, 1117-A-02, 1118-A-01,

7    1118-A-03, 1349-A-01, 1349-A-02, 1349-A-03, 1350-A-01, 1352,

8    1352-A-01, 1352-A-02, 1352-A-03, 1352-A-04, 1352-A-05,

9    1352-A-06, 1354-A-01, 1355-A-01, 1361-A, 1453, 1453-A-01

10   received in evidence.)

11             THE COURT:  Counsel you may proceed.

12   BY MS. AMBUEL:

13   Q    Mr. Sullivan, can you turn to tab two in your binder

14   Government Exhibit 1349-A-03, which is a subexhibit of 1349-A

15   which is already in evidence?

16             (Exhibit published.)

17   Q    Is this a receipt submitted for reimbursement by

18   Tim Leissner?

19   A    Do you want him to use the binder or the screen?

20             MS. AMBUEL:  He can use either.

21   A    I can read off the screen, yes.  This is a receipt from

22   the Four Seasons Hotel London at Park Lane for

23   Mr. Tim Leissner.

24   Q    And what dates did he check in and check out?

25   A    Arrival date is February 26, 2012.  Check out is the same

Sullivan - direct - Ambuel                    2584

1    day, February 26, 2012.

2    Q    And if you're going to use the screen maybe I'll just

3    refer to the exhibit number.  So Mr. Youkilis can pull it up

4    or would you like the tab number in your binder?

5    A    I will take both.

6    Q    Turn to Tab 3, Government's Exhibit 1107-A-01 which is

7    already in evidence.

8                (Exhibit published.)

9    Q    Is this a record submitted for reimbursement by Roger Ng?

10   A    Yes, it is.

11   Q    What are these at the bottom of the page?

12   A    These are airline ticket stubs for a boarding pass also

13   for Mr. Roger Ng.

14   Q    And what are these flights that are indicated on these

15   stubs?

16   A    On February 25, 2012, going from Singapore to London and

17   also for Mr. Roger Ng going from London back to Singapore on

18   February 26, 2012.

19   Q    And what time, if you look at the broader page, what time

20   was Mr. Ng scheduled to depart on February 26?

21   A    2205 or 10:05 p.m.

22   Q    Turn to page -- tab ten -- tab four in your binder,

23   Government's Exhibit 1107-A-03 which is already in evidence.

24                (Exhibit published.)

25   Q    Is this a record submitted for reimbursement by Roger Ng?

Rivka Teich

Sullivan - direct - Ambuel                2585

1    A    It is.

2    Q    To whom does this Waldorf Hilton receipt relate?

3    A    It relates to a stay Mr. Roger Ng.

4    Q    And what are the arrival and departure dates?

5    A    Approval date is February 25, 2012 and departure is

6    February 26, 2012.

7    Q    And does this receipt contain any late checkout charges?

8    A    Yes, it did.

9    Q    Can you turn to Tab 5 in your binder, Government Exhibit

10   2831-A which is already in evidence?

11        (Exhibit published.)

12   Q    Is this an extract from a flight log associated with an

13   aircraft with the tail number N689WM covering flights on

14   February 26 and February 28?

15   A    Could you say the first date again?

16   Q    February 22nd and February 28, 2012.

17   A    Yes.

18   Q    And for the flight on February 22nd, what can you tell us

19   about that?

20   A    It was a flight with that tail number that you had just

21   mentioned going from Dubai and going to -- arriving in London

22   and there were two passengers, one of which was Jho Low.

23   Q    And the flight on February 28, 2012, what can you tell us

24   about that flight?

25   A    It was a flight from the same tail number that went from

                    Sullivan - direct - Ambuel              2586

1    London, Luton Airport, to Zurich and there were also two

2    passengers on that one, one of which was Jho Low.

3    Q    When you say tail number, do you know what a tail number

4    is?

5    A    Yes, I do.

6    Q    What is it?

7    A    A tail number is a register that this aircraft was

8    registered in the United States.  It has November and it tells

9    me certain things about it.  It's a specific aircraft itself.

10   Q    When you say it has November, is that a way of saying the

11   letter N?

12   A    That's correct.

13   Q    So what is the detail number on this aircraft?

14   A    The aircraft number is November, or N, 689WM.

15   Q    And is that a unique number associated with an aircraft?

16   A    It is.

17   Q    If you turn to tab six in your binder, Government Exhibit

18   2836, which is already in evidence.

19            (Exhibit published.)

20   Q    Is this an e-mail from CS.CST11@gmail.com to two

21   addresses associated with Jet Aviation on January 20, 2012?

22   A    It is.

23   Q    What's the subject line?

24   A    It reads, Trip from HK to London on 21st February.

25   Q    What does it say?

                           Rivka Teich

Sullivan - direct - Ambuel                2587

A    Dear Blueteam:  Please note that there is only one
passenger on board.  Low Taek Jho.  Address in London 1
Stratton Street, London W1J 8LA.  Thank you.

Q    Can you please turn to Tab 7, Government Exhibit 2244 for
identification purposes.

            (Exhibit published to witness only.)

Q    Is this A February 24, 2012 e-mail to Terence Geh
confirming a booking at a hotel?

A    Yes it is.

            MS. AMBUEL:  Your Honor, the Government moves to
admit Government Exhibit 2244.

            MR. AGNIFILO:  No objection, Your Honor.

            THE COURT:  It is admitted.

            (Government Exhibit 2244 received in evidence.)

            (Exhibit published.)

Q    Mr. Sullivan, do you know if Terence Geh's name is Geh
Choh Heng?

A    It is.

Q    Where is this hotel reservation for?

A    For the Mayfair on Stratton Street in London.

Q    And what are the dates of check in and check out?

A    Arrival date is February 24, 2012 and the check out is
February 28, 2012.

Q    And who is this reservation for?

A    Mr. Geh Choh Heng.

Sullivan - direct - Ambuel                    2588

1   Q    And the e-mail -- going back to the e-mail at the top of
2   the page, it's an e-mail from someone at yahoo.com to someone
3   on February 24, 2012.  What name is listed in the to spot
4   there?
5   A    Terence Geh.
6   Q    Okay.  Please turn to Tab 8, Government Exhibit 1350-A-01
7   which is already in evidence.
8           (Exhibit published.)
9   Q    Is this a record submitted for reimbursement by
10  Tim Leissner?
11  A    Yes, it is.
12  Q    Is this a receipt for breakfast at the Mandarin Oriental
13  Hotel in London?
14  A    It is.
15  Q    Who does it say attended?
16  A    On the right, I see Jasmine Loo and TL.
17  Q    Tab 9, Government Exhibit 1745 which is already in
18  evidence.
19          (Exhibit published.)
20  Q    Is this an e-mail from Jasmine Loo to Tim Leissner and
21  Roger Ng on February 26, 2012?
22  A    Yes, it is.
23  Q    What is the subject line of this e-mail?
24  A    Project Magnolia chart.
25  Q    Turn to the second page showing the attachment.

1          What is this?

2    A    This is the attachment chart that is in the e-mail.

3    Q    Please turn to tab 10, Government Exhibit 1750 for

4    identification.

5    A    I'm sorry, what tab was that?

6    Q    Tab 10, please.

7             (Exhibit published to witness only.)

8    Q    Is this an e-mail from Terence Geh to Roger Ng, Jasmine

9    Loo, Tim Leissner and others at Goldman Sachs dated February

10   27, 2012?

11   A    Yes, it is.

12            MS. AMBUEL:  The Government moves to admit

13   Government Exhibit 1750.

14            MR. AGNIFILO:  No objection.

15            THE COURT:  It is admitted.

16            (Government Exhibit 1750 received in evidence.)

17            (Exhibit published.)

18   BY MS. AMBUEL:

19   Q    Let's take a look at the e-mail towards the bottom of the

20   page from Jasmine Loo to Jane Lah, Roger Ng, Tim Leissner and

21   others starting, Hey Jane.  What does it say in that first

22   sentence?

23   A    I am still in London running now into meetings.  Then

24   will be heading on a plane back home arriving Wednesday 7 a.m.

25   Q    Let's turn to the Abu Dhabi part of your demonstrative if

1    we can pull up Government Exhibit 55.

2              (Exhibit published.)

3    Q    And chronologically was Abu Dhabi the second meeting in

4    2012 that is displayed on this chart?

5    A    Yes, that's correct.

6    Q    And that meeting was attended by --

7              MR. AGNIFILO:  Your Honor, I'm going to object to

8    meeting.  I think we're just talking cities.

9              THE COURT:  Correct.

10   BY MS. AMBUEL:

11   Q    During the course of your review, did you identify

12   meetings that were attended in Abu Dhabi during these dates?

13   A    Yes.

14   Q    And were those meetings attended by Ng, Leissner, Low and

15   others?

16   A    Yes, they were.

17   Q    Where in the UAE did meetings take place?

18   A    In Abu Dhabi.

19   Q    At any hotel?

20   A    Yes.

21   Q    Which hotel?

22   A    The Emirates Palace.

23   Q    In addition to Roger Ng, Tim Leissner and Jho Low were

24   Andrea Vella and Jasmine Loo at certain of these meetings?

25   A    Yes, they were.

1   Q    Before we take a look at the next set of documents, can

2   you tell us in your experience when people use cellular

3   devices outside of their home countries, do local cellular

4   carriers send them notifications to let them know what

5   cellular service they're using in country?

6   A    Yes, that's correct; they will.

7   Q    As part of your preparation for this testimony, did you

8   identify any such records for this March 2012 trip to Abu

9   Dhabi?

10  A    Yes.

11  Q    Please turn to Tabs 11, 12 and 13, Government Exhibits

12  1775, 1776 and 1777.

13           (Exhibit published to witness only.)

14  Q    Do these appear to be those types of notifications we

15  discussed to Roger Ng, Tim Leissner and Andrea Vella?

16  A    Yes, they are.

17  Q    Let's turn to Tab 13, Government Exhibit 1377.

18           MS. AMBUEL:  At this time I would like to move 1775,

19  1776 and 1777 into evidence.

20           MR. AGNIFILO:  No objection, Your Honor.

21           THE COURT:  They're admitted.

22           (Government Exhibits 1775, 1776 and 1777 received in

23  evidence.)

24           MS. AMBUEL:  Thank you.

25           (Exhibit published.)

Sullivan - direct - Ambuel                2592

1   Q    For Government Exhibit 1777, this notification is to

2   Roger Ng welcoming him to where?

3   A    Welcome to the UAE, United Arab Emirates.

4   Q    And tab 11 Government Exhibit 1775, this notification is

5   to Tim Leissner welcoming him to where?

6   A    Welcoming back to the UAE.

7   Q    And Government Exhibit 1776, this notification is to

8   Andrea Vella welcoming him to where?

9   A    Welcome to the UAE.

10  Q    Let's move on to Tab 14, Government's Exhibit 1114-A

11  which is already in evidence.

12            (Exhibit published.)

13  Q    Is this a record submitted for a reimbursement by Roger

14  Ng?

15  A    Yes, it is.

16  Q    Please turn to page two.  To whom do these flights

17  relate?

18  A    These relate to Roger Ng.

19  Q    Can you please describe the flights on these ticket

20  stubs?

21  A    Mr. Ng was on a flight on March 3, 2012 going from

22  Singapore to Abu Dhabi and then once again he was on a flight

23  on March 5, 2012 going from Abu Dhabi to Singapore.

24  Q    Please turn to page seven of this exhibit.  To whom does

25  this Intercontinental Abu Dhabi receipt relate?

                    Sullivan - direct - Ambuel            2593

1   A    Roger Ng.

2   Q    And what are the arrival and departure dates?

3   A    The arrival date is March 3, 2012.  Departure date is

4   March 4, 2012.

5   Q    Please turn to Tab 15 in your binder Government Exhibit

6   1352-A-05 which is already in evidence.

7               (Exhibit published.)

8   Q    Is this a record submitted for reimbursement by

9   Tim Leissner?

10  A    Yes, it is.

11  Q    Turning your attention to the first page, the ticket stub

12  there, what flight is represented?

13  A    This is a flight that Mr. Tim Leissner took from Hong

14  Kong to Dubai on March 3, 2012.

15  Q    Turning to the third page of this same exhibit, there's

16  a -- another ticket stub on the bottom part of the page.  To

17  whom does that ticket stub relate?

18  A    It also relates to Mr. Tim Leissner for a flight on March

19  5, 2012 going from Abu Dhabi to Hong Kong.

20  Q    Please turn to Tab 16, Government Exhibit 1352-A-2, which

21  is already in evidence.

22              (Exhibit published.)

23  Q    Is this a record submitted for reimbursement by

24  Tim Leissner?

25  A    Yes, it is.

1    Q    Turning your attention to the -- first, to whom does this

2    Emirates Palace receipt relate?

3    A    To Mr. Tim Leissner in Hong Kong.

4    Q    And what are the dates of arrival and departure?

5    A    March 3, 2012 arrival, departure March 5, 2012.

6    Q    Let's turn to Tab 17, Government Exhibit 2831-B which is

7    already in evidence.

8              (Exhibit published.)

9    Q    Is this an extract from a flight log associated with that

10   same aircraft we were discussing earlier N689WM covering

11   flights on March 2nd and March 6, 2012?

12   A    Yes, it is.

13   Q    Let's focus on the March 2nd flight.  Where is that from

14   and to?

15   A    Departing Zurich and arriving in Abu Dhabi.

16   Q    And who was on that flight?

17   A    Jho Low.

18   Q    Turning your attention to the flight on March 6, 2012

19   from Abu Dhabi, what is that flight to and from?

20   A    It's from Abu Dhabi and going to Kuala Lumpur.  There are

21   three passengers on board, one of which is Jho Low.

22   Q    If we turn to Tab 16, Government Exhibit 1352 which is

23   already in evidence.

24              (Exhibit published.)

25              MS. AMBUEL:  Mr. Youkilis, if you could turn to page

1  five.

2  Q    Is this a record submitted for reimbursement by

3  Tim Leissner?

4  A    Yes, it is.

5  Q    On page five, can you please describe what is listed

6  under item 32.5?

7  A    This is a line item expense put in for a reimbursement

8  for lunch for Mr. Leissner, for attendees of Mr. Leissner.

9  I'm going to go back to the book.  Mr. Leissner, Jasmine Loo,

10 Roger Ng and Andrea Vella.

11 Q    Can you please describe what is listed on item 32.6 right

12 below them?

13 A    This is also a line item expense report for a dinner at

14 the Emirates Palace Hotel for Project Magnolia with attendees

15 Tim Leissner, Roger Ng and Andrea Vella.

16 Q    Can you turn your attention to the item listed at 32.7

17 and describe what's listed there?

18 A    This also was a line item expense report for a breakfast

19 lunch at Emirates Palace Hotel for Project Magnolia for

20 attendees Tim Leissner, Roger Ng and Andrea Vella.

21 Q    And, again, 32.8, please describe the expense listed

22 there.

23 A    Once again, the line item expense report for a dinner at

24 the Emirates Palace Hotel for Project Magnolia in 2012.

25 Attendees are Tim Leissner, Roger Ng and Andrea Vella.

1           MS. AMBUEL:  Maybe we can back out of that

2    highlighting, Mr. Youkilis.

3    Q    For the expenses listed in line items 32.5, 32.6, 32.7

4    and 32.8 what is the transaction date listed there?

5    A    All of them read March 6, 2012.

6           MS. AMBUEL:  And if we can quickly, Mr. Youkilis,

7    pull up -- pull back up Government Exhibit 1352-A-02 which is

8    already in evidence.

9           (Exhibit published.)

10          MS. AMBUEL:  And if we can zoom in on the expenses

11   portion of the invoice.

12   Q    Next to the numbers 5, 6, 7 and 8, let's take them one at

13   a time.  If you look at the numbers 5, 6, 7 and 8 for item --

14   the number 5, what does that number relate to on the receipt?

15   A    For an expense at Levendome.  Line number 2317, check

16   number 1804 in the amount of 214.99.

17   Q    On what date?

18   A    This would have been March 4, 2012.

19   Q    And if you can look at the expense listed there next to

20   item six, what does that describe?

21   A    On March 4, 2012, cafe, line 2317, check number 7488, in

22   the amount of 274.92.

23   Q    And there appear to be two number sevens on this chart.

24   Can you tell us what is on the top number seven?

25   A    Once again, on March 4th there is an expense for Cascade,

Sullivan - direct - Ambuel                    2597

1  line number 2317, check number 3860, 53.36.

2  Q    Moving to the second number seven on that chart, tell us

3  what's listed there.

4  A    There's an expense on March 4, 2012, cafe, line number

5  2317, check 7542, 162.42.

6

7              (Continued on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  EXAMINATION CONTINUES

2  BY MS. AMBUEHL:

3  Q    And I said chart, but this is really just a zoomed-in

4  version of the invoices; is that right, Mr. Sullivan?

5  A    That's correct.

6  Q    Thank you.  And line 8 on this invoice, what does that

7  relate to, the number 8?

8  A    You're really going to test my French.

9        On March 4th, 2012, this is L'Auberge Restaurant,

10 line number 2317, check number 2451 for 791.12.

11        MS. AMBUEHL:  Thank you, better than I could do.

12 Q    If we turn --

13        MS. AMBUEHL:  We can back out of that, Mr. Youkilis.

14        And turn to tab 16B, which is Government

15 Exhibit 1453-A-01, which is already in evidence.

16        (Exhibit published.)

17 Q    Is this a record submitted for reimbursement by Andrea

18 Vella?

19 A    Yes, it is.

20 Q    And where is it from?

21 A    This is from the Emirates Palace, Abu Dhabi.

22 Q    And what are the check-in and check-out dates, the

23 arrival and departure dates?

24 A    Arrival is March 4th, 2012; departure is March 5th, 2012.

25        MS. AMBUEHL:  If we can turn to tab 17, Government

1    Exhibit 2831-B.

2    BY MS. AMBUEHL:

3    Q    Is this an abstract from the same flight log associated

4    with the aircraft N689 WM covering flights on March 2nd and

5    March 6th, 2012?

6    A    It is.

7    Q    Tell us about the flight on March 2nd.

8    A    The flight on March 2nd, 2012 left from Zurich and

9    arrived in Abu Dhabi.  There were -- there was one passenger

10   on board, Jho Low.

11   Q    And please tell us about the flight on March 6th.

12   A    The March 6th, 2012 flight left from Abu Dhabi and

13   arrived in Kuala Lumpur.  There were three passengers on

14   board, one of which was Jho Low.

15   Q    Thank you.

16        MS. AMBUEHL:  Please turn to tab 18, Government

17   Exhibit 1780 for identification.

18   BY MS. AMBUEHL:

19   Q    Is this an e-mail from Roger Ng to Toby Watson on

20   March 4, 2012?

21   A    Yes, it is.

22        MS. AMBUEHL:  The Government moves to admit

23   Government Exhibit 1780.

24        MR. AGNIFILO:  No objection.

25        THE COURT:  It's admitted.

1              (Government's Exhibit 1780 was received in

2       evidence.)

3              (Exhibit published.)

4       BY MS. AMBUEHL:

5       Q    Let's start at the third e-mail from the top.

6              It appears to be an e-mail from Roger Ng to Toby

7       Watson on March 4, 2012.

8              What does he say?

9              MS. AMBUEHL:  I think if you scroll up,

10      Mr. Youkilis.  Thank you.

11      A    Did Andrea post you?

12      Q    And what is the subject line of that e-mail?

13      A    IPIC GMTN covenants.

14      Q    How does Toby Watson respond?

15      A    No, I missed his call.  How did it go?  I am three

16      bottles of red -- I am three bottles of red the wrong side of

17      sober at the moment.

18      Q    And what does the defendant say in response?

19              And you can start with the third sentence, CEO IPIC.

20      A    CEO IPIC, who is also chairman of Aabar, and CEO Aabar

21      have in principal agreed, they want us to do this as a

22      partnership with Aabar and IPIC will provide the guarantee.

23      They going through the process internally, given this is

24      guarantee from IPIC - credit ratings, no other covenant

25      breaches, et cetera.  PM Malaysia will also be speaking with

Sullivan - direct - Ambuehl                2601

1  ruler/Emir of Abu Dhabi.  R.

2  Q    What is the date of this e-mail?

3  A    March 4, 2012.

4  Q    What do you understand PM Malaysia to mean?

5  A    Prime Minister.

6  Q    And how is this e-mail signed?

7  A    R.

8         MS. AMBUEHL:  Your Honor, this is a good stopping

9  point if you are inclined to break for the day.

10        THE COURT:  It is the end of the trial day.

11        Members of the jury, please remember not to discuss

12  the case or read anything about it.  Have a great night and

13  we'll see you tomorrow morning at 9:30.

14        (Jury exits.)

15        THE COURT:  Please be seated, everyone.  Can you

16  take the witness out?

17        (Witness steps down and exits courtroom.)

18        THE COURT:  I have a note from one of the

19  alternates.  It doesn't appear to be anything of concern, but

20  he wanted us to know.  It says:

21        Dear Judge Brodie, today's testimony reminded me of

22  something -- the writing is very faint -- of something I

23  didn't think to disclose during jury selection.  In my work as

24  a free-lance writer, I wrote a blog post for a

25  bicycle-oriented law firm's website in the San Francisco Bay

SAM      OCR      RMR      CRR      RPR

Sullivan - direct - Ambuehl                    2602

1    area.  The law firm is called Bay Area Bike Law.  It was

2    either 500 or a thousand words on PTSD -- can't make out that

3    word -- bike crash.  The post included no law or legal

4    content.  It was designed for search engine optimization to

5    direct searches for terms like bay -- I can't read what that

6    word is -- bay something bike, PTSD, crash, et cetera, to

7    their website.  I don't believe the afternoon I spent writing

8    it shows my perception of the facts of this case, but I did

9    want to disclose just in case it could pose an issue.

10             MR. AGNIFILO:  My inclination is to not be

11   concerned.  We are not going with a PTSD defense in light of

12   the bike accident.  So, I don't think there's anything.

13             I guess I would have -- want to have a better handle

14   on -- on the stuff that he's saying that seems to be hard to

15   understand, just to make sure there are no issues.

16             THE COURT:  I will read it with my glasses on

17   tonight.  I am finally of that age where I need glasses at

18   times.

19             MR. AGNIFILO:  Yes, Judge.

20             THE COURT:  And so, I will read it with that and see

21   if I can't decipher the rest of the words, or I'm happy to

22   just pass it around to the parties and you can take a look at

23   it also.

24             I am not concerned about it, but I wanted to raise

25   it with the parties so that you can think about it and let me

1  know if you have any concerns.  That's it.

2           MS. SMITH:  Your Honor, can we just -- we'll just

3  get a copy of it.

4           THE COURT:  That's fine.

5           MS. SMITH:  We'll look at it tonight --

6           THE COURT:  That's fine.

7           MS. SMITH:  -- if there's any issues with it, we'll

8  let you know.

9           THE COURT:  That's perfectly fine.

10           MS. SMITH:  Thank you.

11           THE COURT:  That's fine.  Have a good night

12  everybody.

13           MR. AGNIFILO:  Oh, yes, we have an agreement on

14  something.

15           At the end of yesterday we were discussing some bank

16  records.

17           THE COURT:  Yes.

18           MR. AGNIFILO:  I thought the Government was going to

19  put them in, but I don't know that they're going to put them

20  all in.  So, we have a stipulation that we're just going to

21  put that in.  So, Ms. Geragos will read that for the record,

22  if that's okay.

23           THE COURT:  That's perfectly fine tomorrow.

24           And the Government should doublecheck, I wasn't sure

25  that I have admitted into evidence the forfeiture re the

Sullivan - direct - Ambuehl                 2604

1    Celsius docs.

2             MR. ROLLE:  I believe that we did offer it on direct

3    at the end of his testimony, Judge.  We did admit it with

4    Mr. Leissner, and I think our records show March 1st.

5             THE COURT:  Okay.

6             MR. ROLLE:  But it was 3002.

7             THE COURT:  Oh, so I was looking maybe for a

8    different number.

9             MR. ROLLE:  Okay.

10            THE COURT:  So, if you can just confirm that on the

11   record tomorrow morning.

12            MR. ROLLE:  Yes, we will.

13            THE COURT:  Because I couldn't find the exhibit on

14   my list this evening.

15            MR. ROLLE:  We will, Judge.

16            THE COURT:  And please send me a list of all the

17   exhibits that were just admitted.  I do have them on the

18   realtime, so I would need to just doublecheck to make sure.

19            Have a good night, everyone.

20            MR. AGNIFILO:  Very good, thank you.

21            MR. ROLLE:  Thanks, Judge.

22            MS. SMITH:  Have a good night.

23            (Chief Judge MARGO K. BRODIE exited the courtroom.)

24            (Matter adjourned to March 10, 2022 at 9:30 a.m.)

25                          ooo0ooo

2605

**I N D E X**

**WITNESS**                                                        **PAGE**

TIM LEISSNER

    CONTINUED CROSS-EXAMINATION

    BY MR. AGNIFILO:                                     **2387**

    REDIRECT EXAMINATION BY MR. ROLLE                    **2404**

    RECROSS-EXAMINATION BY MR. AGNIFILO                  **2494**

PAUL GAROFALLOU

    DIRECT EXAMINATION BY MR. ROLLE                      2519

    CROSS-EXAMINATION  BY MR. INTRATER                   2537


    ROBERT PEPITONE                                      2540

      DIRECT EXAMINATION BY MS. AMBUEHL                2540

      CROSS-EXAMINATION  BY MR. INTRATER               2554

MARTIN SULLIVAN

    DIRECT EXAMINATION BY MS. AMBUEL                     2569

2606

1                          **E X H I B I T S**

2

3      **Defense Exhibit 2706**                          **2402**

4

5      Government Exhibit 2514                         **2414**

6

7      Government Exhibit 2374                         **2417**

8

9      Government Exhibit 1770                         **2427**

10

11     Government Exhibit 2249                         **2428**

12

13     Governemnt Exhibits 2504, 2509 and 2526        **2442**

14

15     Government's Exhibits 2532, 2527, 2528, 2529

16     and 2530                                       **2449**

17

18     Government Exhibit 2533                         **2458**

19

20     Government Exhibit 2531                         **2460**

21

22     Government Exhibits 1995 and 1998              **2476**

23

24     Government's Exhibit 1860                       **2527**

25

2607

```
1
2       Government Exhibit 254-F                    2530
3
4       Government Exhibit 254-C                    2532
5
6       Government Exhibits 254-A, B, D, E          2535
7
8       Government Exhibit 3003                     2553
9
10      Government Exhibits 2825, 2826, 2831-A
11      through H with the redactions that have been
12      agreed to by the parties and 2836           2573
13
14      Government Exhibits 2871 and 2872           2574
15
16      Government Exhibit 55                       2575
17      Government Exhibits 1027-B-01, 1031-A-01,
18      1035, 1035-A, 1045-A, 1047-A, 1107-A-01,
19      1107-A-03, 1113-A-01, 1113-A-02, 1113-A-03,
20      1114-A, 1117-A-01, 1117-A-02, 1118-A-01,
21      1118-A-03, 1349-A-01, 1349-A-02, 1349-A-03,
22      1350-A-01, 1352, 1352-A-01, 1352-A-02,
23      1352-A-03, 1352-A-04, 1352-A-05, 1352-A-06,
24      1354-A-01, 1355-A-01, 1361-A, 1453,
25      1453-A-01                                   2583
```

2608

1

2    Government Exhibit 2244                          2587

3

4    Government Exhibit 1750                          2589

5

6    Government Exhibits 1775, 1776 and 1777          2591

7

8    Government's Exhibit 1780                        2600

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25